No. 25-1373

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

112 GENESEE STREET, LLC, *et. al*,
Plaintiffs-Appellees,

v.

UNITED STATES,
Defendant-Appellant.

**DEFENDANT-APPELLANT'S RESPONSE TO PLAINTIFFS-APPELLEE'S MOTION TO EXPEDITE BRIEFING AND ARGUMENT OF INTERLOCUTORY APPEAL**

BRETT A. SHUMATE
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

WILLIAM J. GRIMALDI
Assistant Director

REBECCA S. KRUSER
Senior Trial Attorney
Commercial Litigation Branch
Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2035
Email:  rebecca.s.kruser@usdoj.gov

January 27, 2025                    Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................i

TABLE OF AUTHORITIES ....................................................................ii

DEFENDANT-APPELLANT'S RESPONSE TO PLAINTIFFS-APPELLEE'S
MOTION TO EXPEDITE BRIEFING AND ARGUMENT OF
INTERLOCUTORY APPEAL ...................................................................1

STATEMENT OF RELEVANT FACTS........................................................2

    I.    History Of The Restaurant Revitalization Fund.........................................2

    II.    Procedural History................................................................................5

ARGUMENT .........................................................................................6

    I.    Plaintiffs-Appellees Have Failed To Demonstrate Good Cause For
          Expediting This Case.............................................................................6

    II.    Plaintiffs-Appellees Have Failed To Demonstrate That They Would Be
          Adversely Affected By The Normal Briefing And Disposition
          Schedule...............................................................................................7

    III.    The Government Would Be Prejudiced By Expedition Of This
          Appeal ............................................................................................ 11

CONCLUSION ................................................................................. 13

# TABLES OF AUTHORITIES

## CASES

*Maine Community Health Options v. United States,*
  590 U.S. 296 (2020) ...................................................................................12

*Tidewater Oil Co. v. United States,*
  409 U.S. 151 (1972) ...................................................................................11

*W6 Rest. Grp., Ltd. v. Guzman,*
  732 F. Supp. 3d 739 (N.D. Ohio 2024) ................................................... 3, 4

## STATUES

15 U.S.C. § 9009c ..................................................................................... 2, 13

15 U.S.C. § 9009c(a)(3) ..................................................................................4

15 U.S.C. § 9009c(a)(4)(C) .............................................................................2

15 U.S.C. §§ 9009c(a)(4), (7) .........................................................................2

15 U.S.C. § 9009c(b)(2)(A) .............................................................................5

15 U.S.C. § 9009c(c)(6) ..................................................................................4

28 U.S.C. § 1292(d)(2) ..................................................................................11

28 U.S.C. § 1657(a) ..................................................................................... 6, 7

28 U.S.C. §§ 2107(b), 2522 ...........................................................................6

Pub. L. No. 117-2, 135 Stat. 4 (2021) ......................................................... 2, 4

Pub. L. No. 118-5, 137 Stat. 10 (2023) ..........................................................4

## RULES

Fed. Cir. R. 1(a)(1)(C) ....................................................................................6

Fed. Cir. R. 27 ..................................................................................8

Fed. R. App. P. 2 ..............................................................................8

Fed. R. App. P. 2(a) .........................................................................8

Fed. R. App. P. 4(a)(1)(B) ...............................................................6

Rule 26(b) .........................................................................................8

Rule 27 ........................................................................................8, 10

Rule 27(b) .........................................................................................1

Fed. R. App. P. 27(d)(1)(E) ...........................................................14

Fed. R. App. P. 27(d)(2)(A) ...........................................................14

Fed. R. App. P. 32(a)(5) .................................................................14

Fed. R. App. P. 32(a)(6) .................................................................14

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | | |
|---|---|---|
| 112 GENESEE STREET, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | 25-1373 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

## DEFENDANT-APPELLANT'S RESPONSE TO PLAINTIFFS-APPELLEE'S MOTION TO EXPEDITE BRIEFING AND ARGUMENT OF INTERLOCUTORY APPEAL

Defendant-appellant, the United States, pursuant to Rule 27(b), respectfully opposes plaintiffs-appellees' motion to expedite briefing and argument of this interlocutory appeal (Mot.) (ECF No.4). Plaintiffs-appellees have not established good cause to deviate from the ordinary briefing and oral argument schedule. Contrary to their conclusory assertions, plaintiffs-appellees' own arguments demonstrate that they would not be adversely affected by the standard schedule. Plaintiffs-appellees' concerns are applicable to almost all cases appealed to this Court but this Court does not routinely expedite. Indeed, granting this motion would prejudice both the Government and the Court by inhibiting full consideration of the important issues raised in this appeal.

## STATEMENT OF RELEVANT FACTS

## I.    History of the Restaurant Revitalization Fund

This case concerns the Restaurant Revitalization Fund (RRF), a fund created by Congress and overseen by the Small Business Administration (SBA) to give assistance to restaurants struggling during the COVID-19 pandemic.  Congress created the RRF as part of the American Rescue Plan Act of 2021 (ARPA), Pub. L. No. 117-2, 135 Stat. 4 (2021), which was enacted on March 11, 2021.  The RRF is contained in Section 5003 of ARPA (later codified at 15 U.S.C. § 9009c), which describes the purpose of the RRF as providing grants to "eligible entities" for "pandemic-related revenue loss" caused by the COVID-19 pandemic.  15 U.S.C. §§ 9009c(a)(4), (7).

Eligible entities were defined to include restaurants and other similar business types in which food or drinks are served, but excluded State or local government-operated business, entities with more than 20 locations, entities that had applied for or received another type of SBA grant, or publicly-traded companies.[1]  *See id.* at § 9009c(a)(4).  For eligible entities that were open and operating for the entirety of 2019, the pandemic-related revenue loss was defined simply as the entity's 2020 gross receipts subtracted from its 2019 gross receipts.  *See id.* at § 9009c(a)(7).  Eligible

---

[1]  In their motion, plaintiffs-appellees refer to themselves as "small businesses." *See* Mot. at 7, 11.  However, the RRF program was open to companies that are not legally "small businesses."  Other than excluding entities that owned or operated more than 20 locations or were publicly traded companies, 15 U.S.C. § 9009c(a)(4)(C), there was no size standard and/or income test or limit to receive a RRF grant.

entities could receive grants equal to their pandemic-related revenue loss up to an aggregate maximum of $10 million, with no more than $5 million per physical location.

SBA began accepting grant applications on May 3, 2021. *See W6 Rest. Grp., Ltd. v. Guzman*, 732 F. Supp. 3d 739, 742 (N.D. Ohio 2024). By May 18, 2021, SBA had received 303,000 applications requesting approximately $69 billion in grants, which far exceeded the $28.6 billion Congress appropriated for the RRF program. *Id.* Due to this overwhelming demand, SBA decided to stop accepting applications on May 24, 2021. *Id.*

Plaintiffs-appellees do not correctly represent the timeline of when SBA made awards and when SBA announced that no money remained to be distributed. *See* Mot. at 4. Plaintiffs-appellees erroneously suggest that it was not until February 2023 that SBA made clear that no further RRF grants would be distributed. *Id.* However, this statement ignores that SBA conducted two distinct periods of distribution.

As acknowledged in their own complaint, after the RRF program first opened in May 2021, SBA processed and made awards through June 30, 2021. Appx23, Appx25.[2] Indeed, plaintiffs-appellees' complaint details various distributions made to other applicants in May 2021 that plaintiffs-appellees allege violated the statutory order of payment. *See* Appx42-45. On July 2, 2021, SBA announced that the RRF

---

[2] Appx__ refers to the appendix attached to this response.

fund was exhausted.  *See W6 Rest. Grp., Ltd.*, 732 F. Supp. 3d at 742.  Plaintiffs-appellees therefore should have been well-aware by July 2021 that they had not received and would not be receiving RRF grants.

Then, separately, in November 2022, SBA announced that approximately $83.4 million in recovered funds was available to be reallocated.  *Id.*  SBA made awards to another 169 applicants before this money was also exhausted.  *Id.*  In February 2023, the SBA announced again that all grants from the RRF had been distributed and no money remained.  *Id.*

The RRF statute included a "covered period" beginning on February 15, 2020, and ending "on December 31, 2021, or a date to be determined by the Administrator that is not later than 2 years after March 11, 2021."  15 U.S.C. § 9009c(a)(3).  The SBA Administrator exercised this authority and the "covered period" thus ended on March 11, 2023.  If a recipient failed to use its entire award before the covered period ended, Congress required the recipient to return any unused funds to the Treasury.  *See id.* § 9009c(c)(6).

On June 3, 2023, the Fiscal Responsibility Act became law.  *See* Pub. L. No. 118-5, 137 Stat. 10.  As part of a bipartisan agreement to suspend the public debt limit through January 1, 2025, the Fiscal Responsibility Act rescinded unobligated funds from at least eighty-one different Federal programs, including the RRF.  *See id.* § 52, 137 Stat. at 28 ("The unobligated balances of amounts made available by section 5003(b)(2)(A) of Public Law 117-2 are hereby permanently rescinded.").

4

## II.    Procedural History

Plaintiffs-appellees filed their complaint at the Court of Federal Claims (trial court) on October 25, 2023.  Notably, plaintiffs-appellees did not file suit while the RRF funding was still extant in May 2021.  Nor did plaintiffs-appellees file suit during the second period of grant distribution in November 2022.  Furthermore, even accepting plaintiffs-appellees' assertion that they did not understand that they would not receive grants until February 2023, plaintiffs-appellees inexplicably waited eight months beyond this date to file suit.[3]  *See* Mot. at 4.  Additionally, plaintiffs-appellees waited seven months after the statutory "covered period" ended on March 11, 2023, meaning that they missed the window during which they could have actually used any grant funds to support their businesses.  Plaintiffs-appellees also waited until after the Fiscal Responsibility Act permanently rescinded any unobligated balances of the $28.6 billion made available by 15 U.S.C. § 9009c(b)(2)(A) in June 2023.

The Government filed its motion to dismiss at the trial court on February 26, 2024.  Briefing, oral argument, the filing of supplemental briefing after oral argument at the trial court's request, as well as the time needed for the trial court to issue a decision, brought the case to July 2024.  The trial court denied our motion on July 24, 2024.

---

[3]  Plaintiffs-appellees cite several paragraphs of their complaint, but none of these paragraphs provides any support for the contention that they were unaware until February 2023 that the RRF program had been exhausted and that they would not receive grants.  *See* Mot. at 4; Appx7, Appx9, Appx40-45.

The Government immediately began the process of seeking authorization from the Solicitor General to move for certification of the trial court's order for interlocutory appeal.  On August 21, 2024, the trial court set a deadline of September 23, 2024 for the Government to file such a motion.  Appx47.  We required a brief 14-day extension of time, which plaintiffs-appellees did not oppose.[4]  Appx48-49.  After receiving authorization from the Solicitor General, we filed our motion to certify for interlocutory appeal on October 7, 2024.  The trial court granted our motion on October 24, 2024, over plaintiffs-appellees' opposition.  Appx50-57.  Our petition to this Court followed.

## ARGUMENT

### I.     Plaintiffs-Appellees Have Failed to Demonstrate Good Cause For Expediting This Case

Plaintiffs-appellees invoke 28 U.S.C. § 1657(a).  This statute states,

> Notwithstanding any other provision of law, each court of the United States shall determine the order in which civil actions are heard and determined, except that the court shall expedite the consideration of any action brought under chapter 153 or section 1826 of this title, any action for temporary or preliminary injunctive relief, or any other action if good cause therefor is shown. For purposes of this subsection, "good cause" is shown if a right under the Constitution of the United States or a Federal Statute (including rights under section 552 of title 5) would be

---

[4]  Contrary to plaintiffs-appellees' contention, the Government did not "wait" 75 days to seek an interlocutory appeal.  *See* Mot. at 1.  If this had not been an interlocutory appeal, the Government would have had 60 days following entry of a final judgment to bring an appeal to this Court.  *See* 28 U.S.C. §§ 2107(b), 2522; Fed. R. App. P. 4(a)(1)(B); Fed. Cir. R. 1(a)(1)(C).

> maintained in a factual context that indicates that a request
> for expedited consideration has merit.

28 U.S.C. § 1657(a).  Other than a conclusory statement that this standard is met in

these circumstances, plaintiff-appellees do not tie their arguments to the actual

wording of this statute.  *See* Mot. at 6-7.

Plaintiffs-appellees have not identified any "right under the Constitution of the

United States or Federal Statute" that would be "maintained in a factual context that

indicates that a request for expedited consideration has merit."  28 U.S.C. § 1657(a).

Other than emphasizing their "resounding victory" at the trial court and unduly

disparaging the Government's arguments, plaintiffs-appellees do not set forth any

right that would require expedited briefing and oral argument to be maintained.  Mot.

at 7-8.  Plaintiffs-appellees merely assert that they seek to "enforce the bedrock

principle that agencies must comply with the federal law laid down by Congress[.]"  *Id.*

However, this argument could be wielded by basically all plaintiffs suing the

Government and thus does not present any special "factual context" meriting

expedited briefing and argument.  Therefore, plaintiffs-appellees have not met the

good cause standard of this statute.

## II.     Plaintiffs-Appellees Have Failed to Demonstrate that They Would Be Adversely Affected By The Normal Briefing and Disposition Schedule

As a second basis for why the Court should grant their motion, plaintiffs-

appellees assert that they will be adversely affected by the normal briefing and

disposition schedule.  Mot. at 8-14.  This standard is expressed in the Court's Practice

Notes to Rule 27. However, these Practice Notes do not support plaintiffs-appellees'

motion. Plaintiffs-appellees ignore that the Practice Notes to Rule 27 specify that

motions to expedite are "not routinely granted." Practice Notes to Fed. Cir. R. 27.

Furthermore, the Practice Notes give the example of when the normal briefing and

disposition schedule may adversely affect one of the parties as appeals "involving

preliminary or permanent injunctions or government contract bid protests." *Id.* This

type of situation is clearly not implicated here.[5]

Plaintiffs-appellees present two interrelated bases for claiming that, despite this

case not involving an injunction or a bid protest, they would still be adversely affected

by the standard briefing and disposition schedule. Plaintiffs-appellees first generally

invoke the "devastating financial effects of the COVID-19 pandemic." Mot. at 3, 8,

11, 17. Plaintiffs-appellees note that they were "abruptly forced to shut their doors

and navigate sharp declines in revenue, labor challenges, supply-chain shortages, and

increases in operating expenses." *Id.* at 8. Plaintiffs-appellees also point out that the

RRF program was meant to aid restaurants with these pandemic-related revenue

losses. *Id.* at 8, 17.

---

[5] Plaintiffs-appellees also invoke Federal Rule of Appellate Procedure 2. Mot. at 1, 6. This rule states that, "On its own or a party's motion, a court of appeals may – to expedite its decision or for other good cause – suspend any provision of these rules in a particular case and order proceedings as it directs, except as otherwise provided in Rule 26(b)." Fed. R. App. P. 2(a). However, this rule does not appear to be relevant because plaintiffs-appellees are not seeking a suspension of any rule, only a compression of the standard schedule.

8

Although we have no reason to doubt that plaintiffs-appellees' businesses were impacted by the pandemic restrictions, it does not follow that this requires expedition of the case on appeal. These harms cannot be remedied by this Court at all and cannot be the result of a normal briefing schedule, given that they have already occurred. Furthermore, we are not aware of any locality that is currently imposing pandemic restrictions on food and beverage businesses and thus plaintiffs-appellees cannot argue that expediting is necessary to resolve the case before further economic impact occurs as a result of these restrictions.

Plaintiffs-appellees next focus on the more general idea that unless they obtain the damages that they seek in this case as quickly as possible, 114 out of 303 plaintiffs-appellees would be "significantly more likely" to close their businesses or petition for bankruptcy. *Id.* at 11. Plaintiffs-appellees allege that SBA "encouraged RRF applicants to take out SBA loans to pay their operating expenses while awaiting their RRF grants." *Id.* at 8. However, because they did not receive RRF grants, 138 plaintiffs-appellants assert that they are still paying off loans that "continue to threaten the viability of their businesses." *Id.* at 9. Plaintiffs-appellees argue that any delay in receiving a damages award would be "financially ruinous" and that they cannot "endure years of litigation." *Id.* at 10.

Plaintiffs-appellees' reliance on this argument must fail. First of all, it only appears to apply to roughly half of plaintiffs-appellees. Furthermore, plaintiffs-appellees' argument is highly speculative and assumes that they will prevail on this

appeal and also that they will prevail on the merits at the trial court such that they will be able to show entitlement to RRF grants even if SBA had made grant awards in the order in which applications were received. For example, a restaurant that applied on the first day still may not have received a grant if it was not a priority applicant. Additionally, as noted above, the RRF program was immediately and severely oversubscribed. No individual applicant was guaranteed a grant and thus many plaintiffs-appellees still may have faced the situation of needing to take out loans. It is unknown at this point how many plaintiffs-appellees are actually entitled to damages if the trial court's opinion is upheld on appeal.

Naturally, plaintiffs-appellees would like to conclude this case on favorable terms as quickly as possible. However, despite this current desire for speed, as we pointed out in our statement of facts above, plaintiffs-appellees inexplicably did not bring suit until well beyond the end of the RRF program. Plaintiffs-appellees fail to show any adverse impact beyond the standard effect of litigation. Any party can claim that the delay of an appeal will "exacerbate" financial difficulties. *See id.* at 1.

This Court routinely deals with cases brought by small businesses both in its Government contracts/bid protest docket and in the patent realm. Plaintiffs-appellees' argument would certainly apply to the claims of individual veterans seeking benefits and Federal employees who have been removed from service in Merits Systems Protection Board appeals. Yet, as the Practice Note to Rule 27 states, motions to expedite are not routinely granted.

Plaintiffs-appellees also suggest that the nature of this case as an interlocutory appeal warrants expediting the briefing and disposition schedule. Mot. at 12-14. We agree that 28 U.S.C. § 1292(d)(2) reflects the view that "interlocutory appeals involving important and controlling questions of law are a useful means of expediting litigation." *Tidewater Oil Co. v. United States*, 409 U.S. 151, 179 (1972). However, "expediting litigation" refers to resolving what claims may proceed before wasteful effort occurs at the trial court level.[6] There is no requirement that once an interlocutory appeal is accepted, it must be done on an expedited schedule. Plaintiffs-appellees cannot demonstrate any reason to deviate from the standard briefing and disposition schedule.

## III.    The Government Would Be Prejudiced By Expedition of this Appeal

Contrary to plaintiffs-appellees' contention, the Government would be prejudiced by expediting this matter. Although we agree that there are no factual disputes on appeal, plaintiffs-appellees are incorrect that the legal issues on appeal have been briefed multiple times already.[7] *See* Mot. at 15. The Government has never had the opportunity to fully develop and brief its arguments in response to the errors

---

[6] As plaintiffs-appellees also acknowledge, the trial court has already addressed their concerns by only staying the case through the completion of briefing at this Court. Mot. at 14.

[7] Plaintiffs-appellees are, however, incorrect that the factual allegations in the complaint are "entirely uncontroverted." *See id.* at 15. The Government has not yet filed an answer at the trial court.

contained in the trial court's decision.

Obviously, our motion to dismiss and related briefing preceded the trial court's opinion and could not have addressed its specific reasoning. Although we summarized the variety of errors made by the trial court in our motion to the trial court to certify for interlocutory appeal and in our petition to this Court, this was done in the limited context of explaining why they meet the interlocutory appeal standard of a substantial ground for difference of opinion. This briefing was not similar to or a substitute for the Government's opening brief.

Plaintiffs-appellees also argue that the issues on appeal are "relatively uncomplicated" and "straightforward." *Id.* at 16. We do not agree with this characterization, but in any event, that rationale is not a reasonable basis to expedite the appeal. Any appeal could (and many do) present only a small number of discrete issues for the Court to address. Yet, the Court does not routinely expedite appeals.[8]

This case is a particularly poor choice for expedited scheduling. This case involves the fundamental scope of the trial court's jurisdiction and the Tucker Act waiver of sovereign immunity as well as the novel question of whether 15 U.S.C.

---

[8] Plaintiffs-appellees' motion inappropriately veers into merits-based arguments, perhaps hoping to cast doubt on our arguments in advance of our opening brief. *See* Mot. at 8, 16-17. Obviously, we do not agree that our appeal grounds are "incorrect and dubious." *See id.* at 8. Notably, this is not an action for "presently due money damages" and *Maine Community Health Options v. United States*, 590 U.S. 296 (2020) does not resolve this case. *See id.* at 3, 16. We will discuss these issues further in our opening brief, as set forth in the Court's rules.

§ 9009c caps the funds authorized for the RRF and, if so, whether such a cap limits the Government's liability to the funds already spent on grants to other applicants. These issues require careful and fulsome consideration. Plaintiffs-appellees are of course free to self-expedite their response brief, but they should not seek to force the Government to compress its own briefing.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs-appellees' motion to expedite.

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ William J. Grimaldi
WILLIAM J. GRIMALDI
Assistant Director

/s/ Rebecca S. Kruser
REBECCA S. KRUSER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tele: (202) 305-2035
Email: rebecca.s.kruser@usdoj.gov

January 27, 2025                    Attorneys for Defendant-Appellant

CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 27(d)(2)(A), the undersigned certifies that the word processing software used to prepare this motion indicates that there are a total of 3,047 words, excluding the portions of the motion identified in the rules. The motion complies with the typeface requirements and type style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) and has been prepared using Garamond 14-point font, proportionally spaced typeface.

/s/ Rebecca S. Kruser
REBECCA S. KRUSER

14

## INDEX TO APPENDIX

Complaint in Case No. 23-1876 (ECF No. 1) (October 25, 2023) ............. Appx1

Order in Case No. 23-1876 (ECF No. 22) (August 21, 2024) ..................... Appx47

Defendant's Motion for an Enlargement of Time in Case No. 23-1876
(ECF No. 26) (September 18, 2024) ............................................................. Appx48

Memorandum Opinion in Case No. 23-1876 (ECF No. 32)
(October 24, 2024) ......................................................................................... Appx50

Amended Order in Case No. 23-1876 (ECF No. 33)
(October 24, 2024) ......................................................................................... Appx57

Receipt number AUSFCC-9106480

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

112 GENESEE STREET LLC; 1233 POLK STREET LLC; 1490
RESTAURANT INC.; 160 FOOD CORPORATION; 1651 FOOD
CORPORATION; 1900 UNIVERSITY BLVD LLC; 316 W 49TH
RESTAURANT CORPORATION; 341 FRAME INC; 37 N
MAIN STREET ENTERPRISES, LLC; 413 BEDFORD DRIVE
LLC; 4945 GULF BOULEVARD, INC.; 5M GROUP, LLC; 6
WATER INC.; 6049 MAIN ST INC; 66 TO GO LLC; 7 E
LANCASTER FANCY FACE, LLC; 700 MANHATTAN AVE
LLC; 7452 N WESTERN AVE INC; 7SKI, INC; 946 EIGHTH
AVENUE FOOD CORPORATION; AADI INVESTMENTS
LLC; AFTERS SPECIAL EVENTS, LLC; ALASKA
WEATHERVANE SEAFOODS LLC; ALEXANDERS CAFÉ 64
INC.; ALLIANCE ARIZONA, LLC; ALLIANCE
BRENTWOOD, LP; ALLIANCE FOOD, LLC; ANTOON
PROPERTIES LLC; AP FRANCHISE GROUP, LLC;
ARGAMAK LLC; ARROYO CORPORATION; BARTOW
BREWING COMPANY LLC; BAY FRIES, INC; BB
RIDGEWOOD LLC; BB TICES CORNER LLC; BEETS
CATERING, INC.; BEG, LLC; BERGEN QSR, LLC; BIG
DEAN'S OCEAN FRONT, INC.; BILAMIL, INC.; BILL-ES,
LLC; BITETIME LLC; BLACK SAILS BREWERY AND
TAPROOM LLC; BLACKBERRY RIVER BAKING CO LLC;
BOB MAXWELL WALK-A-WAYS, INC.; BONAVIDA INC.;
BRADFORD & MARTH LLC; BRIDGEWATER QSR, LLC;
BROOKPARK FREEWAY LANES; BRU DADDY'S
BREWING CO.; BURGER FRY PIE LLC; BW BRANDS LLC;
CA PARTNERS LLC; CADUCEUS ENTERPRISES INC; CAFÉ
MARTIN LLC; CAFE VERANDA ENTERPRISES INC.;
CANAL STREET FOOD CORPORATION; CAREFREE
FOODS LLC; CB RIVERFRONT, LLC; CGV HOSPITALITY
HOLDINGS LLP; CHAOS BREWING COMPANY, LLC;
CHATEAU DIANA LLC; CHIN & SUE INC.; CIBO 2621 LLC;
CITY STATE INC.; CLAUDISAL REST. CORP.; COLOSSAL
CAFE ST. PAUL, LLC; COMONCY GALLERIA, LLC;
COMONCY WESTWOOD, LLC; COOPER'S CAVE ALE
COMPANY, LTD.; CRAFT ON DRAUGHT; CRAVINGS
LAKEHOUSE LLC; CRUDO RESTAURANT GROUP, LLC;
CTC CAFE ENCINO, LLC; CUBANISISIMO LLC; CUENCA
LLC; CULT BOWL & BREW LLC; DANIEL MARCIANO
LLC; DANLEX LLC; DARR WORKS, LLC; DB CALIFORNIA
HERO INC; DIAMOND GIRLS BARTENDERS, LLC; DISH
FUNCTIONAL, INC.; DLS US LLC; DM CONCESSIONS, INC;
DOC RESTAURANT GROUP LLC; DOS PULPOS LLC;
DOSEY DOE, INC; DOZEN BAGELS CO. INC.;
DRAGONMEAD LC; DRIFTWOOD BAY CONCEPTS, INC.;

**23-1876 C**

No.  **23-10000**

**COMPLAINT**

Caption-1

**Appx1**

DT DELI LLC; DUST INVESTMENTS, INC.; EBVA1, LLC; EC
SPARTY LLC; ECI INVESTMENTS, LLC; EDUCATIONAL
CATERING, INC.; EJC ENTERTAINMENT LLC; EMMAR
BIGGENS LLC DBA THE DINER; ETM CFC HOLDINGS,
INC. AS SUCCESSOR-IN-INTEREST OF COMPONERE FINE
CATERING INC.; EXQUISITE CATERING LLC; FIELD DAY
INCORPORATED; FLORENTYNAS INC.; FOOD SERVICES,
INC.; FRESH PULP HOLDINGS LLC; FROZEN SMILES
INCORPORATED; FRUIT CABOOSE CONCESSIONS INC;
GALBREATH ENTERPRISES INC.; GANESH LAXMI;
GARVEY'S SPORTS BAR AND GRILL LLC; GHM TRADING
INC.; GLACIER CITY FOODS, INC.; GOOSECUP COFFEE
LLC; GOWA INC; GRACE SKYE LLC; GRACIE'S
INSPIRATION, LLC; GREAT FOOD 57TH ST, LLC;
GREATER BUFFALO RESTAURANTS, INC.; GRIFFON
ENTERPRISES, INC; GRIFFON GASTRO PUB INC; GRIGGS
INDUSTRIES LLC; H&D RESTAURANTS, LLC; H&H
RESTAURANTS, INC.; H.S. CHEEMA, INC; HACKSTAFF
RESTAURANTS, LLC; HARRY BASSILAKIS DBA QUAKER
DINER; HDH INVESTMENTS, LLC; HEARTH BAKERY,
INC.; HENNEPIN ENTERPRISES INC; HERITAGE
NORTHWEST, INC.; HILL COUNTRY CHICKEN NY, LLC;
HILL COUNTRY DC LLC; HILL COUNTRY NY LLC; HK
EXPRESS FALLS CHURCH INC; HOT INDIAN FOODS LLC;
HSD ENTERPRISES, INC; HUNAN CAFE ALEXANDRIA
INC.; HYSTIKE A.W., LLC; I WRAP LLC; J&H
BREAKFASTOLOGY INC.; JAMES FRASER; JAMESTOWN
MERCANTILE CAFE LLC; JAY SQUARE LLC; JIMMY KS
RESTAURANTS LLC; JIN LI YUAN INC; JK FOOD INC; JKC
FINE DINING INC.; JNE CANDY CO LLC; JOHNNYS GONE
FISHING; JT'S CAFE BLUE POINT INC; JT'S FARMHOUSE
INC; KATE O'BRIENS, INC.; KATLO INC; KEFAYA'S CAFE;
KENCO CATERING, INC.; KIMBERLY ANN HARTMAN;
KITCHEN AT THE DOVEGATE INN, LLC; KY-LA
DEVELOPMENT; L CARPENTIER INC; LA VELA
RISTORANTE INC.; LAKES HOSPITALITY INC; LASER
ENTERTAINMENT GROUP, INC; LE QI DE INC.; LE
ROYALE LLC; LEADVILLE GRILL, LLC; LINCOLN LIQUOR
LLC; LIX LLC; LOCAL BUFFALO INC; LOCAL GRILLE
AND CATERING LLC; LOULOU LLC; LYNDEN PIONEERS,
INC.; M&M ESTABLISHMENTS INC.; M. D. ASSOCIATES,
LLC; MAD RAVEN INC; MAIDENEIRE LLC; MAKE
BEVERAGE GROUP LLC; MAMA JENNIE'S ITALIAN
RESTAURANT INC.; MANGIA YOU FOOD LLC; MARY
LANE CAFE; MATEVEZA USA, LLC; MAURICES DELI AT
SOUTH PEARL ST LLC; MEXICAN MAFIA LLC; MILLERS

Caption-2

**Appx2**

LLC; MINESHAFT PROPERTIES LLC; MM ASSOCIATES, LLC; MODERNE BARN ARMONK, INC; MUSCLE BAR LLC; NADA NASHVILLE, LLC; NAPA VALLEY BREWING CO. INC.; NATALIE CASTANEDA; NBJ CONCEPTS, INC; NEW ENGLAND VENTURE GROUP, LLC; NEW JERSEY ABP INC; NEXT REP SOLUTIONS LLC; NIGHT OWL LLC; NKJW PARTNERS, LLC; NORTHEAST PIE, LLC; NOSTRANA, LLC; NOT JUST CHOCOLATE LLC; NYC BURGER NO. 1 LLC; O.R.S.I LLC; OLD TOWN PROPERTIES, LLC; OLLIES 42ND LLC; ON MY GRIND COFFEE; OREGON ENTERPRISES INC.; ORGANIC JUICE BAR CRANBERRY LLC; P&C SWEET HOME LLC; P.DIBURRO & SONS INC; P2 INC.; PAPANICOLAOU ENTERPRISES; PBS CREATIVE INC; PETRA NY INC; PICNIC TIME INC; PIPPO PLUTO PAPERINO INC; PIRATE PETE S SODA POP LLC; PITCHOUN INC.; PLANET POPCORN, INC.; PLAZA RESTAURANT LLC; POLVORA, INC.; POPOP CORPORATION; POTOMAC CUISINARY SERVICES INC; POTOMAC FOOD SERVICES INC; PROPAGANDA WYNWOOD LLC; PUBLICUS LLC; QUEEN CITY FOODS, LLC; QUINS BAR LLC; RAPPAHANNOCK ENTERTAINMENT CENTER INC.; RC INVESTMENT GROUP, LLC; RED LANTERN INC; RED PARROT RESTAURANT INC.; REEL AND KARAT RESTAURANT GROUP, LLC; RESTAURANT ASSOCIATES OF CINCINNATI, INC.; RESTAURANTES KAYARDA, INC; RISTORANTE PIEMONTESE; RN FOODS LLC; ROKAMCO DISTRIBUTING INC.; ROUGEFOX ENTERTAINMENT LLC; ROYAL NEPAL LLC; SALAD HEADS INC.; SAN FRANCISCO PUB COMPANY LLC; SANDUSKY STAR LANES INC; SANKO RESTAURANT INC; SAVORY KITCHEN, LLC; SCHWARZ2 CORPORATION; SHERYL ANN CATERING LLC; SHIBUMI LLC; SOLO RESTAURANT LLC; SOUTH INDIAN LLC; SOUTHERN RESTAURANT OPERATIONS, LLC; STAG DINING GROUP, INC; STANDEATDRINK, LLC; STAR LANES AT THE HARBOR LTD; STERNBACH HOLDINGS LLC; STOVE 3 WEST CHESTER LLC; STRIKE HOLDINGS, LLC; SUB OF SUBS, LLC; SURFRIDGE BREWING COMPANY EAST, LLC; SUSETTE SLEVIN; SW3, LLC; SZAKACS INVESTMENTS LLC; TACKY TARPON, INC.; TAJ NIEL INC; TASTE OF A'ROMA, INC.; TASTINGS INC; TC DUGAN ENTERPRISES INC; TDMULL PROPERTIES, INC.; TERENEO 3634 LLC; THE CITY CATERING COMPANY, INC.; THE DIRTY BOURBON DANCE HALL & SALOON CS LLC; THE DIRTY BOURBON DANCE HALL & SALOON LLC; THE DUDES'

**Appx3**

BREWING COMPANY, LLC; THE FALLS BAR LIMITED
PARTNERSHIP; THE FIREHOUSE BBQ, LLC; THE GUTTER
BAR LES LLC; THE GUTTER BAR LLC; THE
HEARTHSTONE RESTAURANT GROUP, INC.; THE KATIE
CATLIN CORPORATION; THE PHOENIX IRISH BAR, LLC;
THE PULPO GROUP INC.; THE SLEEK GREEK; THE
STAVE, INC.; THE STUDIO, AN ARTISTIC DINING
EXPERIENCE, INC; THE VICTOR CAFE; THOMAS COSTA
DBA NORTH PLANK ROAD TAVERN; THREE SHEETS,
LLC; THREE-ZERO-EIGHT, LLC; TIMIOS ENTERPRISES
CORP; TOM RALYS; TREL RESTAURANT INC; UPDOG
LLC; USHERS OF MOORHEAD LLC; VASILIKI CORP;
VILLAGE FOOD COURT LLC; VILLAGE TAVERN SALEM,
INC; VS SERVICES, L.L.C.; WATERSTONE EVENTS, INC.;
WHISKEY R. LLC; WHITNEY'S INN, LLC; WINCHESTER
INN LLC; WLC RESTAURANT LLC; XENIA ENTERPRISES
INC; YAJIKA RESTAURANTS, INC; ZECHSAN BUSINESS
DEVELOPMENT INC.,

     Plaintiffs

  v.


THE UNITED STATES OF AMERICA,


    Defendant

**Appx4**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

THE PARTIES........................................................................................................... 4

JURISDICTION ........................................................................................................ 5

FACTUAL ALLEGATIONS ..................................................................................... 5

    A.    The COVID-19 Pandemic Devastates American Restaurants....................... 5

    B.    Congress Establishes the Restaurant Revitalization Fund. .......................... 7

    C.    Section 5003 of the American Rescue Plan Act Is Money-Mandating. ..................... 11

    D.    SBA Creates the RRF Program.................................................................... 12

    E.    SBA Launches the RRF Program. ............................................................... 16

    F.    SBA Engages in Numerous Unlawful, Negligent, and Arbitrary and Capricious Acts and Omissions in Administering the RRF Program. ................................. 20

        1.    SBA Failed To Comply with the Statutory Mandate To Award Grants to Eligible Entities in the Order Applications Were Received. .......................... 20

        2.    SBA's Pre-Award Controls Had Numerous Unaddressed Weaknesses, Resulting in Improper Award of Grants and Misallocation of RRF Funds.... 26

        3.    SBA Failed To Comply with Its Obligations To Conduct Post-Award Monitoring and To Recover Misallocated and Unused Funds. ..................... 33

    G.    Plaintiffs Are Eligible Entities Who Applied on Day 1............................... 35

    H.    SBA's Unlawful, Negligent, and/or Arbitrary and Capricious Acts and Omissions Directly Harmed Plaintiffs and Give Rise to Money Damages.................................. 36

    CAUSE OF ACTION ............................................................................................. 40

Appx5

## INTRODUCTION

1.      The restaurant industry is an integral part of the U.S. economy, and it has provided an opportunity for countless Americans to achieve success and prosperity through creativity, hard work, and determination. It is the second largest private sector employer in the Nation, employing nearly 10% of the total U.S. workforce, and represents about 4% of U.S. gross domestic product. A majority of American adults have worked in the restaurant industry, and it has more female and minority managers than any other industry in the United States.  The restaurant industry uniquely provides a path to the American Dream of small business ownership because many restaurant owners begin their restaurant careers as entry-level employees and work their way through management to ownership.

2.      Plaintiffs represent a cross-section of small businesses in America.  They are owned by men, women, veterans, minorities, non-minorities, immigrants, and include restaurants, bars, and catering businesses of many varieties and sizes.  They reside in 36 states in addition to the District of Columbia and Puerto Rico.  Their owners spent years sinking everything—including their own blood, sweat, and tears—into building their businesses.  The pandemic instantly changed everything. The restaurant industry saw sales drop a staggering $240 billion from the pre-pandemic forecast.  Seemingly overnight, Plaintiffs were abruptly forced to shut their doors and navigate sharp declines in revenue, labor challenges, supply-chain shortages, and increases in operating expenses.

3.      In March 2021, Congress recognized these sacrifices and challenges—and the insufficiency of prior relief programs for the restaurant industry—by establishing the Restaurant Revitalization Fund ("RRF") and appropriating $28.6 billion specifically to compensate restaurants and other food service businesses for pandemic-related revenue losses.  Congress

tapped the Small Business Administration ("SBA") to administer the program, but also laid down detailed mandatory rules for SBA to follow about who was eligible to receive grants, how grant amounts would be determined, and the order in which grants were to be awarded. Importantly for this case, Congress mandated that SBA "shall award" grants to eligible entities "in the order in which applications are received."

4. During the pandemic, Plaintiffs were subjected to lengthy forced shutdowns, mask mandates, to-go-only restrictions, outdoor-only restrictions, social-distancing, and inside dining restrictions, and they strove to follow all of SBA's guidance to ensure that they would receive their RRF grants. Plaintiffs listened to SBA webinars, collected the required documents, prepared calculations, consulted accountants, and submitted their applications on Day 1. They heard SBA urge applicants to apply on the first day the online portal was opened, which SBA referred to as "Game Day" or "Day 1." In fact, many Plaintiffs submitted applications within the first hour of Day 1, which SBA referred to as "Hour 1." SBA's repeated exhortation to apply on Day 1, coupled with SBA's terminology, reflects that at least some SBA officials understood the RRF program's statutory framework required grants be awarded in the order applications were received.

5. While awaiting RRF funding critical to their businesses, many Plaintiffs were forced to take on large amounts of debt just to stay afloat and pay rent and other operating expenses. They reasonably expected RRF grants would help them pay off these loans, especially since they had heeded SBA's advice to apply on Day 1. But Plaintiffs' RRF grants never arrived for one overriding reason: SBA did not follow Congress's mandate to award grants in the order applications were received.

6. Despite legislators' prescient warning that SBA must correct previous failures in administering programs like the RRF, SBA fumbled the ball yet again. Multiple government

2

investigations and audits establish beyond dispute that SBA badly mismanaged the RRF program. Its oversight was so inept that its independent auditor was unable to provide an opinion as to the accuracy of SBA's financial statements for three consecutive years. For fiscal year 2021, this was in part because SBA failed to comply with statutory requirements in disbursing RRF grants, the very issue at the heart of this case.

7. Multiple Federal courts also have recognized that SBA's management of the RRF program was unlawful and arbitrary and capricious in various respects. SBA's persistent and material oversight problems surely would doom any public company accountable to regulators, creditors, and shareholders. Yet even when repeatedly confronted with independent findings of mismanagement, SBA failed to effectively remediate. SBA only now is auditing many thousands of RRF grants it awarded in violation of statutory and program requirements. Its efforts to identify and recover hundreds of millions or billions of dollars in misallocated RRF funds will continue through at least July 2024.

8. Plaintiffs, on the other hand, did nothing wrong and endeavored to do everything right. They followed SBA's instructions, timely submitted their applications, and trusted SBA would award their grants in the order their applications were received. SBA instead awarded grants in the order applications were arbitrarily *processed*. This vital error, combined with SBA's other faults and omissions, caused the misallocation of billions of dollars in RRF funds to applicants who were in line *behind* Plaintiffs, and to other applicants who were ineligible, committed fraud, or otherwise failed to meet requirements. Thus, after falling victim to the pandemic and government shutdown orders, Plaintiffs were re-victimized by SBA's mismanagement and failure to award grants in the order Congress mandated.

9.      Had SBA followed statutory mandates, Plaintiffs' grants would have been awarded and they would have received their RRF funds.  SBA should have reserved funds for earlier-received applications to account for varying processing times, but SBA instead awarded grants in a way that unlawfully resulted in SBA picking winners and losers by how quickly—or slowly— SBA agents happened to process applications through an error-ridden system.  It is clear that this resulted in grants being awarded to later-received applications in amounts that exceed the collective amount of grants that should have been awarded to Plaintiffs, even accounting for priority categories (which were later held unconstitutional) and set-asides. SBA could have complied with the statutory mandate to award RRF grants in the order applications were received, and no technical or practical barriers prevented or excused SBA from doing so.  As a direct result of SBA's unlawful, negligent, and arbitrary and capricious acts and omissions, and actions that exceeded SBA's authority under Section 5003, Plaintiffs did not receive RRF grants.

10.     SBA's failure to award and disburse Plaintiffs' RRF grants utterly devastated them. They struggled to meet expenses.  Many were unable to pay off loans taken in anticipation of their RRF grants, and were threatened with the loss of valued employees, customers, and even in some cases, their homes.  Plaintiffs bring this action seeking money damages for economic injury caused by SBA's failure to comply with—and wrongful administration of—a money-mandating statute.

11.     The Court should correct the grave injustices and undeniable violations of law detailed in this complaint by awarding Plaintiffs money damages in the amounts specified below, and such other relief as the Court deems appropriate.

## THE PARTIES

12.     The Defendant is the United States.

13.     Plaintiffs are 303 businesses who applied for grants from the Restaurant

4

**Appx9**

Revitalization Fund ("RRF") on May 3, 2021.  Each Plaintiff is identified on Exhibit A.

## JURISDICTION

14.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1491 (the "Tucker Act") and 15 U.S.C. § 9009(c) ("Section 5003" of the American Rescue Plan Act).

## FACTUAL ALLEGATIONS

**A.  The COVID-19 Pandemic Devastates American Restaurants.**

15.  The concept of the American Dream is interwoven into the fabric of the United States.  For years, the restaurant industry has helped provide the threads to that fabric and paved a path for countless Americans to achieve success and prosperity through hard work and determination.

16.  In light of these American ideals, the restaurant industry was a thriving and important part of the overall U.S. economy before the pandemic.  According to one trade association, before the pandemic, the restaurant industry employed 15.3 million people—about 1 out of every 10 working Americans—and more female and minority managers than any other industry in the United States.  Sales in 2019 were projected to be $863 billion—about 4% of the overall U.S. gross domestic product.

17.  But that all changed on January 30, 2020, when the Center for Disease Control and Prevention ("CDC") confirmed that COVID-19—had for the first time—spread between two people in the United States.  On March 3, 2020, the CDC reported 60 cases of COVID-19 across Arizona, California, Florida, Georgia, Illinois, Massachusetts, New Hampshire, New York, Oregon, Rhode Island, Washington, and Wisconsin.  The exponential spread of COVID-19 in succeeding months led to severe illnesses, hospitalizations, and deaths.

18.  In response to rapidly changing COVID-19 conditions, prominent American

5

**Appx10**

institutions announced shutdowns, foreshadowing the economic devastation that would soon follow. On March 10, 2020, Harvard University announced that it would terminate in-person instruction. The following day, the NBA suspended its season. On March 13, 2020, the NCAA canceled the men's and women's Division I basketball tournaments. Other schools, sports leagues, entertainment venues, and cultural events soon closed their doors.

19.     That same month, Federal agencies and state and local governments across the country issued stay-at-home orders and encouraged—or required in most cases—restaurants and other customer-facing businesses to also close their doors.

20.     Government mandates resulted in the sudden and severe drop in consumer economic activity, which quickly reverberated through the economy. Real gross domestic product in the second quarter of 2020 dropped by more than 30% —one of the most severe quarterly contractions ever recorded.

21.     The restaurant industry was hit especially hard by the pandemic. The restaurant industry ended 2020 with total sales that were $240 billion below the pre-pandemic forecast. More than 8 million restaurant employees were laid off or furloughed. Monthly sales for food and beverage services declined from $66 billion in February 2020 to $30 billion in April 2020. Overall, restaurants in the United States saw a decline of approximately 24% in 2019 revenues.

22.     The economic hardships endured by the restaurant industry were in large part a sacrifice disproportionately borne by small business owners—through no fault of their own—in service of efforts directed by governments at the Federal, state, and local levels to stop the spread of COVID-19 in the United States. Extended closures, mandated restrictions, sharp declines in revenue, supply chain scarcities, rising labor costs and employee retention challenges left restaurants uncertain about the road ahead as they struggled to survive.

6

**Appx11**

**B.      Congress Establishes the Restaurant Revitalization Fund.**

23.      Between March 2020 and March 2021, Congress appropriated an unprecedented $5 trillion to address emergencies caused by the pandemic.

24.      On March 25, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which appropriated $2.2 trillion for pandemic relief, including $349 billion to fund the Paycheck Protection Program ("PPP") for potentially forgivable loans to small businesses for use meeting payroll, rent, and other operating costs. *See* Pub. L. No. 116-136.  The CARES Act also increased funding for existing SBA loan programs, including for Economic Injury Disaster Loan ("EIDL") grants. *See id.* §§ 1107(a)(6), 1110, 4024(a), (b).

25.      In December 2020, Congress appropriated $900 billion in pandemic relief in the Consolidated Appropriations Act. Pub. L. No. 116-260 (Dec. 27, 2020).

26.      On March 11, 2021, Congress appropriated another $1.9 trillion for pandemic relief through the American Rescue Plan Act ("ARPA"), Pub. L. No. 117-2.  Legislators recognized that SBA had in the past been found to consistently fail "to provide effective oversight of its lending program participants as one of the most serious issues facing the agency" and warned that SBA "must improve its oversight to ensure that it can provide proper accounting of its capital access programs."  H.R. 117-7 (American Rescue Plan Act of 2021) (Feb. 24, 2021), at 476.

a.      Section 5003 of ARPA provides financial support to restaurants and other businesses in the food service industry who were adversely impacted by the COVID-19 pandemic.

b.      ARPA's "Date of Enactment" is March 11, 2021.

c.      Section 5003 has three subsections which: (1) set forth definitions, (2) establish the Restaurant Revitalization Fund ("RRF"), and (3) govern the award of RRF Grants.

7

**Appx12**

27. <u>Subsection (a) of Section 5003 sets forth statutory definitions.</u>

 a. The "Covered Period" is the period beginning February 15, 2020 and ending December 31, 2021, or a date determined by the Administrator that is not later than 2 years after the date of enactment (i.e., not later than March 11, 2023). ARPA § 5003(a)(3). The Administrator determined that the Covered Period would end on March 11, 2023.

 b. The term "Eligible Entity" includes "a restaurant, food stand, food truck, food cart, caterer, saloon, inn, tavern, bar, lounge, brewpub, tasting room, taproom," among others, as well as any "other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink." *Id*. § 5003(a)(4)(A).

 c. Excluded from eligibility are State or local government-operated businesses; businesses that as of March 13, 2020, own or operate (together with affiliated businesses) more than 20 locations, and businesses that received or have a pending application for a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the Shuttered Venue Operators Grant Program or "SVOG," codified at 15 U.S.C. § 9009a). *Id*. § 5003(a)(4)(C).

 d. "Pandemic-related revenue loss" is defined generally as gross receipts during 2020 subtracted from gross receipts in 2019. *Id*. § 5003(a)(7)(A). Grants made to eligible entities "shall be equal to the pandemic-related revenue loss of the eligible entity." § 5003(c)(4)(B)(i). For most eligible entities, the RRF grant to which they are entitled is equal to their 2019 gross receipts minus their 2020 gross receipts. Section 5003 contains other formulas for calculating "pandemic-related revenue loss" for businesses depending upon when the restaurant opened or otherwise incurred expenses. *Id*. § 5003(a)(7)(B)-(C). These formulas dictated a fixed grant amount that was not subject to case-by-case modification by SBA. SBA

8

**Appx13**

adopted these statutory formulas and embedded the statutory formulas into the RRF application that each applicant submitted.

28.     Subsection (b) of Section 5003 establishes the Fund and appropriates money to be used for RRF grants.

        a.      Congress established in the Treasury of the United States the "Restaurant Revitalization Fund," *Id.* § 5003(b)(1), and appropriated $28,600,000,000 "to remain available until expended." *Id.* § 5003(b)(2)(A).

        b.      Congress appropriated an additional $840,000,000 for expenses incurred by SBA in connection with the administration of several specified programs, including the RRF.  *Id.* § 5006(a)(1).

        c.      Congress defined an "Initial Period" from the date of enactment (March 11, 2021) through and including 60 days after enactment (May 10, 2021). *Id.* § 5003(b)(2)(C).  On information and belief, the Administrator did not make any determination to establish a different Initial Period, and the Initial Period therefore ended on May 10, 2021.

        d.      During the Initial Period, $5,000,000,000 of the amount appropriated to the Fund "shall be available to" eligible entities with 2019 gross receipts of not more than $500,000, Section 5003(b)(2)(B)(i)(I), and the remaining $23,600,000,000 would be available to the Administrator to award grants "in an equitable manner to eligible entities of different sizes based on annual gross receipts. Section 5003(b)(2)(B)(i)(II).

        e.      After the Initial Period, grants may be awarded "to any eligible entity regardless of the annual gross receipts of the eligible entity."  *Id.* § 5003(b)(2)(C).

        f.      The Administrator "shall use" RRF funds only to award RRF grants to eligible entities.  *Id.* § 5003(b)(3).

9

**Appx14**

29. <u>Subsection (c) of Section 5003 governs the process by which RRF Grants are awarded and to whom RRF grants must be awarded.</u>

a.  Subject only to the set-aside of certain funding for the Initial Period and statutory priority in awarding grants during the Priority Period (explained below), Congress mandated that "the Administrator shall award grants to eligible entities in the order in which applications are received by the Administrator." *Id*. § 5003(c)(1).

b.  During the 21-day period beginning when the portal opened on May 3, 2021 and ending on May 23, 2021 (the "Priority Period"), Congress required SBA to prioritize awarding grants to businesses owned by women, veterans, or self-certified as economically disadvantaged (collectively "Priority Applicants"). *Id*. § 5003(c)(1).

c.  Congress limited the amount of grants made to an eligible entity and any affiliated businesses to $10,000,000 in the aggregate and $5,000,000 per physical location of the eligible entity. *Id*. § 5003(c)(4)(A).

d.  The grant made to an eligible entity "shall be equal to the pandemic-related revenue loss of the eligible entity." *Id*. § 5003(c)(4)(B)(i).

e.  RRF funds may be used for certain enumerated allowable expenses ("Allowable Expenses") that were "incurred as a direct result of, or during, the COVID-19 pandemic." *Id*. § 5003(c)(5).

f.  Allowable Expenses include payroll costs, mortgage payments (other than prepayment of principal), rent payments (other than prepayments), utilities, certain maintenance expenses, supplies, normal food and beverage expenses, covered supplier costs, operational expenses, paid sick leave, and any other expenses the Administrator determines to be essential to maintaining the eligible entity. *Id*. § 5003(c)(5)(A)-(K).

10

**Appx15**

g.      Excess grant amounts are required to be returned to the extent that estimated receipts differed from actual receipts, *id*. § 5003(c)(4)(B)(ii), and to the extent a recipient "fails to use all grant funds or permanently ceases operations on or before the last day of the covered period. *Id*. § 5003(c)(6).

30.     During each of the following periods, SBA was to do as follows:

a.      <u>Day 1 to Day 8</u>:  SBA must prioritize awarding grants to eligible Priority Applicants and make available $5 billion to eligible entities with no more than $500,000 in 2019 gross receipts.

b.      <u>Day 9 to Day 21</u>:  SBA must continue prioritizing awarding grants to eligible Priority Applicants but may award grants without regard to gross receipts.

c.      <u>Day 22 and later</u>:  SBA must award grants to eligible entities in the order applications were received without regard to priority status and may award grants without regard to gross receipts.

**C.      Section 5003 of the American Rescue Plan Act Is Money-Mandating.**

31.     Congress expressly defined who is eligible to be awarded an RRF grant.

32.     Section 5003 supplies a clear standard for the payment of money.

33.     Section 5003 provides a formula for the computation of the amount of RRF grants that leaves no substantive discretion to SBA.  SBA has conceded that Section 5003 sets forth a simple formula for determining what funds an eligible entity will receive.

34.     After the Priority Period, Section 5003 mandates that SBA "shall award" grants to eligible entities in the order applications are received.  Subject only to set-asides for the Initial Period and the Priority Period, this mandate requires SBA to award grants in the order applications are received to each eligible applicant that satisfies objective criteria.

11

**Appx16**

35.     After the Priority Period, SBA had no discretion to withhold RRF grants from eligible entities whose applications were received before RRF funds were properly expended through the lawful award of RRF grants, and SBA violated Section 5003 by awarding grants to entities whose applications were received after applications submitted by eligible entities whose grants were not awarded due to SBA errors and purported exhaustion of funds.

**D.     SBA Creates the RRF Program.**

36.     SBA delegated to the Office of Capital Access ("OCA") responsibility for creating a program to award grants from the Fund (the "RRF Program").

37.     OCA contracted with a private company to develop an online portal through which entities could apply for RRF grants.  The online portal included:

> a.     a two-way message capability for communicating with applicants; and

> b.     automated controls such as verification of bank accounts by a third-party agent, verification of taxpayer identification numbers and tax returns through the IRS, and verification of addresses through the U.S. Post Office.

38.     OCA also partnered with five point-of-sale (POS) vendors (who provide inventory, sales, and payment-processing services) to allow applicants to submit RRF applications through the POS vendors' electronic systems.

39.     Applicants could apply for RRF grants in one of three ways: (1) directly through SBA online portal; (2) by telephone through a call center; and (3) through POS vendors.

40.     SBA deemed an application to be received when it was submitted to the DocuSign electronic signature service.

41.     The amount of an RRF grant ("Grant Amount") is computed by one of three mathematical formulas imbedded in the electronic application.  These formulas remove any

12

discretion for SBA to adjust the amount of the award.

42.     Grant recipients were to use RRF grants on Allowable Expenses incurred during the Covered Period.  Grants could be used on past-due expenses so long as the expenses were incurred during the Covered Period.

43.     SBA requested applicants submit the following documentation:

a.       the RRF application;

b.       IRS Form 4506-T; and

c.       any one of the following as evidence of gross receipts: (1) business tax returns (IRS Form 1120 or IRS Form 1120-S); (2) IRS Form 1040 Schedule C or F; (3) IRS Form 1065 for partnerships; (4) bank statements; (5) financial statements such as Income Statements or Profit or Loss Statements (whether internally or externally prepared); or (6) Point of sale reports, including IRS Form 1099-K.

44.     SBA's processing of received applications consisted of the following steps: (1) tax information verification by the IRS; and (2) SBA review (either automatic or manual) and resolution of any issues or discrepancies.  Payment processing was initiated by SBA after an applicant was informed of the award of the RRF grant.

45.     <u>Tax Information Verification by IRS</u>.

a.       SBA attempted to validate gross receipts before disbursing RRF funds.

b.       Gross receipts were in general verified through IRS tax records.

c.       SBA in general did not require IRS tax records for applicants who submitted through POS partners because SBA assumed that the POS partners would adequately verify gross receipts.  This assumption was incorrect for at least one POS partner and thousands of applications representing hundreds of millions of dollars in awarded grants.

13

**Appx18**

46.     The Administrative Review of Applications.

a.     SBA staff or contractors determined whether applications would undergo automatic review, (no more than approximately 48 hours), or manual review (10-14 days, or longer).

b.     Because automatic review was faster than manual review, and also because SBA unlawfully awarded grants in the order applications were processed rather than the order applications were received, applications subject to manual review were less likely to result in award of an RRF grant, even if those applications were submitted on Day 1.

c.     The review process did not include any mechanism for reserving funds for applications in the order they were received.  It also did not include a check before awarding a grant to determine the order in which the application under consideration was received.

47.     Payment Processing.  After award of a grant, payment processing was initiated. Payment processing included screening against Treasury Department's Do Not Pay lists and public bankruptcy information, as well as verifying bank deposit information.

48.     SBA awarded RRF grants in the order applications were processed.  Because the time required to process applications varied greatly, the order in which SBA awarded grants differed significantly from the order in which applications were received.

49.     SBA announced that it would "set aside" $9.5 billion for awards to eligible entities based upon the amount of their 2019 gross receipts.  These set-asides were established under Section 5003(b)(2)(C) and included:

a.     the statutory requirement to "make available" $5 billion to eligible businesses with 2019 gross receipts of no more than $500,000;

b.     a $500 million set-aside for eligible businesses with $50,000 or less in 2019

14

gross receipts that was created by SBA; and

       c.     a $4 billion set-aside for eligible businesses with between $500,000 and $1.5 million in 2019 gross receipts that was created by SBA.

       d.     On information and belief, SBA did not make a determination to extend the statutory Initial Period. Accordingly, all set-asides were to expire on May 10, 2021 (Day 8), and beginning on May 11, 2021 (Day 9), SBA was required to award grants without regard to gross receipts.

50.     On April 8, 2021, SBA finalized its proposed RRF implementation plan. The implementation plan was required to be submitted to the SBA Office of Inspector General ("OIG"), the Pandemic Response Accountability Committee ("PRAC"), and the Office of Management and Budget ("OMB").

51.     From approximately April 20, 2021 until May 6, 2021, SBA hosted a series of public outreach events to inform the public about the RRF program.

       a.     SBA repeatedly encouraged businesses to submit applications on May 3, 2021, when the online portal opened.

       b.     SBA knew even before the portal opened that $28.6 billion would not be enough to fund all applications and, as a result, that if SBA followed Section 5003, the order in which applications were received would be determinative of which eligible entities received awards and which did not.

52.     RRF award recipients were to submit a report no later than December 31, 2021 documenting how much of their RRF award was used for each category of Allowable Expenses. Until their grant was fully accounted, recipients were to submit additional such reports on December 31, 2022 and March 11, 2023.

15

**Appx20**

E.      **SBA Launches the RRF Program.**

53.     Between April 25, 2021 and May 2, 2021, approximately 2,600 potential applicants randomly selected from existing PPP participants in the restaurant industry were permitted to submit applications through the online portal to test its operation.  This was referred to as the pilot program.  843 applications were submitted during the pilot program. 758 of these pilot program applications resulted in awarded grants totaling $359,509,845.19.

54.     SBA opened its portal to the general public and began receiving applications for RRF funds at noon on May 3, 2021.

        a.      The statutory 21-day Priority Period began on May 3, 2021.

        b.      From Day 1 until Day 21, SBA processed only applications received from Priority Applicants.  SBA claims to have initiated processing of applications in the order they were received, but SBA awarded grants in the order processing was completed.

        c.      SBA notified non-priority applicants that their applications would remain under review while priority applications were processed during the first 21 days.  SBA represented to grant applicants that after the 21-day priority period, non-priority applications would be funded on a first-come, first-served basis.  Notwithstanding its representation, SBA did not award grants in the order applications were received and instead continued to award grants in the order applications were processed.

55.     Beginning on May 11, 2021 (Day 9), SBA was to award grants without regard to the set aside of certain funds during the Initial Period for applicants with certain levels of 2019 gross receipts.

56.     On May 17, 2021 (Day 15), SBA learned that thousands of applications had not had gross receipts verified, and that there was reason to believe many were fraudulent applications.

16

**Appx21**

57.     On May 18, 2021 (Day 16), a Federal district court held that the plaintiffs in that case were likely to succeed on claims that SBA's use of race-based and sex-based preferences in the administration of the RRF program violates the Equal Protection Clause of the Constitution. *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 651 (N.D. Tex. 2021).  The Court issued a temporary restraining order permitting the plaintiffs to file RRF applications no later than May 19, 2021.  It further required SBA to process the plaintiffs' non-priority applications during the Priority Period and treat those applications as if received on May 13, 2021, the date the Complaint was filed.  *Id*. at 652.

58.     May 23, 2021 (Day 21) was the last day of the Priority Period.

59.     SBA decided that when the Priority Period ended, it would cease processing applications received from Priority Applicants, process only non-priority applications SBA had received, award grants only to non-priority applicants, use remaining RRF funding only for grants awarded to non-priority applicants, and disburse no further awards to Priority Applicants.  SBA repeatedly made such representations, using words to the same effect, to Federal courts.

60.     SBA informed approximately 2,964 Priority Applicants who were previously notified that they had been awarded RRF grants that payment of their awarded grants was precluded by Federal court decisions.

61.     Beginning on May 24, 2021 (Day 22), SBA was to award grants in the order applications were received without regard to priority status or gross receipts.

62.     SBA has represented that it began processing non-priority applications with FY 2019 gross revenues less than $500,000 on May 25, 2021 (Day 23), but that it delayed processing other non-priority applications until May 27, 2021 (Day 25).  This was not permitted by Section 5003.

17

**Appx22**

63.     On May 27, 2021 (Day 25), the Sixth Circuit held that the allocation of RRF funds on the basis of race and sex is unconstitutional.  The Court enjoined the government from using these unconstitutional criteria when processing RRF applications.  *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021).  The Court ordered SBA to "fund the plaintiffs' grant application, if approved, before all later-filed applications, without regard to processing time or the applicants' race or sex." *Id.* at 366.

64.     On or about May 27, 2021 (Day 25), SBA first awarded RRF grants to non-priority applicants.  There were four such awards on Day 25:  three were made to applicants who applied on Day 1, and one was incorrectly made to an applicant who applied on Day 9.

65.     On or about May 27, 2021 (Day 25), SBA awarded the final RRF grants to Priority Applicants.  SBA made 52 awards to Priority Applicants totaling $15,634,182.04.  The applications associated with these awards were submitted as late as May 21, 2021 (Day 19).

66.     On May 28, 2021 (Day 26), a Federal district court directed SBA "to process and consider [the plaintiffs'] applications for RRF grants as if the SBA had initiated processing of those applications at the time the applications were filed," and the Court forbid SBA "from processing or considering any RRF application filed later in time [than the plaintiffs' applications] until [the plaintiffs'] applications have been processed and considered." *Blessed Cajuns LLC v. Guzman*, No. 4:21-677, slip op. at 11 (N.D. Tex. May 28, 2021) (ECF No. 18).

67.     On or about June 30, 2021, SBA stopped processing RRF applications.

68.     As of June 2022, approximately $180 million of RRF funding remained without recorded obligations, including $24 million set aside for litigation.

69.     After November 2022, SBA awarded approximately $83 million in additional grants to businesses whose applications had been fully processed as of June 30, 2021.  On

18

**Appx23**

information and belief, some of the awarded funds came from recoveries of misallocated grants or return of unused grants.

a.    After receiving advice from the Department of Justice on how to comply with statutory requirements and court rulings, SBA changed the manner and order in which it would award RRF grants in November 2022.

b.    From the group of fully processed applications, SBA claims to have awarded grants in the order in which those fully processed applications were received through the DocuSign platform.  But SBA excluded from consideration the eligible entities whose applications it had not finished processing as of June 30, 2021.

70.    On information and belief, available RRF funding will increase in fiscal year 2024 as a result of SBA's mandatory required audit and recovery efforts that will be ongoing through at least July 2024.

71.    On May 12, 2023, Plaintiffs' counsel in this case demanded in writing that DOJ, SBA, and GAO, among others, continue to preserve all information related to SBA's administration of the RRF and the investigation of misallocated funds, among other things, in anticipation of filing this case.

72.    SBA has represented that it will conduct a post-award audit of 10,058 awards.  The post-award audit has not yet been performed. It is to be completed in approximately July 2024. The 10,058 awards that are to be audited represent approximately $2,849,458,000 of grants that were disbursed from the Fund (based upon an average award of approximately $283,302.63). Among the awards to be audited are 2,172 awards that improperly were not verified by the IRS.

19

**Appx24**

F.    **SBA Engages in Numerous Unlawful, Negligent, and Arbitrary and Capricious Acts and Omissions in Administering the RRF Program.**

1.    **SBA Failed To Comply with the Statutory Mandate To Award Grants to Eligible Entities in the Order Applications Were Received.**

73.    Section 5003 of ARPA requires SBA to award RRF grants to eligible entities in the order in which applications are received.

74.    SBA failed to comply with the statutory requirement to award grants to eligible entities in the order applications were received.

75.    From approximately May 3, 2021 until June 30, 2021, SBA awarded approximately $28 billion in RRF grants. The order in which SBA awarded those grants depended on the order in which applications were processed rather than the order in which the applications were received. The time required to make it through processing, in turn, depended upon several factors unrelated to the order in which applications were received. The order in which SBA awarded grants during this period violated Section 5003 of ARPA.

76.    The majority of Plaintiffs were never told by SBA that there was any issue with their applications and were not asked by SBA to provide additional information. For example:

a.    A Plaintiff applied within the first hour of Day 1. Plaintiff qualified for priority treatment under all three priority categories. Plaintiff's owner spent hours gathering information and preparing to apply at the opening of the online portal on Day 1. Plaintiff firmly believes that the information in the application provided all information needed for the SBA to award the RRF grant sought. Plaintiff was never asked by SBA to provide additional information or informed by SBA that there were issues with the application. Plaintiffs' application was for a grant greater than $360,000. Plaintiff obtained an EIDL loan to stay afloat while waiting for RRF funds. Plaintiff's application progressed through IRS verification but never moved out of "under

20

review" status.  Plaintiff never received its RRF grant.

77.     A smaller number of Plaintiffs experienced obvious unlawful, negligent, and arbitrary and capricious errors and omissions that also wrongfully delayed the processing of their applications.  Examples include:

a.     A Plaintiff applied on Day 1. Plaintiff's owner is an immigrant of limited means who came from a refugee camp.  She spent her life building her business.  She was relying on RRF funds to keep her business afloat.  Plaintiff's owner retained a screenshot establishing that her application was submitted in the first 90 minutes after the noon opening of the online portal on May 3, 2021.  An SBA reviewer sent a message inexplicably questioning Plaintiffs' eligibility due to 2019 gross receipts exceeding $10,000,000.00; however, there is no such limitation on gross receipts.  SBA had miscomprehended the limit of $10 million per business in RRF funding, or $5 million per physical location, and Plaintiff's grant amount was well under these limits.  Plaintiff submitted numerous FOIA requests and engaged in hours of email exchanges and teleconferences with SBA in an effort to correct this injustice.  Plaintiff was assisted by two SBA attorneys who confirmed SBA received the application on May 3, 2021 and SBA eventually awarded a grant, which was rescinded because the award came 1 minute too late.  In fact, Plaintiff's application was not too late; SBA's failure to award grants in the order applications were received and SBA's negligence in reviewing Plaintiff's application were the reasons that Plaintiff's grant was not funded.  Plaintiff never received RRF funds.

b.     A Plaintiff applied on Day 1.  More than one month later, Plaintiff received a letter from SBA asking Plaintiff to explain a difference of less than 0.3% between its profit & loss statement and its 2020 tax record.  Plaintiff promptly confirmed the accuracy of the application and explained that the small difference in figures was due to the proper accounting treatment of

21

**Appx26**

returns and allowances.  Plaintiff did not receive an RRF grant.

   c. A Plaintiff owns a bar that is located in a building that also includes arcade games.  The arcade games are owned and operated by an unaffiliated third party.  Plaintiff applied on Day 1 and was in a priority category.  Plaintiff received notice that its grant was awarded.  But SBA subsequently asked Plaintiff to separate receipts from arcade games, on the one hand, and receipts from food and drink sales, on the other.  The very premise of the question was erroneous:  Plaintiff explained that its gross receipts do not include *any* arcade game revenue because the arcade games are owned and operated by a third party and subject to entirely separate accounting.  Despite this clear and simple explanation demonstrating that there was no issue or need for additional information, Plaintiff never received an RRF grant.

   d. A Plaintiff applied on Day 1 within the first 90 minutes after the noon opening of the online portal on May 3, 2021.  Plaintiff's owner had spent the previous weekend gathering and organizing documents so he could apply soon after the online portal opened.  On May 28, 2021, SBA informed Plaintiff that the deposit information listed on the application did not match the bank records submitted.  SBA was incorrect:  Plaintiff maintains multiple bank accounts for different business purposes and had included with its application bank statements covering more than one of its accounts.  It appears SBA did not read beyond the first page of the bank statements; had it done so, it would have seen that the deposit information in the application matched the bank account statements provided.  Plaintiff responded to SBA's message within approximately 30 minutes to correct SBA's misunderstanding.  Plaintiff was told that because an SBA comment was placed on his application, it would be moved to the back of the line.  Plaintiff asked to speak with a supervisor but was never afforded the opportunity to explain the situation to a supervisor and have his application awarded in the order it was received.  Plaintiff never received

22

**Appx27**

an RRF grant.

e.    A Plaintiff operated a catering company and restaurant.  Plaintiff applied on Day 1.  Plaintiff's financial statements were consolidated and reflected receipts from both the catering business and restaurant.  At the time the application was submitted, the restaurant was temporarily closed, but was still eligible because Plaintiff had incurred relevant expenses before March 11, 2021, intended to reopen the restaurant, and had taken steps to do so.  Both the catering business and the restaurant were therefore eligible for an RRF grant (and even had the restaurant been permanently closed and ineligible, Plaintiff would nevertheless have been eligible by virtue of the catering activities), and SBA initially awarded a grant to Plaintiff.  Subsequently, SBA informed Plaintiff that it would not award the grant because the restaurant was closed.  That was not true.  When Plaintiff's owner subsequently inquired further, no mention was made of the operating status of the restaurant, and SBA instead represented to her in writing that her application was submitted on May 3, 2021.  SBA indicated that the Agency had intended to grant the award, but once the Agency was ordered by the Court to stop processing priority applications, SBA told Plaintiff incorrectly that her award could no longer be considered.  Plaintiff never received its RRF grant.

f.    A Plaintiff engages in restaurant and catering activities and is wholly owned by a single individual.  Plaintiff's owner diligently prepared to apply for an RRF grant by reading SBA explanatory materials, collecting documents, and working through a sample application in advance.  He began filling out the online application as soon as he could access the online portal and submitted the completed application on Day 1, within minutes after SBA represented that the online portal would be opened.  Several weeks later, Plaintiff was contacted by SBA and asked to change his bank account to match the bank account that had previously been used to receive PPP

23

funds. Plaintiff did as instructed even though (1) this was not required by SBA's RRF Program Guide or the application instructions; and (2) the bank account initially identified in the RRF application was a valid account that could have received the RRF funds. Plaintiff never received its RRF grant.

g.      A Plaintiff applied on Day 1. Plaintiff's application information was successfully entered into the online portal, but a technical issue with the portal prevented Plaintiff from progressing to the point at which he could download a copy of his DocuSign application. Plaintiff called SBA to report the problem. Plaintiff was told that he would not lose his place in line due to the technical problem with SBA's online portal. SBA also posted a message to Twitter on Day 1 acknowledging a technical issue with the online portal and reassuring affected applicants that "your place in line is reserved and you will be able to complete your application shortly." Plaintiff was encouraged by SBA to apply for an EIDL loan while waiting for his RRF funds and that he could use the RRF funds to repay the EIDL loan. Plaintiff repeatedly logged into the online portal in an attempt to complete the online process. Although Plaintiff's application information remained recorded in SBA's online system without Plaintiff being required to reenter the information (i.e., SBA's online system had received all the application information on Day 1), it was not until May 13, 2021, that SBA's technical issue was resolved. SBA unfairly and incorrectly did not maintain Plaintiff's place in line and Plaintiff never received its RRF grant. Plaintiff is struggling to repay the EIDL loan that SBA encouraged it to take.

78.      In November 2022, SBA awarded approximately $83 million in grants. SBA claimed to have changed from awarding grants in the order applications were processed to awarding grants in the order applications were received after consulting the Department of Justice. On information and belief, this change was an effort to comply with court decisions interpreting

or indicating that Section 5003 of ARPA mandated that SBA award RRF grants in the order applications were received, rather than in the order applications were processed. With respect to these grants, however, SBA unlawfully limited the group of eligible businesses to those whose applications had been fully processed as of approximately June 30, 2021. From that subset of applications, SBA claims to have awarded grants in the order in which applications had been received. The award of these grants violated the statutory requirement to award grants to eligible entities in the order in which applications were received because SBA excluded from consideration eligible entities whose applications were received earlier than those to whom awards were made.

79.    SBA could have—and should have—complied with its obligation to award grants in the order applications were received.

a.    The change in SBA's procedures in November 2022 demonstrated that SBA could have complied with the statutory requirement to award grants in the order in which applications were received.

b.    SBA previously administered at least one grant program in which it had preserved the order in which applications were received to ensure that grants would be awarded in the order applications were received despite that processing times varied significantly.

80.    SBA acted unlawfully, negligently, and arbitrarily and capriciously by failing to treat applications submitted by Priority Applicants and non-priority applicants on equal footing no later than the end of the Priority Period, or May 24, 2021 (Day 22), by awarding grants in the order received without regard to priority categories.

81.    SBA acted unlawfully, negligently, arbitrarily and capriciously by canceling and failing to consider applications of certain Plaintiffs on the basis that court rulings "preclude us from disbursing award funds to you." SBA informed these Plaintiffs that the status of their

25

application would be changed to "fully canceled." This was unlawful, negligent, and arbitrary and capricious with regard to Plaintiffs who received this notification because these Plaintiffs applied on Day 1 and were in line to receive awards even without regard to the two priority categories declared unconstitutional by Federal courts, and the court rulings did not preclude SBA from treating Priority Applicants on equal footing with non-priority applicants; in fact, the Court rulings required it. Nor did the Federal court rulings permit SBA to withhold grants from Plaintiffs who were in priority categories not held unconstitutional by Federal courts. Plaintiffs who were Priority Applicants would have received their awards had SBA treated them on equal footing with the non-priority applicants and awarded grants in the order applications were received.

82.     SBA acted unlawfully, negligently, and arbitrarily and capriciously by failing, after the Initial Period ended, to award all grants in the order applications were received without regard to Priority Categories.

83.     The manner in which SBA awarded RRF grants unlawfully, negligently, and arbitrarily and capriciously caused thousands of later-received applications to be awarded grants. The erroneous disbursement of these grants amounted to billions of dollars; meanwhile, Plaintiffs who submitted earlier-received applications received nothing.

> **2.     SBA's Pre-Award Controls Had Numerous Unaddressed Weaknesses, Resulting in Improper Award of Grants and Misallocation of RRF Funds.**

84.     Federal law and SBA's own procedures required SBA to put in place pre-award controls to ensure grants were only awarded to eligible entities, to identify and stop fraud, and to ensure that awards were made in the proper amounts to the proper applicants. SBA's procedures should have accounted (but did not) for the fact that Congress required grants to be paid to eligible entities in the order that their applications were received.

85. SBA was negligent and/or acted arbitrarily and capriciously with respect to pre-award controls.

**Negligent and Arbitrary and Capricious Awarding of Grants Without IRS Verification of Gross Receipts**

86. SBA required IRS verification of gross receipts as a general matter. But SBA negligently assumed that point-of-sale vendors would properly verify gross receipts reported on applications submitted through their systems. SBA therefore did not send these applications through IRS verification, a processing step that took a significant period of time. This substantially accelerated processing of many applications submitted through several POS vendors with whom SBA partnered, but not other POS vendors, or other methods of accounting used by other applicants, that were not treated on equal footing by SBA.

87. Worse still, at least one POS vendor with whom SBA partnered failed to verify gross receipts at all for thousands of applications submitted through its system. SBA negligently failed to detect this problem before granting thousands of applications representing hundreds of millions of dollars of awarded grants. At least 2,172 awards (totaling approximately $278.6 million) were disbursed without any gross receipts verification.

88. The SBA Inspector General concluded that SBA should have immediately reviewed the 2,172 applications and sought recovery of improper disbursements. But SBA did not review these applications and has not sought any recovery despite the passage of more than 2 years. Until all 2,172 awards are reviewed, there is no basis to conclude that $278.6 million in disbursed RRF grants were properly awarded.

89. SBA's award of grants without verification of gross receipts carried an unreasonable risk of fraud or misallocation of funds to grants made in the wrong amount.

**Appx32**

90. Excess award amounts attributable to inaccurate gross receipts or fraud are required by law to be returned or recovered.

91. SBA's policy of exempting from IRS verification some applications submitted through some POS vendors arbitrarily and unfairly accelerated the processing of such applications ahead of other applications that were earlier received by SBA. This, combined with the practice of awarding grants in the order applications were processed, caused many later-received applications to be unlawfully prioritized over earlier-received applications, including Plaintiffs' applications. If SBA had awarded grants in the order applications were received, the difference in processing time would not have made a difference as to who received grants; however, since SBA awarded grants in the order processed, this wrongfully and arbitrarily caused some applications to skip ahead of Plaintiffs' earlier-filed applications.

92. The manner in which SBA verified gross receipts—or failed to do so—wrongly caused thousands of later-received applications to result in award of grants while earlier-received applications from Plaintiffs did not result in award of grants.

**Negligent and Arbitrary and Capricious Review of Applications and Resolution of Issues and Discrepancies**

93. In general, manual review required significantly longer than automatic review.

94. Applications required to undergo manual review were far less likely to result in award of grants than later-received applications that underwent automatic review.

95. SBA developed risk tiers to determine the level of review required for each application. Purported "higher" risk applications were required to be reviewed manually. Purported "lower" risk applications were processed automatically.

96. Among other criteria, SBA required manual review of (a) applications in excess of

28

**Appx33**

$360,000; (b) for applicants who did not have a history with the PPP program; (c) for applicants whose business opened after 2019; and (d) for certain business types (self-employed, sole proprietorships, and independent contractors). These criteria were not published or otherwise made available to the public or RRF applicants and were erroneously and arbitrarily applied.

97.     SBA negligently and arbitrarily failed to assign risk tiers to at least approximately 16,600 applications that resulted in the award of RRF grants totaling billions of dollars in RRF grants. These applications were unfairly and arbitrarily accelerated through the processing system ahead of earlier-received applications, and SBA failed to subject them to the proper pre-award reviews, including IRS verification. These applications (and others) met the criteria for manual review but SBA has no record of manual review having occurred.

98.     With respect to at least approximately 2,000 applications, SBA erroneously assigned a lower-risk tier than should have been assigned. This error resulted in misallocation of at least hundreds of millions of dollars in RRF grants without the proper pre-award review. The applications were unfairly and arbitrarily accelerated through the processing system ahead of earlier-received applications.

99.     SBA failed to review, audit, or perform any check whatsoever of the self-certification of priority status by tens of thousands of applicants, resulting in award of many billions of RRF grants.

100.     During review of certain Plaintiffs' applications, SBA wrongly delayed processing and/or erroneously treated applications as being received later than they were received based upon SBA's unlawful, negligent, and arbitrary and capricious acts and omissions including but not limited to the following: failure to correct technical problems with the online portal; erroneous identification of purported issues or discrepancies; misclassification of minor non-material issues

29

or discrepancies; provision of erroneous guidance by SBA agents; request of unnecessary information beyond information required by statute or regulation; misinterpretation of financial and other information properly submitted by Plaintiffs; misinterpretation of IRS-provided information; imposition of unreasonable and ad hoc demands that were not published in SBA guidance; mishandling of routine bank issues that should not have resulted in loss of a Plaintiff's place in line.

      a.     In processing applications, SBA represented that "your place in line is reserved" while the issue is resolved, or words to that effect, with respect to one or more of these issues. Plaintiffs relied on such representations. In fact, SBA did not reserve Plaintiffs' places in line.

      b.     SBA's attempted resolution of perceived issues arbitrarily and unfairly delayed processing of certain Plaintiffs' applications and caused SBA to unlawfully and unfairly treat the applications as having been received later than they were actually received.

      c.     The delays injected by SBA's treatment of these issues caused certain Plaintiffs to be unreasonably and unfairly treated as if their applications were received later than they actually were, and contributed to the loss of the RRF grants to which they are entitled.

101.    The manner in which SBA unlawfully, negligently, and arbitrarily and capriciously reviewed applications caused thousands of later-received applications to be awarded grants while earlier-received applications from Plaintiffs did not result in award of grants.

**Negligent and Arbitrary and Capricious Failure to Detect Fraud**

102.    SBA failed to take reasonable measures to detect fraudulent RRF applications, including failing to make use of readily available data analytics.

103.    For example, SBA negligently awarded $8 million to a dentist who applied for

Restaurant Revitalization Fund grants with stolen identities and false business information that would have been detected by any reasonable control system.

104.    At least 110 grants (totaling $20.7 million) were awarded despite clear indications of fraud that should have been detected.  The total dollar amount of fraudulent awards is likely much higher, but is not determinable until Plaintiffs obtain discovery.

105.    The manner in which SBA implemented fraud controls—or failed to do so— unlawfully, negligently, and arbitrarily and capriciously permitted misallocation of RRF grants to fund fraudulent applications rather than to award grants to Plaintiffs.

**Negligent and Arbitrary and Capricious Implementation of Procedures to Ensure Compliance with Program Requirements**

106.    Priority Applicants.  After the Priority Period, SBA erroneously awarded RRF grants to Priority Applicants whose applications were received after Plaintiffs' applications were received.

107.    Set Asides.  SBA set aside $9.5 billion for grants to be made to certain applicants based upon gross receipts.

108.    The manner in which SBA awarded grants from these set-aside funds was unlawful, negligent, and arbitrary and capricious, and resulted in misallocation of RRF grants to applicants whose applications were received after Plaintiffs' applications.

a.    SBA failed, for the purpose of awarding set-aside RRF funds, to reasonably adjust gross revenues of applicants who were not in business for the entirety of 2019.

b.    After the Initial Period expired, SBA unlawfully, negligently, and arbitrarily and capriciously continued to set aside money for later-received applications.

c.    During the period May 25, 2021 to May 26, 2021 (Day 23 to Day 24), SBA

31

unlawfully prioritized applicants with no more than $500,000 in gross receipts and delayed processing applicants with more than $500,000 in 2019 gross receipts.

109.    <u>Statutory Limits On Grant Amounts</u>.  SBA failed to implement effective controls to ensure that affiliated businesses did not receive more than $10 million.

a.    For example, a group of 9 affiliates received over $15 million.  This would have been detected by any reasonable control system:  all 9 businesses applied using the same email address.

110.    SBA's unlawful, negligent, and arbitrary and capricious failure to utilize effective controls and to enforce program requirements caused misallocation of grant money that should have been used to fund Plaintiffs' applications.

**Negligent and Arbitrary and Capricious Assessment of Pre-Award Controls and Correction of Deficiencies**

111.    Government investigations identified many thousands of grants awarded in connection with fraud, or to applicants that were ineligible or otherwise failed to comply with program requirements.  But even after such problems came to light, SBA stubbornly refused to perform a prompt assessment of the effectiveness of its pre-award controls.

112.    Had SBA taken reasonable measures to improve its pre-award controls and correct its mistakes when they came to light, hundreds of millions or billions of misdirected awards could have been avoided or recovered.

113.    SBA failed to take reasonable measures to assess and correct its pre-award controls. For example, SBA refused to promptly establish a dedicated RRF fraud mitigation team.

114.    SBA unlawfully, negligently, and arbitrarily and capriciously failed to effectively assess its own controls, and correct deficiencies, resulting in unnecessary misallocation of

**Appx37**

hundreds of millions or billions of dollars of RRF grants.

> **3.      SBA Failed To Comply with Its Obligations To Conduct Post-Award Monitoring and To Recover Misallocated and Unused Funds.**

115.      Federal law and SBA's own procedures require SBA to put in place numerous post-award monitoring processes to ensure grants are only awarded to eligible entities in proper amounts, to ensure that grants are used for Allowable Uses, and to ensure recovery of misallocated grants, grants involving fraud, or portions of grants that were not used for Allowable Uses.

**<u>Unlawful, Negligent, and Arbitrary and Capricious Failure To Ensure Grants Were Expended on Allowable Uses</u>**

116.      SBA put in place certain reporting requirements to comply with statutory requirements to recover RRF funds not expended on Allowable Uses during the Covered Period.

117.      SBA failed to effectively enforce the requirement of award recipients to report on the use of their grant funds.

          a.      As of June 2022, about 32% of RRF recipients had missed the first reporting deadline of December 31, 2021, and SBA did not take effective steps to enforce compliance.

          b.      On information and belief, many hundreds or thousands of RRF recipients also failed to report on or after March 11, 2023 as they were required to do.

118.      SBA also has failed to seek recovery of funds that were not used for Allowable Expenses.

119.      SBA unlawfully, negligently, and arbitrarily and capriciously failed to monitor and recover RRF funds that were not expended on Allowable Uses during the Covered Period.

**<u>Unlawful, Negligent, and Arbitrary and Capricious Failure To Recover Misallocated Funds</u>**

120.      Federal law and SBA's federal assistance directive require program officials to issue a written demand for payment to recover debts to the government, including to RRF

33

**Appx38**

recipients to demand return of any improper grants or grants in excess of the entitled amount.

121.     SBA failed to comply with its obligation to recover misallocated RRF funds.

122.     More than two years after being informed that 2,172 awards representing $278.6 million in grants had been disbursed without verification of gross receipts figures used to calculate the award amount, SBA has not reviewed these, conducted the required gross receipts verification, or attempted to demand return of any improper grants or grants in excess of the amount of the RRF grant to which the recipient was entitled.

123.     SBA has not recovered—or undertaken reasonable efforts to recover—funds misallocated for other reasons, including but not limited to: (1) unlawful award of grants out of the order required by statute; (2) excess grants based upon inaccurate gross receipts, (3) fraud, (4) awards made to ineligible entities, and (5) awards made in excess of statutory limits on grant amounts.

**Negligent and Arbitrary and Capricious Implementation of Payment Processing**

124.     Payment processing occurred after SBA awarded a grant to an applicant.

125.     Payment processing included screening against the Treasury Department's Do Not Pay lists and public bankruptcy information, as well as verifying bank deposit information provided by the applicant.

126.     SBA negligently, and arbitrarily and capriciously erred in processing payments to certain Plaintiffs causing certain Plaintiffs not to receive the RRF grants to which they were entitled.

**Negligent and Arbitrary and Capricious Failure To Perform an Improper and Unknown Pay Estimate**

127.     On information and belief, SBA has failed to perform the estimate of misallocated

34

**Appx39**

funds required by OMB Circular A-123 Appendix C.

**G.    Plaintiffs Are Eligible Entities Who Applied on Day 1.**

128.    SBA's ever-changing and incorrect procedures reflected confusion and disorganization that resulted in arbitrary, capricious, and negligent actions by SBA that violated Section 5003's mandates.  As a result, SBA awarded grants to applicants who were in line behind Plaintiffs.

129.    While Plaintiffs no longer have access to SBA's online portal, on information and belief, SBA has maintained documents associated with the application portal, including Plaintiffs' applications, communications with Plaintiffs, and, to the extent records were not lost or manipulated by SBA,  the date and time of all RRF applications that were received by SBA.

130.    The RRF application incorporates all eligibility factors for RRF grants.

131.    Each Plaintiff submitted a materially complete and accurate RRF application on or before May 3, 2021, on the dates set forth in Exhibit A.  Many of these applications were received by SBA within the first hour of the scheduled opening of the online portal.

132.    Each Plaintiff's RRF application provided all information necessary to establish eligibility for RRF awards including but not limited to representing or certifying that Plaintiff:

a.    was organized under an eligible corporate form;

b.    was not a government-operated entity;

c.    did not own or operate (together with affiliates) more than 20 locations as of March 13, 2020;

d.    had not received a grant under the SVOG program, and did not have an SVOG application pending when the RRF application was submitted.

e.    qualified as an "Eligible Entity" (i.e., a restaurant or one of the other eligible

35

food service entities set forth in Section 5003);

       f.     was not permanently closed;

       g.     was not ineligible due to bankruptcy;

       h.     was not ineligible due to suspension, debarment or other disqualifying federal action;

       i.     accounted for any PPP loans received;

       j.     self-certification for priority as applicable (see Exhibit A);

       k.     provided required documents;

       l.     made all other required self-certifications.

133.    Each Plaintiff incurred Allowable Expenses during the Covered Period (February 15, 2020 to March 11, 2023).

134.    The amount of each Plaintiff's pandemic-related revenue loss, and the amount of the RRF grant SBA was required to award each Plaintiff, is set forth on Exhibit A.

    **H.**    **SBA's Unlawful, Negligent, and/or Arbitrary and Capricious Acts and Omissions Directly Harmed Plaintiffs and Give Rise to Money Damages.**

135.    None of the Plaintiffs received RRF grants despite the fact that billions of dollars in grants were awarded to recipients who were in line behind Plaintiffs.

136.    For example, after the Priority Period ended on May 24, 2021 (Day 22), SBA awarded grants totaling at least $3,299,407,585.56 to entities whose applications were received on Day 2 or later.  Of this amount, approximately $2,321,371,562.35 was awarded to Priority Applicants;  approximately $978,036,023.21 was awarded to non-priority applicants; and at least $435,250,329.67 was awarded to applicants who were ineligible for any set-asides established by SBA because their 2019 gross receipts necessarily exceeded $1,500,000.  These funds were

36

**Appx41**

misallocated and should have been used to fund Plaintiffs' grants.

137. SBA disbursed more than $16 million to at least 12 companies who alleged in various Federal courts that SBA should have awarded RRF grants to them. More than $9 million was paid to litigants who, on information and belief, did not submit an RRF application before successfully suing SBA. Several of these litigants submitted applications on Day 2 or later.

138. Specific examples of grants that were unlawfully awarded by SBA to recipients in line behind Plaintiffs include but are not limited to the following:

      a. A non-priority applicant operating a restaurant waited until May 5, 2021 to apply and was awarded an RRF grant on May 29, 2021. This business sued SBA over the Constitutionality of the statutory priority given to some businesses. On May 28, 2021, a Federal district court directed SBA "to process and consider [the plaintiffs'] applications for RRF grants as if the SBA had initiated processing of those applications at the time the applications were filed," and the Court forbid SBA "from processing or considering any RRF application filed later in time [than the plaintiffs' applications] until [the plaintiffs'] applications have been processed and considered." *Blessed Cajuns LLC v. Guzman*, *supra*.

      b. This court order did not excuse SBA from its statutory obligation to award grants to Plaintiffs in the order their applications were received. Plaintiffs were in line before this applicant. To comply with this court order, SBA reserved funds for the applicant who had sued so that those funds would not be exhausted by grants awarded in connection with later-received but earlier-processed applications. When ordered to do so, SBA had the means and know-how to award grants in the order applications were received without exhausting funds on later-received applications. SBA also was required to reserve funds to award Plaintiffs' grants because Plaintiffs were in line in front of the *Blessed Cajuns* applicants. SBA failed to do so.

c.  A non-priority applicant operating one or more restaurants waited until May 24, 2021 (Day 22) to apply and was awarded an RRF grant five days later on May 29, 2021.  This applicant was not eligible for statutory priority or set aside funds.

d.  A non-priority applicant operating one or more bars, caterers, and food trucks waited until May 21, 2021 (Day 19) to apply and was awarded an RRF grant on May 29, 2021.  This applicant was not eligible for statutory priority or set aside funds.

e.  A non-priority applicant operating a bar waited until May 20, 2021 (Day 18) to apply and was awarded an RRF grant on May 29, 2021.  This applicant was not eligible for statutory priority or set aside funds.

f.  A non-priority applicant operating a restaurant waited until May 13, 2021 (Day 11) to apply and was awarded an RRF grant on May 29, 2021.  This applicant was not eligible for statutory priority or set aside funds.

g.  A non-priority applicant operating a bar waited until May 7, 2021 (Day 5) to apply and was awarded an RRF grant on May 29, 2021.  This applicant was not eligible for statutory priority or set aside funds.

h.  A non-priority applicant operating a bar waited until May 7, 2021 (Day 5) to apply and was awarded an RRF grant on May 29, 2021.  This applicant was not eligible for statutory priority or set aside funds.

i.  A non-priority applicant ineligible for set-asides operating a food stand waited until May 7, 2021 (Day 5) to apply and was awarded an RRF grant on May 29, 2021.

139.  A non-priority applicant ineligible for set-asides operating a bar waited until May 5, 2021 (Day 3) to apply and was awarded an RRF grant on May 29, 2021.

140.    There are thousands of other examples in which SBA wrongfully awarded grants to applicants whose applications were received by SBA after Plaintiffs, as shown in Table 1 below:

**Table 1:  Grants Awarded to Applicants Who Applied After Plaintiffs**

| Receipt Date | Receipt Day | Number of Grants Awarded | Total Grant Amounts |
|---|---|---|---|
| 5/4/2021 | 2 | 13861 | $2,521,727,355.47 |
| 5/5/2021 | 3 | 6386 | $1,208,882,741.89 |
| 5/6/2021 | 4 | 4683 | $863,012,951.54 |
| 5/7/2021 | 5 | 3450 | $586,306,783.53 |
| 5/8/2021 | 6 | 1523 | $236,793,247.74 |
| 5/9/2021 | 7 | 715 | $99,156,144.75 |
| 5/10/2021 | 8 | 2130 | $342,702,806.01 |
| 5/11/2021 | 9 | 2274 | $376,317,887.95 |
| 5/12/2021 | 10 | 1898 | $286,061,169.65 |
| 5/13/2021 | 11 | 943 | $151,096,459.12 |
| 5/14/2021 | 12 | 742 | $105,813,421.42 |
| 5/15/2021 | 13 | 344 | $48,811,232.15 |
| 5/16/2021 | 14 | 183 | $23,821,967.85 |
| 5/17/2021 | 15 | 502 | $86,315,700.30 |
| 5/18/2021 | 16 | 558 | $81,176,497.53 |
| 5/19/2021 | 17 | 373 | $52,210,605.96 |
| 5/20/2021 | 18 | 510 | $89,596,854.37 |
| 5/21/2021 | 19 | 271 | $37,123,466.85 |
| 5/22/2021 | 20 | 103 | $12,508,936.53 |
| 5/23/2021 | 21 | 86 | $10,116,105.97 |
| 5/24/2021 | 22 | 213 | $24,589,620.65 |
| 5/25/2021 | 23 | 1 | $33,526.00 |
| 5/26/2021 | 24 | - | - |
| 5/27/2021 | 25 | 9 | $1,926,356.72 |
| 5/28/2021 | 26 | 1 | $50,247.92 |
| Total Grants Awarded to Applicants Who Applied After Plaintiffs | - | 41,759 | $7,246,152,087.87 |

| | | |
|---|---|---|
| Priority Applications | 34,087 | $6,268,116,064.66 |
| Non-priority applications | 7,672 | $978,036,023.21 |
| Total | 41,759 | $7,246,152,087.87 |

39

**Appx44**

141. By contrast, Plaintiffs applied on Day 1. Their applications were received by SBA on Day 1. But Plaintiffs never received their RRF grants.

142. Through unlawful, negligent, arbitrary and capricious actions, and actions that exceeded SBA's authority under Section 5003 as set forth above, and other wrongful actions that may be uncovered in discovery, SBA misallocated funds that should have been used to pay Plaintiffs' grant applications.

143. Plaintiffs would have been awarded their RRF grants in the amounts indicated on Exhibit A had SBA followed statutory directives and refrained from engaging in the unlawful, negligent, and arbitrary and capricious conduct alleged in this Complaint.

**CAUSE OF ACTION**
**(Claim for Money Damages)**

144. Plaintiffs re-incorporate by reference each and every allegation set forth above as if fully set forth herein.

145. Pursuant to the Tucker Act, the United States has waived sovereign immunity for claims against the United States under money-mandating statutes.

146. Section 5003 of ARPA is a money-mandating statute.

147. Plaintiffs are eligible entities within the meaning of Section 5003.

148. Plaintiffs applied for grants under ARPA on the first day that applications were opened to the public.

149. Section 5003 required SBA to award grants to eligible entities in the order in which their applications were received. Had SBA followed this statutory requirement, Plaintiffs would have received RRF grants.

150. SBA did not award grants in the order in which eligible entities' applications were

40

**Appx45**

received.

151.    The order in which SBA awarded RRF grants violated a mandatory duty set forth in Section 5003. SBA also engaged in other unlawful, negligent, and arbitrary and capricious acts and omissions in administering the RRF program.

152.    SBA's unlawful, negligent, and arbitrary and capricious acts and omissions resulted in the misallocation of billions of dollars of RRF funds to award grants to applicants who were or should have been in line behind Plaintiffs.

153.    SBA's unlawful, negligent, and/or arbitrary and capricious acts and omissions caused Plaintiffs to incur monetary damages in the amount of their RRF grants as set forth on Exhibit A.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the United States in the amount of at least $252,699,378.20, or such other amount as to be proven at trial, as well as costs, fees, interest, and such further and other relief as the Court deems just and proper.

Washington, D.C.

Dated: October  25, 2023

By: /s/F. Greg Bowman

F. Greg Bowman
Edward C. Reddington
WILLIAMS & CONNOLLY LLP

680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: 202-434-5000
Facsimile: 202-434-5029

*Attorneys for Plaintiffs*

41

**Appx46**

# In the United States Court of Federal Claims

No. 23-1876C
Filed: August 21, 2024

**112 GENESEE STREET, LLC, et al,**

              *Plaintiffs,*

**v.**

**UNITED STATES,**

              *Defendant.*

## ORDER

On August 21, 2024, the Court held a status conference to review a schedule for further proceedings. If it elects to do so, the defendant shall file a motion to certify the case for an interlocutory appeal under 28 USC § 1292(d)(2) by **September 23, 2024**. If the defendant files such a motion, the plaintiffs shall file their response by **September 30, 2024,** and the defendant shall file any reply by **October 4, 2024**. If the defendant does not file such a motion by September 23, the parties shall file a joint status report by **September 30, 2024**, proposing a schedule for further proceedings.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

**Appx47**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| 112 GENESEE STREET LLC., *et. al.*, | ) | |
| | ) | No. 23-1876 |
| Plaintiffs, | ) | Judge Richard A. Hertling |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR AN ENLARGEMENT OF TIME TO FILE MOTION
FOR CERTIFICATION FOR INTERLOCUTORY APPEAL**

On August 21, 2024, the Court ordered that if it elects to do so, defendant, the United States, shall file a motion to certify the case for an interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2) by September 23, 2024. ECF No. 22. Pursuant to Rule 6(b)(1) of the Rules of the United States Court of Federal Claims, we respectfully request a 14-day enlargement of time to this deadline to October 7, 2024. We also respectfully request concomitant extensions to the Court's briefing schedule on the Government's motion. Plaintiffs' counsel represents that plaintiffs do not object to this motion, but would object to an extension longer than 14 days.

There is good cause for this extension. The decision on whether to seek interlocutory appeal is still undergoing review within the Department of Justice. As the Court is aware, this process involves multiple levels of review, concluding with the Solicitor General's Office. Although the United States has made significant progress, undersigned counsel does not anticipate that the review process will be concluded by September 23, 2024.

For this reason, we respectfully request that the Court grant this motion for an enlargement of time of the following deadlines:

| | |
|---|---|
| Defendant's motion to certify for interlocutory appeal | October 7, 2024 |

**Appx48**

Plaintiffs' response, if any       October 14, 2024

Defendant's reply in support of motion       October 18, 2024

The Court's August 21, 2024 order also sets a deadline of September 30, 2024 for the parties to file a joint status report proposing a schedule for further proceedings in the event that the Government does not file a motion to certify for interlocutory appeal. We respectfully request that the Court extend this deadline to October 14, 2024.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ William J. Grimaldi
WILLIAM J. GRIMALDI
Assistant Director

/s/ Rebecca S. Kruser
REBECCA S. KRUSER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2035
rebecca.s.kruser@usdoj.gov

September 18, 2024       Attorneys for Defendant

2

**Appx49**

# In the United States Court of Federal Claims

No. 23-1876C
Filed: October 24, 2024
NOT FOR PUBLICATION

---

**112 GENESEE STREET, LLC, et al.,**

                 ***Plaintiffs,***

**v.**

**UNITED STATES,**

                 ***Defendant.***

---

*F. Greg Bowman*, Williams & Connolly LLP, Washington, D.C., with *Edward Reddington* and *Robel Yared*, of counsel, for the plaintiffs.

*Rebecca S. Kruser*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

**HERTLING**, Judge

On October 7, 2024, the defendant moved to certify the Court's Order of July 24, 2024 (ECF 19), and the accompanying memorandum opinion (ECF 18), *see 112 Genesee Street, LLC v. United States*, 172 Fed. Cl. 426 (2024), for an interlocutory appeal and to stay further proceedings pending the Federal Circuit's resolution of the petition and the appeal.  (ECF 27.)  The plaintiffs opposed the motion on October 14, 2024.  (ECF 28.)

The plaintiffs are 303 restaurant, bar, and catering businesses.  They sued the United States, acting through the Small Business Administration ("SBA"), claiming that they were entitled to receive grants under the Restaurant Revitalization Fund ("RRF"), a program enacted by Congress to support restaurants and related businesses for losses incurred during the COVID-19 pandemic and accompanying business disruptions.  The plaintiffs seek monetary damages equal to the amounts sought in their unpaid grant applications, alleging they are entitled to these payments under 15 U.S.C. § 9009c(c)(1) required the SBA to "award grants to eligible entities in the order in which applications are received by the Administrator," but the SBA instead made payments to applicants in the order in which it processed the applications.  The plaintiffs allege that, had the SBA made the grants in the order the applications were received, sufficient funds would have been left for them to receive grants.

The defendant moved to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), arguing that the plaintiffs' claims are beyond the jurisdiction of the Court of

Federal Claims because: (1) the plaintiffs lack standing due to a lack of redressability for their alleged injury; (2) their claims are moot; (3) 15 U.S.C. § 9009c is not money-mandating and cannot support a claim under the Tucker Act; and (4) the court lacks jurisdiction over claims of arbitrary and capricious as well as negligent conduct by the SBA.

During oral argument on the motion to dismiss, the Court *sua sponte* raised the question of whether 15 U.S.C. § 9009c caps the funds authorized for the RRF and, if so, whether such a cap limits the defendant's liability to the funds already spent, thereby preventing the plaintiffs from stating a claim for relief under Rule 12(b)(6). The parties filed supplemental briefs on that issue.

The defendant's motion to dismiss was denied. The plaintiffs were found to have properly brought claims under the Tucker Act for damages under a money-mandating statute. The plaintiffs were also found to have successfully stated a claim.

The defendant moves to certify two questions for interlocutory appeal. First, whether 15 U.S.C. § 9009c is a money-mandating statute authorizing suits for damages; and second, whether the plaintiffs failed to state a claim upon which relief can be grated because 15 U.S.C. § 9009c(b)(2)(A) limits the government's liability, the statutory covered period has expired, and Congress "permanently rescinded any unobligated balances of the $28.6 billion made available for the [RRF]." (ECF 27 at 5-6.)

Either issue presents a controlling question of law with respect to which there are substantial grounds for difference of opinion. An immediate appeal from the order may materially advance the ultimate termination of the litigation. The defendant's motion to certify the earlier order for an interlocutory appeal is granted. The defendant's motion to stay will be granted in part.

An appeal of an otherwise unappealable order may be certified when it includes the certification required by 28 U.S.C. § 1292(d)(2):

> when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

The law disfavors piecemeal appeals and typically allows an appeal only of a final judgment. 28 U.S.C. 1291). As Judge Allegra noted almost 20 years ago, "[i]t is well-accepted that interlocutory appeals under [section 1292(d)(2)] are reserved for 'exceptional' or 'rare' cases and should be authorized only with great care." *Klamath Irrigation Dist. v. United States*, 69 Fed. Cl. 160, 161 (2005).

**Appx51**

The law requires that before certifying an issue for an interlocutory appeal a court find the existence of three distinct factors: (1) that "a controlling question of law is involved"; (2) that this question of law involves "a substantial ground for difference of opinion"; and (3) that an immediate interlocutory appeal "may materially advance the ultimate termination of the litigation." *See Aleut Tribe v. United States*, 702 F.2d 1015, 1019 (Fed. Cir. 1983).

As to the first factor, a question of law is controlling when resolving it would "materially affect issues remaining to be decided in the trial court." *Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 11, 13 (2001) (internal quotes omitted). Moreover, "a question of law can be controlling even if resolving it leaves factual issues for resolution in the lower court." *Doe No. 1 v. United States*, 163 Fed. Cl. 608, 612 n.5 (2023).

As to the second, a substantial ground for a difference of opinion on a controlling question of law arises when the decision (1) is in tension with other decisions from other courts, or (2) involves a novel issue or one of first impression. *Coast Fed. Bank*, 49 Fed. Cl. at 13. A question of first impression is not sufficient on its own, however, to meet the statutory standard. *See* Matthew H. Solomson, Court of Federal Claims Jurisdiction, Practice, and Procedure, 33-16 (2016).

The third statutory factor will be dependent on the facts of each case.

The defendant argues that the opinion and order denying its motion to dismiss meet the requirements of section 1292(d)(2). The defendant cites five points over which substantial grounds for differences of opinion exist. These are: (1) whether the structure of the RRF statute meets the Supreme Court's conception of a money-mandating statute; (2) whether the statutory language is sufficiently non-discretionary to mandate payment under Federal Circuit precedent; (3-4) whether the Tucker Act's waiver of sovereign immunity confers jurisdiction to hear the plaintiffs' claims, including whether the parties' competing interpretations of *Maine Community Health Options v. United States*, 590 U.S. 296 (2020) and *Bowen v. Massachusetts*, 487 U.S. 879 (1988); and (5) whether, as a matter of first impression, the SBA had made improper payments to unentitled applicants in violation of federal law. (ECF 27 at 10.) These five distinct issues can be boiled down to two questions: whether 15 U.S.C. § 9009c is money-mandating statute and whether the plaintiffs have stated a claim for relief under that statute.

The defendant argues that an immediate appeal will materially advance the termination of the case and avoid unnecessary expense and delay. The defendant argues that by raising these issues now instead of in a post-judgment appeal, years of discovery and piecemeal litigation may be avoided. Moreover, it argues, the resolution of these dispositive questions will be likely to accelerate and simplify the trial-court proceedings. The defendant also requests a stay, arguing that discovery may be unnecessary upon the resolution of the interlocutory appeal. (*Id.* at 14.)

In response, the plaintiffs argue that section 9009c is facially money-mandating, that their claims are properly brought under the Tucker Act rather than the Administrative Procedure Act, and that the defendant fails to identify any substantial question regarding whether the plaintiffs have stated a claim upon which relief can be granted. Moreover, the plaintiffs claim that an interlocutory appeal would not materially advance the ultimate termination of the litigation because, if the Federal Circuit affirms, the defendant will likely raise a distinct set of defenses

3

that could require a second appeal after a final judgment. The plaintiffs maintain that it would be more expedient to resolve all relevant legal issues in a single appeal. (ECF 28.)

The plaintiffs also request that, in the event the defendant's motion is granted, further proceedings not be stayed. The plaintiffs argue that because they are small businesses, any prolonged delay could result in their inability to proceeded in the litigation. Further, the plaintiffs claim that discovery "will not be unreasonably burdensome" and could proceed in tandem with the interlocutory appeal. (*Id.* at 18.)

### A.     Controlling Questions of Law

The issues of whether 15 U.S.C. § 9009c is money-mandating and whether the plaintiffs have stated a claim are controlling questions of law. The resolution of either question would "materially affect issues remaining to be decided in the trial court" and are therefore "controlling." *Coast Fed. Bank* 49 Fed. Cl. at 13. Moreover, the ultimate resolution of all the factual issues and any follow-on legal questions is dependent on the resolution of these underlying legal questions. *Id.* at 612.

The resolution of whether section 9009c is money-mandating will materially affect the issues remaining for decision in the trial court, because the question determines whether subject-matter jurisdiction exists over the plaintiffs' claims. *See Am. Mgmt. Sys., Inc. v. United States*, 57 Fed. Cl. 275, 276 (2003) (a jurisdictional issue "constitutes an appropriate question for certification."). Subject-matter jurisdiction is a threshold issue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Without it, the plaintiffs' complaint must be dismissed. RCFC 12(h)(3).

In addition, whether the claim that the SBA made improper payments to undeserving applicants states a claim upon which relief can be granted is also controlling and will necessarily affect the future of the litigation. *See Doe No. 1*, 163 Fed. Cl. at 612. A finding by the Federal Circuit on this issue of first impression would require the cases dismissal and as a result would "'materially affect [the] issue remaining to be decided.'" *Coast Fed. Bank*, 49 Fed. Cl. at 13 (quoting *Pikes Peak Fam. Hous. LLC v. United States*, 40 Fed. Cl. 673, 686 (1998)).

### B.     Substantial Ground for Difference of Opinion

Each party made strong arguments in favor of its position during the briefing on the motion to dismiss and the supplemental briefing following oral argument. On the two issues on which the defendant seeks to appeal, the substantial amounts of briefing and time during oral arguments devoted to these topics illustrate the differences of opinion on these issues. *See Fairholme Funds, Inc. v. United States*, 147 Fed. Cl. 126, 130 (2020) (recognizing substantial room for disagreement on an issue when parties dedicated extensive briefing to the topic).

The fundamental dispute is whether the plaintiffs have presented a claim within the Tucker Act jurisdiction of the Court of Federal Claims. The nature of the underlying statute and its implementation present distinctive and novel issues. Cases from the Federal Circuit interpreting *Maine Community Health* and its gloss on *Bowen* are few, but of great importance to defining the contours and limits of Tucker Act jurisdiction.

4

**Appx53**

The defendant claims the denial of its motion to dismiss is in tension with binding precedent holding that a statute providing for the payment of forward-looking grants is not money-mandating. *See Maine Cmty. Health Option*, 590 U.S. at 326-27. The defendant cites to the Federal Circuit's decision in *Lummi Tribe* to support its position that a statute requiring grants was not money-mandating. *Lummi Tribe of the Lummi Rsrv., Washington v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017).

The plaintiffs dispute the defendant's contention that a finding that section 9009c is not money-mandating would divest the court of jurisdiction. Citing *Fisher*, they argue that "[i]t is the statute, not the Government official, that provides for the payment. If the Government official's determinations under the statute are in error, the court is there to correct the matter." (ECF 28 at 9 (citing *Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005).) Further, they argue that the statute need only be money-mandating as to the class to which the plaintiffs belong. (ECF 28 at 8 (citing *Roberts v. United States*, 745 F.3d 1158, 1162 (Fed. Cir. 2014).)

Both parties acknowledge to some extent this question is one of first impression. *Coast Fed. Bank*, 49 Fed. Cl. at 13 (a "substantial ground for a difference of opinion" on a controlling question of law may arise when the [question] . . . involves a novel issue or one of first impression). While that factor alone will not justify allowing an interlocutory appeal, that is not the lone factor here.

The denial of the motion to dismiss is not without uncertainty. The underlying issue presents a question of importance to the government and potentially to Congress in the effect of the language it may choose to employ in enacting future grant programs.

The importance and novelty of the issue and the ability of both parties to cite Supreme Court and Federal Circuit precedent in support of their arguments are sufficient to demonstrate that there exists "substantial ground for a difference of opinion."

As to whether the plaintiffs have stated a claim, the substantial ground for difference of opinion arises from the issue's novelty and lack of guiding precedent. *See Coast Fed. Bank*, 49 Fed. Cl. at 13. As to this issue as well, the statute was found to present a case of first impression. *112 Genesee*, 172 Fed. Cl. at 454-55. The distinctive and unusual language used by Congress in enacting the RRF program led to an extended review of whether the law imposes a cap on liability and the redressability of the plaintiffs' alleged injuries. Because of the novelty of the statutory language, there is a paucity of applicable precedent. Both parties were able to point to Federal Circuit precedents to support their positions.

Here again, the issue is uncertain, the statutory language novel, and a resolution may be important to Congress in enacting new grant programs. The novelty, uncertainty, and importance of the issue warrant appellate review at this stage of the case.

## C.     Immediate Appeal May Materially Advance the Litigation

Finally, both issues certified for appeal create the potential for dismissal without consideration of the merits of the claims. As a result, an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(d)(2); *See Atkins N. Am., Inc. v. United States*, No. 09-112 C, 2012 U.S. Claims LEXIS 1496, at *3 (Fed. Cl. Nov. 28,

5

**Appx54**

2012) (finding an immediate appeal might materially advance the termination of the case because it could result in the dismissal of the case for lack of jurisdiction).

If, upon review, the Federal Circuit holds that section 9009c is not money-mandating, the plaintiffs' claims would fall beyond the scope of the Tucker Act's waiver of sovereign immunity, and the complaint would have to be dismissed.  The same is true on the question of whether the plaintiffs have stated a claim for relief.  If they have not because Congress capped the government's liability, dismissal will be required.

A ruling on both issues has the potential to result in a more expeditious and efficient resolution of the case.  In the interest of judicial economy, it would be inefficient to proceed to the merits of the case before receiving a definitive ruling on the preliminary questions of whether the case may proceed to the merits.

Despite the plaintiffs' argument to the contrary, there is little prospect of future appeals if the Court of Appeals affirms the denial of the motion to dismiss.  At that stage, section 9009c will effectively have been found to be money-mandating, and the defendant's liability uncapped, at least as to relief from the Judgment Fund.  A determination as to the facts underlying the claim of each plaintiff, and whether each plaintiff is entitled to relief will be all that remains for resolution.  With 303 plaintiffs, that review will be fact- and labor-intensive, but the outcome for each plaintiff is unlikely to provoke any further appeal by the defendant.

Were the motion to be denied and the case proceed to the merits, discovery and resolution of the claim of each plaintiff will take time, and ultimately the defendant will appeal a final judgment.  The plaintiffs will not see relief until that appeal is resolved.  Relief for each plaintiff may be expedited were the defendant to lose an appeal now of the preliminary legal issues.

The factors here counsel in favor of allowing the defendant to seek to pursue an interlocutory appeal under section 1292(d)(2).

D.     **Stay of Discovery and Further Proceedings**

The defendant has also requested that discovery and further proceedings be stayed until resolution of the interlocutory appeal.  Under 28 U.S.C. § 1292(d)(3), the granting of an interlocutory appeal by a district judge shall not stay proceedings in the trial court unless the judge orders a stay.  The statute implies that even if a case is certified for an interlocutory appeal, Congress established a preference against staying litigation in the trial court during the appeal.  The statute does leave the decision to stay a case to the trial judge exercising discretion under the facts of each case.  In evaluating whether to stay a case that the trial court has certified for an interlocutory appeal, the trial judge should consider whether a stay would promote judicial economy and benefit the parties.  *Doe No. 1*, 163 Fed. Cl. at 614; *see Unionbancal Corp. & Subsidiaries v. United States*, 93 Fed. Cl. 166, 167 (2010).

The defendant seeks to avoid the burdens and costs of discovery; the plaintiffs seek to avoid the delay of a final resolution and payment of damages if they prevail on appeal, and discovery were to start only after the appeal is resolved.  If the defendant is successful on its appeal, any time and resources expended in discovery will have been wasted.  The defendant represents that discovery the plaintiffs seek from the SBA will be burdensome and time-

6

**Appx55**

consuming. Similarly, discovery by the defendant into whether each of the 303 plaintiffs was qualified to receive RRF payments may be time-consuming. If the plaintiffs prevail on appeal, discovery is therefore likely to consume substantial resources and take many months.

Many of the plaintiffs are small businesses. If they are entitled to recover what they should have received under the RRF, extended delays from discovery on remand will place additional strain on them.

Balancing the various efficiencies and burdens, the Court will stay discovery until the Court of Appeals decides whether to allow this interlocutory appeal to proceed. If the appeal is accepted, further proceedings, including discovery, will be stayed pending completion of the briefing in the Court of Appeals. The parties will be required to notify the Court when briefing in the Court of Appeals has been completed, and the Court will hear from the parties at that time about a schedule for further proceedings, including discovery.

## II. CONCLUSION

The requirements for interlocutory appeal are satisfied. The order denying the motion to dismiss involves controlling questions of law with respect to which there are substantial grounds for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation. Accordingly, the defendant's motion to certify interlocutory appeal is granted. The prior order (ECF 19) denying the motion to dismiss will be amended to reflect that this case meets the criteria for an appeal pursuant to 28 U.S.C. § 1292(d)(2). Further proceedings will be stayed until briefing in the Court of Appeals is completed.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

7

**Appx56**

# In the United States Court of Federal Claims

No. 23-1876C

Filed: October 24, 2024

---

**112 GENESEE STREET, LLC, et al,**

            *Plaintiffs,*

**v.**

**UNITED STATES,**

            *Defendant.*

---

## AMENDED ORDER

For the reasons provided in the memorandum opinion filed on July 24, 2024 (ECF 10), the defendant's motion to dismiss (ECF 7) is **DENIED**.

This order involves controlling questions of law with respect to which there are substantial grounds for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation. Accordingly, the defendant's motion (ECF 27) to certify interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2) is **GRANTED**.

The defendant's motion (ECF 27) to stay further proceedings pending appeal is **GRANTED**. Further proceedings, including the filing of the answer and any discovery, are **STAYED**.

If the Court of Appeals does not accept the appeal, this stay shall terminate automatically. If the Court of Appeals accepts the appeal, the parties shall file a notice within five (5) days of the completion of briefing of the appeal. After that notice is filed, the Court will hold a status conference to address a schedule for future proceedings.

It is so **ORDERED**.

           s/ Richard A. Hertling

           **Richard A. Hertling**
           **Judge**

**Appx57**