IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | | |
|---|---|---|
| 112 GENESEE STREET, LLC, et. al., | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 25-1373 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS,
in No. 23-1876C, Judge Hertling

**OPENING BRIEF OF DEFENDANT-APPELLANT**

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

WILLIAM J. GRIMALDI
Assistant Director

REBECCA S. KRUSER
Senior Trial Attorney
Commercial Litigation Branch
Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2035
Email: rebecca.s.kruser@usdoj.gov

March 14, 2025            Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................. viii

INTRODUCTION .............................................................................................. 1

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES ........................................................................ 2

STATEMENT OF THE CASE .......................................................................... 2

I.      Statutory Background .......................................................................... 2

II.     History of the Restaurant Revitalization Fund ................................. 5

III.    Prior Unsuccessful Litigation .............................................................. 6

IV.     Proceedings in the Trial Court ............................................................ 9

SUMMARY OF THE ARGUMENT ................................................................ 11

ARGUMENT ................................................................................................... 12

I.      Standard Of Review ........................................................................... 12

II.     The Trial Court Erred Because Section 9009c is Not
        Money-Mandating .............................................................................. 12

        A.      Tucker Act Claims and the Money-Mandating Requirement ................. 12

        B.      Section 9009c is Not Money-Mandating Under *Maine
                Community Health* and Other Precedent ........................................ 13

        C.      The Trial Court Erred In Reading Implied Money-Mandating
                Obligations Into Non-Monetary Administrative
                Requirements ................................................................................ 21

        D.      The Trial Court Erred In Relying On Cases That Discuss When
                a Discretionary Statute is Money-Mandating ................................ 26

i

III.   The Trial Court's Decision is Contrary to the Court's Precedent Regarding Grant Programs ......................................................................................... 30

IV.   The Trial Court Misunderstood the Scope of Tucker Act Jurisdiction ............ 34

     A.    The Trial Court Erred By Preemptively Determining that Plaintiffs-Appellees' Claims Come Under Tucker Act Jurisdiction ........................ 35

     B.    The Trial Court Erred By Failing to Properly Apply *Bowen* ..................... 38

     C.    The Trial Court Failed to Properly Apply *Katz* ......................................... 44

     D.    The Trial Court Erroneously Opined That It Shares Jurisdiction With the District Courts Over This Case ........................................................... 45

     E.    The Trial Court Erroneously Found the Potential Unavailability of Relief in Another Forum to be Relevant to its Jurisdiction ................. 47

V.    In the Alternative, the Trial Court Erred In Holding that Plaintiffs-Appellees State a Claim Upon Which Relief Can Be Granted ............................................. 48

     A.    15 U.S.C. § 9009c(b)(2)(A) Imposes A Statutory Cap On the Amount That Congress Intended To Spend For the RRF Program ..................... 48

     B.    The Trial Court Misinterpreted Section 9009c(b)(2)(A) to Be Open-Ended and Uncapped ........................................................................ 50

     C.    The Trial Court Ignored That Congress' Subsequent Actions Eliminated Any Payment Obligation ........................................................... 51

     D.    The Trial Court Erred by Determining That Even if the Government's Liability Was Capped, Plaintiffs-Appellees Would Still State a Claim .... 53

CONCLUSION ..................................................................................................... 54

CERTIFICATE OF COMPLIANCE................................................................. 55

ADDENDUM

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Adia Holdings, Inc. v. United States,*
  170 Fed. Cl. 296 (2024) ....................................................................................8

*Bowen v. Mass.,*
  487 U.S. 879 (1988) ...............................................................................passim

*Broughton Lumber Co.*
  939 F.2d 1547 (Fed. Cir. 1991) ........................................................................46

*Chef Time 1520, LLC v. SBA,*
  646 F. Supp. 3d 101 (D.D.C. 2022) ..................................................................8

*Consol. Edison Co. of New York v. Dep't of Energy,*
  247 F.3d 1378 (Fed. Cir. 2001) .........................................................39, 41, 42

*Dancy v. United States,*
  229 Ct. Cl. 300 (1982) .....................................................................................37

*Doe v. United States,*
  463 F.3d 1314 (Fed. Cir. 2006) ................................................................27, 28

*Dorsey v. United States,*
  567 U.S. 260 (2012) ........................................................................................52

*Eastport S. S. Corp. v. United States,*
  372 F.2d 1002 (Ct. Cl. 1967) ...............................................................22, 23, 24

*Fisher v. United States,*
  402 F.3d 1167 (Fed. Cir. 2005) ......................................................................53

*Greenlee County, Ariz., v. United States,*
  487 F.3d 871 (Fed. Cir. 2007) ...............................................................17, 18, 49

*Greer's Ranch Café v. Guzman,*
  540 F. Supp. 3d 638 (N.D. Tex. 2021) ............................................................3

*Hopi Tribe v. United States,*
782 F.3d 662 (Fed Cir. 2015) .............................................................12

*Ind. Mun. Power Agency v. United States,*
154 Fed. Cl. 752 (2021) ......................................................................52

*Infidels, LLC v. Guzman,*
No. 3:22-391, 2023 WL 5599605 (M.D. Tenn. Aug. 29, 2023) ....................................7

*Kanemoto v. Reno,*
41 F.3d 641 (Fed. Cir. 1994) ..............................................................18

*Katz v. Cisneros,*
16 F.3d 1204 (Fed. Cir. 1994) ......................................................passim

*Kingsley Restaurants, Inc.,*
2021 WL 8441778 ..............................................................................7

*Litecubes, LLC v. Northern Light Products, Inc.,*
523 F.3d 1353 (Fed. Cir. 2008) ..........................................................12

*Little River Lumber Co. v. United States,*
7 Cl. Ct. 492 (1985) ...........................................................................37

*Livingston v. Derwinski,*
959 F.2d 224 (Fed. Cir. 1992) ............................................................45

*Lummi Tribe of the Lummi Rsrv. v. United States,*
99 Fed. Cl. 584 (2011) .......................................................................30

*Lummi Tribe of the Lummi Rsrv. v. United States,*
870 F.3d 1313 (Fed. Cir. 2017) ....................................................passim

*Malone v. United States,*
849 F.2d 1441 (Fed. Cir. 1988) ..........................................................22

*Martinez v. United States,*
333 F.3d 1295 (Fed. Cir. 2003) ....................................................34, 46

*MC Mgmt. of Rochester LLC v. Biden,*
  No. 6:22-6337, 2023 WL 4194771 (W.D.N.Y. June 27, 2023) ......................................7

*Me. Cmty. Health Options v. United States,*
  590 U.S. 296 (2020) ................................................................passim

*Nat'l Air Traffic Controllers Ass'n v. United States,*
  160 F.3d 714 (Fed. Cir. 1998) ................................................. 13, 26

*Nat'l Ctr. for Mfg. Scis. v. United States,*
  114 F.3d 196 (1997) ...............................................................32

*Perri v. United States,*
  340 F.3d 1337 (Fed. Cir. 2003) ............................................ 27, 28

*Portland Mint v. United States,*
  102 F.4th 1371 (Fed. Cir. 2024) .............................................46

*Prairie County, Mont. v. United States,*
  782 F.3d 685 (Fed. Cir. 2015) ...............................17, 18, 50

*Reboot Macon, LLC v. United States,*
  No. 5:21-CV-221, 2023 WL 4672395 (M.D. Ga. July 20, 2023) .................................7

*Samish Indian Nation v. United States,*
  419 F.3d 1355 (Fed. Cir. 2005) ................................................passim

*Star-Glo Assocs., LP v. United States,*
  414 F.3d 1349 (Fed. Cir. 2005) ...............................................51

*Suburban Mortgage Associates, Inc. v. United States,*
  480 F.3d 1116 (Fed. Cir. 2007) ...............................................passim

*United States v. Bormes,*
  568 U.S. 6 (2012) ..................................................................26

*United States v. Fisher,*
  109 U.S. 143 (1883) ..............................................................52

*United States v. King,*
  395 U.S. 1 (1969) ............................................................ 13, 26

*United States v. Mitchell*,
    109 U.S. 146 (1883) ........................................................................53

*United States v. Mitchell*,
    463 U.S. 206 (1983) ........................................................................13

*United States v. Testan*,
    424 U.S. 392 (1976) ...................................................................passim

*United States v. White Mountain Apache Tribe*,
    537 U.S. 465 (2003) ........................................................................13

*Vitolo v. Guzman*,
    999 F.3d 353 (6th Cir. 2021) ...................................................3, 7, 54

*W6 Rest. Grp., Ltd. v. Guzman*,
    732 F. Supp. 3d 739 (N.D. Ohio 2024) ......................................5, 6, 8

## STATUTES

5 U.S.C. § 706(2)(A) .............................................................................33

5 U.S.C. § 706(2)(C) .............................................................................33

5 U.S.C. § 706(2)(D) .............................................................................33

5 U.S.C. § 5545(c)(2) ............................................................................26

15 U.S.C. § 9009c ........................................................................1, 6, 53

15 U.S.C. § 9009c(a)(3) .................................................................. 3, 31

15 U.S.C. § 9009c(a)(4) ..........................................................................2

15 U.S.C. § 9009c(a)(7) ..................................................................... 3, 4

15 U.S.C. § 9009c(b)(2)(A) ..........................................................4, 47, 50

15 U.S.C. § 9009c(b)(3) ....................................................................4, 13

15 U.S.C. § 9009c(c)(1) ..................................................................passim

15 U.S.C. § 9009c(c)(3)(A) ......................................................................2

15 U.S.C. § 9009c(c)(4)(A) ......................................................................3

15 U.S.C. § 9009c(c)(5) ......................................................................3, 31

15 U.S.C. § 9009c(c)(6) ..............................................................passim

28 U.S.C. § 524 ..................................................................................27

28 U.S.C. § 1292(d) .............................................................................1

28 U.S.C. § 1292(d)(4)(A) ...................................................................39

28 U.S.C. § 1491 ................................................................................22

28 U.S.C. § 1491(a)(1) ........................................................................12

28 U.S.C. § 1631 ................................................................................36

42 U.S.C. § 18062(a) ..........................................................................14

42 U.S.C. § 18062(b)(1) ......................................................................14

Pub. L. No. 117-2, 135 Stat. 4 (2021) ..............................................2

Pub. L. No. 118-5 ........................................................................5, 51

## **RULES**

Federal Rules of Appellate Procedure 27(d)(1)(E)...........................55

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court. The Government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

112 GENESEE STREET, LLC, *et al.*,  )
                                             )
        Plaintiffs-Appellees,  )
                                             )
       v.  )               25-1373
                                             )
UNITED STATES,  )
                                             )
        Defendant-Appellant.  )

## BRIEF OF DEFENDANT-APPELLANT

## INTRODUCTION

This case presents an opportunity for the Court to reaffirm the fundamental boundaries of the Court of Federal Claims' (trial court) jurisdiction against plaintiffs seeking its expansion. The trial court is not a forum to provide redress to plaintiffs who claim harm stemming from allegedly erroneous Government actions in the absence of one of the bases for jurisdiction listed in the Tucker Act. Nor is the trial court the proper venue to review agency decisions in the administration of Federal programs. The trial court's decision ventures far beyond the governing precedent and conflicts with the well-established understanding of its history, role, and unique jurisdiction.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(d). On July 24, 2024, the trial court issued the interlocutory order that is subject to appeal. Appx1-34. The

trial court certified that order for appeal on October 24, 2024.  Appx35-42.  On January 17, 2025, this Court granted our petition for interlocutory appeal of the order in question.

## STATEMENT OF THE ISSUES

1.     The trial court erred in holding that the statute establishing the Restaurant Revitalization Fund (RRF), 15 U.S.C. § 9009c, which states that the Small Business Administration (SBA) "shall award grants to eligible entities in the order in which applications are received," is a money-mandating statute authorizing damages for SBA's use of a different method of disbursement.

2.     If the statute is money-mandating, the trial court erred in holding that plaintiffs-appellees state a claim upon which relief can be granted in light of a plain language statutory cap on the Government's liability in the specific amount of $28.6 billion.

## STATEMENT OF THE CASE

### I.     Statutory Background

On March 11, 2021, Congress created the RRF and put it within SBA's administration.  *See* Pub. L. No. 117-2, 135 Stat. 4 (2021).  The purpose of the RRF was to provide assistance to restaurants struggling during the COVID-19 pandemic by giving out grants to "eligible entities" in an amount equal to their "pandemic-related

revenue loss[.]"[1] 15 U.S.C. §§ 9009c(a)(4), (7). Eligible entities were defined to include restaurants and other similar businesses, but excluded State or local government-operated businesses, entities with more than 20 locations, entities that had applied for or received another type of SBA grant, or publicly-traded companies. *See id.* at § 9009c(a)(4). For eligible entities that were open and operating for the entirety of 2019, the pandemic-related revenue loss was defined simply as the entity's 2020 gross receipts subtracted from its 2019 gross receipts. *See id.* at § 9009c(a)(7). Eligible entities could receive grants equal to their pandemic-related revenue loss up to an aggregate maximum of $10 million, with no more than $5 million per physical location. *Id.* at § 9009c(c)(4)(A).

Eligible entities were only permitted to use the grant funds on eleven categories of expenses incurred as a "direct result of, or during, the COVID-19 pandemic[.]" *Id.* at § 9009c(c)(5). This list included payroll costs, mortgage payments (except for prepayment of the principal), rent payments (except for the prepayment of rent),

---

[1] The RRF program contained a requirement that SBA "prioritize awarding grants to eligible entities" that were either "small business concerns owned and controlled by women," "small business concerns owned and controlled by veterans," or "socially and economically disadvantaged small business concerns" for the first twenty-one days. 15 U.S.C. § 9009c(c)(3)(A). A divided motions panel of the U.S. Court of Appeals for the Sixth Circuit concluded that this priority program likely violated the Fifth Amendment's equal-protection guarantee. *See Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021). A district judge in the Northern District of Texas reached the same conclusion in two other cases. *See Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638 (N.D. Tex. 2021); Order, *Blessed Cajuns LLC v. Guzman*, No. 4:21-677 (N.D. Tex. May 28, 2021) (ECF No. 18).

utilities, maintenance expenses (including construction to accommodate outdoor seating), supplies (including protective equipment and cleaning materials), food and beverage expenses "within the scope of the normal business practice" for the eligible entity pre-COVID, and paid sick leave. *Id.*

The statute also included a "covered period" beginning on February 15, 2020, and ending "on December 31, 2021, or a date to be determined by the Administrator that is not later than 2 years after March 11, 2021." *Id.* at § 9009c(a)(3). The SBA Administrator exercised this authority and the "covered period" thus ended on March 11, 2023. Crucially, the statute also contained a provision regarding the return of funds, which was tied to the "covered period." If an eligible entity failed "to use all grant funds" or "permanently cease[d] operations on or before the last day of the covered period," the eligible entity "shall return to the Treasury any funds that the eligible entity did not use . . . ." *See id.* at § 9009c(c)(6). Additionally, the statute required that awardees return to the Treasury any amount of a grant "based on estimated receipts that is greater than the actual gross receipts of the eligible entity in 2020[.]" *Id.* at § 9009c(c)(4)(B)(ii).

To implement this program, Congress appropriated money. The statute stated that "[i]n addition to amounts otherwise available, there is appropriated to the [RRF] for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $28,600,000,000, to remain available until expended." *Id.* at § 9009c(b)(2)(A). In

terms of distributing this money, the statute stated that the SBA Administrator "shall use amounts in the Fund to make grants described in subsection (c)." *Id.* at § 9009c(b)(3). This subsection (c) contained the statement that "the Administrator shall award grants to eligible entities in the order in which applications are received by the Administrator." *Id.* at § 9009c(c)(1).

## II.      History of the Restaurant Revitalization Fund

SBA began accepting applications for RRF grants on May 3, 2021. Appx5. By May 18, 2021, SBA had received 303,000 applications requesting approximately $69 billion in grants, which far exceeded the $28.6 billion Congress appropriated for the RRF program. *See W6 Rest. Grp., Ltd. v. Guzman*, 732 F. Supp. 3d 739, 742 (N.D. Ohio 2024).[2] Due to this overwhelming demand, SBA stopped accepting applications on May 24, 2021. *Id.* SBA processed and made awards through June 30, 2021, ultimately funding approximately 101,000 RRF grants.

During this period, SBA processed applications based on the date and time an application was electronically signed and submitted. However, not all applications took the same time to process. Because 15 U.S.C. § 9009c(c)(1) limited SBA to awarding to "eligible entities," SBA had to confirm an applicant's eligibility before issuing an award. In the face of a deluge of applications, some applications took

---

[2]   *W6 Restaurant Group* is currently on appeal before the United States Court of Appeals for the Sixth Circuit. No. 24-3483 (6th Cir.)

longer to process because they were more complex or had errors or omissions that SBA allowed applicants to correct.

On July 2, 2021, SBA announced that the RRF fund was exhausted. *See W6 Rest. Grp., Ltd.*, 732 F. Supp. 3d at 742. Then, separately, in November 2022, still within the "covered period," SBA announced that it would reallocate approximately $83.4 million in recovered funds. *Id.* SBA made awards to another 169 applicants with this money. *Id.* In February 2023, the SBA announced again that all grants from the RRF had been distributed and that no money remained. *Id.*

On March 11, 2023, the "covered period" expired. Congress then expressly defunded the RRF on June 3, 2023, when the Fiscal Responsibility Act became law. *See* Pub. L. No. 118-5, 137 Stat. 10. As part of a bipartisan agreement to suspend the public debt limit through January 1, 2025, the law rescinded unobligated funds from at least eighty-one different Federal programs, including the RRF. *See id.* § 52, 137 Stat. at 28 ("The unobligated balances of amounts made available by section 5003(b)(2)(A) of Public Law 117-2 are hereby permanently rescinded.").[3]

## III.  Prior Unsuccessful Litigation

This case is part of a series of disputes about the administration of the RRF program and should be understood in light of several earlier unsuccessful cases in

---

[3] Congress created the RRF as section 5003 part of the American Rescue Plan Act of 2020.  Section 5003 was later codified at 15 U.S.C. § 9009c.

district court and the Court of Federal Claims, which were all filed after the $28.6 billion had been exhausted.  In *Kingsley Restaurants, Inc.*, *MC Management of Rochester, LLC*, and *Infidels, LLC*, the plaintiffs challenged the constitutionality of the 21-day priority period and sought injunctive relief.  However, unlike the *Vitolo* plaintiffs, they were too late to obtain any relief.  Three different district courts dismissed on standing or mootness grounds because the priority period had ended and all of the money had been disbursed.  *See Kingsley Restaurants, Inc. v. U.S. Small Bus. Admin.*, No. 1:21-2314, 2021 WL 8441778, at *1-*3 (N.D. Ga. Aug. 24, 2021) (unreported); *MC Mgmt. of Rochester LLC v. Biden*, No. 6:22-6337, 2023 WL 4194771, at *1-*3 (W.D.N.Y. June 27, 2023); *Infidels, LLC v. Guzman*, No. 3:22-391, 2023 WL 5599605, at *2-*3 (M.D. Tenn. Aug. 29, 2023).

Next, in *Reboot Macon, LLC*, the plaintiffs were priority applicants who did not receive RRF grants because SBA decided not to fund priority applications after the *Vitolo* decision.  *Reboot Macon, LLC v. United States*, No. 5:21-CV-221, 2023 WL 4672395, at *1 (M.D. Ga. July 20, 2023).  The plaintiffs challenged SBA's actions under the Administrative Procedure Act (APA), alleging that SBA funded non-priority applications that were submitted after plaintiffs' applications.  *Id.*  The district court held that the depletion of the RRF and the end of the "covered period" mooted the plaintiffs' claims.  *Id.* at *4-*7.

The district court decision in *W6 Restaurant Group* is most relevant to the

instant case. The plaintiffs asserted an APA claim that SBA failed to comply with 15 U.S.C. § 9009c(c)(1) because SBA did not process applications for RRF grants in the order in which they were received. *W6 Rest. Grp.*, 732 F. Supp. 3d at 743. The plaintiffs sought an injunction to require SBA to process all applications in the order in which they were received and to obtain the return of grant funds provided to ineligible entities for redistribution. *Id.* The district court held that the APA did not grant jurisdiction to review an agency's non-enforcement decisions. *Id.* at 746-48. The district court also held that the plaintiffs' broader request for review of SBA's compliance with section 9009c(c)(1) was moot because of the end of the "covered period" and the Fiscal Responsibility Act's rescinding of any unobligated RRF funds.[4] *Id.* at 748-53.

Finally, a different group of plaintiffs brought suit regarding the RRF program in the Court of Federal Claims in May 2023 in *Adia Holdings, Inc.* These plaintiffs asserted that the trial court possessed jurisdiction because the RRF statute created a

---

[4]  Relatedly, *Chef Time 1520, LLC v. SBA* is also a useful demonstration of what plaintiffs-appellees here could have done. In that case, the plaintiffs brought an APA claim challenging SBA's failure to maintain their place in the queue after they addressed discrepancies in their applications. 646 F. Supp. 3d 101, 109 (D.D.C. 2022). When the plaintiffs filed suit, SBA had not yet distributed all of the $83 million that it had available in November 2022 and thus there was no redressability problem. *Id.* at 107-08. The district court analyzed the statutory language that SBA must "award grants to eligible entities in the order in which the applications are received" and held that it was not arbitrary and capricious for SBA to use the time an application was substantially correct and complete, not when it was first submitted. *Id.* at 111.

contract with applicants.  The trial court dismissed this case for failure to state a claim. 170 Fed. Cl. 296-97 (2024).

## IV.  Proceedings in the Trial Court

On October 25, 2023, plaintiffs-appellees, 303 businesses in the restaurant industry, brought suit at the trial court over SBA's purported failures in administering the RRF program.  *See* Appx49-50.  In order to ostensibly come within the trial court's Tucker Act jurisdiction, plaintiffs-appellees allege that the RRF statute is money-mandating.  However, plaintiffs-appellees did not simply claim that they submitted eligible applications that the statute required SBA to pay.

Instead, plaintiffs-appellees allege that SBA's actions were unlawful, arbitrary, capricious, and negligent.  Appx50-87.  Plaintiffs-appellees focus on the idea that SBA failed to follow a statutory mandate to award grants in the order that applications were received.[5]  Appx82-88.  Plaintiffs-appellees theorize that as first-day applicants,

---

[5] Although plaintiffs-appellees have made the order in which grants were awarded their central theory, their complaint details a large number of other alleged administrative failures on the part of SBA.  Plaintiffs-appellees claim that the SBA did not have sufficient pre-award controls to stop fraud or verify applicants' gross receipts, Appx73-75, did not properly review applications and resolve issues, Appx76, did not manage the online portal properly, Appx76-77, failed to take reasonable measures to detect fraud, Appx77-78, unlawfully applied program procedures, Appx78-79, did not perform an assessment of the effectiveness of its pre-award controls, Appx79-80, failed to enforce reporting requirements, Appx80, failed to act to recover fraudulent, misused, or unused funds, Appx81, incorrectly implemented payment processing, Appx81, and did not perform an estimate of misallocated funds, Appx81-82.  Plaintiffs-appellees also alleged instances in which the SBA applied its

they would have received grants but for SBA's unlawful, negligent, and arbitrary and capricious use of processing order, not time of application, to make awards. Appx88. According to plaintiffs-appellees, the use of an incorrect method of making awards "resulted in the misallocation of billions of dollars of RRF funds to award grants to applicants who were or should have been in line behind [plaintiffs-appellees]." Appx58-59, Appx87-88. Plaintiffs-appellees thus claim that the requirement to award grants in the order in which applications were received is money-mandating and that they have an entitlement to money damages because SBA prevented them from receiving grants by arbitrarily and capriciously exhausting the appropriated funding on grants to later applicants. Appx83-88.

On February 26, 2024, we moved to dismiss for lack of subject-matter jurisdiction, primarily because the RRF statute is not money-mandating. After oral argument, the trial court requested supplemental briefing as to whether plaintiffs-appellees failed to state a claim. On July 24, 2024, the trial court issued an opinion and accompanying order denying our motion. Appx1-34.

Despite the novel and indirect nature of this claim, the trial court determined that it possesses subject-matter jurisdiction. The trial court also held that plaintiffs-

---

rules too strictly and excluded plaintiffs' applications from consideration. Appx68-72. Plaintiffs-appellees assert that these issues caused SBA to "misallocate" program funds towards undeserving or fraudulent parties, instead of awarding them grants. Appx82, Appx83.

appellees state a claim for which relief can be granted.  We bring this interlocutory appeal to challenge both of these holdings.

## SUMMARY OF THE ARGUMENT

Although on the surface, the trial court's lengthy and detailed opinion may seem like a grand edifice, it is built on a faulty foundation.  The most basic problem is that section 9009c is not money-mandating.  The trial court erred by taking statutory language out of context and reading it in isolation.  Importantly, section 9009c's wording is dissimilar to statutes that have been found to genuinely create a payment obligation on the part of the Government either through mandatory or even discretionary language.  The trial court would read into non-pecuniary statutes an implied right of compensation for wrongful Government decisions or actions, a theory that has been soundly rejected by this Court.  Even further, the trial court's decision conflicts with the Court's recent decision finding no jurisdiction over a statute addressing a similar strings-attached grant program.

Furthermore, the trial court incorrectly relied upon plaintiffs-appellees' own characterization of their claims to find that it possesses jurisdiction.  The trial court brushed aside key cases explaining the boundary of Tucker Act jurisdiction and demonstrating why plaintiffs-appellees' claims should have been brought elsewhere.  The trial court's expansive view of its jurisdiction as concurrent with or dependent upon the existence of district court jurisdiction is unfounded and unsupported.

Alternatively, even if section 9009c is money-mandating, the trial court erred in determining that plaintiffs-appellees state a claim upon which relief can be granted. The statute contains a clear cap on the Government's obligation. The trial court also ignored that Congress' subsequent actions eliminated any payment obligation. At base, plaintiffs-appellees cannot state a claim that they were harmed by SBA's alleged violation of a non-money-mandating statute.

## ARGUMENT

## I.      Standard of Review

Subject-matter jurisdiction is a question of law that the Court reviews *de novo*. *Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1358 (Fed. Cir. 2008). The Court also "reviews without deference the trial court's statutory interpretation." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005). The plaintiff bears the burden of establishing jurisdiction. *Hopi Tribe v. United States*, 782 F.3d 662, 666 (Fed Cir. 2015).

## II.     The Trial Court Erred Because Section 9009c is Not Money-Mandating

### A.      Tucker Act Claims and the Money-Mandating Requirement

The Tucker Act authorizes the Court of Federal Claims to exercise jurisdiction over claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in

tort." 28 U.S.C. § 1491(a)(1). However, the Tucker Act "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). In order to come within the waiver of sovereign immunity stated in the Tucker Act, a plaintiff must identify a "money-mandating" source of substantive law that creates the right to money damages. *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *Testan*, 424 U.S. at 398).

A statute is money-mandating if it can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 322 (2020) (citing *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003)). The Court must examine whether the sources of law relied upon by a plaintiff mandate "compensation for damages sustained as a result of a breach of the duties they impose." *Mitchell*, 463 U.S. at 219. Crucially, "[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *Id.* at 216. "[A] plaintiff seeking to invoke the court's jurisdiction must present a claim for 'actual, presently due money damages from the United States.'" *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *United States v. King,* 395 U.S. 1, 3 (1969)).

B. **Section 9009c is Not Money-Mandating Under *Maine Community Health* and Other Precedent**

In its opinion, the trial court found section 9009c to be money-mandating

based on isolated pieces of the language of sections 9009c(b)(3) and 9009c(c)(1). Appx16-23. Section 9009c(b)(3) established the RRF program and stated that "[t]he Administrator shall use amounts in the Fund to make grants described in subsection (c)[.]" 15 U.S.C. § 9009c(b)(3). Section 9009c(c)(1) stated that "the Administrator shall award grants to eligible entities in the order in which applications are received by the Administrator." *Id.* at § 9009c(c)(1). The trial court concluded the statute was money-mandating "by its plain terms." Appx23.

However, the trial court did not compare the language of section 9009c(b)(3) and section 9009c(c)(1) to known money-mandating statutes. Performing this exercise establishes that the trial court erred. Section 9009c is dissimilar to statutes that have genuinely created a payment obligation on the part of the Government. The most recent Supreme Court decision finding a statute to be money-mandating, *Maine Community Health*, exemplifies these differences.

*Maine Community Health* addressed the Affordable Care Act (ACA), which expanded healthcare coverage and created online marketplaces where insurers could sell plans. 590 U.S. at 300. The ACA contained several initiatives to encourage insurers to participate and to defray their costs and risks. *Id.* In particular, the "Risk Corridors" program was meant to "compensate insurers for unexpectedly unprofitable plans during the marketplaces' first three years." *Id.*

The statute creating the Risk Corridors program stated that the agency "shall

14

establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016" under which a qualified health plan "shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums." 42 U.S.C. § 18062(a). The agency "shall provide" that if an insurance plan lost a specified amount of money, then the agency "shall pay to the plan" a certain amount based on a calculation stated in the statute. *See id.* at § 18062(b)(1). Conversely, if the plan made a certain amount of money, the plan "shall pay" the agency. *Id.* at § 18062(b)(2). The plaintiffs were insurers who experienced losses under the Risk Corridors program but had not been paid due to a lack of appropriated funds. *Me. Cmty. Health*, 590 U.S. at 304-06. The plaintiffs sought a money judgment for these unpaid sums. *Id.* at 305-06.

The Supreme Court concluded that the Risk Corridors statute "imposed a legal duty of the United States that could mature into a legal liability" through the insurers' participation in the healthcare exchanges. *Id.* at 310. This conclusion flowed from the statute's "express terms and context," in particular its use of mandatory language. *Id.* Such mandatory language is "significant." *Id.* at 324.

The statute could fairly be interpreted as money-mandating because the phrase "shall pay" demonstrated Congress' intent to "create both a right and a remedy under the Tucker Act." *Id.* at 324 (quoting *Bowen v. Mass.*, 487 U.S. 879, 906 (1988)). In particular, the Supreme Court referenced the statute's "triple mandate" that the

15

agency "shall establish and administer" the program, "shall provide" for payment according to the statutory formula, and "shall pay" qualifying insurers. These features put the statute "comfortably within" the class of money-mandating statutes. *Id.* at 324-25. *Id.* The Supreme Court also noted that money-mandating provisions are "uncommon." *Id.* at 324.

In the instant case, the trial court failed to perceive the difference between the mandatory language needed for Congress to establish a benefits program and the type of mandatory language that creates a payment right and a remedy for specified members of the public. The trial court, without citing *Maine Community Health*, stated that it was relying on the "shall use" and "shall award" language in sections 9009c(b)(3) and (c)(1) "to find the statute money-mandating by its plain terms," suggesting that it found this usage of the word "shall" dispositive. Appx23. However, the trial erred by not considering the statute's "express terms and context." *See Me. Cmty. Health*, 590 U.S. at 310.

At most, section 9009c(b)(3) required that SBA "shall use the amounts in the Fund to make grants," established the RRF program, and prevented SBA from using the $28.6 billion appropriation for some other purpose. This provision is akin to the first part of the Risk Corridors statute's "triple mandate," namely that the agency shall "establish and administer" the program. However, if Congress' general creation of a grant program was sufficient to be money-mandating, even in the absence of any

specific "shall pay" requirement, then the Supreme Court would not have had to perform any further analysis in *Maine Community Health* and money-mandating statutes would be far from uncommon. The trial court's reasoning therefore cannot be correct.

Similarly, the trial court ignored the full wording of section 9009c(c)(1). This provision indeed states that SBA "shall award grants to eligible entities," but the remainder of the sentence, the instruction to award grants in the order in which applications are received, cannot be erased or removed. Statutes found to be money-mandating have not been directions on *how* the agency should make awards in general but instead have directly stated a payment mandate and specified a group to which the Government shall make the payment.

For example, in *Maine Community Health*, the subject of the "shall pay" language was a particular group, specifically insurers with unprofitable plans. 590 U.S. at 310. Further, in terms of this Court's recent decisions, *Greenlee County* and *Prairie County* found the Payment in Lieu of Taxes Act (PILT) to be money-mandating. PILT stated that "the Secretary of the Interior shall make a payment for each fiscal year to each unit of general local government in which entitlement land is located . . . ." *Greenlee County, Ariz., v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007); *see also Prairie Couty, Mont. v. United States*, 782 F.3d 685, 686 (Fed. Cir. 2015). Going further back, in *Kanemoto v. Reno*, the Court examined a statute aimed at providing restitution to

individuals of Japanese descent who were interned during World War II. 41 F.3d 641, 643, 646 (Fed. Cir. 1994). The statute provided that the Attorney General shall pay the sum of $20,000 "to each eligible individual," with eligibility further defined in the statute and regulations. *Id.*

Here, however, section 9009(c)(1) does not contain the same type of wording, an actual command for SBA to make payment to a defined group, as in *Maine Community Health*, *Greenlee County*, *Prairie County*, and *Kanemoto*. The "shall award grants to eligible entities" language of section 9009(c)(1) does not stand alone, but is definitively coupled with an instruction to SBA to make awards "in the order in which applications are received." If Congress had intended to create an obligation to pay grants to all eligible entities or any specified subset of eligible applicants, such as, for example, first-day applicants, it would have said so directly. We are not aware of any case in which a similar type of administrative instruction to an agency was found to be money-mandating and none were cited by the trial court.

But if section 9009c is not analogous to any other money-mandating statute, why did the trial court determine that the statute entitled plaintiffs to compensation? It appears from the decision below that the trial court determined that section 9009c created an "individual right" or "limited mandated" for an applicant (depending upon the order in which that applicant applied).

Specifically, the trial court made contradictory statements as to the meaning of

the statute's language, which should have confirmed that the statute does not fit comfortably within Tucker Act jurisdiction. The trial court first cautioned that section 9009c "is not an unlimited money-mandate requiring the payment of grants to all eligible entities." Appx19. "In other words, the statute does not provide a general entitlement and is not a money-mandating grant to all eligible entities; instead the provision requires the use of a specific fund of money to be awarded to eligible entities in a specified order until the funds are exhausted." *Id.*

Nonetheless, the trial court then stated that the requirement in section 9009c(b)(3) that SBA make grants and do so in the order specified by section 9009c(c)(1) "gave each eligible applicant an individual right to receive payment before any later applicant." Appx22. The trial court also described this "individual right" as the right for eligible entities to received awards based on a "first-come, first served" basis. Appx19. According to the trial court, "[i]t does not matter that section 9009c does not literally command payment to all eligible entities because of the limited funding provided to the RRF, what matters is that the plaintiffs fall within the scope of section 9009c's money-mandate." Appx22.

Then, despite its previous statement that section 9009c does not require the payment of grants to all eligible entities, Appx19, the trial court explained that when the statutory provisions are read together, it was clear that section 9009c required SBA "to award grants to all eligible applicants, the hallmark of a money-mandating statute,

until the RRF was exhausted." Appx23. But the trial court formulated its overall conclusion somewhat differently – section 9009c is money-mandating, "but it is a limited mandate applying only to the money within the RRF because section 9009c(b)(3) only requires making awards to applicants out of the money available within the RRF." Appx23.

The trial court failed to properly apply *Maine Community Health* and other cases that provide examples of when a statute can fairly be interpreted as money-mandating. The trial court thus invented new concepts when it spoke of a plaintiff falling within the scope of a "money-mandate" generated out of a statute that does not command payment, a "limited mandate," or that section 9009c(c)(1) created an inchoate "individual right" for each eligible applicant to receive a grant before any later applicant that can be vindicated through money damages. But the much simpler and correct reasoning, based on precedent, is that section 9009c required SBA to operate the RRF program and give out the appropriated funds in a certain order of disbursement, but did not create any mandatory payment obligation to any or all applicants to the program, such that plaintiffs-appellees are now owed money because they did not receive grants. As such, the trial court failed to properly apply *Maine Community Health* and other cases that provide examples of when a statute can fairly be interpreted as money-mandating.

## C. The Trial Court Erred In Reading Implied Money-Mandating Obligations Into Non-Monetary Administrative Requirements

Perhaps the trial court's misinterpretation of section 9009c can be explained by plaintiffs-appellees' failure to bring a standard claim for a violation of a money-mandating statute. Plaintiffs-appellees do not simply claim that they submitted eligible applications but were not awarded grants, contrary to a statutory payment mandate. Instead, they put forth an indirect theory that section 9009c required SBA to award RRF grants in the order that applications were received and that SBA's decision to award grants instead in the order that applications were processed, along with other issues, misallocated the limited funding to applicants who had applied later in time, or were ineligible to receive an RRF award. Plaintiffs-appellees attribute the fact that they did not receive RRF grants to SBA's alleged unlawful, arbitrary, capricious, and negligent acts or omissions.

In order to address this unusual theory, the trial court incorrectly substituted the idea that SBA lacked discretion in administering the RRF program for the necessary money-mandating language. The trial court held that SBA did not have authority to refuse to make a grant, to reject any otherwise eligible applicant, or to deny an award to any eligible entity. Appx17-19. The trial court then analyzed the word "received" in section 9009c(c)(1), and raised various concerns about fairness to applicants, to determine that SBA was required to use a strict line order. Appx18-21. As stated above, the trial court held that due to this lack of discretion, section 9009c

contained a "money-mandate" that "each eligible applicant" had an "individual right" to receive payment before any later applicant. Appx22.

The trial court's faulty logic turned an instruction to SBA to award grants in the order in which applications were received into a "money-mandate" providing jurisdiction over plaintiffs-appellees' claims that they would have received grants if SBA had not arbitrarily used processing order to dole out the money. Appx22-23. However, the trial court's reasoning is in conflict with well-established precedent. The Court of Claims long ago rejected reading into statutes an implied right of compensation for wrongful Government decisions or actions. *See Eastport S. S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967) *abrogated in part on other grounds by Malone v. United States*, 849 F.2d 1441, 1444-45 (Fed. Cir. 1988).

Indeed, the Court of Claims' explanation in *Eastport* of its jurisdiction and its refusal to extend that jurisdiction demonstrates the trial court's error here. In *Eastport*, the plaintiff sought damages for the Maritime Commission's failure to timely approve the sale of a repurposed ex-German ship to a Danish company pursuant to section 9 of the Shipping Act, which caused the plaintiff to lose that contract opportunity. *Id.* at 1005-06. The key question was therefore whether section 9 of the Shipping Act could be read to grant the plaintiff compensation for the business loss it incurred. *Id.*

To answer this question, the Court of Claims reviewed "the historical boundaries" of the Court's jurisdiction and found that it excluded instances in which

"the basis of the federal claim – be it the Constitution, a statute, or a regulation – cannot be held to command, in itself and as correctly interpreted, the payment of money to the claimant, but in which some other principle of damages has to be invoked for recovery." *Id.* at 1008. The Court of Claims gave the example that a Federal criminal defendant who has been "invalidly convicted or deprived of his liberty because of a violation of the Constitution or an Act of Congress cannot obtain compensation under 28 U.S.C. § 1491 for his loss," outside of specific legislation covering unjust convictions or civil rights violations. *Id.* at 1009.

On its face, section 9 of the Shipping Act was a "regulatory measure" that forbade foreign sale of a vessel originally purchased from the Maritime Commission unless the Maritime Commission approved and authorized the sale. *Id.* The Court of Claims explained that neither the statute's text nor its legislative history suggested that "the United States will compensate an applicant who suffers a business loss because of the Commission's improper failure to grant the request." *Id.* Indeed, "[t]here is no decision of this or any other federal court holding or intimating that the United States will be liable under the Tucker Act for such a commercial injury resulting from a failure or wrong done in the course of the regulatory process." *Id. Eastport* therefore eliminates plaintiffs-appellees' theory that the Government is liable for money damages to make up for harms that their businesses suffered when they did not receive RRF grants due to SBA's failure to award grants in the order in which

applications were received.

Even more, *Eastport* rejects the trial court's invocation of an implied money-mandating "individual right" in section 9009c(c)(1) to have SBA award grants in a certain order. The Court of Claims declined to read an "unexpressed summons to compensate plaintiff for its business loss" into the "mass of other regulatory and prohibitory activities of the Federal Government (including criminal prosecutions) which can and do cause pecuniary loss if improperly conducted . . . ." *Id.* at 1009-10. The Court of Claims would "have to break entirely new and treacherous ground to find in [s]ection 9 an implied directive to allow such compensation." *Id.* at 1009. "A wholly new ground of obligation would be summarily created by mere implication from statutes which say nothing to suggest such pecuniary responsibility." *Id.* at 1010. Given that a claim of "liability for damages occasioned by wrongful regulatory action smacks more of tort than of non-tortious obligation," the Court of Claims refused to find in section 9 any "implied direction to compensate plaintiff." *Id.*

Nor is *Eastport* the only case that has rejected implied rights of compensation in non-pecuniary statutes. In *Testan*, the Supreme Court addressed the claims of two Government attorneys seeking reclassification of their positions to GS-14 level pursuant to the Classification Act. *Testan*, 424 U.S. at 393-94. It was "implicit in the [lower] court's decision" that a "violation of the Classification Act gives rise to a claim for money damages for pay lost by reason of the allegedly wrongful classifications."

*Id.* at 399.  However, the Supreme Court analyzed the Classification Act and held that it did not contain any provision that "expressly makes the United States liable for pay lost through allegedly improper classifications."  *Id.*

The Supreme Court rejected the position that the Tucker Act "fundamentally waives sovereign immunity with respect to any claim invoking a constitutional provision or a federal statute or regulation . . . ."  *Id.* at 400.  The Supreme Court specifically stated that it regarded as "unsound the argument of *amici* that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available to redress their violation."  *Id.*  *Testan* thus also rejects the trial court's view that it possesses jurisdiction to entertain plaintiffs-appellees' claims of money damages borne from SBA's alleged violation of section 9009c(c)(1).

The trial court's error would turn a wide variety of alleged agency failures in managing a benefits program into "individual rights" to money damages.  For example, plaintiffs-appellees' complaint alleges that SBA failed to weed out fraudulent applicants and that SBA misspent substantial amounts of the $28.6 billion based on fraud.  Appx63, Appx73, Appx74, Appx77-79.  There was obviously no discretion for SBA to award money to fraudsters, even inadvertently, and section 9009c requires payment to only "eligible entities."

Under the trial court's conception of a money-mandating statute, SBA's alleged failure to implement proper payment controls could be framed as an "individual

right" to money damages.  Hence plaintiffs-appellees could assert that the statute

established an "individual right" for each eligible applicant to receive payment over

fraudulent, ineligible entities, that they thus fall within a money-mandate, and that

they can demand money damages to compensate for not receiving grants because the

money that should have gone to them was wasted due to SBA's loose fraud controls.

However, not every "failure to perform an obligation" creates a right to

monetary relief against the Government.  *Me. Cmty. Health*, 590 U.S. at 322 (quoting

*United States v. Bormes*, 568 U.S. 6, 16 (2012)).  It is insufficient to create Tucker Act

jurisdiction that a "decision will ultimately enable the plaintiff to receive money from

the government."  *Nat'l Air Traffic Controllers Ass'n*, 160 F.3d at 716 (citing *United States*

*v. King*, 395 U.S. 1, 4 (1969)).  The trial court erred by reading into sections

9009c(b)(3) and 9009(c)(1) an implied direction to compensate plaintiffs-appellees for

any financial harms incurred when they did not receive grants due to SBA's alleged

misallocation of the money to applicants who applied later in time.  Section 9009c is

not money-mandating and the trial court erred in this fundamental determination of

its jurisdiction.

### D.     The Trial Court Erred in Relying On Cases That Discuss When a Discretionary Statute is Money-Mandating

The trial court also held that even if the "shall use" and "shall award" language

in sections 9009c(b)(3) and 9009c(c)(1) "simply authorized the Administrator to make

awards, section 9009c would still be money-mandating because it would meet each of

the three prongs of the test for determining if a discretionary statute is money-mandating." Appx23 (citing *Samish Indian Nation*, 419 F.3d 1355, 1364-65 (Fed. Cir. 2005); *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006); *Perri v. United States*, 340 F.3d 1337, 1342-43 (Fed. Cir. 2003)). These cases speak to when a statute that appears to give an agency discretion "over the decision whether or not to pay an individual or group" is actually money-mandating. *Doe*, 463 F.3d at 1324. For this type of situation, the *Doe* Court set forth a test that examines if: "(1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Id.* (quoting *Samish Indian Nation*, 419 F.3d at 1364-65).

The trial court again ignored the differences in language between statutes found to be money-mandating under this three-part test and section 9009c. In *Doe*, the statute in question stated that "[t]he head of an agency, with the approval of the Office of Personnel Management, may provide that . . . an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty . . . shall receive premium pay for this duty . . . ." *Doe*, 463 F.3d at 1324-25 (citing 5 U.S.C. § 5545(c)(2)). Even though the statute used the word "may," the Court found it to be money-mandating because once an agency determined that a particular position is entitled to this type of pay, the employee "shall" receive premium pay. *Id.* at 1325.

27

However, section 9009c does not contain any similar language that all eligible applicants or some subset of eligible applicants "may" be paid or that they "shall" be paid after SBA makes some discretionary determination. Such direct payment language, whether framed in discretionary or mandatory terms, is entirely absent from section 9009c. There is no "individual or group" specified for payment at all in section 9009c. *See id.* at 1324. Section 9009c does not contain facially discretionary language that plaintiffs-appellees seek to interpret as money-mandating. The trial court erred by finding this line of cases to even be relevant.[6]

Furthermore, the trial court failed to perceive that the facts and holding of *Samish Indian Nation* actually instruct against reliance on an agency's limited discretion in an administrative matter to create an implied right of compensation. In *Samish Indian Nation*, the plaintiff tribe claimed entitlement to benefits from 1969 to 1996 under the Indian Self-Determination and Education Assistance Act (ISDA) on the theory that but for Federal misconduct they would have received Federal benefits since 1969. 419 F.3d at 1358. ISDA obligates the Government to pay benefits to tribes under self-determination contracts, but only Federally recognized tribes can obtain such contracts. *Id.* at 1362-63. The tribe argued that the Government's refusal

---

[6] *Perri* also does not bolster the trial court's opinion. The statute in that case created a fund to make payments "at the discretion of the Attorney General" for "awards for information or assistance leading to a civil or criminal forfeiture involving any Federal agency . . . ." 340 F.3d at 1341 (citing 28 U.S.C. § 524).

to accord them Federal recognition wrongfully prevented them from obtaining a contract. *Id.* at 1362.

Although the tribe argued that the agency did not have discretion to refuse to make a self-determination contract upon request of a tribe, the Court found the "reliance on that limited discretion misplaced" and the agency's lack of discretion to enter into a self-determination contract to be irrelevant to the jurisdictional question of whether the statute was money-mandating. *Id.* at 1365. The Court concluded that ISDA did not demonstrate "congressional intent to allow the Samish to seek damages for contract support costs never incurred, on contracts never created, based on a wrongful refusal to accord federal recognition." *Id.* Furthermore, the statute did not express any intent to establish a damages remedy for non-payment of benefits absent the existence of self-determination contract. *Id.* at 1365-67.

In essence, the Court rejected the Samish's counterfactual theory of recovery that the tribe would have obtained a contract and thus benefits had the Government not wrongfully refused recognition. Plaintiffs-appellees similarly rely on the counterfactual idea that they would have received grants had SBA not wrongfully awarded grants in the order applications were processed, not the order that applications were received. However, *Samish Indian Nation* establishes, as in *Eastport*, the principle that a statute removing an agency's discretion to take some non-pecuniary action cannot be turned into an implied money-mandate allowing

jurisdiction over a claim for money damages if that action does not occur.

## III. The Trial Court's Decision is Contrary to the Court's Precedent Regarding Grant Programs

The trial court's decision also conflicts with the Court's binding precedent regarding grant programs, specifically *Lummi* and *National Center for Manufacturing Sciences* (*National Center*). In *Lummi*, the Court reversed, on interlocutory appeal, the trial court's determination that the Native American Housing Assistance and Self-Determination Act of 1996 (NAHASDA) was money-mandating. 870 F.3d 1313, 1315 (Fed. Cir. 2017). The relevant sections of NAHASDA required the agency to make grants for affordable housing to Indian tribes based on a specific regulatory formula. *Id.* Once awarded, grantees were limited in how and when they could dispense the funds, which could be used only on statutorily specified activities in accordance with program requirements. *Id.* The agency determined that it had made overpayments and deducted these amounts from subsequent grant allocations. *Id.* The plaintiff tribe claimed that the agency misapplied the NAHASDA formula when it calculated the overpayment and thus improperly deprived them of grant funds. *Id.* at 1316.

Notably, the basis for the trial court's opinion that NAHASDA was money-mandating was that the statute left "no room for [the agency] to exercise discretion in making grants." *Lummi Tribe of the Lummi Rsrv. v. United States*, 99 Fed. Cl. 584, 594 (2011). The trial court pointed to statutory language providing that the agency "shall .

. . make grants," "shall allocate any amounts" among Indian tribes that complied with certain requirements, and directed that the funding allocation be made pursuant to a particular formula. *Id.* According to the trial court, the agency was "bound by the statute to pay a qualifying tribe the amount to which it is entitled under the formula" and thus NAHASDA could fairly be interpreted as mandating the payment of compensation by the Government. *Id.*

The trial court's erroneous reasoning in *Lummi* has strong similarities to the trial court's opinion in the instant case, which also relied on the idea that SBA lacked discretion in making RRF grants. *See* Appx16-23. However, on appeal, this Court did not find any mandatory language or supposed lack of discretion in the agency making grants to be dispositive. This Court reversed and concluded that under NAHASDA "the Tribes are not entitled to an actual payment of money damages, in the strictest terms; their only alleged harm is having been allocated too little in grant funding." *Lummi*, 870 F.3d at 1318. The Court concluded that the Tribes claims were ultimately equitable in nature. *Id.* at 1317. The same is true of plaintiffs-appellees here. Their only alleged harm is that they did not receive RRF grants because SBA arbitrarily and capriciously misallocated the funding to other entities who applied later in time.

Furthermore, *Lummi* requires reversal of the trial court's decision because the RRF program also only gave out "strings-attached disbursement[s]." *Id.* The Court found it significant that the Tribes were restricted in their use of NAHASDA funds

for certain purposes and held that "[t]o label the disbursement of funds so thoroughly scrutinized and cabined as a remedy for 'damages' would strain the meaning of the term to its breaking point." *Id.* at 1318. The NAHASDA grants could also be "later reduced or clawed back." *Id.* Based on these limitations, the Court concluded that "the underlying claim is not for presently due money damages" but instead merely for a larger "strings-attached" grant. *Id.* at 1319.

The same logic applies to plaintiffs-appellees' claim here. Recipients of RRF grants were limited by statute to use the funds for specified categories of expenses. *See* 15 U.S.C. § 9009c(c)(5). The RRF program also mandated that awardees could only use the grants for expenses incurred during the statutory "covered period." *See id.* at § 9009c(a)(3). Awardees were required to return any unused funds to the Treasury at the end of the "covered period" or if they went out of business before that date. *See id.* at § 9009c(c)(6). Plaintiffs-appellees do not make a claim for presently due money-damages, but to obtain compensation for not receiving a strings-attached grant.

The Court's earlier decision in *National Center* also supports reversal. In that case, the Court examined whether a district court possessed jurisdiction to entertain a grant claim under the APA and therefore erred in transferring the case to the Court of Federal Claims. *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 197 (1997). At issue was the Department of Defense Appropriations Act for Fiscal Year 1994, which

appropriated $12 billion and stated that "$40,000,000 of the funds appropriated in this paragraph shall be made available" for the plaintiff, a not-for-profit research and development consortium, to assist in a particular research program. *Id.* at 197-98. When the Air Force only made a portion of the sum available, the plaintiff sued for the remainder. *Id.* at 198.

The Court concluded that the case belonged in district court because the true nature of the claims presented was not amenable to Tucker Act jurisdiction. In reaching that conclusion, the Court focused on the limitations contained in the statute on the use of the funds. The Court noted that the grantee "would not be entitled to a monetary judgment that would allow it to use the funds appropriated under the Act for any purpose, without restriction," and that, in light of the "restrictions governing the manner in which money may be allocated" it was reasonably clear that "a simple money judgment" would not be an appropriate remedy. *Id.* at 201.

The same is true here. The trial court acknowledged that any award of money damages would come from the Judgment Fund and "would not be subject to the RRF's requirement to return grant funds nor the Fiscal Responsibility Act's recission of funds . . . ." Appx26. Allowing plaintiffs-appellees to receive money damages "equal to the amounts sought in their unpaid grant applications," Appx1, would allow plaintiffs-appellees to avoid the strings-attached nature of the RRF program and its requirement to use or give back the funds by the end of the "covered period."

Section 9009c does not entitle plaintiff-appellees to receive a payment now, five years after the pandemic started, for any purpose, without restriction. The trial court's reasoning is counter to *Lummi* and *National Center* and should be reversed on this basis.

## IV. The Trial Court Misunderstood the Scope of Tucker Act Jurisdiction

In our motion to dismiss, we argued that plaintiffs-appellees' central allegations that SBA engaged in numerous unlawful and arbitrary and capricious acts and omissions, were only, at best, a disguised APA claim. *See* Appx9. It is the APA that waives sovereign immunity to allow a person suffering legal wrong because of final agency action to obtain judicial review. Section 706 of the APA empowers courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), § 706(2)(C), § 706(2)(D).

As support, we pointed to the Supreme Court's delineation between the Tucker Act and APA waivers of sovereign immunity in *Bowen v. Massachusetts* and this Court's decision in *Katz v. Cisneros*. We noted that this Court has expressly held that the trial court does not possess jurisdiction over APA claims. *See, e.g.*, *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003). Despite its secondary placement in our motion to dismiss behind our arguments that section 9009c is not money-mandating, the trial

court made this issue the centerpiece of its decision. In so doing, the trial court misunderstood the delineation between the Tucker Act and APA, brushed aside binding precedent, and incorrectly primed itself to read section 9009c as money-mandating.

### A. The Trial Court Erred by Preemptively Determining that Plaintiffs-Appellees' Claims Come Under Tucker Act Jurisdiction

Before considering the money-mandating issue, the trial court cast its eye over the alleged "scope" of plaintiffs-appellees' claims and found them to be genuinely within the Tucker Act's waiver of sovereign immunity. Appx10-15. The trial court stated that it was following this Court's decision in *Suburban Mortgage* in performing this analysis. Appx10. To determine whether a claim falls under the APA or the Tucker Act, the proper analysis is whether the Court of Federal Claims could provide an "adequate remedy" for the alleged wrong, pursuant to section 704 of the APA. *Id.* (citing *Suburban Mortgage Associates, Inc. v. United States*, 480 F.3d 1116, 1125 (Fed. Cir. 2007)). However, the trial court erroneously made a preemptive determination that it possessed jurisdiction based only on plaintiffs-appellees' own characterization of their claims and the nature of the relief that they requested.

The trial court repeatedly emphasized that plaintiffs-appellees' cause of action is "explicitly limited to a claim for money damages under the Tucker Act." Appx10, Appx15. The trial court accepted plaintiffs-appellees' circular argument that because they seek a payment of money from the Government, money damages would be a

legally available and appropriate remedy that the trial court could order.[7]  *Id.*  Even more, the trial court suggested that if a plaintiff's "goal" is to obtain a money judgment, then the court must consider itself as the "putatively correct forum" for the claim.  Appx12-13 (citing Matthew H. Solomson, Court of Federal Claims Jurisdiction, Practice, and Procedure, 29.IV.A (2016)).  The trial court also found it significant for making out a Tucker Act claim that plaintiffs-appellees did not request any type of prospective, injunctive relief in their complaint.  Appx13-15.

The trial court's analysis runs counter to the basic principle that the Tucker Act itself "does not create any substantive right enforceable against the United States for money damages."  *Testan*, 424 U.S. at 398.  There is no basis in the law for the trial court giving its initial impressions that the case feels like a Tucker Act suit without analyzing whether it indeed possesses jurisdiction.  Indeed, the trial court misunderstood the Court's instruction in *Suburban Mortgage*.  In *Suburban Mortgage*, the Court plainly explained that if plaintiff's complaint can be read as seeking monetary relief, the ability of the Court of Federal Claims to provide an "adequate remedy"

---

[7]  The trial court also addressed the inconvenient fact that plaintiffs-appellees' complaint is replete with exceedingly non-Tucker Act language of arbitrary and capricious acts and omissions on the part of SBA.  According to the trial court, plaintiffs-appellees' complaint is "inartful" and contains "much superfluous and useless rhetoric to add atmospherics to the claim."  Appx15.  However, the trial court decided that this wording, which states plaintiffs-appellees' own theory of why they should recover damages, could be ignored because plaintiffs-appellees did not "explicitly" state a cause of action under the APA and did not claim to rely on the APA to obtain the trial court's jurisdiction.  Appx15-16.

turns on whether the jurisdictional requirements of the Tucker Act are satisfied.

*Suburban Mortg. Assocs., Inc.*, 480 F.3d at 1126.

Here, because section 9009c is not money-mandating, the jurisdictional requirements of the Tucker Act are not satisfied and the trial court cannot provide an "adequate remedy." Section 704 of the APA thus does not present a barrier to recognizing that plaintiffs-appellees' challenge to SBA's method and order of awarding grants is, at best, a disguised equitable claim. Plaintiffs-appellees' request for money damages cannot create jurisdiction at the trial court or avoid district court jurisdiction and the associated standing and mootness issues. The trial court erred by focusing on plaintiffs-appellees' desire for a monetary remedy and not the statutory basis for the court's jurisdiction to provide that remedy.

By discussing the "scope" of plaintiffs-appellees' claims as falling within the Tucker Act in some general sense first, the trial court erroneously primed itself to look for a way to make section 9009c money-mandating. The trial court should have first found the statute to not be money-mandating and then determined whether another court would possess jurisdiction and if a transfer would be appropriate.[8]

---

[8] We have consistently argued that although this matter could potentially be transferred to district court, *see* 28 U.S.C. § 1631, it would not be in the interest of justice to do so because such a transfer would be futile. *See Little River Lumber Co. v. United States*, 7 Cl. Ct. 492, 494 (1985) (citing *Dancy v. United States*, 229 Ct. Cl. 300, 308 (1982)). As explained in the statement of the case, several district courts have held that similar plaintiffs lack standing or the matter is moot.

## B. The Trial Court Erred by Failing to Properly Apply *Bowen*

Plaintiffs-appellees' request for monetary compensation for various agency wrongs does not move a case into the jurisdiction of the Court. The Supreme Court explained the delineation between the Tucker Act and APA waivers of sovereign immunity in *Bowen*. In *Bowen*, the Commonwealth of Massachusetts brought suit in district court challenging the refusal of the Secretary of Health and Human Services to reimburse it for funds it expended under a Medicaid program and the court of appeals affirmed in favor of the State. *See* 487 U.S. at 885-89. In its petition for certiorari, the Secretary argued that the Claims Court had exclusive jurisdiction over the claim, not the district court. *Id.* at 890-91.

The Supreme Court rejected this argument, holding that the relief sought by the State, the release of Medicaid funds, was not "money damages," and that the case was not excluded from the waiver of sovereign immunity in section 702 of the APA. *Id.* at 893. In particular, the Supreme Court noted that the State's case "is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* at 900 (emphasis in original). Any payment made by the Government would be "a mere by-product of [the district court's] primary function of reviewing the Secretary's interpretation of federal law." *Id.* at 910.

Here, similarly, plaintiffs-appellees are attempting to enforce what they assert is the statutory mandate in section 9009c(c)(1) for SBA to award grants in the order that applications were received. By extension, they seek the payment of money that they believe that they would have received if SBA had awarded grants in that order. As in *Bowen*, any money paid would not be in compensation for an injury or labor, but would be a byproduct of a determination that SBA misinterpreted section 9009c(c)(1) and awarded grants in the "wrong" order.

The trial court, however, rejected our argument based on its conclusion that the Supreme Court's holding in *Bowen* "has been narrowly interpreted by the Federal Circuit." Appx12. The trial court identified a purported "effort to limit *Bowen* to the nature of the underlying statutory regime" in this Court's decisions in *Consolidated Edison* and *Suburban Mortgage*. *Id.* However, neither of these decisions expresses any actual intent or effort on the part of the Court to narrowly interpret or limit the application of *Bowen* going forward.

The trial court read far too much into this Court's distinguishing of *Bowen* in two cases that presented different factual and legal circumstances. In *Suburban Mortgage*, the Court addressed the proper forum for a dispute between the plaintiff and the Department of Housing and Urban Development (HUD) over a contract for insurance. *Suburban Mortgage Assocs., Inc.*, 480 F.3d at 1117. The plaintiff sued in district court for specific performance of the contract and a declaratory judgment,

with the aim of obtaining "the money allegedly due it under the insurance agreement." *Id.* The district court denied the Government's motion to dismiss or transfer, relying on *Bowen* for the idea that the plaintiff was not seeking money damages, but instead money "that HUD was obligated to pay under the agreement." *Id.* at 1120. The Government brought an interlocutory appeal to this Court pursuant to 28 U.S.C. § 1292(d)(4)(A).

The Court first reviewed the historical boundary between the Tucker Act and APA waivers of sovereign immunity. *Id.* at 1122. As this Court explained, a plaintiff seeking something other than monetary relief from a "disputed government agency action could challenge that action in district court under the APA." *Id.* Conversely, "a suit requesting relief in the form of a money judgment against the Government could be brought in the Court of Federal Claims under the Tucker Act, but not in a district court." *Id.*

The Court then characterized *Bowen* as a "leak that has threatened to become a gusher" in the "relatively watertight barrier" that had existed between the Tucker Act and APA. *Id.* The Court decried the new "cottage industry" of lawyers who attempted to craft suits seeking money from the Government as "suits for declaratory or injunctive relief without mentioning the money." *Id.* at 1124. The Court criticized attempted forum shopping aimed at avoiding the jurisdiction of the Court of Federal Claims and the Federal Circuit. *Id.*

With this background, the Court held that the plaintiff's claim, being in essence for breach of contract, belonged at the Court of Federal Claims, and that the Court of Federal Claims could order the "adequate remedy" of expectation damages. *Id.* at 1126-27. The plaintiff had relied on *Bowen* to argue that a money judgment would not be adequate. *Id.* at 1127. However, the Court rejected that contention because of the distinctive circumstances of *Bowen* and because *Bowen* did not involve any kind of contract. *Id.*

*Consolidated Edison* also does not speak of any effort to limit *Bowen*. *See* Appx12. In that case, the plaintiff filed suit in district court to challenge the constitutionality of the Energy Policy Act of 1992 and an injunction against payments that were required to be made by nuclear utilities to the Government pursuant to the statute. *Consol. Edison Co. of New York v. Dep't of Energy*, 247 F.3d 1378, 1381 (Fed. Cir. 2001). The district court case came after several losses by other nuclear utilities seeking refunds of the payments in the Court of Federal Claims as illegal exactions. *Id.*

Similar to *Suburban Mortgage*, the district court denied the Government's motion to dismiss or transfer based on *Bowen*. *Id.* at 1382. But on appeal, this Court rejected the district court's conclusion that the Court of Federal Claims could not offer an adequate remedy. *Id.* The Court pointed out the specific set of circumstances in *Bowen* that made a "naked money judgment" inadequate in that case but that did not exist between the Government and the nuclear utilities, given that the situation

41

presented, at base, an illegal exaction claim.  *Id.* at 1383-84.

Therefore, the trial court's analysis here was misplaced.  The portions of *Suburban Mortgage* and *Consolidated Edison* relied upon by the trial court were addressing a problem that is not raised by the instant case, specifically plaintiffs that were attempting to use *Bowen* to escape the Court of Federal Claims' jurisdiction.  The Court's statements distinguishing *Bowen* must be read in that context.  Neither case "narrowly interpreted" or limited *Bowen* to its facts.  *See* Appx12.  The trial court erred by unduly focusing on the unique facts of *Bowen*, without applying its overall legal principles, under the misperception that *Bowen* had been limited by this Court.

The trial court further erred when stating that "the Supreme Court appears to have agreed with the Federal Circuit when it clarified how to apply *Bowen* in *Maine Community Health*."  Appx13.  The trial court stated that in *Maine Community Health*, the Supreme Court "appeared to accept the Federal Circuit's approach by pointing to two grounds on which to distinguish *Bowen*."  *Id.*  However, there is absolutely nothing in *Maine Community Health* suggesting that the Supreme Court believed that it was following any "approach" of this Court or even limiting *Bowen* in some manner.

Rather, the Supreme Court merely considered whether *Bowen* and the APA provided an alternate avenue for the insurance companies' claims such that the Tucker Act would not apply.  *See Me. Cmty. Health*, 590 U.S. at 328.  The Supreme Court concluded that *Bowen* dealt with a different type of situation – an "injunction to

correct the method of calculating payments going forward" and not a claim for "past-due sums." *Id.* Therefore, the insurance companies brought valid Tucker Act claims pursuant to a money-mandating statute. *Id.*

Of course, the facts of the instant case are not identical to *Bowen*. The instant case does not involve a program as large and complex as Medicaid or a "dispute between two sovereigns." *See Suburban Mortgage*, 480 F.3d at 1127. Plaintiffs-appellees were also extremely careful to not openly request any form of injunctive or declaratory relief, but to frame their complaint as a plea for a one-time payment of retrospective damages. However, between the two waivers of sovereign immunity, the APA and the Tucker Act, *Bowen* demonstrates why plaintiffs-appellees' theory of recovery is dissimilar to a genuine Tucker Act claim: plaintiffs-appellees seek to obtain money by having a court enforce the statutory mandate for SBA to award grants in the order that applications were received.

## C.    The Trial Court Failed to Properly Apply *Katz*

This Court's ruling in *Katz* also confirms that the trial court does not possess subject-matter jurisdiction over this matter. In that case, Mr. Katz, a private developer, challenged the Government's interpretation of HUD regulations that were used to calculate rent that would be paid to his company pursuant to a contract with a public housing agency. *Katz*, 16 F.3d at 1207. Mr. Katz brought suit in district court, but the district court agreed with HUD that the case belonged in the Court of Federal

Claims because it involved a Government contract. *Id.*

However, this Court reversed and held that, as in *Bowen*, Mr. Katz's company "seeks payments to which it alleges it is entitled pursuant to federal statute and regulations; it does not seek money as compensation for a loss suffered." *Id.* at 1208. Mr. Katz sought to "compel HUD to perform the calculation of contract rents" in accordance with its regulations. *Id.* "That a payment of money may flow from a decision that HUD has erroneously interpreted or applied its regulation does not change the nature of the case." *Id.* Furthermore, because Mr. Katz sought an adjudication of the lawfulness of HUD's regulatory interpretation, this was prospective relief that would have a future impact on the ongoing relationship between the parties. *Id.* at 1209. Therefore, "no relief is available in the Court of Federal Claims here because the case challenges the interpretation of law which controls payment to [Mr. Katz's company]." *Id.*

Here, the trial court made the same error.[9] The trial court seemed to find dispositive plaintiffs-appellees' own characterization of their damages as retrospective when it distinguished *Katz.* Appx13-14. Yet *Katz* specifically warns that regardless of the characterization of the case by plaintiffs, the Court must "look to the true nature

---

[9] Notably, in *Katz*, this Court applied *Bowen* to a situation that did not involve any of *Bowen*'s distinctive circumstances. Neither *Suburban Mortgage* nor *Consolidated Edison* suggested that *Katz* should be called into question or overruled on this basis. This is further support that *Suburban Mortgage* and *Consolidated Edison* did not limit *Bowen* as the trial court believed.

of the action in determining the existence or not of jurisdiction." *Katz*, 16 F.3d at 1207 (citing *Livingston v. Derwinski*, 959 F.2d 224, 225 (Fed. Cir. 1992)). The trial court failed to perceive that plaintiffs-appellees do not seek money damages for a past injury or labor because nothing is currently due and owing to them.

Plaintiffs-appellees instead seek to create a new relationship with SBA prospectively and outside of the RRF program's limitations. The trial court's ruling would require SBA to put all applicants in a new, "corrected" order based on time of application submission. Once this is done, SBA will need to review a large subset of all applications to figure out which entities "should have" received grants and thus at what point the $28.6 billion would have been expended in this counterfactual scenario. The trial court's decision requires SBA to redo or recreate the RRF program, which essentially concluded its mission in May to June of 2021, by starting over with a new list of eligible awardees. Plaintiffs-appellees seek a payment of money that would flow from a determination that SBA misinterpreted section 9009c(c)(1) and awarded grants in the "wrong" order.

### D. The Trial Court Erroneously Opined That It Shares Jurisdiction With the District Courts Over This Case

As part of its analysis of the "scope" of plaintiffs-appellees' claims, the trial court reached the surprising conclusion that this case "is simply an instance of concurrent jurisdiction" with the district courts. Appx14. According to the trial court, it "often considers under the Tucker Act claims over which district courts may

have concurrent jurisdiction." *Id.* Furthermore, the trial court asserted that its judges "routinely review the way federal agencies administer and apply statutes and regulations in a wide variety of contexts." *Id.*

These statements are inaccurate. The cases cited by the trial court are inapposite and irrelevant. *Broughton Lumber Co.* only noted that district court jurisdiction may be concurrent with that of the Court of Federal Claims in some specialized instances, but did not hold that the Court of Federal Claims routinely shares district court jurisdiction. *See* Appx14 (citing 939 F.2d 1547, 1551, 1551 n.2 (Fed. Cir. 1991)). The other cases cited by the trial court similarly addressed statutes that grant the district courts jurisdiction over types of claims that would normally go to the Court of Federal Claims, such as tax refunds. Furthermore, the trial court most certainly does not possess jurisdiction over APA claims. *See, e.g.*, *Martinez*, 333 F.3d at 1313.

None of these cases suggest that the Court of Federal Claims has been empowered to share jurisdiction with the district courts to review the administration of Federal programs. We do not dispute that the Court of Federal Claims may interpret the meaning of a statute or regulation and that the need for such interpretation does not convert a Tucker Act claim into an APA claim. *See Portland Mint v. United States*, 102 F.4th 1371, 1381 n.6 (Fed. Cir. 2024). But the key prerequisite is that the Court of Federal Claims must possess jurisdiction in the first

place, either pursuant to the Constitution, a money-mandating statute or regulation, an express or implied Government contract, an illegal exaction, or a bid protest. However, the trial court appeared to believe that it possesses jurisdiction to ferret out and award damages for a violation of any kind of "statutory command," tying in with its determination that section 9009c(c)(1) created an "individual right" for eligible entities to receive awards in a first-come, first-served manner. *See* Appx14, Appx19. This conception of Tucker Act jurisdiction erroneously expands into the territory of the district courts and does not find any support in the law.

### E.      The Trial Court Erroneously Found the Potential Unavailability of Relief in Another Forum to be Relevant to its Jurisdiction

In considering whether plaintiffs-appellees' claims fell "more neatly under the Tucker Act than they do under the APA," the trial court found it relevant that "relief has not been available under the APA to claimants seeking RRF grants." Appx11. The trial court pointed to district court cases finding equitable relief to be unavailable due to mootness and stated that in the absence of available APA remedies, the Tucker Act would provide "likely the only available remedy" for plaintiffs-appellees' claims. *Id.*

However, the trial court erred because a lack of available remedy elsewhere is not determinative of Tucker Act jurisdiction. There is no basis in the law for providing plaintiffs-appellees with an avenue to seek money damages simply because they may not be able to obtain equitable relief now that the RRF program is over.

This holding would make the trial court a backup forum for litigants to repackage and reassert non-redressable or defective APA claims. The trial court drastically misunderstood the boundary and equilibrium between itself and the district courts.

## V. In the Alternative, the Trial Court Erred in Holding that Plaintiffs-Appellees State a Claim Upon Which Relief Can Be Granted

In the alternative, if this Court finds section 9009c to be money-mandating, the decision of the trial court must still be reversed because the trial court erred in holding that plaintiffs-appellees state a claim upon which relief can be granted. Any obligation or liability under the RRF program was capped at $28.6 billion. This money has already been expended and Congress has demonstrated its intent that no further money should be spent by defunding the RRF program.

### A. 15 U.S.C. § 9009c(b)(2)(A) Imposes a Statutory Cap On the Amount That Congress Intended To Spend For the RRF Program

If section 9009c can be read as money-mandating, the trial court erred by failing to recognize that section 9009c(b)(2)(A) contains a cap on that obligation. Section 9009c(b)(2)(A) states, "[i]n addition to amounts otherwise available, there is appropriated to the Restaurant Revitalization Fund for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $28,600,000,000, to remain available until expended." 15 U.S.C. § 9009c(b)(2)(A). The inclusion of a specific amount, $28.6 billion, creates a clear limit on the amount to be expended.

The Supreme Court in *Maine Community Health* explained how Congress can

limit its obligations. The Supreme Court held the Risk Corridors statute contained an unlimited obligation to pay insurers for losses. *Me. Cmty. Health*, 590 U.S. at 313-14. However, as contrast, the Supreme Court noted that "Congress could have expressly limited an obligation to available appropriations or specific dollar amounts." *Id.* at 313.

In a footnote, the Supreme Court then cited numerous provisions of the ACA and other statutes that contained the "limiting language" of the phrase "subject to the availability of appropriations" or *listed an appropriated amount*, such as "[t]here is authorized to be appropriated to carry out this section, $10,000,000[.]" *Id.* at 313 n.7 (emphasis added). As is the case for the RRF program, "Congress has also been explicit *when it has capped payments, often setting a dollar amount* or designating a specific fund from which the Government shall pay." *Id.* (emphasis added). Therefore, the specific amount of $28.6 billion in section 9009c(b)(2)(A) is express "payment-capping language." *See id.* at 314.

Given that the *Maine Community Health* decision treated the wording "subject to the availability of appropriations" as having the same limiting effect as listing a dollar amount, the result here should be the same as this Court's decision in *Greenlee County*. In that case, despite finding the PILT Act to be money-mandating, the Court held that the plaintiff failed to state a claim because Congress had limited the Government's liability with the phrase "[a]mounts are available only as provided in

appropriations laws." 487 F.3d at 877. This language was equivalent to stating that amounts are "subject to the availability of appropriations."[10] *Id.* Again, listing a specific amount serves the same function and limited the Government's liability here to the $28.6 billion.

## B. The Trial Court Misinterpreted Section 9009c(b)(2)(A) to Be Open-Ended and Uncapped

Despite this clear case law, the trial court found this simple statutory provision to be "unusual" and "ambiguous." *See* Appx29-30. The trial court erroneously focused on the words "in addition to amounts otherwise available," finding that this phrase made section 9009c(b)(2)(A) "open-ended" and "allowed an unspecified amount of money to be used for the RRF." Appx29-31. According to the trial court, Congress did not intend to limit the Government's liability to the specific $28.6 billion appropriation because it also allowed "other, unspecified, additional amounts to be used." Appx31. Yet, similar to its hedging on the money-mandating issue, the trial court also cautioned that the Government's liability was not "completely uncapped" because it "only requires expenditure of funds in the RRF," and so "any claim for damages must be limited to a claim that a plaintiff was entitled to receive funds that were at one point in the RRF but were misspent . . . ." Appx32.

---

[10] The Court confirmed in *Prairie County*, another PILT case, that in the absence of a contract with a plaintiff, such language limits the Government's payment obligations to the amounts appropriated. 782 F.3d at 690.

The trial court's error was based on its misinterpretation of the words "otherwise available" as obviating the $28.6 billion limit. But the word "otherwise" generally connotes a different situation or a different set of circumstances that is not the same as the present. *See Otherwise*, Merriam-Webster, https://www.merriam-webster.com/dictionary/otherwise (last visited February 24, 2025). The correct reading of section 9009c(b)(2)(A) is that Congress left open the possibility that additional amounts of money for further RRF grants could be made available but that this did not occur.[11] Neither the trial court nor plaintiffs-appellants ever identified any such funds. The statute is thus not open-ended as to the Government's liability because Congress chose not to make any funds available beyond the original $28.6 billion appropriation.

### C. The Trial Court Ignored That Congress' Subsequent Actions Eliminated Any Payment Obligation

Although the trial court requested the parties' position on the effect of the expiration of the statutory "covered period" and the Fiscal Responsibility Act's recission provision in its order for supplemental briefing, Appx27, the trial court's analysis ignored these issues. Assuming *arguendo* that section 9009c is money-mandating, the trial court still failed to perceive that even if the Government's liability

---

[11] Section 9009c(b)(2)(A) also states that the $28.6 billion will "remain available until expended," which implies that after the expenditure occurs there is no further money available. 15 U.S.C. § 9009c(b)(2)(A); *cf. Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1355 (Fed. Cir. 2005).

was open-ended or uncapped when section 9009c went into effect, Congress

subsequently eliminated any payment obligation under this statue.

The Fiscal Responsibility Act became law on June 3, 2023 and permanently

rescinded unobligated funds from at least eighty-one different Federal programs,

including the RRF.  *See* Pub. L. No. 118-5, 137 Stat. at 28.  "Generally, Congress is

not bound by earlier legislation; it remains free to modify earlier statutes." *Ind. Mun.*

*Power Agency v. United States*, 154 Fed. Cl. 752, 765 (2021), *aff'd* 59 F.4th 1382 (Fed. Cir.

2023) (citing *Dorsey v. United States*, 567 U.S. 260, 274 (2012)).  The Supreme Court

affirmed in *Maine Community Health* that a later Congress can alter, amend, modify, or

cancel its previous obligations through further legislation.  *Me. Cmty. Health*, 590 U.S.

at 318-19 (discussing *United States v. Mitchell*, 109 U.S. 146, 150 (1883) and *United States*

*v. Fisher*, 109 U.S. 143, 145-146 (1883)).  When Congress reforms a payment formula

in a manner "irreconcilable" with the original method, the later expression of

Congress controls.  *Id.*; *Ind. Mun. Power Agency*, 154 Fed. Cl. at 765.  By permanently

rescinding any unobligated balances in the RRF, Congress plainly intended to

eliminate any obligation created by the RRF program.

Similarly, the trial court failed to consider the requirement for grant recipients

to return any funds to the Treasury that were not used on or before the last day of the

"covered period."  *See* 15 U.S.C. § 9009c(c)(6).  There is no way for plaintiffs-

appellees to use any money on any allowable expenses by March 11, 2023, even if

those expenses were incurred during the covered period.  Section 9009c(c)(6)

represents Congress' intent for the RRF program to end and all funds to be spent by

awardees not later than March 11, 2023, or be forfeited.

### D. The Trial Court Erred by Determining That Even if the Government's Liability Was Capped, Plaintiffs-Appellees Would Still State a Claim

The trial court determined that even if there was a cap on the Government's

liability, plaintiffs-appellees could still state a claim that SBA failed to pay them funds

that they should have received had SBA not "misinterpreted the statute and made

award to the wrong applicants, contrary to Congress's express command in section

9009c(c)(1)."  Appx32.  The trial court expressed that it sought to effectuate

Congress' intent that plaintiffs-appellees be compensated for their pandemic-related

losses.  *Id.*

The problem with the trial court's analysis is that it is inextricably bound to its

jurisdictional errors.  SBA awarded grants based on its interpretation of section

9009c(c)(1) and its belief that the actual awardees met the statutory eligibility

requirements.  The trial court does not possess jurisdiction to determine that SBA

arbitrarily and capriciously "misspent" some portion of the $28.6 billion on "improper

payments" or awarded grants to the "wrong entities" based on a misinterpretation of

section 9009c(c)(1).  *See id.*

Plaintiffs-appellees cannot sufficiently allege that they "fall within the class as to

whom the statute is money-mandating" because creating this class in the first place would require the trial court to retroactively declare that SBA wasted money on "undeserving applicants" that might have gone to plaintiffs-appellants.  *See* Appx32, Appx22 (citing *Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005)).  Instead, plaintiffs-appellees should have invoked the equitable powers of the district courts to challenge SBA's disbursements while there was still funding available, like the *Vitolo* plaintiffs who asserted that the priority period was unconstitutional.  If the trial court's reasoning as to why plaintiffs-appellees state a claim is allowed to stand, it would necessarily expand the trial court's jurisdiction in novel and unforeseen ways.

## CONCLUSION

For these reasons, we respectfully request that this Court reverse the trial court's holding that 15 U.S.C. § 9009c is money-mandating and reverse the trial court's holding that plaintiffs-appellees' complaint states a claim upon which relief can be granted.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ William J. Grimaldi
WILLIAM J. GRIMALDI
Assistant Director

/s/ Rebecca S. Kruser
REBECCA S. KRUSER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tele: (202) 305-2035
Email: rebecca.s.kruser@usdoj.gov

March 14, 2025                    Attorneys for Defendant-Appellant

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit of Federal Rule of Appellate Procedure 5(c)(1) and Federal Circuit Rule 5 because the brief was generated by a computer and contains 13,368 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface, 14-point Garamond font.

/*s*/ Rebecca S. Kruser
Rebecca S. Kruser

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 14th day of March, 2025, a copy of the foregoing "BRIEF OF DEFENDANT-APPELLANT" was filed electronically.

X This filing was served electronically to all parties by operation of the Court's electronic filing system.

/s/ Rebecca S. Kruser

**ADDENDUM**

Opinion of the United States Court of Federal Claims Case No. 23-1876
(July 24, 2024) ................................................................ Appx1-34

# In the United States Court of Federal Claims

No. 23-1876C
Filed: July 24, 2024
FOR PUBLICATION

---

**112 GENESEE STREET, LLC, et al,**

        *Plaintiffs,*

v.

**UNITED STATES,**

        *Defendant.*

---

*F. Greg Bowman*, Williams & Connolly LLP, Washington, D.C., with *Edward Reddington* and *Robel Yared*, of counsel, for the plaintiff.

*Rebecca S. Kruser*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

### MEMORANDUM OPINION

***HERTLING*, Judge**

In March 2021, Congress enacted the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4 (2021), which, among other things, created the Restaurant Revitalization Fund ("RRF" or the "Fund"). The RRF was administered by the Small Business Administration ("SBA"). The SBA was to make grants to qualifying entities from the RRF to assist them to remedy the harms caused by the COVID-19 pandemic.

The plaintiffs are 303 restaurant, bar, and catering businesses. They have sued the United States, acting through the SBA, claiming that they were entitled to receive grants under the RRF. The plaintiffs seek monetary damages equal to the amounts sought in their unpaid grant applications. They allege they are entitled to these payments because 15 U.S.C. § 9009c(c)(1) required the SBA to "award grants to eligible entities in the order in which applications are received by the Administrator," but the SBA instead made payments to applicants in the order in which it processed the applications. The plaintiffs allege that, had the SBA made the grants in the order the applications were received, sufficient funds would have been left for them to receive grants. The plaintiffs also base their claims in part on factual allegations of unlawful,

**Appx1**

negligent, and/or arbitrary and capricious acts and omissions by the SBA.[1]  These actions and omissions, the plaintiffs allege, resulted in the improper payment of grants to the awardees, further depleting the funds that should have been used to pay grants to the plaintiffs.

The defendant has moved to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC").  According to the defendant, the plaintiffs' claims are beyond the jurisdiction of the Court of Federal Claims because: (1) the plaintiffs lack standing due to a lack of redressability for their alleged injury; (2) their claims are moot; (3) 15 U.S.C. § 9009c is not money-mandating and cannot support a claim under the Tucker Act; and (4) the court lacks jurisdiction over claims of arbitrary and capricious as well as negligent conduct by the SBA.  The defendant argues further that transfer to a district court would be futile because suits in district courts seeking RRF grants under the Administrative Procedure Act ("APA") have been rejected.  At oral argument, the Court *sua sponte* raised the question of whether 15 U.S.C. § 9009c caps the funds authorized for the RRF and, if so, whether such a cap limits the defendant's liability to the funds already spent, thereby preventing the plaintiffs from stating a claim for relief under Rule 12(b)(6).  The parties were directed to file supplemental briefs on that issue.

The defendant's motion to dismiss is denied.  The plaintiffs have properly brought their claim under the Tucker Act for damages under a money-mandating statute.  The plaintiffs' claims are not moot because the plaintiffs seek recovery from the Judgment Fund, and such funds would redress their alleged injuries.

The plaintiffs have also successfully stated a claim.  To be sure, there is caselaw establishing that Congress can limit the government's liability for damages under statutes that authorize grant programs to the specific amounts set forth in those statutes.  Such a cap is not present here because, although 15 U.S.C. § 9009c only requires using money in the RRF to award grants, it does not cap the defendant's liability as to the plaintiffs' claims that the defendant awarded grants in a manner that was contrary to the express command of the statute.  Even if the defendant's liability were capped, the relevant precedents in which a liability cap was essential to the decision involved claims in which the plaintiffs sought the difference between the amounts authorized under the statutes creating the grant programs and the amount of money Congress had therefore appropriated.  The plaintiffs, in contrast, are seeking damages because they allege the SBA violated Congress' express directive by using funds that should have been paid to the plaintiffs instead to make awards to the wrong applicants.  The plaintiffs' claims are of a different nature than the claims rejected in prior cases on which the defendant relies in seeking dismissal and are *sui generis*.  Without applicable precedent foreclosing them, the plaintiffs' claims may proceed on the merits.

---

[1] Although the plaintiffs collectively only bring one cause of action, contained within that action are 303 distinct claims, one for each plaintiff.  This opinion, therefore, refers interchangeably to the plaintiffs' claim or claims.

**Appx2**

## I.  BACKGROUND

### A.  Factual and Legal Background

On March 11, 2021, Congress created the RRF pursuant to section 5003 of ARPA, later codified as 15 U.S.C. § 9009c, to compensate "eligible entities" for "pandemic-related revenue loss" caused by the COVID-19 pandemic according to a formula provided in the statute. 15 U.S.C. § 9009c(a)(4), (7).  Eligible entities were broadly defined:

> The term "eligible entity" —
>
> (A) means a restaurant, food stand, food truck, food cart, caterer, saloon, inn, tavern, bar, lounge, brewpub, tasting room, taproom, licensed facility or premise of a beverage alcohol producer where the public may taste, sample, or purchase products, or other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink;
>
> (B) includes an entity described in subparagraph (A) that is located in an airport terminal or that is a Tribally-owned concern; and
>
> (C) does not include—
>
>> (i) an entity described in subparagraph (A) that—
>>
>>> (I) is a State or local government-operated business;
>>>
>>> (II) as of March 13, 2020, owns or operates (together with any affiliated business) more than 20 locations, regardless of whether those locations do business under the same or multiple names; or
>>>
>>> (III) has a pending application for or has received a grant under section 9009a of this title; or
>>
>> (ii) a publicly-traded company.

*Id.* § 9009c(a)(4).

The definition of the term "pandemic-related revenue loss" varies based on when an eligible entity initially opened and whether it was continuously in operation in 2019.  For entities that were open and operating for the entirety of 2019, "pandemic-related revenue loss" was defined as an entity's 2020 gross receipts subtracted from its 2019 gross receipts.  *Id.* § 9009c(a)(7).  For other entities, section 9009c(a)(7) provided different formulas to define "pandemic-related revenue loss," but also alternatively included in the definition "an amount based on a formula determined by the Administrator" for each different defined entity.

Under the RRF, eligible entities could receive grants equal to their pandemic-related revenue loss up to an aggregate maximum of $10 million, with no more than $5 million "per physical location of the eligible entity."  *Id.* § 9009c(c)(4).  The covered period for pandemic-

related losses spanned February 15, 2020, through March 11, 2023.  *Id.* § 9009c(a)(3); (ECF 1 at ¶ 27(a)).

To fund the RRF, Congress provided that "[i]n addition to amounts otherwise available, there is appropriated to the Restaurant Revitalization Fund for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $28,600,000,000, to remain available until expended."  15 U.S.C. § 9009c(b)(2)(A).  This $28.6 billion was further subdivided into two pots of money.  First, $5 billion was reserved for "eligible entities with gross receipts during 2019 of not more than $500,000."  *Id.* § 9009c(b)(2)(B)(i)(I).  Second, $23.6 billion "shall be available to the Administrator to award grants under subsection (c) in an equitable manner to eligible entities of different sizes based on annual gross receipts."  *Id.* § 9009c(b)(2)(B)(i)(II).  For this larger pot of money, the Administrator was authorized to "make adjustments as necessary to the distribution of [these] funds . . . based on demand and the relative local costs in the markets in which eligible entities operate."  *Id.* § 9009c(b)(2)(B)(ii).

This division into two separate pots of money lasted for "60 days after March 11, 2021," that is until May 10, 2021, "or another period of time determined by the Administrator," after which "the Administrator may make grants using amounts appropriated under subparagraph (A) to any eligible entity regardless of the annual gross receipts of the eligible entity."  *Id.* § 9009c(b)(2)(C).  The plaintiffs have pleaded "[o]n information and belief," that the Administrator did not extend this timeframe past May 10, 2021, meaning that any unobligated funds were freely available for award to any eligible entity after that date.  (ECF 1 at ¶ 28(c).)

Section 9009c limited how eligible entities could use the grants funds they received, but these limits were minimal.  Grant awardees could "use the grant funds for the following expenses incurred as a direct result of, or during, the COVID-19 pandemic," including: "[p]ayroll costs," mortgage payments, "[r]ent payments" (except for prepayment of rent), "[u]tilities," "[m]aintenance expenses," "[s]upplies," normal "[f]ood and beverage expenses," "[c]overed supplier costs," "[o]perational expenses," "[p]aid sick leave," and "[a]ny other expenses that the Administrator determines to be essential to maintaining the eligible entity."  15 U.S.C. § 9009c(c)(5).

Any eligible entity that "receive[d] a grant" and "fail[ed] to use all grant funds or permanently cease[d] operations on or before the last day of the covered period," was required to "return to the Treasury any funds that the eligible entity did not use for the allowable expenses . . . ." *Id.* § 9009c(c)(6).  Because the covered period ran through March 11, 2023, any unused grant awards as of March 12, 2023, had to be returned to the Treasury.

To receive an award, eligible entities had to submit applications to the SBA certifying their need for the grant money and that they had not already received a grant under the Shuttered Venue Operators Grant program, 15 U.S.C. § 9009a.  *Id.* § 9009c(c)(2)(A)(ii).

All applications were subjected to a two-step review process by the SBA.  This process included a tax verification and then either an automatic or manual SBA review, including resolution of any issues or discrepancies.  (ECF 1 at ¶ 44.)  A manual review could take 10 to 14 days or longer, while an automatic review took "no more than approximately 48 hours."  (*Id.*

¶ 46(a)-(b).)  "The review process did not include any mechanism for reserving funds for applications in the order they were received.  It also did not include a check before awarding a grant to determine the order in which the application under consideration was received."  (*Id.* ¶ 46(c).)

The SBA processed applications in three different sets: first a trial set, second the set of applicants prioritized by the statute, and, finally, all other applicants.

The trial group was processed "[b]etween April 25, 2021[,] and May 2, 2021."  (*Id.* ¶ 53.)  The trial group consisted of "approximately 2,600 potential applicants randomly selected from existing [Paycheck Protection Program] participants in the restaurant industry [who] were permitted to submit applications through the online portal to test its operation."  (*Id.*)

After the trial set, on May 3, 2021, the SBA began accepting applications through an online portal, a telephone call center, and five electronic systems.  (*Id.* ¶¶ 29(b), 37-39.)  As of that day, the SBA accepted applications from applicants in both priority and non-priority groups.  (*Id.* ¶¶ 4, 51(a) (The "SBA repeatedly encouraged businesses to submit applications on May 3, 2021, when the online portal opened."), 54.)

Regarding the priority applicants, section 9009c established a 21-day window in which applications from women-owned, veteran-owned, and socially and economically disadvantaged small business concerns received priority consideration.  15 U.S.C. § 9009c(c)(3)(A).[2]  That 21-day period ran from May 3, 2021, to May 23, 2021.  (ECF 1 at ¶ 29(b)).  After May 11, 2021, the Administrator was permitted, but not required, to "make grants using amounts appropriated under subparagraph (A) to any eligible entity regardless of the annual gross receipts of the eligible entity."  15 U.S.C. § 9009c(b)(2)(C); (*see also* ECF 1 at ¶¶ 28(c), 49(d), 55.)[3]

As for all other applicants, the SBA did not begin processing their applications on May 24, 2021, the first day after the end of the priority period.  Instead, the "SBA has represented" that on May 25, 2021, two days after the expiration of the priority application period, it "began

---

[2] On May 27, 2021, the Sixth Circuit issued a preliminary injunction ordering the SBA to fund an applicant's "grant application, if approved, before all later-filed applications, without regard to processing time or the applicants' race or sex."  *Vitolo v. Guzman*, 999 F.3d 353, 365 (6th Cir. 2021).  In so doing, the Sixth Circuit held that, except for the preference for veteran-owned applicants, the priority provisions likely violated the equal protection component of the due process clause to the extent they prioritized grant award to businesses based on the sex or race of their owners.  *Id.* at 360-66.

[3] After the priority period ended on May 23, 2021, the "SBA decided . . . it would cease processing applications received from [p]riority [a]pplicants, process only non-priority applications SBA had received, award grants only to non-priority applicants, use remaining RRF funding only for grants awarded to non-priority applicants, and disburse no further awards to [p]riority [a]pplicants."  (ECF 1 at ¶ 59.)

processing non-priority applications with FY 2019 gross revenues less than $500,000 . . . ." (ECF 1 at ¶ 62.) It was not until May 27, 2021, that the SBA finished making awards to priority applicants and began processing and making awards to other non-priority applications. (*Id.* ¶¶ 62, 64, 65). Notably, on May 24, 2021, the SBA stopped accepting RRF applications due to "overwhelming demand." *Kingsley Restaurants, Inc. v. United States Small Bus. Admin.*, No. 1:21-CV-2314-SCJ, 2021 WL 8441778, at *1 (N.D. Ga. Aug. 24, 2021).[4] "[C]laims on the RRF rapidly dwarfed the allocation of funds set aside by Congress." *Id.*

When making awards, section 9009c required that, except for the priority applicants during the 21-day priority period and the division of the RRF into the two pots of money based on gross revenues through May 10, 2021, "the Administrator shall award grants to eligible entities in the order in which applications are received by the Administrator." 15 U.S.C. § 9009c(c)(1). The plaintiffs allege that despite this express requirement, the SBA decided to issue awards in the order in which applications were processed, not the order in which they were received. (ECF 1 at ¶ 8.) Even though the plaintiffs' well-pleaded allegations are taken to be true in resolving a motion to dismiss, the defendant notably has not denied that the SBA proceeded in the manner alleged by the plaintiffs.

The plaintiffs each submitted its application to the SBA for RRF grant awards on May 3, 2021. (*Id.* ¶ 13.) Despite applying on the first possible day, none of the plaintiffs was ever awarded a grant from the RRF, even though other non-priority applicants that filed their applications later received grants. (*See id.* ¶¶ 5, 9, 138.) The plaintiffs contend that they should have been awarded grants but were not because the SBA unlawfully did not award grants in the order that applications were received. (*Id.* ¶¶ 5, 75.) Instead, the "SBA awarded RRF grants in the order applications were processed. Because the time required to process applications varied greatly, the order in which SBA awarded grants differed significantly from the order in which applications were received." (*Id.* ¶ 47.) While the SBA awarded grants in the order in which applications were processed (*id.* ¶ 8), and although the complaint notes the SBA "*claims* to have initiated processing of applications in the order they were received" (*id.* ¶ 54(b) (emphasis added)), it is nevertheless unclear from the complaint and the parties' briefs how and in what order the SBA decided to process the non-priority applications.

On or about June 30, 2021, the SBA stopped processing RRF applications. (*Id.* ¶ 67.) By that point, the SBA had awarded approximately $28 billion in RRF grants. (*Id.* ¶ 75.) In "June 2022, approximately $180 million of RRF funding remained without recorded obligations, including $24 million set aside for litigation." (*Id.* ¶ 68.) "After November 2022, SBA awarded approximately $83 million in additional grants to businesses whose applications had been fully processed as of June 30, 2021." (*Id.* ¶ 69.) These funds were at least partially "from recoveries of misallocated grants or return of unused grants." (*Id.*) This set of RRF grant awards was allegedly issued in the order in which the applications had been received, after the Department of

---

[4] Although the date the SBA stopped accepting applications is not noted in the complaint, the plaintiffs tacitly agree with the defendant that no new applications were accepted after May 24, 2021. (*See* ECF 8 at 40 (citing ECF 7 at 2 n.3).)

Justice advised the SBA on "how to comply with statutory requirements and court rulings." (*Id.* ¶ 69(a)-(b).)

On June 3, 2023, the Fiscal Responsibility Act, Pub. L. 118-5, 137 Stat. 10, became law. Division B, Title I, Section 52 of that act provided that "[t]he unobligated balances of amounts made available by section 5003(b)(2)(A) of Public Law 117-2," that is 15 U.S.C. § 9009c(b)(2)(A), "are hereby permanently rescinded." Notwithstanding this law, the plaintiffs allege "[o]n information and belief, available RRF funding will increase in fiscal year 2024 as a result of SBA's mandatory required audit and recovery efforts that will be ongoing through at least July 2024." (ECF 1 at ¶ 70.)

### B. Procedural History

On October 25, 2023, the plaintiffs filed their complaint. (ECF 1.) On February 26, 2024, the defendant moved to dismiss pursuant to RCFC 12(b)(1). (ECF 7.) The plaintiffs responded on March 25, 2024 (ECF 8), and the defendant replied on April 22, 2024 (ECF 10). Oral argument was heard on May 22, 2024. During oral argument, the Court raised the question of whether 15 U.S.C. § 9009c(b)(2)(A) included a cap on the defendant's liability that may preclude the plaintiffs from stating a claim. The Court ordered supplemental briefing to address this issue. (ECF 13.) Each side filed its supplemental brief on June 5, 2024. (ECF 16-17.)

## II.   JURISDICTION AND STANDARDS OF REVIEW

The Tucker Act, 28 U.S.C. § 1491(a), vests in the Court of Federal Claims jurisdiction over claims for money damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The Tucker Act itself does not "create[ ] a substantive right enforceable against the Government by a claim for money damages." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). To bring a claim within the Court of Federal Claim's limited jurisdiction, a plaintiff must allege a violation of a statutory, regulatory, or constitutional provision which is money-mandating, meaning the provision "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States v. Testan*, 424 U.S. 392, 400 (1976) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)).

The defendant has moved to dismiss the complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1). In considering a motion under RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed.

Cir. 2011).  When a plaintiff's asserted jurisdictional facts are disputed, however, only the plaintiff's uncontroverted factual allegations are accepted as true.  *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012).  A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings.  *Id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)).  Accordingly, a court may consider in resolving a motion to dismiss for lack of jurisdiction information provided by the defendant contrary to the allegations in the complaint.

The plaintiffs have the burden of establishing jurisdiction by a preponderance of the evidence.  *Trusted Integration, Inc*, 659 F.3d at 1163.  If a court finds that the plaintiffs have not met their burden to establish subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires dismissal of that claim.

As permitted by Federal Circuit precedent, the Court *sua sponte* raised the question of whether the plaintiffs' complaint must be dismissed for failure to state a claim under RCFC 12(b)(6).  *See Anaheim Gardens v. United States*, 444 F.3d 1309, 1315 (Fed. Cir. 2006) ("The trial court may dismiss sua sponte under Rule 12(b)(6), provided that the pleadings sufficiently evince a basis for that action.").  Dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  In considering dismissal under RCFC 12(b)(6), a court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party.  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).  To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiffs are entitled to the relief sought.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

## III.   DISCUSSION

### A.   The Parties' Arguments

The defendant raises four arguments in its motion to dismiss for lack of subject-matter jurisdiction.

First, it argues the plaintiffs lack standing because their claims are not redressable.  Specifically, the defendant argues that because the amount of funding set by Congress has been expended, no money remains in the RRF to pay for any grants; the plaintiffs' injuries, if any, therefore cannot be redressed.  (ECF 7 at 14-16.)

Second, the defendant argues that the plaintiffs' claims are moot for two reasons: (1) the covered period for RRF grants has expired, meaning any unused grants would have to be returned to the Treasury as required by section 9009c(c)(6); and (2) Section 52 of Division B,

Title I of the Fiscal Responsibility Act "permanently rescinded" any "unobligated balances of amounts made available by section [9009c](b)(2)(A)." (*Id.* at 16-19.)

Third, the defendant contends that section 9009c is not money-mandating because it does not require awarding a grant to any applicant. (*Id.* at 19-22.) The defendant argues that section 9009c(c)(1) does not confer a substantive right to money because it "only speaks to the method of application administration and processing of award disbursements." (*Id.* at 20.) As for section 9009c(b)(3), while it requires the money to be used by the administrator, it is not money-mandating because it does not require payment to any specific applicant. (*Id.* at 21-22.)

Finally, the defendant argues that the complaint's references to arbitrary and capricious acts and omissions and negligence are attempts to bring claims under the APA over which the Court of Federal Claims lacks jurisdiction. (*Id.* at 22-24, 28-29.) Further, the defendant argues that the substance of the plaintiffs' "allegations in essence is an APA claim challenging SBA's decisions in administering the RRF program," notwithstanding their claim for money damages. (*Id.* at 24-27.)

The plaintiffs, naturally, disagree. They contend that they have standing because they are not seeking equitable relief that would order the SBA to award a grant, but rather money damages for the SBA's failure to award grants in compliance with the law that established the RRF. (ECF 8 at 21-23.) The availability of funds, the plaintiffs argue, is a question for the merits, not a jurisdictional defect, because the Judgment Fund can be used to pay any award for monetary damages. (*Id.* at 23 n.13, 23-27.)

Next, the plaintiffs argue their claims are not moot because section 9009c(c)(5) allows them to use any grant money received to offset already incurred expenses that predate the receipt of funds. Specifically, the plaintiffs point to the fact that the term "covered period" under section 9009c(c)(5) allows grant awards to be used for expenses that were incurred as early as February 15, 2020, well before any awards were made. (*Id.* at 27-29.) As to whether section 9009c is money-mandating, the plaintiffs argue that 9009c(c)(1) required payment of grants to them specifically because of the timeliness of their applications. (*Id.* at 18-21.) According to the plaintiffs, the SBA lacked discretion to decide whether to award a grant based on finding an applicant was qualified but had to award a grant to any qualified applicant in the order in which the application was received. (*Id.* at 12-21.)

Lastly, the plaintiffs contend that the court has jurisdiction to review whether an agency followed statutes and regulations and that the possibility of an overlap between the APA and the Tucker Act does not divest the court of jurisdiction. (*Id.* at 34-39.) The plaintiffs further emphasize how their claims for money damages more closely resemble the money damages claims in *Maine Community Health Options v. United States*, 590 U.S. 296 (2020), than the claim for injunctive relief in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), and thus fall within the jurisdiction of the Court of Federal Claims under the Tucker Act, not the district courts under the APA. (*Id.* at 39-42.) The plaintiffs notably disclaim any attempt to bring APA claims and instead explain that references in the complaint to negligence or arbitrary and capricious actions are simply a "characterization of agency action," not a basis for relief. (*Id.* at 36, 39.)

9

**Appx9**

B.      **Rule 12(b)(1)**

1.      **The Scope of the Plaintiffs' Claims**

a.      **The Tucker Act vs. the APA**

The complaint's singular cause of action is explicitly limited to a claim for money damages under the Tucker Act.  (ECF 1 at 45.)  The defendant, however, argues the court entirely lacks jurisdiction over the complaint because in substance the plaintiffs plead a claim under the APA for the SBA's illegal conduct in administering the RRF and its negligence.  Such claims, the defendant asserts, fall within the jurisdiction of the district courts.

In advancing these arguments, the defendant relies heavily on *Bowen* and the Federal Circuit's opinion in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994) while attempting to distinguish the present case from *Maine Community Health*.  (ECF 7 at 34, 38-41.)

A court's "jurisdiction cannot be circumvented by [ ] artful pleading and, accordingly, [courts] customarily look to the substance of the pleadings rather than their form."  *Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998).  "Regardless of the characterization of the case ascribed by [a plaintiff] in its complaint, [courts] look to the true nature of the action in determining the existence or not of jurisdiction." *Katz*, 16 F.3d at 1207 (Fed. Cir. 1994).

When examining whether a claim falls under the APA or the Tucker Act, the Federal Circuit has instructed that "[t]he analysis begins [ ] with the question raised by 5 U.S.C. § 704— is there an 'adequate remedy' in a court other than the district court, that is, can the Court of Federal Claims provide an adequate remedy under the Tucker Act for the alleged wrong." *Suburban Mortg. Assocs., Inc. v. United States*, 480 F.3d 1116, 1125 (Fed. Cir. 2007).  As the Federal Circuit explained, "[i]f the jurisdictional requirements of the Tucker Act are satisfied . . . and if the Court of Federal Claims through a money judgment can provide an adequate remedy under the Tucker Act, § 704 bars the district court from hearing the case because it belongs in another court—the Court of Federal Claims." *Id.* at 1125-26 (cleaned up).

There is no question that the payment of money damages to the plaintiffs, if available, "would provide them with a complete and adequate remedy for the relief currently sought." *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 24 (2011) (citing *Suburban Mortg.*, 480 F.3d at 1126 and noting that when adequate remedies are available under the Tucker Act, "the district courts lack jurisdiction under section 704 of the APA"); *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349-50 (Fed. Cir. 2005) (cleaned up) ("The availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes.  Because [the plaintiff] can bring an action under the Tucker Act or Little Tucker Act to redress the allegedly improper exaction, there is no waiver of sovereign immunity under the APA.").

The plaintiffs here seek only money damages (ECF 1 at 46); such damages would adequately compensate them for the allegedly illegal failure of the SBA to award the plaintiffs

10

**Appx10**

the grants, *i.e.*, money, which they applied for and were entitled to but did not receive.  The plaintiffs are not seeking prospective relief.  Similarly, there is no request that would entangle the court in a "complex ongoing relationship" necessitating adjudication of future disputes. *Maine Cmty. Health*, 590 U.S. at 327.  These factors suggest that the plaintiffs' claims fall more neatly under the Tucker Act than they do under the APA.

Also relevant to the analysis is the fact that relief has not been available under the APA to claimants seeking RRF grants.  Multiple district courts have found that equitable relief is unavailable because the RRF has been depleted, and that claims under the APA are therefore moot.  *Reboot Macon, LLC, v. United States*, 5:21-CV-221, 2023 WL 4672395, at *3-5 (M.D. Ga. July 20, 2023); *Collins v. Small Business Admin.*, No. 2:22-CV-4104, 2024 WL 128201, at *3-4 (E.D. Pa. Jan. 11, 2024); *W6 Restaurant Group, Ltd, v. Guzman*, No. 1:21-CV-2361, 2024 WL 1973132, at *6-10 (N.D. Ohio May 3, 2024).  In the absence of available APA remedies, not only does the Tucker Act provide an "adequate remedy," but likely the only remedy for the plaintiffs' claims.

The defendant attempts to shoehorn the plaintiffs' claims into the *Bowen* framework to argue they must be raised under the APA.  The plaintiff in *Bowen* sought "to review a final order of the Secretary of Health and Human Services refusing to reimburse a State for a category of expenditures under its Medicaid program."  487 U.S. at 882.  The Supreme Court held that a:

> suit to enforce § 1396b(a) of the Medicaid Act, which provides that the Secretary "shall pay" certain amounts for appropriate Medicaid services, is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.

*Id.* at 900.[5]

---

[5] The Supreme Court hinted that its holding in *Bowen* was not broad, noting in a footnote immediately after the language quoted in the text that "[t]here are, of course, many statutory actions over which the Claims Court has jurisdiction that enforce a statutory mandate for the payment of money rather than obtain compensation for the Government's failure to so pay.  The jurisdiction of the Claims Court, however, is not expressly limited to actions for 'money damages,' whereas that term does define the limits of the exception to § 702.  Moreover, such statutes, unlike a complex scheme such as the Medicaid Act that governs a set of intricate, ongoing relationships between the States and the Federal Government, are all statutes that provide compensation for specific instances of past injuries or labors; suits brought under these statutes do not require the type of injunctive and declaratory powers that the district courts can bring to bear in suits under the Medicaid Act.  Thus, to the extent that suits to enforce these statutes can be considered suits for specific relief, suits under the Tucker Act in the Claims Court

11

**Appx11**

The Supreme Court's holding in *Bowen* has been narrowly interpreted by the Federal Circuit.  In *Consolidated Edison Company of New York v. U.S. Department of Energy*, the Federal Circuit explained that "[i]n *Bowen*, the Supreme Court linked its judgment to a specific set of circumstances," that were "not present in [*Consolidated Edison*]."  247 F.3d 1378, 1384, *cert. denied*, 534 U.S. 1034 (2001).  In *Suburban Mortgage,* the Federal Circuit expounded on the appropriate and limited application of *Bowen* by focusing on the distinctive circumstances present in that case:

> These circumstances include: Bowen was a dispute between two sovereigns—a state government and the federal government—implicating federalism issues; the dispute centered on the administration of a major federal grant, the Medicaid program, involving enormous sums of money and complex interactions between the governments and the beneficiaries; at issue were the institutional arrangements between these two governments; the governments were locked into a fabric of long-term administration of the program; and the money involved in the uncovered education services was a small fraction of the total reimbursement the state received each year for its Medicaid costs under the program. In addition, the Court's focus was on the statutory requirements set forth in this complex grant program—nowhere in *Bowen* did the Court make reference to the existence of any specific contract or express agreement defining the relationship between the parties.

*Suburban Mortg*., 480 F.3d at 1127.  These distinctive factors of *Bowen* were absent from *Consolidated Edison* and *Suburban Mortgage*; they are also absent from this case.

The effort to limit *Bowen* to the nature of the underlying statutory regime at issue and the remedy sought was reinforced in *Suburban Mortgage*, in which the Federal Circuit identified as the key feature of *Bowen* the fact that it involved "a complex, ongoing relationship between plaintiff and the Government in which the plaintiff seeks declaratory or injunctive relief to modify the Government's *future* obligations under the program."  *Suburban Mortgage*, 480 F.3d at 1127 (emphasis in original).

Because of these absent features, in *Suburban Mortgage*, unlike in *Bowen*, "a judgment ordering prospective relief w[as] not [ ] necessary or appropriate".  *Id.*  Thus, jurisdiction in *Suburban Mortgage* was found to be appropriate in the Court of Federal Claims, not the district court.  As now-Judge Solomson observed in analyzing these precedents in his book on the jurisdiction and procedure of the Court of Federal Claims, "[t]he bottom line is that, if a plaintiff's goal is to obtain a money judgment and the claim does not sound in tort, the [Court of Federal Claims] should be considered as the putatively correct forum for the claim in the first

---

offer precisely the sort of 'special and adequate review procedures' that § 704 requires to direct litigation away from the district courts."  *Bowen*, 487 U.S. at 900 n.31 (cleaned up).

instance."  Matthew H. Solomson, Court of Federal Claims Jurisdiction, Practice, and Procedure, 29.IV.A. (2016).

Most importantly, the Supreme Court appears to have agreed with the Federal Circuit when it clarified how to apply *Bowen* in *Maine Community Health.*  In *Maine Community Health*, its most recent exposition on the Tucker Act, the Supreme Court appeared to accept the Federal Circuit's approach by pointing to two grounds on which to distinguish *Bowen*.

First, the Court noted that the nature of relief sought in *Bowen* was not money damages but instead "prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations under the Medicaid program."  *Maine Cmty. Health*, 590 U.S. at 326-27.  Similarly, the plaintiffs here are seeking "past due sums," *see id.*, and not injunctive, declaratory, or other prospective relief.  (ECF 1 at ¶ 153 (specifying plaintiffs have "incur[red] monetary damages in the amount of their RRF grants"); ECF 1-2.)

Second, the Supreme Court emphasized the importance of the relationship between the parties.  According to the Supreme Court, "the Administrative Procedure Act 'is tailored' to '[m]anaging the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets,' while the Tucker Act is suited to 'remedy[ing] particular categories of past injuries or labors for which various federal statutes provide compensation.'"  *Maine Cmty. Health*, 590 U.S. at 326-27 (quoting *Bowen*, 487 U.S. at 904-05 n.39).  The plaintiffs' claims are for a one-time grant award.  They would not require any ongoing or prospective relationship with the SBA regarding the RRF; the plaintiffs are seeking only a one-time payment of damages for grants that they contend they are owed but did not receive, contrary to the express requirements imposed on the SBA by Congress.

As refined and clarified by ensuing precedents from both the Supreme Court and the Federal Circuit, *Bowen* does not support the defendant's argument that the plaintiffs' claims are beyond the jurisdiction of the Court of Federal Claims under the Tucker Act.

The defendant's reliance on *Katz v. Cisneros* is also misplaced.  That case involved a challenge by a plaintiff to a federal agency's interpretation of its regulations related to federal housing-support payments to local housing agencies.  *Katz* did not involve a claim under a direct statutory obligation between the plaintiff and a federal agency; rather, it involved a challenge to an agency's regulations that happened to have financial consequences for the plaintiff.  16 F.3d at 1205-06; *see also Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1059-60 (Fed. Cir. 1995) (relying on the fact that the plaintiff in *Katz* was not in privity with the federal government, but rather sought to challenge an interpretation of federal regulations that would indirectly and prospectively provide money to the plaintiff by changing how a federal agency calculated future contract rents under a contract between the plaintiff and a local housing agency); *Boaz Hous. Auth. v. United States*, 141 Fed. Cl. 74, 81 (2018) (same), *aff'd*, 994 F.3d 1359 (Fed. Cir. 2021).  The Federal Circuit held that the claim in *Katz* was properly heard in district court under the APA because the plaintiff was seeking prospective relief through an interpretation of a federal regulation.  *Katz*, 16 F.3d at 1208-1209.  In contrast, the plaintiffs in the present case request retrospective damages resulting from the SBA's denial of a one-time

payment of money directly from the federal government under a grant program administered by the SBA.  The relief sought by the plaintiffs does not require any prospective relief.

While the plaintiffs' claim involves a challenge to the SBA's past administration of the RRF, this fact on its own does not convert the plaintiffs' claim for damages into an APA claim. "The fact that the Claims Court ha[s] to interpret the meaning of [a] regulation does not convert [the plaintiffs' claim] into an APA claim.  The Claims Court can resolve issues, including interpreting a government regulation." *Portland Mint v. United States*, 102 F.4th 1371, 1381 n.6 (Fed. Cir. 2024) (citing *Radium Mines Inc. v. United States*, 153 F. Supp. 403, 405-06 (Ct. Cl. 1957)) (interpreting the word "redemption" in regulations governing the redemption of bent or partial coins by the U.S. Mint).  This recent holding by the Federal Circuit in *Portland Mint* is consistent with its long-standing jurisprudence.  "'It is often necessary to interpret or apply statutory or common law principles in order to resolve contract claims, but the fact that the resolution of a contract claim may turn on the interpretation of a statute does not deprive the Court of Federal Claims of jurisdiction over that claim.'"  *Holmes v. United States*, 657 F.3d 1303, 1312 (Fed. Cir. 2011) (quoting *Del–Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358, 1367 (Fed. Cir. 1998)).

The fact that the plaintiffs' claims are based directly on an alleged violation of a statutory command rather than the interpretation of a contract does not *ipso facto* place the claims under the APA and outside the Tucker Act.  Indeed*, Maine Community Health* addressed the effect of a limitation in an appropriations rider that sought to limit the obligations authorized in the underlying statutory scheme, a case of statutory interpretation.  590 U.S. at 314-21.  *Bowen* and its progeny provide the test for determining whether a claim falls under the APA, for the district courts to resolve, or under the Tucker Act, for this court to resolve.  Whether the underlying legal issue involves the interpretation of a statute, regulation, contract, or other legal instrument is not determinative to the outcome of that test.

Judges of this court routinely review the way federal agencies administer and apply statutes and regulations in a wide variety of contexts.  The court often considers under the Tucker Act claims over which district courts may have concurrent jurisdiction.  *See Quality Tooling, Inc. v. United States*, 47 F.3d 1569, 1573 (Fed. Cir. 1995) ("There can be little doubt that, by statute, both the District Court, sitting in bankruptcy, and the Court of Federal Claims are empowered with subject matter jurisdiction over this contract dispute."); *Qwest Corp. v. United States*, 48 Fed. Cl. 672, 686 (2001) ("There is nothing irreconcilable between the statutes in permitting [a plaintiff] to seek 'just compensation' in the Court of Federal Claims under the Tucker Act for an alleged taking . . . even though [a plaintiff] may seek the same relief in a federal district court under the Telecom Act.").

This case is simply an instance of concurrent jurisdiction, which the Court of Federal Claims already has with the district courts in several legal areas, such as claims for tax refunds, 28 U.S.C. § 1346(a)(1), and claims seeking less than $10,000, 28 U.S.C. § 1346(a)(2).  This concurrent jurisdiction can also include claims that involve questions of statutory interpretation. *See Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1551 & n. 2 (Fed. Cir. 1991) ("agree[ing] with th[e] principle" "that district court jurisdiction can be concurrent with that of the Claims Court," particularly in suits under the APA or "involve[ing] statutes with language permitting a

14

**Appx14**

party to 'sue and be sued' in district court."); *Brit. Airways PLC v. United States*, 170 Fed. Cl. 305, 311 (2024) (noting "[i]t is well established that this jurisdictional grant extends to suits for the refund of taxes remitted to the Treasury"; such suits often involve interpreting the Internal Revenue Code) (citing 28 U.S.C. § 1346(a)); *Prochazka v. United States*, 116 Fed. Cl. 444, 451-57 (2014) (in the context of an Equal Access to Justice Act fee petition, evaluating whether the defendant's interpretation of a statute was substantially justified in part by looking to a district court's opinion addressing the same "general issue raised in this case"). Further, the Federal Circuit, without suggesting that such a challenge was properly raised only under the APA, has specifically considered whether the government's interpretation of a term in a grant-authorizing statute was correct. *Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1356-58 (Fed. Cir. 2005) (addressing the meaning of "trees per acre" in Pub. L. No. 106-387, § 810(a)).

The plaintiffs are seeking a one-time payment of a specific amount of money they contend is due to them and are not seeking prospective relief nor are in an ongoing, long-term relationship with the federal government. Their claim properly falls under the Tucker Act and not the APA, provided that 15 U.S.C. § 9009c is money-mandating.

### b.    The Plaintiffs' Inartful Complaint

Before addressing whether section 9009c is money-mandating, the plaintiffs' complaint must be addressed. On its face, the complaint is explicitly limited to a claim for money-damages under section 9009c. (ECF 1 at ¶ 14, pg. 41, 45-46.) Nevertheless, the complaint repeatedly alleges negligent and arbitrary or capricious conduct by the SBA. (*Id.* ¶¶ 80-143.) These references have, fairly, led the defendant to question whether the plaintiffs are attempting to raise an APA claim or, even further afield, a claim for negligence.

It is well-established that the court does not possess jurisdiction over negligence claims, which sound in tort and are expressly excluded from Tucker Act jurisdiction, 28 U.S.C. § 1491(a); *Keene Corp. v. United States*, 508 U.S. 200, 214 (1993) ("[T]ort cases are outside the jurisdiction of the Court of Federal Claims today . . . ."). Likewise, claims under the APA are beyond the jurisdiction of the Court of Federal Claims. *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) ("[T]he Court of Federal Claims lacks APA jurisdiction . . . ."). The plaintiffs do not dispute this settled law. Instead, they assert that they only intended their complaint to characterize the defendant's actions, rather than raise additional claims. (ECF 8 at 36, 39.)

The complaint is inartful, containing much superfluous and useless rhetoric to add atmospherics to the claim. Not only does this surplusage needlessly put at risk the jurisdictional basis for the plaintiffs' claims, but it is ineffective.

To the extent the plaintiffs' complaint simply includes a "characterization of agency action," however, that characterization is not relevant to the court's jurisdiction. *See Brazos*, 144 F.3d at 787; *Katz*, 16 F.3d at 1207. "Of course, the party who brings a suit is master to decide what law he will rely upon . . . ." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913). The complaint should not have included references to negligence or arbitrary conduct by the SBA, but it does not explicitly state a cause of action under the APA or a negligence

theory and does not claim to rely on the APA or another basis for asserting this court's jurisdiction. (ECF 1 at ¶ 14, pg. 41, 45-46.) In short, the plaintiffs are arguing that the SBA did not have discretion to refuse to make grant awards to them under the statute, and the arbitrary exercise of discretion that the SBA did not have does not affect the legal issue raised by the plaintiffs.

The gravamen of the plaintiffs' complaint is that the defendant violated a money-mandating statute within this court's Tucker Act jurisdiction, and not whether the defendant committed a tort or violated the APA. *Cf. Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("The [well-pleaded complaint] rule makes the plaintiff the master of the claim; he or she may avoid" raising claims they do not wish to raise.). If on the merits the plaintiffs attempt to argue they may recover based on the SBA's negligent or arbitrary conduct without connecting it to a violation of a money-mandating statute, the defendant can object to such claims as falling outside the scope of the plaintiffs' complaint and the court's jurisdiction.

## 2.    Whether Section 9009c is Money-Mandating

The plaintiffs' claims are properly heard under the Tucker Act because they seek monetary relief rather than prospective relief under the APA and do not sound in tort. The question remains whether section 9009c is money-mandating such as to allow the plaintiffs the monetary relief they seek. The two relevant provisions are: (1) subsection (b)(3)'s requirement that "[t]he Administrator shall use amounts in the Fund to make grants described in subsection (c)," and (2) subsection (c)(1)'s requirement that "[e]xcept as provided in subsection (b) and paragraph (3), the Administrator shall award grants to eligible entities in the order in which applications are received by the Administrator." The plaintiffs rely on the "shall award" language of section 9009c(c)(1) to support their claim that the statute is money-mandating.

The defendant acknowledges that a statue is money-mandating "when the Government does not have any discretion to pay funds once the requirements of the statute are met." (ECF 7 at 19 (citing *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005)).) The defendant argues, however, that "nothing in [section 9009c's] text compels SBA to pay upon receipt of a satisfactory application." (*Id.* at 21.) "If Congress had intended SBA to award grants after the priority period to all eligible entities" or some variation thereof, "it would have said so." (*Id.* at 20.) Instead, the defendant argues that the "shall award" language of section 9009c(c)(1) "only speaks to the method of application administration and processing of award disbursements." (*Id.*) The defendant also points to section 9009c(b)(3), which provides that "[t]he Administrator shall use amounts in the RRF to make grants described in subsection (c)," to argue that this provision shows Congress only *empowered* the SBA to make awards to entities that met the eligibility criteria; Congress did not require "SBA to specifically make payments to any applicant." (*Id.* at 21.)

"A statute is money mandating if either: (1) it can fairly be interpreted as mandating compensation by the Federal Government for damages sustained; or (2) it grants the claimant a right to recover damages either expressly or by implication." *Lummi Tribe of the Lummi Rsrv., Washington v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017) (cleaned up). "It is enough 'that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates

16

a right of recovery in damages.' [*United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003)]. Further, the statute and regulations must be money-mandating as to the class of which plaintiff claims to be a member." *Roberts v. United States*, 745 F.3d 1158, 1162 (Fed. Cir. 2014).

"A statute is not money-mandating when it gives the government *complete* discretion over the decision whether or not to pay an individual or group." *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (emphasis added). Even statutes that appear to be discretionary can be money-mandating. An apparently discretionary statute is money-mandating "when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Id.* (quoting *Samish Indian Nation*, 419 F.3d at 1364-65).[6] Although this test apparently requires the "precise amounts to be paid" to be clear from the statute, the Federal Circuit has noted that a statute may be found to be money-mandating even when an agency "retains some discretion to determine the amount of an award, within prescribed limits . . . ." *Doe v. United States*, 100 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Bradley v. United States*, 870 F.2d 1578 (Fed. Cir. 1989)).

"'Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Gross v. FBL Fin. Servs.*, Inc., 557 U.S. 167, 175 (2009) (quoting *Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 252 (2004)). "When terms used in a statute are undefined, [courts] give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (cleaned up). "The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences." *Beecham v. United States*, 511 U.S. 368, 372 (1994).

Section 9009c does not provide the Administrator discretion as to whether to award a grant. Section 9009c(b)(1) establishes the RRF, with subsection (b)(2)(A) specifically appropriating $28.6 billion in funding for the RRF and authorizing the SBA to place an "amount otherwise available" into the RRF. The next provision, (b)(2)(B)(i) goes on to specify that $5 billion should be set aside for certain smaller businesses, and that the remaining $23.5 billion should be available "to award grants under subsection (c) in an equitable manner to eligible

---

[6] Notably, both *Doe* and *Samish Indian Nation* frame this test with the disjunctive "or," but a later case, *Roberts v. United States*, without explanation, frames this test with the conjunctive "and," requiring all three prongs to be met. 745 F.3d at 1163 (citing *Perri v. United*, 340 F.3d 1337, 1343 (Fed. Cir. 2003) (finding all three factors met in that case without framing them as elements of a test)). Because *Doe* and *Samish Indian Nation* both preceded *Roberts* and, unlike *Perri*, explicitly expounded a three-part disjunctive test, the Court relies on the earlier framing of the test.

entities of different sizes based on annual gross receipts." Subsection (b)(2)(B)(ii) allows the Administrator to "make adjustments as necessary to the distribution of funds under clause (i)(II) based on demand and the relative local costs in the markets in which eligible entities operate." Skipping over subparagraph (b)(2)(C), which deals with when the Administrator is allowed to make awards after the initial period, subsection (b) ends with paragraph (b)(3)'s unambiguous command that "[t]he Administrator shall use amounts in the Fund to make grants described in subsection (c)."

This language allows the Administrator no discretion as to the uses to which she may put the amounts in the Fund. None of provisions in subsection (b) establishing the RRF provide any discretion to the Administrator to refuse to use the money in the RRF to make a grant. At best, the references to "award[ing] grants under subsection (c) in an equitable manner" in section 9009c(b)(2)(B)(i)(II) and to "mak[ing] adjustments as necessary to the distribution of funds under clause (i)(II) based on demand and the relative local costs" in section 9009c(b)(2)(B)(ii) allow the Administrator to apportion the funds into different pots of money from which she may make award to different groups of "eligible entities of different sizes based on annual gross receipts." Notably, these provisions do not affect the amount any given applicant may receive, which is specifically governed by section 9009c(c)(4)(B). That provision species that "[e]xcept as provided *in this paragraph*," thereby excluding the provisions in subsection (b), "the amount of a grant made to an eligible entity under this subsection shall be equal to the pandemic-related revenue loss of the eligible entity." (Emphasis added). It is unclear from the complaint if the Administrator used her authority to create different pots of money, but even if she did, there is no provision that would have authorized her to deny an award to an eligible entity that fell within the size requirements for award from any specific pot of money.

Beyond restricting the uses the Administrator may make of the amounts in the RRF, the statutory language does not grant the Administrator any discretion as to how much any given applicant is to be awarded. Section 9009c(c)(4)(B)(i) requires that, subject to aggregate maximum award limits, "the amount of a grant made to an eligible entity under this subsection shall be equal to the pandemic-related revenue loss of the eligible entity," with pandemic-related revenue loss defined in section 9009c(a)(7). At best, section 9009c(a)(7) allows the Administrator to offer alternate formulas for calculating pandemic-related revenue loss in certain situations. But that does not give the Administrator the ability to reject any given application for award.

Further, section 9009c(b)(3) requires the Administrator to use the money "in the Fund to make grants described in subsection (c)," and subsection (c)(1) precisely specifies the order in which the Administrator is required to award grants: "in the order in which applications are received by the Administrator."

The provisions of subsection (c) go on to specify application requirements, priorities in awarding grants, the way grant amounts are to be determined, and the permissible uses of the grants. None of the remaining provisions, however, vests the Administrator with any discretion over whether to make an individual grant award or authorize her to make awards in the order in which applications are processed or any other order in addition to or in lieu of the order specified

18

by Congress in the law.[7]  Instead, these provisions, combined with the requirements that an applicant prove a pandemic-related revenue loss under subsection(a)(7), only give the Administrator a ministerial role in implementing the RRF.

Importantly, section 9009c is not an unlimited money-mandate requiring the payment of grants to all eligible entities.  Section 9009c(b)(3) only requires the Administrator to "use amounts in the Fund to make grants described in subsection (c)."  In other words, the statute does not provide a general entitlement and is not a money-mandating grant to all eligible entities; instead, the provision requires the use of a specific fund of money to be awarded to eligible entities in a specified order until the funds are exhausted.  Once the funding runs out, applicants are out of luck.  The plaintiffs allege they fall within the order of payment specified by Congress and are entitled to payment because they filed their applications on the first day applications could be submitted, yet applicants that filed their applications later than the plaintiffs received grants and the plaintiffs did not.  (ECF 1 at ¶¶ 5, 9, 13, 138.)

Section 9009c(c)(1) requires payment of grants in the order applications are received.  By its plain terms, therefore, section 9009c(c)(1) establishes an individual right for eligible entities to receive awards based on, with limited exceptions, a first-come, first-served basis.  The congressional intent and consequence of this provision is obvious: diligent applicants would be assured an award over less diligent ones.  *See Vitolo v. Guzman*, 999 F.3d 353, 357 (6th Cir. 2021) ("The key to getting a grant is to get in the queue before the money runs out. The Small Business Administration distributes money on a first come, first served basis.").  The approach taken by Congress makes sense because Congress knew the demand would exceed the amount of funding it was providing for the RRF.

If an eligible entity filed an application right after the first $28.6 billion worth of eligible applications were submitted, it would only have itself to blame for not receiving an award. Diligent applicants would not be subject to unpredictable administrative processing speeds; no applicant would lose out on a grant simply because the processor assigned to consider its application happened to be on vacation or home with a sick child that day.  In short, Congress wrote into the law a clear order of awardees for a grant; it specifically rejected a lottery system in which some applicants apply for a grant in one order but receive them in a totally different one outside of their control.  Congress rejected the notion that the vicissitudes and vagaries of

---

[7] At best, the Administrator had some discretion to set aside additional funding for priority applicants.  Section 9009c(c)(3)(A) provides that "[t]he Administrator may take such steps as necessary to ensure that [priority applicants] described in this subparagraph have access to grant funding under this section after the end of such 21-day period."  This provision is referring to the need to take systemic steps, such as reserving necessary sums of money, and does not otherwise authorize the Administrator to exercise discretion when reviewing specific applications.  Given the SBA stopped processing priority applications on May 23, 2021 (*see* ECF 1 at ¶ 59), and the "SBA awarded the final RRF grants to [p]riority [a]pplicants" on May 27, 2021 (*id.* ¶ 65), there is no indication that the Administrator took any such steps.

19

administrative or bureaucratic happenstance would influence which applicants received a grant and which did not.

Despite the clear congressional directive spelled out in the statute itself, the SBA decided to make awards in the order that it processed applications, precisely the kind of bureaucratic vagary Congress sought to avoid.  The defendant offers a weak justification of the SBA's interpretation that the statute allowed it to make awards in the order that applications were processed.  In support of the SBA's approach, the defendant musters two authorities in a footnote.  (ECF 7 at 20 n.5.)

First, although a court must give undefined statutory terms "their ordinary meaning," *Asgrow Seed*, 513 U.S. at 187, the defendant inventively argues for a plausible but uncommon definition of the word "receive" based on a citation to a single dictionary's definition of the word "receive" as "'[t]o admit or accept (a person or thing).'"  (ECF 7 at 13 n.5 quoting *Receive*, Oxford English Dictionary (3d ed. 2009) ("OED").)  According to the defendant, this means that section 9009c(c)(1)'s requirement to "award grants to eligible entities in the order in which applications are received by the Administrator" only applied once the Administrator fully processed and approved an application, *i.e.*, accepted it.

The defendant's interpretation, however, is not even strongly supported by the OED. Digging further into the primary definition of receive, the OED, available online with some revisions, specifies that this usage of "receive" is often rare or obsolete.  *See Receive*, OED, https://www.oed.com/dictionary/receive_v?tab=meaning_and_use#26545903 (last visited July 24, 2024).  As reflected in the online edition, many of the detailed definitions under the defendant's cited headline definition are also described as being "chiefly [used] in religious contexts," "obsolete," "chiefly historical," applying only to a person, or used in combination with references to personal objects or simple predicates, such as "as," "for," "to," or "to be."  *Id.*

The defendant's proffered definition must be rejected.  "'It is a fundamental canon of statutory construction that words will be interpreted as taking their ordinary, contemporary, common meaning,' which may be derived from 'dictionaries from the era of the statutory provision's enactment.'"  *New York & Presbyterian Hosp. v. United States*, 881 F.3d 877, 882 (Fed. Cir. 2018) (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (cleaned up)).

Contrary to the single "rare" or "obsolete" definition of "receive" relied on by the defendant, there are several other dictionaries whose primary definition of "receive" is "to come into possession of," *Receive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/receive (last visited July 24, 2024); "to get or be given something," *Receive*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/receive (last visited July 24, 2024); *Receive*, The Britannica Dictionary, https://www.britannica.com/dictionary/receive first in the context (last visited July 24, 2024) (same); or "to get something that someone has given or sent to you," *Receive*, https://dictionary.cambridge.org/us/dictionary/essential-american-english/receive (last visited July 24, 2024).

20

**Appx20**

In contrast, the defendant's asserted definition seems to be overly technical or outdated rather than the ordinary, plain meaning of the statutory term "receive." To illustrate, imagine an applicant called the SBA to inquire, "have you received my application?" It would be inconsistent with modern, common usage of the word for an SBA representative to reply "no, we're still processing it." Or, more generally, imagine if a person sent someone a letter and asked the recipient if the letter had been received. If the recipient said no, the sender would naturally think it had not yet arrived or was lost in the mail, not that the recipient left it in the mailbox and thereby did not "admit or accept" it into his home. Absent some indication from the text of section 9009c that this more arcane and less colloquial meaning of the word "receive" was intended, no person would understand the plain meaning of "receive" to mean "accept." This reading is especially applicable because section 9009c(c)(2)(B) directs the Administrator "[i]n *accepting* applications for grants under this subsection" to "prioritize the ability of each applicant to use their existing business identifiers . . . ." (Emphasis added). This language reflects that Congress intended to draw a distinction between the SBA *accepting* applications and simply *receiving* them. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 793 (Fed. Cir. 2021) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)) ("'A word or phrase is presumed to bear the same meaning through a text; a material variation in terms suggests a variation in meaning.'").

Most importantly, the defendant's interpretation also would effectively make section 9009c(c)(1) a nullity, as the SBA likely would have defaulted to making awards in the order in which it processed applications; a congressional directive would not have been necessary. Reading the statute as the defendant proposes would effectively nullify one of the RRF's central provisions. Such a reading is impermissible. *See United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (cleaned up) ("The cardinal principle of statutory construction is to save and not to destroy. It is [a court's] duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section, as the Government's interpretation requires."); Scalia & Garner, supra, at 174-79 (the Surplusage Canon). Reading "receive" to carry its normal meaning avoids that problem.

Creating surplusage is not the only serious problem with the defendant's proposed definition of "receive." Unless the context demands otherwise, "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, (1932); *accord Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 319-20 (2014). The defendant's proffered definition of "receive" in the statute appears to be incompatible with at least one usage of the word "received" in section 9009c. Section 9009c(a)(7)(C)(i) provides "the expenses described in subsection (c)(5)(A) that were incurred by the eligible entity minus any gross receipts received." Businesses generally do not "accept" gross receipts, *i.e.*, money, they come into possession of or are given it. The defendant's reading of "receive" instead of the more common understanding of the term is not a good fit for the statute.

Second, the defendant relies on an out-of-context quote from *Vitolo* to support the SBA's interpretation of the statute. That case focused on the constitutionality of the priority period for women-owned and socially and economically disadvantaged small business concerns under section 9009c(c)(3). The Sixth Circuit's opinion did note that after the priority period ended,

21

"'[t]he statute now requires [SBA] to *begin processing* grant requests in the order they were received, without regard to the applicants' race or sex.'" (ECF 7 at 20 n.5 (quoting *Vitolo*, 999 F.3d at 359) (emphasis by the defendant).)  In its opinion, however, the Sixth Circuit also noted that "[t]he key to getting a grant is to get in the queue before the money runs out.  The [SBA] distributes money on a first come, first served basis." *Vitolo*, 999 F.3d at 357.  The statement that the SBA had to process grants in the order in which the applications were received does not in any way suggest there was no statutory requirement that the SBA pay grants to applicants in the order in which applications were received; instead, the Sixth Circuit's comment complements the statutory obligation, because processing applications was a prerequisite to making a grant award.

Finally, the defendant argues the SBA had to make grant awards in the order applications were processed because otherwise "no money could be disbursed until the first-filed application was processed to approval."  (ECF 7 at 20 n.5.)  This defense, however, presents a policy argument that at best attempts to argue the absurdity of following section 9009c(c)(1)'s language literally.

Even accepting the argument that Congress could not have intended that each applicant literally had to wait until each earlier applicant received a grant, that would only suggest the SBA could have examined the amount sought by each application in the order received until the amounts sought totaled $28.6 billion.  Then once an application in that group was denied, it could start processing the next application in line from outside that group.  The SBA then could have made awards on later-filed applications, provided it had reserved amounts claimed by earlier-filed applicants until those applications were either paid out or denied as ineligible.  The plaintiffs allege that the SBA has previously adopted this course in other grant programs, suggesting this approach was administratively feasible.  (ECF 1 at ¶ 79(b).)  This process would have ensured no earlier applicant was harmed by awarding a grant to a later applicant, thereby satisfying both the text and the intent of section 9009c(c)(1).

The Administrator therefore was required to use the RRF to make grants under section 9009c(b)(3), and to do so in the order specified by section 9009c(c)(1), an order that gave each eligible applicant an individual right to receive payment before any later applicant.  Because the SBA lacked discretion under section 9009c as to whether to pay money to specific applicants who meet the requirements of the statute or as to the amounts to award a specific applicant, section 9009c can fairly be read to be money-mandating.  It does not matter that section 9009c does not literally command payment to all eligible entities because of the limited funding provided to the RRF, what matters is that the plaintiffs fall within the scope of section 9009c's money-mandate.[8]  *See Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005) (citing

---

[8] To the extent the defendant argues the statute is not money-mandating because the Administrator did not determine the plaintiffs were eligible to receive a grant (ECF 7 at 20 ("Congress could not have intended SBA to hand out money without an eligibility determination"), that fact alone does not render the statute not money-mandating.  "The fact that

*Sawyer v. United States*, 930 F.2d 1577, 1580 (Fed. Cir. 1991) and noting that the statute at issue in *Sawyer* was held to be money-mandating "because when the requirements of the statute are met . . . the [plaintiff] is entitled to compensation"); *Roberts v. United States*, 745 F.3d at 1162.

When the statutory provisions are read together, it becomes clear that section 9009c required the Administrator to award grants to all eligible applicants, the hallmark of a money-mandating statute, until the RRF was exhausted. The Court relies on the "shall use" and "shall award" language in section 9009c(b)(3) and (c)(1) to find the statute money-mandating by its plain terms. Even if this language simply authorized the Administrator to make awards, section 9009c would still be money-mandating because it would meet each of the three prongs of the test for determining if a discretionary statute is money-mandating. *See Samish Indian Nation*, 419 F.3d at 1364-65; *Doe*, 463 F.3d at 1324; *Perri v. United*, 340 F.3d 1337, 1342-43 (Fed. Cir. 2003).

Section 9009c therefore is money-mandating, but it is a limited mandate applying only to the money within the RRF because section 9009c(b)(3) only requires making awards to applicants out of the money available within the RRF. Because the plaintiffs allege sufficient facts to demonstrate they likely were eligible entities (ECF 1 at ¶¶ 128-134), a contention the defendant does not currently dispute, section 9009c is "money-mandating as to the class of which plaintiff[s] claim[ ] to be a member." *Roberts*, 745 F.3d at 1162.

### 3.   Redressability and Mootness

The defendant's final jurisdictional arguments are that the plaintiffs' claims are not redressable and are moot. (ECF 7 at 14-19.) The defendant bases its redressability argument on the lack of available sums remaining in the RRF for any further awards. (*Id.* at 15-16.) The defendant also argues that because no funds remain available in the RRF and any funds awarded now from the RRF would have to be returned to the Treasury under the Fiscal Responsibility Act or section 9009c(c)(6), the plaintiffs' claims are moot. (*Id.* at 16-19.)

Redressability is one of the three irreducible constitutional requirements for standing.[9] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). For an injury to be

---

the statute imposes requirements for the payment of money does not mean that only claimants who have been determined by a Government official to meet those requirements have a right to the money the statute provides. It is the statute, not the Government official, that provides for the payment. If the Government official's determinations under the statute are in error," or as here were never made in the first place, "the court is there to correct the matter, and to have the proper determinations made." *Fisher*, 402 F.3d at 1175.

[9] The defendant does not contest that the plaintiffs have met the other two requirements for standing established in *Lujan v. Defenders of Wildlife*: (1) an actual, concrete, and particularized injury that is (2) fairly traceable to the defendant. *See* 504 U.S. 555, 560-61 (1992). The

redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (cleaned up). In contrast, a claim becomes moot when "in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief . . . ." *Uzuegbunam v. Preczewski,* 141 S. Ct. 792, 796 (2021); *see Momenta Pharms., Inc. v. Bristol-Myers Squibb Co.*, 915 F.3d 764, 770 (Fed. Cir. 2019) (quoting *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of the City of Milwaukee,* 708 F.3d 921, 929 (7th Cir. 2013) ("In essence, 'mootness is the doctrine of standing set in a time frame; that is, the requisite personal interest that must exist at the time of commencement of the litigation (standing) must continue throughout its existence (mootness).'").

Any argument that the plaintiffs' claims are not redressable because no money remains in the RRF is unavailing. "Congress can also create an obligation directly by statute, without also providing details about how it must be satisfied," and "a subsequent failure to appropriate enough funds neither 'abrogate[s] nor suspend[s]' the Government's pre-existing commitment to pay." *Maine Cmty. Health Option*, 590 U.S. at 309 (quoting *United States v. Langston*, 118 U.S. 389, 394 (1886)).  Thus, "the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." *N.Y. Airways, Inc. v. United States*, 369 F.2d 743, 748 (1966).

The absence of money in the RRF does not prevent the plaintiffs from recovering money damages, because money damages would not be paid out of the RRF.  The Court of Federal Claims does not award equitable relief requiring payment from a specific funding source. Instead, with one exception not relevant here, "every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and chief judge of the court." 28 U.S.C. § 2517 (entitled "Payment of judgments").  In other words, the Judgment Fund is generally the source for the payment of awards by the Court of Federal Claims.  31 U.S.C. § 1304(a)(3)(A) (appropriating to the Judgment Fund amounts necessary to pay final judgments and settlements payable under 28 U.S.C. § 2517).

It is true that "funds may be paid out [of the Judgment Fund] only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 432 (1990).  The fact a plaintiff must have a substantive right to compensation is only jurisdictional, however, to the extent the plaintiff must rely on a money-mandating statute, not that the plaintiff must prove its case on the merits.  *See Fisher*, 402 F.3d at 1176 (citing *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999)) (noting that when a "money-mandating statute, applied to the facts proven, did not afford the remedy claimed," it is "a failure on the plaintiff's part to state a claim on which relief

---

plaintiffs have met these requirements by pleading that they were each injured by the SBA's failure to award them the grants they sought.  (*See* ECF 1-2.)

could be granted, and not a jurisdictional defect").  The merits of a claim do not affect its redressability because, as Judge Wheeler concluded, "the Judgment Fund is generally available to pay the liabilities of the Government as enforced by this Court. . . . When a statute . . . is money-mandating, the Judgment Fund will always be an appropriation from which the Government's promises can be fulfilled."  *Molina Healthcare of California, Inc. v. United States*, 133 Fed. Cl. 14, 35 (2017).[10]  The exhaustion of funds in the RRF therefore does not go to redressability of the plaintiff's claim for damages because section 9009c is money-mandating; the only question is whether the plaintiffs are entitled to recover money damages on the merits.

Recognizing the problem with its argument (ECF 10 at 9) ("Plaintiffs are generally correct that when a statute is money-mandating, the failure to appropriate funds does not eliminate the Government's payment obligation"), the defendant falls back on the argument that its liability is limited by section 9009c to the already-expended RRF, making the Judgment Fund unavailable and the plaintiffs' claims not redressable.  (*Id.* at 9-10 n.4.)

Under its spending power, Congress can limit the government's liability under money-mandating statutes by making any payment obligation subject to the availability of funds or limiting expenditures to certain amounts.  Such limitations do not, however, present redressability concerns.  Instead, the cases that have addressed the issue of a statutory limitation on expenditures have considered the issue a question of entitlement to recovery.  *See Prairie Cnty., Montana v. United States*, 782 F.3d 685, 691 (Fed. Cir. 2015) (affirming the dismissal of a plaintiff's claim for failure to state a claim because of the existence of a liability cap), *cert. denied*, 577 U.S. 923 (2015); *Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 887-81 (Fed. Cir. 2007) (same), *cert. denied*, 552 U.S. 1142 (2008); *Star-Glo Assocs., LP v. United States*, 59 Fed. Cl. 724, 734-35 (2004) (granting summary judgment against a plaintiff when a statutory cap barred recovery), *aff'd on other grounds*, 414 F.3d 1349 (Fed. Cir. 2005).

For example, in *Star-Glo Associates, LP v. United States*, the Federal Circuit considered whether a benefits program intended to compensate citrus growers included a statutory cap on expenditures that barred a claim from two plaintiffs, who claimed the Department of Agriculture had used the wrong definition of "acre" in calculating their grant award.  414 F.3d at 1350-53.  Despite finding there was a statutory expenditure cap that had been met by the time the plaintiffs filed suit, the Federal Circuit did not suggest that it lacked jurisdiction due to any lack of standing by the plaintiffs or lack of redressability.  *Id.* at 1354-55.  Instead, rather than addressing the effect on the statutory cap on expenditures when the cap had not been reached at the time a claim accrued, the Federal Circuit held on the merits that the plaintiffs were not

---

[10] Judge Wheeler's broad language in *Molina* notwithstanding, the Judgment Fund is unavailable if "payment is [ ] otherwise provided for." 31 U.S.C. § 1304(a)(1).  One such example is in cases under the National Vaccine Injury Compensation Program, in which payments for those injuries are made from the Vaccine Injury Compensation Trust Fund, pursuant to 42 U.S.C. § 300aa–15(i)(2) and 26 U.S.C. § 9510.  The defendant has not, however, argued that other funding sources are available, and none is readily apparent, so this limitation is not relevant to the plaintiffs' claims.

entitled to further funds because the Department of Agriculture had used the correct definition of "acre." *Id.* at 1355-58.

In short, when the effect of a cap on expenditures was clear, courts considering such statutory limitations on funding have treated them as an absolute affirmative defense, the success on which by the defendant precluded the award of damages to a plaintiff on the merits. Even in *Star-Glo*, in which a cap on expenditures existed but its effect was unclear, no court ever suggested that the cap presented a threshold jurisdictional issue that would bar consideration of the merits of a claim. The defendant has not identified any contrary authority in which a statute was held to be money-mandating, but a plaintiff's claims were not redressable due to an exhaustion of funds. The question of whether there is a statutory cap limiting the defendant's liability therefore confuses redressability with "whether the plaintiff has established a right to recover, a question which it is inappropriate to treat at this stage of the litigation." *Chafin v. Chafin*, 568 U.S. 165, 174 (2013) (cleaned up).

On mootness, the defendant makes largely the same arguments. It attempts to find additional support in section 9009c(c)(6)'s mandate that any unused grant funds held by eligible entities after March 11, 2023, must be returned to the treasury and in the Fiscal Responsibility Act's rescission of unobligated funds. (ECF 7 at 16-19.) The defendant also cites several district court decisions which dismissed claims raised by eligible entities on mootness grounds because the RRF was exhausted and/or because the plaintiffs raised their claims after March 11, 2023. (*Id.* at 18 (citing *Reboot Macon*, 2023 WL 4672395, at *5; *Keener v. United States*, No. 2:22-1640, 2023 WL 2478367, at *7 (D.S.C. Mar. 13, 2023)).)

The flaw in the defendant's mootness argument, however, lies in the differences between the relief available in the district courts and this court. The district courts under the APA can only award "relief other than money damages." 5 U.S.C. § 702. Any request for injunctive or declaratory relief related to grant applications were rendered academic when the RRF was exhausted because such relief could not cause the plaintiffs to receive any grant money. *See Reboot Macon*, 2023 WL 4672395, at *4 ("Because the RRF has run dry, and because the only relief available to the plaintiffs requires the Court to direct the SBA to process RRF applications in the order that they were received, a depleted RRF renders that requested relief moot and the government is entitled to dismissal."); *Keener*, 2023 WL 2478367, at *7 ("However, if defendants were to show evidence that the RRF program lacks funds, at that point plaintiffs' claims would be moot.").

In contrast, the Court of Federal Claims awards money damages and can only rarely provide injunctive or other equitable relief (outside of bid-protest cases under 28 U.S.C. § 1491(b)) "as an incident of and collateral to any" judgment for money. 28 U.S.C. § 1491(a)(1); *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (cleaned up) ("Stated another way, the Court of Federal Claims has no power to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment."). Money damages are paid out of the Judgment Fund and are not orders for the award of money from any other specific funds. 28 U.S.C. § 2517; 31 U.S.C. § 1304(a)(3)(A). An award of money damages therefore would not be subject to the RRF's requirement to return grant funds nor the Fiscal Responsibility Act's recission of funds as these laws do not include any language affecting monetary awards from the Judgment Fund. The

26

possibility of a damages award therefore is not moot and could provide the plaintiffs with the relief they seek.

The only way for the plaintiffs' claims for money damages to be mooted is for them to receive grants or otherwise be voluntarily compensated by the defendant.  Unless and until this happens, their claims are not moot.

To summarize, the plaintiffs' claim that section 9009c, read properly, commands the payment of money to them.  *Bowen* does not require the plaintiffs to raise their claims under the APA in district court.  The plaintiffs' case does not present *Bowen*'s specific circumstances, and monetary relief is adequate to redress retrospectively their injuries for the SBA's alleged failure to pay them the one-time grants they allege the SBA was obligated to provide under the statute.  The plaintiffs therefore present a classic money-mandating claim within the Tucker Act jurisdiction of the Court of Federal Claims, 28 USC § 1491(a).  The only way such a claim may be dismissed for lack of jurisdiction is if the statute cannot fairly be construed to command the payment of money; if the plaintiffs fail to allege facts demonstrating they are within the class of beneficiaries entitled to payment under that statute; or if the plaintiffs lack standing.  As the plaintiffs have overcome all three hurdles, the plaintiffs' claims are within this court's jurisdiction and would be redressable by the Judgment Fund if the plaintiffs succeed on the merits.

## C.      Rule 12(b)(6)

Although not raised by the parties, the Court *sua sponte* raised the issue of whether the plaintiffs have failed to state a claim because of the possible existence of a cap on the defendant's liability under section 9009c.  The parties were directed to file supplemental briefs addressing this issue, specifically:

> 1 – Does 15 U.S.C. § 9009c(b)(2)(A) impose a statutory cap on the amount of money to be spent under the Restaurant Revitalization Fund, or does § 9009c create an uncapped liability to support an award to the plaintiffs, either directly or through the Judgment Fund?
>
> 2 – Presuming that § 9009c caps liability and that § 9009c(c)(1) required the SBA to award grants strictly in the order in which applications were received, does the exhaustion of the available funds through the award of grants to entities who submitted their applications after the plaintiffs foreclose the plaintiffs from stating a claim for relief?  What effect does the Fiscal Responsibility Act's de-obligation provision and § 9009c(c)(6)'s requirement that unspent funds be returned to the Treasury have on this question?

(ECF 13).

Without conceding the existence of jurisdiction, the defendant argues that 15 U.S.C. § 9009c(b)(2)(A) imposes a statutory cap that prevents the plaintiffs from stating a claim because

the statute included a specific amount of money to be expended, $28.6 billion. In support, the defendant relies on language from *Maine Community Health* that noted "'Congress c[an] expressly limit[ ] an obligation to available appropriations or specific dollar amounts.'" (ECF 16 at 1-2 (quoting 590 U.S. at 313) (edits by the Court).) Any resort to the Judgment Fund, the defendant argues, would be an inappropriate circumvention of Congress's intent to cap the amount available for the RRF. (*Id.* at 4-6.) Instead, the plaintiffs should have challenged the SBA's interpretation of section 9009c(c)(1) and disbursements of funds under the APA while the RRF still contained funds. (*Id.* at 6-7 & 6-7 n.4.) Further, the defendant argues that the Fiscal Responsibility Act rescinded any payment obligation because, citing to a district court opinion, the rescinded "unobligated balances" were those "funds that the SBA has not yet promised to pay to a specific entity that has applied and been approved for payment.'" (*Id.* at 9 (quoting *W6 Rest. Grp.*, 2024 WL 1973132, at *9).) Finally, the defendant reiterates its argument that the obligation to return unspent RRF funds prevents the plaintiff from stating a claim because to allow otherwise would circumvent Congress's intent to forfeit unspent RRF grant awards. (*Id.* at 10 (citing *Reboot Macon*, 2023 WL 4672395, at *5).)

In contrast, the plaintiffs argue that section 9009c(b)(2)(A) does not impose a statutory cap because the statute is not limited to available appropriations, but instead included a specific appropriation "in addition to amounts otherwise available." Relying on *Samish Indian Nation v. United States*, the plaintiffs argue that section 9009c(b)(2)(A) only "narrow[ed] the group of entities SBA was obligated to pay (based on the order applications were received)" but did not "limit liability for amounts the agency was obligated to pay." (ECF 17 at 8-10 (citing 657 F.3d 1330, 1339-41 (Fed. Cir. 2011), *vacated as moot*, 568 U.S. 936 (2012)).) Even if section 9009c(b)(2)(A) imposed a cap, the plaintiffs argue that they have stated a claim for relief that can be granted because the SBA's erroneous disbursements did not satisfy the SBA's obligation to them. Citing to the Government Accountability Office's ("GAO") *Principles of Federal Appropriations Law* ("GAO Redbook") and Steven N. Tomanelli, Appropriations Law 43 (2003), the plaintiffs argue that the obligation to pay them arose at the time they submitted their applications.[11] (ECF 17 at 10-13.) Any improper payments, the plaintiffs argue, must be paid to them as damages up to the amount appropriated. (*Id.* at 13-14 (quoting *Sutton v. United States*, 256 U.S. 575, 582 (1921)) ("'Unless the parties can agree as to the facts, the case should be remanded to the Court of Claims to determine what, if any, amount was erroneously charged against the appropriations . . . ; and for the amount of such improper charges, if any, judgment should be entered for the petitioner.'").) Finally, the plaintiffs argue that the Fiscal

---

[11] The GAO Redbook "present[s] a basic reference work covering the legal issues that arise as the Comptroller General carries out his statutory duties to issue decisions and opinions concerning the use and obligation of appropriated funds." United States GAO, GAO Redbook Preface (4th ed. 2016), available at https://www.gao.gov/assets/2019-11/675699.pdf. The Supreme Court, the Federal Circuit, and other circuit courts "have relied on the opinions of the [GAO] as expressed in [the GAO Redbook] . . . whose opinions, while not binding, are 'expert opinion[s], which we should prudently consider.'" *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1084 (Fed. Cir. 2003) (citing, *inter alia*, *Lincoln v. Vigil*, 508 U.S. 182, 192, (1993); *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984)).

Responsibility Act and section 9009c(c)(6) do not foreclose their claims.  As to the former, the plaintiffs emphasize that only "unobligated balances" were rescinded, but that the statute did not attempt to de-obligate any funds that were already due.  (*Id.* at 15-16.)  And as for the latter, the plaintiffs argue that this provision does not prevent the SBA from re-awarding any recovered erroneous disbursements before they are returned to the treasury and does not affect damages from the Judgment Fund.  (*Id.* at 16.)

Section 9009c(b)(2)(A) is unusual; the parties have not cited any precedent involving a statute like it, and the Court has found none either.  On the one hand, the statute appropriated a specific sum of money for the RRF.  On the other hand, it also authorized the SBA, in a paragraph entitled "Appropriations," to use "amounts otherwise available" for the RRF.  Despite appropriating a specific sum of money, the statute was also open-ended and allowed an unspecified amount of money be used for the RRF.  This unusual amalgam muddies the water as to whether section 9009c(b)(2)(A) imposed a cap on the defendant's liability, because it did not limit RRF grants to the specific sum of money appropriated to the RRF.

Because the statute here is ambiguous on this point, it is important to examine exactly what the Federal Circuit has done in evaluating whether a funding limit in a money-mandating statute prevents a plaintiff from stating a claim.

As previously noted, in *Star-Glo* the Federal Circuit considered whether a benefits program intended to compensate citrus growers included a statutory funding cap that barred a claim.  Section 810(e) of Public Law No. 106-387 (2000) provided that "the Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section [to compensate citrus tree growers for losses from citrus canker], to remain available until expended."  The plaintiffs in the case had previously sought and received funds under the program but then sued, contending the Department of Agriculture had used the wrong type of acreage measure to calculate the compensation due to them.  At the time the plaintiffs filed their claims with the Department of Agriculture, the $58 million had not been expended.  By the time the plaintiffs filed their lawsuit, however, the $58 million cap had been met.  *Star-Glo*, 59 Fed. Cl. at 726-27.  The plaintiffs argued that the lack of terms such as "not to exceed" or "not more than" meant there was no statutory cap.  Judge Horn held, however, that the exhaustion of the authorized funds barred the plaintiffs' claims.  *Id.* at 732-35.

On appeal, the Federal Circuit affirmed.  Although the Federal Circuit acknowledged that "the statutory text is ambiguous," after looking to legislative history the Circuit held that the language imposed a funding cap.  *Star-Glo*, 414 F.3d at 1354-55.  The Federal Circuit relied on language from a conference report in which Congress explained that "section 810 'directs the Secretary of Agriculture to use *not more than* $58,000,000 for replacement of citrus trees and for compensation for losses as a result of citrus canker.'"  *Id.* at 1355 (emphasis added by Federal Circuit) (quoting H.R. Conf. Rep. No. 106-948, at 147 (2000)).

Two points distinguish this case from *Star-Glo*.  First, even if reliance on legislative history were appropriate in construing the meaning of a statute, no such clarifying legislative history exists for section 9009c and cannot serve to aid in construing the provision.  Second, the relevant statute in *Star-Glo*, unlike section 9009c, did not provide for any potentially available

**Appx29**

additional funds beyond the $58 million appropriated.  Further, the Federal Circuit did not ultimately base its decision in *Star-Glo* on the effect of the cap on expenditures in the statute. Instead, the court held that the plaintiffs were not entitled to recover on the merits of their claim. *Id.* at 1356-58.

The Federal Circuit did expressly reach the effect of a cap on expenditures in *Greenlee County*.  In that case, Federal Circuit addressed the Payment in Lieu of Tax Act ("PILT Act"), 31 U.S.C. § 6901 et seq., a statute "enacted to compensate local governments for the loss of tax revenues resulting from the tax-immune status of federal lands located in their jurisdictions, and for the cost of providing services related to these lands." *Greenlee Cnty.*, 487 F.3d at 873 (cleaned up).  Greenlee County had not received the amounts due to it under the statute because Congress had not appropriated sufficient funds. *Id.* at 874.

According to the version of 31 U.S.C. § 6906 in effect at the time, the PILT Act provided that the amounts to fund the compensation "are available only as provided in appropriations law."  Based on that explicit provision, the Federal Circuit upheld a dismissal for a failure to state a claim because "the government's liability is capped" under the plain text of the statute. *Greenlee Cnty.*, 487 F.3d. at 879.  The Federal Circuit noted that "[t]he fact that *Star-Glo* involved a specific dollar amount while the statute here refers to 'amounts . . . provided in appropriation laws' is a distinction without a difference." *Id.*  The Federal Circuit, relying on prior caselaw in which the phrase "subject to the availability of appropriations" had been found to limit the government's liability in contract cases, held that there was no functional difference between such language and the language of the PILT Act. *Id.* at 878 (citing *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 643 (2005); *Babbitt v. Oglala Sioux Tribal Public Safety Dep't*, 194 F.3d 1374, 1380 (Fed. Cir. 1999)).  In so doing, the Federal Circuit noted that "'there is greater room' in benefits programs to find the government's liability limited to the amount appropriated." *Id.* at 879 (quoting *Star-Glo*, 414 F.3d at 1355).

The Federal Circuit would later reiterate its conclusions from *Greenlee County* in *Prairie County*, another case arising under the PILT Act.  The Federal Circuit in *Prairie County* summarized that "the question here is whether the statute reflects congressional intent to limit the government's liability for PILT payments, or whether PILT imposes a statutory obligation to pay the full amounts according to the statutory formulas regardless of appropriations by Congress." 782 F.3d at 690.  It answered this question by emphasizing that "[t]he inclusion of the word 'only' limits the availability of PILT payments to appropriations." *Id.*  Congress did not, however, employ the limiting words "only" or "subject to the availability of appropriations" in section 9009c.

*Greenlee County* left open the question of what would happen when sufficient unrestricted amounts remained available and whether those reprogrammable funds could cover the obligation.  The Federal Circuit did note, however, that "[t]he Supreme Court recently addressed this issue in *Cherokee Nation* in the context of a contract case and concluded that the presence of sufficient unrestricted lump-sum appropriations (not specifically appropriated for the program in issue) to meet the government's contractual obligation qualified as available appropriations." *Greenlee Cnty.*, 487 F.3d at 880 n.3 (citing *Cherokee Nation of Oklahoma*, 543 U.S. at 641).

30

Compared to those cases, however, the text of the RRF statute is more ambiguous. The plaintiffs point to the open-ended nature of section 9009c(b)(2)(A) ("In addition to amounts otherwise available . . . ."), while the defendant points to the specific sum allocated to the RRF ("[T]here is appropriated to the Restaurant Revitalization Fund for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $28,600,000,000, to remain available until expended . . . ."). Neither party has presented any evidence of legislative history, and none appears to exist specifically concerning section 9009c(b)(2)(A).

On its face, the plaintiffs have the better argument as to the interpretation of section 9009c. Section 9009c either sets a specific amount of money aside for the RRF or is open-ended, but it cannot be both. Given that one part of section 9009c(b)(2)(A) is open-ended, providing that funds are appropriated "[i]n addition to amounts otherwise available," the entire provision must be read so as not to set a specific cap on the funds available for the RRF.

The open-ended statutory add-on that Congress allocated to the RRF by allowing the SBA to spend "amounts otherwise available" in addition to the $28.6 billion it specifically allocated is crucial. The Supreme Court has explained that "Congress could have expressly limited an obligation to available appropriations or specific dollar amounts." *Maine Cmty. Health*, 590 U.S. at 313. For the RRF, Congress chose instead to provide a specific sum of money "[i]n addition to amounts otherwise available." The formulation Congress used in section 9009c(b)(2)(A) on its face therefore does not express a congressionally mandated limit on the RRF's funding to a *specific* dollar amount. This lack of a specific limitation makes this case seem closer to *Maine Community Health*, in which Congress simply never provided the funds necessary to fulfill the government's statutory obligations, rather than a case in which Congress limited the government's obligations to a specific sum of money, as in *Star-Glo*.

The RRF statute is also different from the ones previously considered by the Federal Circuit because section 9009c lacks phrases like "available only as provided in appropriations laws" or "subject to the availability of appropriations." These were the phrases the Federal Circuit found in *Greenlee County* to reflect a cap. While section 9009c, like the statute in *Star-Glo*, does use the phrase "to remain available until expended," as noted above, that case is distinguishable because of the RRF's open-ended appropriations provision and the lack of any relevant legislative history of the kind the Federal Circuit relied on in *Star-Glo*.

Applying the factors deemed important by the Federal Circuit in its precedents to the apparently unprecedented language of the RRF statute leads to the conclusion that section 9009c does not impose a cap on the defendant's liability because the statutory text does not demonstrate Congress's intent to limit the defendant's liability to the specific amount appropriated. Rather, section 9009c(b)(2)(A) demonstrates that Congress provided a minimum sum of money for the RRF, while also allowing other, unspecified, additional amounts to be used.

Admittedly, the Federal Circuit has repeatedly noted that "'there is greater room' in benefits programs to find the government's liability limited to the amount appropriated." *Greenlee Cnty.*, 487 F.3d at 879 (quoting *Star-Glo*, 414 F.3d at 1355); *Prairie Cnty.*, 782 F.3d at 689 (same). This statement by the Federal Circuit, however, is little more than dicta, as these cases do not purport to establish a controlling interpretive cannon of construction for benefits-

31

granting statutes.  Regardless, "greater room" cannot read into the RRF statute a limitation on the defendant's liability that does not exist.  Instead, it is the statutory language itself, not a general principle, that must control.  Read together, the statute's appropriation of a specific sum of money and its provision of an additional unlimited "amounts otherwise available" produce a conclusion that section 9009c(b)(2)(A) does not limit the government's liability to a specific sum of money.

While Congress did not limit the defendant's liability, that conclusion does not mean that the defendant's liability for the RRF is completely uncapped.[12]  Section 9009c(b)(3) only requires expenditure of funds in the RRF.  This limitation *de facto* creates a cap on the government's liability because, as previously noted, the payment obligation of section 9009c only flows to money in the RRF.  The practical effect is that any claims for damages must be limited to a claim that a plaintiff was entitled to receive funds that were at one point in the RRF but were misspent, even if additional sums could have been added to it by the "amounts otherwise available" provision.  There is no indication, however, that Congress intended section 9009c(b)(2)(A) to be a *de jure* cap on spending for the RRF that would limit the defendant's liability under Federal Circuit precedent.  Whether a statute is money-mandating and whether a plaintiff falls within the class as to whom the statute is money-mandating present separate questions from whether Congress created a statutory cap on the defendant's liability; these distinct questions should not be conflated.  In this case, limited to the requirements imposed by section 9009c, the exhaustion of the funds in the RRF neither deprives this court of jurisdiction nor prevents the plaintiffs from stating a claim.

Even if there were a cap on the defendant's liability, "[t]he question [would] remain[ ], however, as to the effect of the cap."  *Star-Glo*, 414 F.3d at 1355.  In the relevant Federal Circuit precedents, the plaintiffs were seeking damages under the Tucker Act because Congress had failed to appropriate sufficient funds to pay the full amounts of its outstanding obligations; there was no question as to whether the government had made improper payments to undeserving applicants in violation of federal law.  The plaintiffs here, however, claim there would have been sufficient funding available to pay them had the SBA not misinterpreted the statute and made award to the wrong applicants, contrary to Congress's express command in section 9009c(c)(1).

This difference is key.  The plaintiffs argue that Congress directed the SBA to provide grants to one group of businesses, and the SBA instead awarded them to a different group.  The defendant cannot evade its obligations by paying the wrong entities out of the RRF and then claiming there is no money left to pay the plaintiffs, the text of the statute notwithstanding.  The plaintiffs therefore do not seek to use the Judgment Fund to circumvent Congress's failure to fund the RRF with sufficient funds to cover all applications.  Instead, they seek to be compensated for the failure to pay them funds they contend should have been awarded to them in

---

[12] Although the plaintiffs have argued that section 9009c(b)(2)(A) is not a cap on the defendant's liability, even they have not argued that section 9009c is an uncapped liability that required the government to make grants to all applicants.  In other words, even the plaintiffs agree there exists some limit on the expenditures the SBA had to make under the RRF.

the first place rather than to other applicants.  In short, the plaintiffs seek to effectuate Congress's intent from the plain text of section 9009c, contrary to the SBA's administration of the law, which contravened that express intent.

Existing caselaw does not extend to this scenario, and it appears to be a question of first impression.  In the absence of caselaw holding that a plaintiff cannot state a claim under these circumstances, there is no reason to extend a doctrine here when it would frustrate Congress's intent to compensate the plaintiffs for their pandemic-related loss because of the SBA's misinterpretation of section 9009c(c)(1).  Instead, it makes sense to effectuate Congress's intent that the plaintiffs receive such money by allowing them to recover money damages.

No funding cap exists in section 9009c to limit the defendant's liability for the allegedly illegal actions of the SBA.  The plaintiffs' claims may proceed to the merits.

## IV.    CONCLUSION

The plaintiffs have stated a claim within the jurisdiction of this court and have stated a claim on which relief can be granted.  Accordingly, the defendant's motion to dismiss (ECF 7) is denied.  A separate order reflecting this outcome is being filed concurrently with this opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**

**Appx33**

# In the United States Court of Federal Claims

No. 23-1876C
Filed: July 24, 2024

---

**112 GENESEE STREET, LLC, et al,**

                    *Plaintiffs,*

**v.**

**UNITED STATES,**

                    *Defendant.*

---

### ORDER

    For the reasons provided in the memorandum opinion filed concurrently with this order, the defendant's motion to dismiss (ECF 7) is **DENIED**.  In consultation with the parties, the Court will schedule an in-person status conference to review further proceedings.

    It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

**Appx34**