No. 25-1373

# In the United States Court of Appeals for the Federal Circuit

112 GENESEE STREET, LLC, ET AL.,
*Plaintiffs-Appellees*

*v.*

UNITED STATES,
*Defendant-Appellant*

*On Appeal of Interlocutory Order of
the United States Court of Federal Claims in No. 23-cv-1876,
Judge Richard A. Hertling*

**PLAINTIFFS-APPELLEES' RESPONSE BRIEF**

F. GREG BOWMAN
EDWARD C. REDDINGTON
CHARLES L. MCCLOUD
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  fbowman@wc.com*

*Counsel for Plaintiffs-
Appellees 112 Genesee Street,
LLC, et al.*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1373

**Short Case Caption** 112 Genesee Street LLC, et al., v. United States

**Filing Party/Entity** 112 Genesee Street LLC, et al. (All Plaintiffs/Respondents)

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/17/2025

Signature: /s/ F. Greg Bowman

Name: F. Greg Bowman

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| 112 Genesee Street LLC | | |
| 1233 Polk Street LLC | | |
| 1490 Restaurant Inc. | | |
| 160 Food Corporation | | |
| 1651 Food Corporation | | |
| 1900 University Blvd LLC | | |
| 316 W 49th Restaurant Corporation | | |
| 341 Frame Inc | | |
| 37 N Main Street Enterprises, LLC | | |
| 413 Bedford Drive LLC | | |
| 4945 Gulf Boulevard, Inc. | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable              ☐   Additional pages attached

| Williams & Connolly LLP | F. Greg Bowman<br>Edward C. Reddington | Charles Luke McCloud |
|---|---|---|
| | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑  No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable              ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# ADDITIONAL PAGES ATTACHED

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| 5M Group, LLC | | |
| 6 Water Inc. | | |
| 6049 Main St  Inc | | |
| 66 To Go LLC | | |
| 7 E Lancaster Fancy Face, LLC | | |
| 700 Manhattan Ave LLC | | |
| 7452 N Western Ave Inc | | |
| 7SKI, Inc | | |
| 946 Eighth Avenue Food Corporation | | |
| AADI Investments LLC | | |
| Afters Special Events, LLC | | |

☑    Additional pages attached

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Alaska Weathervane Seafoods LLC | | |
| Alexanders Café 64 Inc. | | |
| Alliance Arizona, LLC | | |
| Alliance Brentwood, LP | | |
| Alliance Food, LLC | | |
| Antoon Properties LLC | | |
| AP Franchise Group, LLC | | |
| Argamak LLC | | |
| Arroyo Corporation | | Termos J |
| Bartow Brewing Company LLC | | |
| Bay Fries, Inc | | |

☑     Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| BB Ridgewood LLC | | RMA Holdings LLC |
| BB Tices Corner LLC | | RMA Holdings LLC |
| Beets Catering, Inc. | | |
| BEG, LLC | | |
| Bergen QSR, LLC | | |
| Big Dean's Ocean Front, Inc. | | |
| Bilamil, Inc. | | |
| Bill-Es, LLC | | |
| Bitetime LLC | | |
| Black Sails Brewery and Taproom LLC | | |
| Blackberry River Baking Co LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Bob Maxwell Walk-A-Ways, Inc. | | |
| Bonavida Inc. | | |
| Bradford & Marth LLC | | |
| Bridgewater QSR, LLC | | |
| Brookpark Freeway Lanes | | |
| Bru Daddy's Brewing Co. | | |
| Burger Fry Pie LLC | | |
| BW Brands LLC | | |
| CA Partners LLC | | |
| Caduceus Enterprises Inc | | |
| Café Martin LLC | | |

☑ Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Cafe Veranda Enterprises Inc. | | |
| Canal Street Food Corporation | | |
| Carefree Foods LLC | | |
| CB Riverfront, LLC | | |
| CGV Hospitality Holdings LLP | | |
| Chaos Brewing Company, LLC | | |
| Chateau Diana LLC | | |
| Chin & Sue Inc. | | |
| Cibo 2621 LLC | | |
| CITY STATE INC. | | |
| Claudisal Rest. Corp. | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Colossal Cafe St. Paul, LLC | | |
| Comoncy Galleria, LLC | | |
| Comoncy Westwood, LLC | | |
| Cooper's Cave Ale Company, LTD. | | |
| Craft on Draught | | |
| Cravings Lakehouse LLC | | |
| Crudo Restaurant Group, LLC | | |
| CTC Cafe Encino, LLC | | Alliance Foods Holdings, LLC |
| Cubanisisimo LLC | | |
| Cuenca LLC | | |
| Cult Bowl & Brew LLC | | |

☑ Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Daniel Marciano LLC | | |
| Danlex LLC | | |
| Darr Works, LLC | | |
| DB California Hero Inc | | |
| Diamond Girls Bartenders, LLC | | |
| Dish Functional, Inc. | | |
| DLS US LLC | | |
| DM Concessions, Inc | | |
| DOC Restaurant Group LLC | | |
| Dos Pulpos LLC | | |
| DOSEY DOE, INC | | |

☑ Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Dozen Bagels Co. Inc. | | |
| Dragonmead LLC | | |
| Driftwood Bay Concepts, Inc. | | |
| DT Deli LLC | | |
| Dust Investments, Inc. | | |
| EBVA1, LLC | | |
| EC Sparty LLC | | |
| ECI Investments, LLC | | |
| Educational Catering, Inc. | | |
| EJC Entertainment LLC | | |
| Emmar Biggens LLC DBA The Diner | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| ETM CFC Holdings, Inc. as successor-in-interest of Componere Fine Catering Inc. | | |
| Exquisite Catering LLC | | |
| Field Day Incorporated | | |
| Florentynas Inc. | | |
| Food Services, Inc. | | |
| Fresh Pulp Holdings LLC | | |
| Frozen Smiles Incorporated | | |
| Fruit Caboose Concessions Inc | | |
| Galbreath Enterprises Inc. | | |
| Ganesh Laxmi | | |
| Garvey's Sports Bar and Grill LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| GHM Trading Inc. | | |
| Goosecup Coffee LLC | | Goosecup Holdings LLC |
| Gowa Inc | | |
| Grace Skye LLC | | |
| Gracie's Inspiration, LLC | | |
| Great Food 57th ST, LLC | | |
| Greater Buffalo Restaurants, Inc. | | |
| Griffon Enterprises, Inc | | |
| Griffon Gastro Pub Inc | | |
| Griggs Industries LLC | | |
| H&D Restaurants, LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| H&H Restaurants, Inc. Trading Inc. | | |
| H.S. Cheema, Inc | | |
| Hackstaff Restaurants, LLC | | |
| Harry Bassilakis  dba Quaker Diner | | |
| HDH Investments, LLC | | |
| Hearth Bakery, Inc. | | |
| Hennepin Enterprises Inc | | |
| Heritage Northwest, Inc. | | |
| Hill Country Chicken NY, LLC | | |
| Hill Country DC LLC | | |
| Hill Country NY LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| HK Express Falls Church Inc | | |
| Hot Indian Foods LLC | | |
| HSD Enterprises, Inc | | |
| Hunan Cafe Alexandria Inc. | | |
| Hystike A.W., LLC | | |
| I WRAP LLC | | |
| J&H Breakfastology Inc. | | |
| James Fraser | | |
| Jamestown Mercantile Cafe LLC | | |
| Jay Square LLC | | |
| Jimmy Ks Restaurants LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Jin Li Yuan Inc | | |
| JK Food Inc | | |
| JKC Fine Dining Inc. | | |
| JNE CANDY Co LLC | | |
| Johnnys Gone Fishing | | |
| JT's Cafe Blue Point Inc | | |
| JT's Farmhouse Inc | | |
| Kate O'Briens, Inc. | | |
| Katlo Inc | | |
| Kefaya's Cafe | | |
| Kenco Catering, Inc. | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Kimberly Ann Hartman | | |
| Kitchen at the Dovegate Inn, LLC | | |
| KY-LA Development | | |
| L Carpentier Inc | | |
| La Vela Ristorante Inc. | | |
| Lake Park Steakhouse | | |
| Lakes Hospitality Inc | | |
| Laser Entertainment Group, Inc | | |
| Le Qi De Inc. | | |
| Le Royale LLC | | Hadidi Capital, LLC |
| Leadville Grill, LLC | | |

☑     Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Lincoln Liquor LLC | | |
| Lix LLC | | |
| Local Buffalo Inc | | |
| Local Grille and Catering LLC | | |
| LouLou LLC | | |
| Lynden Pioneers, Inc. | | |
| M&M Establishments Inc. | | |
| M. D. Associates, LLC | | |
| Mad Raven Inc | | |
| Maideneire LLC | | |
| Make Beverage Group LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Mama Jennie's Italian Restaurant Inc. | | |
| Mangia You Food LLC | | |
| Mary Lane Cafe | | |
| MateVeza USA, LLC | | |
| Maurices Deli At South Pearl St LLC | | |
| Mexican Mafia LLC | | |
| Millers LLC | | |
| Mineshaft Properties LLC | | |
| MM Associates, LLC | | |
| Moderne Barn Armonk, Inc | | |
| Muscle Bar LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Nada Nashville, LLC | | Nada Development, LLC |
| Napa Valley Brewing Co. Inc. | | |
| Natalie Castaneda | | |
| NBJ Concepts, Inc | | |
| New England Venture Group, LLC | | |
| New Jersey ABP **Inc.** | | |
| Next Rep Solutions LLC | | |
| Night Owl Inc | | |
| Northeast Pie, LLC | | |
| Nostrana, LLC | | |
| Not Just Chocolate LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| NYC Burger No. 1 LLC | | |
| O.R.S.I LLC | | |
| Old Town Properties, LLC | | |
| Ollies 42nd LLC | | |
| On My Grind Coffee | | |
| Oregon Enterprises Inc. | | |
| Organic Juice Bar Cranberry LLC | | |
| P&C Sweet Home LLC | | |
| P.DiBurro & Sons Inc | | |
| P2 Inc. | | PITCH DEV LLC |
| Papanicolaou Enterprises | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☒ None/Not Applicable |
| PBS Creative Inc | | |
| Peppercini's Deli & Catering | | |
| Petra NY LLC | | |
| Picnic Time Inc | | |
| Pippo Pluto Paperino Inc | | |
| Pirate Petes Soda Pop LLC Enterprises Inc. | | |
| Pitchoun Inc. | | |
| Planet Popcorn, Inc. | | |
| Plaza Restaurant LLC | | |
| Polvora, Inc. | | |
| Popop Corporation | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Potomac Cuisinary Services Inc | | |
| Potomac Food Services Inc | | |
| Propaganda Wynwood LLC | | |
| PublicUs LLC | | |
| Queen City Foods, LLC | | |
| Quins Bar LLC | | |
| Rappahannock Entertainment Center Inc. | | |
| RC Investment Group, LLC | | |
| Red Lantern Inc | | |
| Red Parrot Restaurant Inc. | | |
| Reel and Karat Restaurant Group, LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Restaurant Associate of Cincinnati, Inc. | | |
| Restaurantes Kayarda, Inc | | |
| Ristorante Piemontese | | |
| Rokamco Distributing Inc. | | |
| Rougefox Entertainment LLC | | |
| Royal Nepal LLC | | |
| Salad Heads Inc. | | |
| San Francisco Pub Company LLC | | |
| Sandusky Star Lanes Inc | | |
| Sanko Restaurant Inc | | |
| Savory Kitchen, LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Schwarz2 Corporation | | |
| Sheryl Ann Catering LLC | | |
| Shibumi LLC | | |
| Solo Restaurant LLC | | |
| South Indian LLC | | |
| Southern Restaurant Operations, LLC | | Southern Restaurant Holdings, LLC |
| Stag Dining Group, Inc. | | |
| StandEatDrink, LLC | | |
| Star Lanes at the Harbor Ltd | | |
| Sternbach Holdings LLC | | |
| Stove 3 West Chester LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☒ None/Not Applicable |
| Strike Holdings, LLC | | |
| Sub of Subs, LLC | | |
| Surfridge Brewing Company East, LLC | | |
| Susette Slevin | | |
| SW3, LLC | | |
| Szakacs Investments LLC | | |
| Tacky Tarpon, Inc. | | |
| Taj Niel Inc | | |
| Taste of A'Roma, Inc. | | |
| Tastings Inc | | |
| | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☒ None/Not Applicable |
| TC Dugan Enterprises Inc | | |
| TDMull Properties, Inc. | | |
| Tereneo 3634 LLC | | |
| The City Catering Company, Inc. | | |
| The Dirty Bourbon Dance Hall & Saloon CS LLC | | |
| The Dirty Bourbon Dance Hall & Saloon LLC | | |
| The Dudes' Brewing Company, LLC | | |
| The Falls Bar Limited Partnership | | |
| The Firehouse BBQ, LLC | | |
| The Gutter Bar LES LLC | | |
| The Gutter Bar LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| The Hearthstone Restaurant Group, Inc. | | |
| The Katie Catlin Corporation | | |
| The Phoenix Irish Bar, LLC | | |
| The Pulpo Group Inc. | | |
| The Regatta On Grand | | |
| The Sleek Greek LLC | | |
| The Stave, Inc. | | |
| The Studio, an Artistic Dining Experience, Inc | | |
| The Victor Cafe | | |
| Thomas Costa dba North Plank Road Tavern | | |
| Three Sheets, LLC | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☒ None/Not Applicable |
| Three-Zero-Eight, LLC | | |
| Timios Enterprises Corp | | |
| Tom Ralys | | |
| Trel Restaurant Inc | | |
| Updog LLC | | |
| Ushers of Moorhead LLC | | |
| Vasiliki Corp | | |
| Village Food Court LLC | | |
| Village Tavern Salem, Inc | | |
| VS Services, L.L.C. | | |
| Waterstone Events, Inc. | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. <br><br> ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. <br><br> ☒ None/Not Applicable |
| Whiskey R. LLC | | |
| Whitney's Inn, LLC | | |
| Winchester Inn LLC | | |
| WLC Restaurant LLC | | |
| Xenia Enterprises Inc | | |
| Yajika Restaurants, Inc | | |
| Zechsan Business Development Inc. | | |
| | | |
| | | |
| | | |
| | | |

☐　Additional pages attached

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ................................................ viii

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION .................................................... 5

STATEMENT OF THE ISSUES .......................................................... 5

STATEMENT OF THE CASE ............................................................. 5

SUMMARY OF THE ARGUMENT .................................................... 9

STANDARD OF REVIEW ................................................................. 13

ARGUMENT ..................................................................................... 13

I.   The Trial Court Had Jurisdiction Under The Tucker Act .................... 13

     A.   Section 9009c Is Money-Mandating ................................................ 14

          1.   Section 9009c Uses Mandatory Language To Direct
               Payments ................................................................................ 15

          2.   Section 9009c Compensates For Past Injury ...................... 28

          3.   The Trial Court's Alternative Conclusion That
               Section 9009c Is Money-Mandating Even If It
               Affords SBA Some Discretion Is Correct .......................... 41

     B.   Plaintiffs Were Not Required To Bring Their Claims
          Under The APA ................................................................................ 44

II.  Plaintiffs Have Stated A Claim Upon Which Relief Can Be
     Granted ............................................................................................... 56

CONCLUSION .................................................................................. 67

CERTIFICATE OF SERVICE .......................................................... 70

# TABLE OF AUTHORITIES

Page

## CASES

*Agwiak v. United States*, 347 F.3d 1375 (Fed. Cir. 2003) ..................................16

*Biltmore Forest Broad. FM, Inc. v. United States*,
    555 F.3d 1375 (Fed. Cir. 2009) ........................................................................13

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ..........................................*passim*

*Cambridge v. United States*, 558 F.3d 1331 (Fed. Cir. 2009) ...........................13

*Doe v. United States*, 100 F.3d 1576 (Fed. Cir. 1996)........................................25

*Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006)........................................42

*Eastport S. S. Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967) ..........27, 28

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005)................13, 45, 51, 56

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)...........47

*Greenlee County v. United States*, 487 F.3d 871 (Fed. Cir. 2007) ..........*passim*

*Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614 (2020) .....................56

*Kanemoto v. Reno*, 41 F.3d 641 (Fed. Cir. 1994) ...............................................50

*Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994)..........................................48, 49

*Keco Indus., Inc. v. United States*, 428 F.2d 1233 (Ct. Cl. 1970) ....................56

*Landgraf v. USI Film Prod.*, 511 U.S. 244 (1994) ............................................65

*Lummi Tribe of the Lummi Rsrv., Wash. v. United States*,
    870 F.3d 1313 (Fed. Cir. 2017) ...............................................................*passim*

*Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003) (en banc) .............56

*McIntosh v. Dep't of Defense*, 53 F.4th 630 (Fed. Cir. 2022)............................58

Page

Cases—continued:

*Maine Community Health Options v. United States,*
590 U.S. 296 (2020)..........................................................*passim*

*Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) .................................15

*Nat'l Ctr. for Mfg. Scis. v. United States,*
114 F.3d 196 (Fed. Cir. 1997) ......................................31, 32, 33, 34

*Nat'l Guard-Fiscal Year to Be Charged for Mandated Unif. Purchases
(Reconsideration)*, B-265901 (Oct. 14, 1997) .................................66

*Salazar v. Ramah*, 567 U.S. 182 (2012)..............................................64

*Samish Indian Nation v. United States,*
419 F.3d 1355 (Fed. Cir. 2005) ..........................................42, 43

*Samish Indian Nation v. United States,*
657 F.3d 1330 (Fed. Cir. 2011), *rehrg. & rehrg. en banc denied,
vacated as moot*, 568 U.S. 936 (2012)..............................................64

*Sanford Health Plan v. United States,*
969 F.3d 1370 (Fed. Cir. 2020) ..........................................14, 38, 61

*Shoshone Indian Tribe of Wind River Rsrv. v. United States,*
672 F.3d 1021 (Fed. Cir. 2012) ........................................................6

*Silver State Land LLC v. United States*, 148 Fed. Cl. 217 (2020) ...................52

*Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) ...............................52

*Star-Glo Assocs., LP v. United States*, 414 F.3d 1349 (Fed. Cir. 2005) ..........64

*Suburban Mortg. Assocs. v. HUD*, 480 F.3d 1116 (Fed. Cir. 2007)........*passim*

*Sutton v. United States*, 256 U.S. 575 (1921).....................................62

*Taylor v. United States*, 959 F.3d 1081 (Fed. Cir. 2020)..................................56

Page

Cases—continued:

*Thompson v. Cherokee Nation of Okla.,*
    334 F.3d 1075 (Fed. Cir. 2003) *aff'd*, 543 U.S. 631 (2005)......................60, 61

*Tyson v. United States*, 32 F. Supp. 135 (Ct. Cl. 1940) ....................................25

*United States v. Testan*, 424 U.S. 392 (1976)................................................27, 28

*United States v. White Mountain Apache Tribe,* 537 U.S. 465 (2003)......13, 14

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) .............................18

*Vitolo v. Guzman*, 548 F. Supp. 3d 765 (E.D. Tenn. 2021) ................................54

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) .................................................53

## STATUTES, REGULATIONS, AND RULE

15 U.S.C.
    § 9009a......................................................................................................18
    § 9009a(b)(2) .......................................................................................1, 18
    § 9009c....................................................................................................*passim*
    § 9009c(a)(1)...............................................................................................6
    § 9009c(a)(3).............................................................................................67
    § 9009c(a)(7)........................................................................................6, 20
    § 9009c(a)(7)(A)......................................................................................30
    § 9009c(b)(1) ............................................................................................19
    § 9009c(b)(2) .......................................................................................1, 20
    § 9009c(b)(2)(A)..................................................................6, 12, 58, 59
    § 9009c(b)(3) ................................................................2, 16, 20, 22
    § 9009c(c)(1).........................................................................................*passim*
    § 9009c(c)(4).......................................................................2, 16, 20, 30
    § 9009c(c)(4)(B) ......................................................................................31
    § 9009c(c)(4)(B)(i)....................................................................................5
    § 9009c(c)(5).......................................................................................31, 36
    § 9009c(c)(6).................................................................................31, 36, 66

Page

Statutes, Regulations, and Rule—continued:

19 U.S.C. § 1619 ....................................................................25

28 U.S.C.
   § 1292................................................................................5
   § 1500..............................................................................53

29 U.S.C. § 794 .....................................................................40

31 U.S.C.
   § 1553..............................................................................66
   § 1555..............................................................................66
   § 3701..............................................................................40
   § 3711..............................................................................40
   § 6902..............................................................................39

42 U.S.C.
   § 2000d............................................................................40
   § 18116............................................................................39
   § 18062............................................................................17

Administrative Procedure Act (APA) ........................................ *passim*

American Rescue Plan Act of 2021,
   Pub. L. 117-2, 135 Stat. 5 (Mar. 11, 2021) ........................................1

45 C.F.R.
   § 153.540..........................................................................39
   § 158.402..........................................................................39

78 Fed. Reg. 72,322 (Dec. 2, 2013) ........................................39

Fed. R. Civ. P. 12(b)(6) ........................................57, 64

Page

## OTHER AUTHORITIES

GAO Redbook
    (3d. ed. 2015)......................................................................61
    (4th ed. 2016) ...............................................................63, 65

H.R. Rep. No. 117-7 (Feb. 24, 2021) ......................................1

Steven N. Tomanelli, Appropriations Law: Principles and Practice
    (2003) .............................................................................62

U.S. Cert. Pet., *United States v. Samish Indian Nation*,
    2012 WL1961403, No. 11-1448 (June 1, 2012)...................64

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court.  Plaintiffs are not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

**INTRODUCTION**

The COVID-19 pandemic required restaurants to severely limit their operations to help contain the virus. Appx.52-53. The financial effects were devastating. The restaurant industry saw sales drop in 2020 by an estimated $240 billion. Appx.53. And as revenue plummeted, restaurants were simultaneously hit with skyrocketing operating expenses due to labor and supply-chain shortages. Congress took note: "Restaurants across the country, a notoriously-thin margin business, faced full or partial shutdowns, and limited capacity and abbreviated hours when they were open."[1] Through legislation creating the Restaurant Revitalization Fund ("RRF"), enacted in March 2021, Congress committed to compensating restaurants for revenue they lost in 2020 as a result of the pandemic.[2]

Congress started off the Fund with $28.6 billion "in addition to amounts otherwise available." 15 U.S.C. § 9009c(b)(2). Congress required the Small Business Administration ("SBA") to administer the program, and it laid down detailed mandatory rules regarding who would receive grants and how grant

---

[1] Committee on the Budget, United States House of Representatives, H.R. Rep. No. 117-7 (Feb. 24, 2021), at 457.

[2] *See* American Rescue Plan Act of 2021, Pub. L. 117-2, 135 Stat. 5 (Mar. 11, 2021), Section 5003, codified at 15 U.S.C. § 9009c.

amounts were to be determined. Congress mandated that the SBA "shall use amounts in the Fund to make grants" and "shall award grants to eligible entities in the order in which applications are received." *Id*. §§ 9009c(b)(3), (c)(1). And Congress specified that the amount paid out to each recipient "shall be equal to the pandemic-related revenue loss of the eligible entity." 15 U.S.C. § 9009c(c)(4).

Plaintiffs are small businesses in the restaurant industry. Many are family-owned restaurants passed down through generations. All submitted RRF applications on the first day, and many within the first hour, that SBA accepted applications from the public. Appx.49. But SBA had not yet awarded grants to Plaintiffs when it announced closure of the program. Appx.50-51. Plaintiffs later learned that SBA had violated the statutory mandate to award applications in the order received, and instead had depleted the Fund by unlawfully awarding grants to applicants in line behind Plaintiffs.

SBA does not dispute that it violated Congress' instructions to award grants in the order in which applications were received or that Plaintiffs would have received urgently-needed RRF grants had SBA complied with the law. Appx.51. Plaintiffs would have been able to pay their expenses with the grant money owed to them under Section 9009c, but instead were forced to pay out

2

of pockets already emptied by the pandemic. Many were forced to take out loans, as the SBA had encouraged them to do in anticipation of receiving grant money. Appx.51. Now, with mounting and compounding debt, many Plaintiffs are on the verge of losing their businesses while they pursue damages claims in this case. Mot. to Expedite at 9-11.

With no other options available, Plaintiffs filed this suit to recover what they are owed: money damages for the injuries caused by SBA's past violation of the clear statutory payment mandate. As the trial court found in a comprehensive opinion, the Tucker Act and its waiver of sovereign immunity provide the proper avenue for Plaintiffs' claims.

The government disagrees. In its view, Plaintiffs have no legal remedy for SBA's decision to flout Congress' mandate. The government is wrong. Section 9009c employs classic money-mandating language bringing this case comfortably within the Tucker Act's scope. Indeed, Section 9009c was written and enacted in the wake of the Supreme Court's seminal Tucker-Act-jurisdiction decision, which held that the Affordable Care Act's Risk Corridor provision is money-mandating. *See Me. Cmty. Health Options v. United States*, 590 U.S. 296, 324-25 (2020). Against that immediate backdrop, Congress in Section 9009c chose to repeatedly use mandatory language that is

materially indistinguishable from the language found to be money-mandating in *Maine*.  Congress also squarely focused Section 9009c on compensating grant recipients for past injury under a "backwards-looking formula"— revenue loss in the year before enactment—another feature which "[b]olster[ed]" the Supreme Court's money-mandating holding in *Maine*.  *Id*. *Maine* provided the roadmap for creating a money-mandating obligation, and Congress followed it to a tee in Section 9009c.

On the merits, SBA similarly contends that its statutory violations cannot be remedied because it has already (by virtue of its statutory violation) misspent all the money Congress provided.  But as the trial court correctly concluded, SBA "cannot evade its obligations by paying the wrong entities out of the RRF and then claiming there is no money left to the pay the plaintiffs, the text of the statute notwithstanding."  Appx.32.

At bottom, the government in this case seeks a holding that would have the effect of broadly immunizing an executive-branch agency from judicial review of its compliance with Congress' mandatory directions on how to spend appropriated funds in a short-term, one-time spending program.  When Congress mandates that agencies pay out certain money to certain entities in a certain order, the agency must comply, and it cannot escape judicial review

by rushing money out the door in violation of Congress' directives and then claiming that it is too late for the courts to review its actions. When an agency's statutory violation causes injury, as here, the Court of Federal Claims has jurisdiction to adjudicate damages claims arising from the statutory violation. That straightforward and well-established principle decides this case.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §1292(d). The trial court properly exercised jurisdiction under the Tucker Act.

## STATEMENT OF THE ISSUES

1. Whether the trial court had jurisdiction over Plaintiffs' suit.

2. Whether Plaintiffs have stated a claim upon which relief can be granted.

## STATEMENT OF THE CASE

1. The pandemic and government shutdown orders inflicted devastating economic injury on restaurants across the country in 2020. Appx.48-49, 52-53. The effects of those injuries were reverberating through the broader U.S. economy when in March 2021 Congress established the Restaurant Revitalization Fund ("RRF") to compensate restaurants for "pandemic-related revenue loss" incurred in the prior year. Section 9009c(c)(4)(B)(i). RRF grants were computed under a backwards-looking statutory formula for

determining the decline of gross receipts during 2020 as compared to 2019. *Id.* § 9009c(a)(7).

Congress required the Small Business Administration ("SBA") to administer the RRF program according to detailed statutory directives, *id.* § 9009c(a)(1); appropriated $28.6 billion exclusively for RRF grants "[i]n addition to amounts otherwise available," *id.* § 9009c(b)(2)(A); and mandated that the SBA "shall award grants to eligible entities in the order in which applications are received by the Administrator." *Id.* § 9009c(c)(1).

2.  Plaintiffs are 303 businesses in the restaurant industry who met all statutory requirements for RRF grants.[3]  Appx.51-52, 82-83.  Plaintiffs submitted RRF applications on the first day the program was open to the public, many within the first hour of Day 1.  Appx.49.  Plaintiffs' applications were among the first $28.6 billion eligible applications received by the SBA. Appx.50-51, 86-87.  But SBA announced that the program had closed before Plaintiffs' grants were awarded.  Appx.50-51.  Plaintiffs then learned that SBA had disbursed RRF money in violation of Section 9009c.  Despite that date and

---

[3] The government has not challenged the sufficiency of the Complaint's factual allegations, nor attempted to contravene them.  Accordingly, Plaintiffs' factual allegations are accepted as true for this appeal.  *See Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 672 F.3d 1021, 1029-30 (Fed. Cir. 2012).

time stamps recorded the receipt of every application, Appx.82, SBA ignored the plain language of Section 9009c by awarding grants in the order applications were processed instead of the order received. Appx.50. Plaintiffs later determined that SBA had unlawfully disbursed to applicants in line behind Plaintiffs an amount of grant money that exceeded the total that SBA was required to award Plaintiffs. Appx.86. Accordingly, Plaintiffs allege (and the government does not dispute on appeal) that their grants would have been awarded had the agency followed the statutory command. Appx.51, 87. SBA failed to award grants to Plaintiffs as required by Section 9009c. *See* Appx.50-51.

3. Plaintiffs filed this suit asserting a single count seeking presently due damages for SBA's violation of a money-mandating statute. The government moved to dismiss for lack of subject matter jurisdiction. After oral argument, the trial court *sua sponte* ordered supplemental briefing on the question whether the complaint failed to state a claim upon which relief could be granted. The trial court issued an order and 33-page opinion denying the government's motion to dismiss. Appx.1-33.

a. The trial court first concluded that Section 9009c is money-mandating. The court reached that conclusion because Section 9009c: (i)

requires that the SBA establish and administer the RRF program using appropriated funds only for RRF grants; (ii) provides a backwards-looking statutory formula for computing grants to compensate for prior pandemic-related losses, and (iii) mandates that the agency "shall award grants to eligible entities in the order in which applications are received." Appx.13-14, 17-19.

b. The trial court further concluded that Plaintiffs were not required to bring their claims under the Administrative Procedure Act ("APA"). Examining the "true nature" of the action, the trial court explained that "[P]laintiffs are seeking a one-time payment of a specific amount of money they contend is due to them and are not seeking prospective relief nor are [they] in an ongoing, long-term relationship with the federal government." Appx.15. The trial court rejected the government's attempt to recharacterize Plaintiffs' claims as seeking prospective equitable relief by "shoehorn[ing]" them into *Bowen*, explaining that the "complaint's singular cause of action is explicitly limited to a claim for money damages under the Tucker Act." Appx.10-11.

c. Finally, the trial court held that Plaintiffs stated a claim upon which relief can be granted. Appx.2. The court found that Section 9009c is not

"capped" within the meaning of this Court's precedents because it does not include limiting language like "subject to available appropriations," but instead contains the open-ended phrase "in addition to amounts otherwise available." Appx.31. The trial court, moreover, explained that even if Section 9009c capped liability, Plaintiffs' claims would survive because they should have been awarded grants before funds were exhausted had the SBA complied with Section 9009c. Appx.32-33. The trial court concluded that the government "cannot evade its obligations by paying the wrong entities out of the RRF and then claiming there is no money left to pay the plaintiffs." Appx.32.

## SUMMARY OF THE ARGUMENT

I. The Court of Federal Claims has Tucker Act jurisdiction over this suit. This case is on all fours with the Supreme Court's controlling decision in *Maine*, 590 U.S. 296. Here, as in *Maine*, the two relevant requirements for jurisdiction are met: Section 9009c is money-mandating and Plaintiffs' suit is for money damages.

A. Section 9009c is money-mandating. The Supreme Court in *Maine* confirmed the two key indicators that a statute is money-mandating: (1) mandatory language and (2) compensation for past injury. *Id.* at 324-25.

9

Section 9009c contains both features:  It uses classic "shall" pay language three times over to direct payments to a specified group to compensate for past injuries stemming from COVID-19.

The government's efforts to muddy this straightforward analysis are unavailing.  The government claims that Section 9009c merely sought to establish a program while giving SBA carte blanche over the program's administration, including the decision whether to make payments at all. That contention cannot be squared with the plain statutory text, which mandates payments and directs SBA whom to pay.  The government argues that because Section 9009c contains an ordering requirement, Section 9009c's command that SBA "shall award" should instead be interpreted to mean "may award" such that payment obligations become discretionary.  But as a matter of logic and English, the additional requirement that SBA pay entities in the order in which applications are received further *constrains* SBA's discretion, rather than enabling it.

Ultimately, the government fails to identify a single decision of any court holding that a statute with mandatory language and a backwards-looking formula to compensate for past injury is not money-mandating.  One set of cases cited by the government involve statutes without "shall" or similar

10

mandatory language. The other set of cases (which the government labels as "grant program" cases) involve statutes that did not seek to compensate recipients for past injuries, but instead instituted forward-looking, long-term, cooperative grant programs solely to subsidize future expenses. Supreme Court precedent expressly distinguishes such statutes from this one, which seeks to compensate for past injuries and calculates compensation by utilizing a backwards-looking formula.

B. Plaintiffs' suit is for money damages. While the government is correct that suits for prospective injunctive relief typically cannot be brought in the Court of Federal Claims and must instead proceed in district court under the APA, this suit seeks no prospective relief. Plaintiffs were injured by the SBA's statutory violations that led to Plaintiffs not receiving funds when they were due. Plaintiffs do not seek a judgment obligating SBA to properly administer the now-defunct program going forward. Rather, Plaintiffs request compensation for past injury: the SBA's unlawful failure to award their grants resulting in their payment of expenses out of pocket that should have been paid by grant money.

II. Plaintiffs have stated a claim. Had SBA complied with Section 9009c's directives, Plaintiffs would have received money. The government

contends that Plaintiffs' suit for damages cannot succeed because SBA has already misspent the money. That is not the law. Recovery in suits for money damages like this one can come out of the Judgment Fund—a point the government does not contest in its brief and has forfeited.

The government instead claims that Congress capped liability under the RRF by appropriating a specific amount of money to the program. But Congress went out of its way to specify that the amount it appropriated was to be available "in addition to amounts otherwise available." 15 U.S.C. § 9009c(b)(2)(A). This is open-ended language that does not evidence any intent to limit liability for the SBA's statutory violations and distinguishes the RRF from the inapposite authorities upon which the government relies.

In any event, even if Section 9009c were read to create a capped obligation, Plaintiffs' claims are cognizable because SBA's obligation to pay Plaintiffs arose before the RRF's funds were depleted. Put differently, even if Congress capped the money-mandating obligation at $28.6 billion, Plaintiffs' uncontroverted allegations establish that their applications fall within the scope of that obligation. The government's only argument on this point collapses entirely into its jurisdictional arguments, effectively forfeiting it.

12

## STANDARD OF REVIEW

The trial court found that it had subject-matter jurisdiction over this case and that Plaintiffs stated a claim upon which relief can be granted. These holdings are reviewed de novo. *Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d 1375, 1380 (Fed. Cir. 2009); *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

## ARGUMENT

Text and precedent make clear that Congress created an enforceable legal obligation in the RRF that required the SBA to award grants to a specified group of applicants that includes Plaintiffs. SBA's undisputed violation of this clear statutory mandate gave rise to a claim for money damages under the Tucker Act that was properly brought in the Court of Federal Claims.

## I.    The Trial Court Had Jurisdiction Under The Tucker Act

When an agency fails to comply with a statutory directive to pay money, the Court of Federal Claims has jurisdiction under the Tucker Act for an ensuing suit if two key requirements are satisfied. First, a suit must invoke a money-mandating statute. *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003); *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part). And second, the suit must be for

13

relief that the Court of Federal Claims is authorized to provide—typically, money damages. *See Suburban Mortg. Assocs. v. HUD*, 480 F.3d 1116, 1124-26 (Fed. Cir. 2007). Both requirements are satisfied here.

## A. Section 9009c Is Money-Mandating

A statute creates a right capable of grounding a claim within the Tucker Act's waiver of sovereign immunity if it can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *White Mountain*, 537 U.S. at 472 (cleaned up). The jurisdictional inquiry turns on the question whether the plaintiff "is within the class of plaintiffs entitled to recover under the statute if the elements of a cause of action are established." *Greenlee County v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007).

As the Supreme Court recently explained in *Maine*, there are two key indicators that a statute is money-mandating: mandatory language and a focus on compensating for past injury. *See id.* at 324-25 (holding that the statute is money-mandating because it contained mandatory language and focused on compensating for past injury); *see also Sanford Health Plan v. United States*, 969 F.3d 1370, 1380, 1381 (Fed. Cir. 2020) (same). Both of those indicators are present here.

14

### 1. Section 9009c Uses Mandatory Language To Direct Payments

A. "[A] statute commanding the payment of a specified amount of money by the United States impliedly authorizes (absent other indication) a claim for damages in the defaulted amount." *See Maine*, 590 U.S. at 324 (cleaned up). "Satisfying this rubric is generally both necessary and sufficient to permit a Tucker Act suit for damages in the Court of Federal Claims." *Id.* at 323-24 (citation omitted). The prime indicator that an agency's obligation to make payments is mandatory is Congress' use of the word "shall": "[U]se of the word 'shall' generally makes a statute money-mandating." *Greenlee County*, 487 F.3d at 877 (citation omitted). As the Supreme Court has explained, Congress' use of "'shall pay' language often reflects congressional intent to create both a right and a remedy under the Tucker Act." *Maine*, 590 U.S. at 324 (cleaned up).

This presumption regarding Congress' use of "shall" makes "good sense." *Id.* at 323 n.12. Courts presume that "when Congress enacts statutes, it is aware of relevant judicial precedent," including the "history and precedent surrounding the use of [a given] word"—here, "shall." *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010). And courts have "repeatedly recognized

15

that use of the word 'shall' generally makes a statute money-mandating." *Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003).

Against this backdrop, Congress used the word "shall" multiple times in Section 9009c when directing the SBA to make payments to a particular class of persons.  Congress directed that (i) the "Administrator *shall* use amounts in the Fund to make grants"; (ii) that the Administrator "*shall* award grants to eligible entities in the order in which applications are received by the Administrator," and (iii) that "the Amount of a grant made to an eligible entity … *shall* be equal to the pandemic-related revenue loss of the eligible entity." 15 U.S.C. § 9009c(b)(3), (c)(1), (c)(4) (emphases added).  Section 9009c therefore imposes a crystal-clear mandate to issue payments to eligible entities in conformity with Congress' directives.  This makes the statute money-mandating.

B.    Making Congress' intent all the more apparent is the fact that Congress enacted Section 9009c and its triple "shall" mandate less than a year after the Supreme Court issued *Maine*, which could not have been clearer about the legal significance of Congress' use of "shall" instead of "may" in statutes directing payment. *Maine* concerned the Risk Corridors Program—a program to issue payments to reduce health insurers' financial risk during

16

the first three years of the Affordable Care Act's marketplaces. 590 U.S. at 300-01. Under that program, certain qualified health plans "with losses below [a] threshold would receive payments from the Government." *Id.* at 302. Congress refused to appropriate funds for the agency to make the payments, and the government racked up a "deficit exceed[ing] $12 billion." *Id.* at 305. The plaintiff health insurers subsequently sued for damages.

The Supreme Court concluded that Congress' use of "shall" in that statute (*e.g.*, "shall establish and administer a program of risk corridors," "shall pay to" certain plans in certain circumstances, 42 U.S.C. § 18062(a), (b)) instead of "may" (which Congress used in nearby provisions) rendered the statute "comfortably" "money-mandating." *Id.* at 310-11, 324-25 (cleaned up). As the Court emphasized, Congress' use of "mandatory" "shall pay" language is "significant," as it "often reflects congressional intent to create both a right and a remedy under the Tucker Act." *Id.* at 324.

Just as in *Maine*, Section 9009c's mandatory language requires SBA to "establish and administer the program," mandates that the program "shall provide for payment according to the statutory formula," and directs SBA to pay "qualifying" entities. *See id.* at 324-25. Section 9009c therefore also "falls

comfortably within the class of money-mandating statutes that permit recovery of money damages in the Court of Federal Claims." *Id.*

And just as in *Maine*, "[a]djacent provisions also underscore [Section 9009c's] mandatory nature." *Id.* at 310. Section 9009a is another SBA pandemic relief provision enacted in the wake of *Maine*. There, in contrast to Section 9009c, Congress chose to use the discretionary "may award" formulation, providing that the "Administrator *may* make … grants to eligible persons or entities." 15 U.S.C. § 9009a(b)(2) (emphasis added). That choice underscores the mandatory nature of 9009c's "shall" directions. *See Maine*, 590 U.S. at 310-11. "Congress' choice of words is presumed to be deliberate." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 357 (2013). And "[w]hen, as is the case here, Congress distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty." *Maine*, 590 U.S. at 310-11 (cleaned up).

C. The government makes three main counterarguments. First, that the triple "shall" mandate in Section 9009c requires only that SBA create and administer a program, not that SBA actually pay qualifying applicants. Second, that by including a requirement that SBA pay applicants in the order in which SBA received applications, Congress made any payment obligation

non-mandatory. And third, that courts have hesitated to conclude that statutes *without* mandatory language are money-mandating. None of these arguments are persuasive.

1. The government (at 16-17) makes the sweeping argument that Section 9009c's triple "shall" mandate does not require SBA to make any payments at all and instead reflects only an obligation to "establish and administer" a program, leaving everything else—including the question of whether to spend any money at all—to SBA's discretion. The government (at 16-17) claims that this distinguishes Section 9009c from the Risk Corridors Statute at issue in *Maine*. This argument is plainly wrong: Section 9009c has a triple mandate that is indistinguishable from *Maine* and required SBA to make payments according to Congress' dictates. Section 9009c speaks for itself:

Mandate 1 – establish and administer a program:

- "There is established … a fund to be known as the Restaurant Revitalization Fund." 15 U.S.C. § 9009c(b)(1).

- Congress provided a minimum amount of money to that fund, specifying that the "Restaurant Revitalization Fund" "is

appropriated" "$28,600,000,000" "[i]n addition to amounts otherwise available."  15 U.S.C. § 9009c(b)(2).

- "The Administrator shall use amounts in the Fund to make grants described in subsection (c)" (*i.e.*, in the order in which applications are received).  15 U.S.C. § 9009c(b)(3).

Mandate 2 – payment according to a backwards-looking statutory formula:

- "[T]he amount of a grant made to an eligible entity under this subsection shall be equal to the pandemic-related revenue loss of the eligible entity."  15 U.S.C. § 9009c(c)(4); *see also id.* § 9009c(a)(7) (detailing formula for calculation of "pandemic-related revenue loss").

Mandate 3 – the agency shall pay a defined class of beneficiaries:

- Congress mandated that "the Administrator shall award grants to eligible entities in the order in which applications are received."  15 U.S.C. § 9009c(c)(1).

This detailed series of mandates cannot plausibly be read as permitting SBA discretion to *not* use the provided funds to award grants or to withhold grants from earlier applicants in favor of later applicants.[4]

In any event, even if the government were correct that Section 9009c contains only a single mandate, nothing in *Maine* suggests that Congress must follow precisely the format of the Risk Corridors provision to render a statute money-mandating. As *Maine* explains, the relevant question for purposes of the Tucker Act is simply whether a statute can "fairly be interpreted as mandating compensation by the Federal Government." *Maine*, 590 U.S. at 323 (citation omitted). The use of "shall pay" language—which Section 9009c indisputably contains—is by itself a sufficient basis for deeming a statute money-mandating, whether or not it is paired with additional mandates from Congress.

2. The government (at 17-20) argues that Section 9009c is not money-mandating because it contains an ordering requirement, directing SBA to pay

---

[4] In fact, the government appears to agree in a different section of its brief that Section 9009c *does not* contain discretionary language that would afford the agency such discretion. *See* Gov. Br. at 28 (arguing that line of cases pertaining to discretionary grant programs is not relevant due to lack of discretionary statutory language in RRF).

money to eligible applicants in the order in which applications are received. According to the government, Section 9009c only provides "direction[] on *how* the agency should make awards in general" and does not contain a "directly stated … payment mandate" and a "specified … group to which the Government shall make the payment." Gov. Br. 17 (emphasis in original). This argument is wrong for several reasons.

a.    The premise of the government's argument is incorrect. As explained, Section 9009c does far more than merely provide "direction[] on how the agency should make awards." *Contra* Gov. Br. 17. Congress mandated that awards be made, and it specified to whom the awards should go and in what amounts. Congress expressly required that "[t]he Administrator shall use amounts in the Fund to make grants described in subsection (c)." 15 U.S.C. § 9009c(b)(3). That provision alone imposes a mandatory obligation. Subsection (c) then repeats the payment command and details to whom the payments must go and how much must be paid.

Even zooming in on subsection (c) alone, that provision's use of an ordering requirement does not make its "shall award grants" command any less mandatory. As a matter of ordinary English and logic, imposing an ordering requirement does not make mandatory language discretionary—it

22

makes the language *more* prescriptive, by mandating an additional consideration the actor must account for.  If the operator of a music venue tells an employee that he "shall let people into the concert in the order in which they lined up," the employee would not have discretion to not let anyone in (or to let late-arrivers in at the expense of those first in line).  So too here, Congress' directive that the SBA "shall" award grants in the order applications are received does not somehow vest the agency with discretion to make awards in a different order.

Tellingly, the government (at 18) concedes that if Section 9009c had provided that SBA "shall award grants" to "all eligible entities" or to "first-day applicants," the statute would be money-mandating.  There is no meaningful distinction between the government's hypothetical instruction to pay "first-day" applicants and the language Congress chose in Section 9009c. In both situations, Congress identifies the class to whom the statute is money-mandating: in the government's hypothetical, to those who applied on the first day; in Section 9009c, to those whose applications were received first in time before the agency ran out of funds.  Under the government's own concession, Section 9009c is money-mandating notwithstanding the fact that it contains an ordering requirement.

23

b.  To the extent that the government's theory is that Section 9009c is not money-mandating because (given its ordering requirement) it could not be known in advance which businesses would ultimately get paid, that theory would not work either.  For one thing, the same problem would face the government's hypothetical money-mandating statute directing payment to "first-day applicants."  Gov. Br. 18.  Until the applications come in, there is no way of knowing who will be paid.  For another, this *ex ante* indeterminacy is a common feature of money-mandating statutes.  Take for instance the statutory scheme found to be money-mandating by the Supreme Court in *Maine*.  In the Risk Corridors Program, Congress required insurers who profited to pay the agency, and insurers who lost money to be paid by the agency.  *Maine*, 590 U.S. at 302.  No one knew in advance which insurers would profit and which would lose money.[5]

Section 9009c required the agency to award grants in the order applications were received until the appropriated funds were fully obligated.

---

[5] In fact, this uncertainty was central to the dispute in *Maine*; the government vehemently argued that it was expected that payments to the losers would be fully funded by the payments from the winners.  When that did not happen, the government argued that the losers could not collect the obligated money from the Treasury, but the Supreme Court disagreed.

That mandate defined a specific and determinable class of applicants that included Plaintiffs.  *See* Appx.22-23.  Congress need not have been more specific.

c.  The government ignores cases holding that statutes with an ordering requirement are no less money-mandating.  For instance, 19 U.S.C. § 1619 has been repeatedly held to be money-mandating, even though it contains a strict prioritization requirement.  *See Doe v. United States*, 100 F.3d 1576, 180 (Fed. Cir. 1996) (collecting cases).  That statute states that an informer who provides "original information" to the government about customs violations that "leads to a recovery" "may" be awarded a specified amount of compensation.  19 U.S.C. § 1619(a).  In other words, only the "first" person to submit the information under section 1619 can be paid.  *See Doe*, 100 F.3d at 1579-80 (quoting *Tyson v. United States*, 32 F. Supp. 135, 136 (Ct. Cl. 1940)).

The statute is nonetheless money-mandating because it "confer[s] upon the informer an absolute right to demand payment of the award when he ha[s] met the conditions precedent thereto laid down by Congress," including the requirement that "the information" he provided "was the first information which the secretary had."  *Doe*, 100 F.3d at 1579-80 (quoting *Tyson*, 32 F. Supp. at 136)).

25

This case is no different with regard to the ordering requirement:  In Section 9009c, "shall use amounts in the Fund to make grants" and "shall award grants," commands payment.  And the phrases "to eligible entities" and "in the order in which applications are received" together define "the class of plaintiffs entitled to recover under the statute if the elements of a cause of action are established."  *See Greenlee County*, 487 F.3d at 876.  Plaintiffs have alleged they were entitled to that money because they were "eligible entities" whose applications were among the first $28.6 billion received, yet SBA unlawfully did not follow the statutory command to award their grants. Because Plaintiffs "met the conditions" Congress provided and SBA nonetheless refused to pay, plaintiffs have "the right to file suit" under the Tucker Act.

d.  The government (at 17-18) cites cases in which courts have held statutes without an ordering rule to be money-mandating.  But the fact that courts have held statutes *without* an ordering requirement to be money-mandating does not mean that statutes *with* an ordering requirement are *not* money-mandating.  More to the point, the government has identified no case holding or even suggesting that ordering rules render statutes non-money-mandating.  Nor is there any dicta, reasoning, or implication in any of the

26

government's cited cases that the result turned on the lack of an ordering requirement.

3.  The government's policy arguments likewise fail.

The government (at 25) claims that Plaintiffs' theory would "turn a wide variety of alleged agency failures in managing a benefits program into 'individual rights' to money damages."  Not so.  It is not Plaintiffs' theory or any individual right, but instead the statute passed by Congress that created the mandatory obligation to pay.  If the government fails to meet a payment requirement to someone to whom Congress directed payment, longstanding precedent dictates that person has a right to sue.

The government also argues that courts should not "read[] into statutes an implied right of compensation for wrongful Government decisions or actions."  Gov. Br. 22-26 (citing *Eastport S. S. Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967) and *United States v. Testan*, 424 U.S. 392 (1976)).  As explained, however, the payment obligation Plaintiffs seek to vindicate is not implied—it is expressly provided for under the Tucker Act in light of Section 9009c's mandatory "shall" language.

The use of mandatory language in Section 9009c distinguishes it from the statute at issue in *Eastport*, which had no "shall pay" language or any

27

equivalent. 372 F.2d at 1005 n.1. And *Eastport* emphasized that statutes that *do* mandate payment (like Section 9009c) authorize suits for damages: "[A] claimant who says that he is entitled to money from the United States because a statute or a regulation (or the Constitution) grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous but arguable." *Id.* at 1008 (cleaned up).

*Testan* is similar to *Eastport*. *Testan* involved two statutes: the Classification Act and the Back Pay Act. The Classification Act, which the Court held to not be money-mandating, had no "shall pay" or equivalent mandatory language. 424 U.S. at 399-400 (explaining that the statute contains no "express provision for an award of backpay to a person who has been erroneously classified"). The Back Pay Act, however, *did* create a money-mandating obligation, and the plaintiffs in that case lost simply because the statute did not cover them. So, as with *Eastport*, the principle in *Testan* is at most that statutes lacking mandatory language will often not be money-mandating. Section 9009c, however, imposes plainly mandatory obligations.

## 2.    Section 9009c Compensates For Past Injury

Section 9009c's backwards-looking statutory formula to compute grants compensating for past injury confirms jurisdiction under the Tucker Act.

28

A.  A tell-tale sign that a statutory provision is money-mandating is its "focus[] on compensating" beneficiaries "for past conduct" as opposed to "subsidiz[ing] future state expenditures." *Maine*, 590 U.S. at 325.  The reason why, the Supreme Court has explained, is that it is "likely that … Congress intend[s] 'shall pay' language in statutes" that "attempt to compensate … for past injuries or labors" "to be self-enforcing—*i.e.,* to create both a right and a remedy." *Bowen v. Massachusetts*, 487 U.S. 879, 905 n.42 (1988).  But when Congress uses "shall pay" language in forward-looking, ongoing multi-year programs, Congress is more likely to have intended "to provide merely a right, knowing that the APA provide[s]" the more appropriate avenue for correcting misapplication of such statutes on a prospective basis, which often requires declaratory or injunctive relief.  *See id.*

*Maine* spelled out a clear rule.  Precedent "distinguish[es] statutes that attempt to compensate a particular class of persons for past injuries or labors from laws that subsidize future state expenditures." *Maine*, 590 U.S. at 325 (quoting *Bowen*, 487 U.S. at 906 n.42).  "The first group permits Tucker Act suits; the second does not." *Id.*

Applying that rule, *Maine* held that the "Risk Corridors statute sits securely in the first category" because the statute "uses a backwards-looking

formula to compensate insurers for losses incurred in providing healthcare coverage for the prior year." *Id.* The Risk Corridors statute, the Court explained, is therefore not a "grant-in-aid program" directing an agency "to subsidize future state expenditures" and as a result suits for money damages under the statute belong in the Court of Federal Claims. *Id.* at 326-27 (citation omitted).

This case is no different. As in *Maine*, Section 9009c "uses a backwards-looking formula to compensate" restaurants "for losses incurred in … the prior year." *Id.* at 325. Congress mandated that a grant provided to an eligible entity "shall be equal to the pandemic-related revenue loss of the eligible entity"—*i.e.*, a past loss. 15 U.S.C. § 9009c(c)(4). Congress' formula for calculating "pandemic-related revenue loss" in this 2021 legislation directed compensation based on a restaurant's 2020 gross receipts subtracted from the restaurant's 2019 gross receipts. 15 U.S.C. § 9009c(a)(7)(A). In other words, the statute directs compensation for pandemic-related losses a restaurant suffered in the prior year by utilizing a "backwards-looking formula." Less than a year after *Maine*, Congress' use of this "backwards-looking formula" in combination with the "shall award" mandate strongly indicates that Congress knew and intended that the implication of this statutory formulation

30

was that damages claims would be permitted to remedy violations of the statutory obligation to pay.

Further demonstrating that Congress' focus was on compensation for losses caused by the pandemic (as opposed to subsidizing future expenses) are Section 9009c's provisions ensuring that grant recipients receive only money needed to compensate for COVID-caused financial injuries.  Subsections (c)(5) and (c)(6) provide that the entity receiving a grant "may use the grant funds for [enumerated] expenses incurred as a direct result of, or during, the COVID-19 pandemic" and require the return of any grant money in excess of amounts expended in connection with the pandemic.  In addition, subsection (c)(4)(B) provides that in the case of a miscalculation of pandemic-related losses (e.g., when the grant amount is based on estimations that overstate the loss of revenue in 2020) the additional money must be returned—again ensuring that grant money is tied to pandemic-related injury.

B.    Section 9009c's backward-looking nature distinguishes the government's "grant program" decisions that it contends conflict with the trial court's decision.  Gov. Br. 30-34 (citing *National Center* and *Lummi*).  Those two decisions (which the government failed to cite below in its motion to dismiss) involved ongoing programs that subsidized *future* expenses rather

31

than compensated for past injuries—a doctrinally conclusive distinction. *See Bowen*, 487 U.S. at 889; *Maine*, 590 U.S. at 326-27.

1. Start with *National Center*. The program there looks nothing like this one. Congress allocated money for scientific research that was to be utilized by the beneficiary for future expenses under a "Cooperative Agreement" with the Air Force for joint public-private projects. *See Nat'l Ctr. for Mfg. Scis. v United States*, 114 F.3d 196, 198, 201 (Fed. Cir. 1997). The scheme there contemplated that the government would be "an active participant" in the use of the funding plaintiff claimed it was entitled to, and funding was for "collaborative projects" with the government. *Id.* at 201. The dispute in *National Center* therefore amounted to a dispute regarding "a cooperative, ongoing relationship between [the plaintiff] and the Air Force in the allocation and use of [certain] funds." *Id.* The plaintiff's suit "in effect ask[ed] that the Air Force be required to expand the existing contractual relationship [with the government] or to create a new one to cover the remaining appropriated but unobligated funds." *Id.* at 202. The claims at issue sought to compel the government to allocate more money to future contracts with the plaintiff. It was clear that, unlike here, the plaintiff there was "not seeking money in compensation for losses that it has suffered or will suffer as

32

a result of the withholding of [the disputed] funds." *Id.* at 200. The Court unsurprisingly held that under *Bowen*, that suit belonged in federal district court. *Id.*

The *National Center* Court, however, also took care to distinguish that forward-looking program from provisions like Section 9009c. The Court explained that "[t]he statutory mandate of a federal grant-in-aid program … differs from the mandate of a statute designed to afford 'compensation for a past wrong,' in that the former 'directs the [government] to pay money to the [recipient] not as compensation for a past wrong, but to subsidize future … expenditures.'" *Id.* at 201 (quoting *Bowen*, 487 U.S. at 907 n.42)). Suits regarding statutes "that provide compensation for specific instances of past injuries or labors," in contrast, the Court emphasized, "fall[] squarely within the competence of the Court of Federal Claims" and a "Tucker Act remedy is available." *Id.* at 201, 202.

2. *Lummi* is no different. The program there was an annual "block grant system" whereby Indian tribes received funding based upon a "calculated operating subsidy and modernization allocation," to be held *in trust* to provide affordable housing to their members. *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1315, 1318 (Fed. Cir.

2017).  In other words, the program was not to refill tribal coffers to compensate for past expenditures; the program subsidized future expenditures for affordable housing and its modernization.

Moreover, the money would go to the Tribe, not for the Tribe to spend on its own expenses, but instead to purchase property that must be "held in trust" by the Tribe for statutory beneficiaries subject to comprehensive federal oversight.  *Id.* at 1318.  The statute, in other words, authorized grants of money that the Tribes had to use in cooperation with federal regulators for the future benefit of third parties.  *Lummi* analogized that scheme to the one in *National Center* and found that any money paid in satisfaction of the "underlying claim" would be subsidies for future expenditures that would entail "subsequent supervision and adjustment."  *Id.* at 1319.  The tribe was even restricted as to "particular bidding and bond terms they may use for, say, housing construction contracts" that it might enter into in the future using any proceeds from their claims.  *Id.* at 1318.  The subsidy statute at issue in *Lummi* therefore was not money-mandating because "any … claim for relief" had to

be viewed as seeking prospective relief—the distribution of "thoroughly scrutinized and cabined" "strings-attached" grants. *Id.* at 1318-19.[6]

3. The government argues that the result here should be the same as in *Lummi* because "[r]ecipients of RRF grants were limited by statute to use the funds for specified categories of expenses" and to "use the grants for expenses incurred during the statutory 'covered period.'"  Gov. Br. 32 (citations omitted).  But for several reasons Section 9009c's instructions to use the money to compensate for specific injuries does not turn Section 9009c into the sort of prospective, "strings-attached" program that *Lummi* held to be not money-mandating.

a.  RRF grants were firmly rooted in past injury by employing a backwards-looking statutory formula to calculate grant amounts based directly on past losses caused by the pandemic.  The requirement to use grants

---

[6] Although it issued more than seven years ago, the government has failed to identify a single decision doing what it urges here: apply *Lummi* to recharacterize a damages claim filed in the Court of Federal Claims as one for equitable relief.  *Lummi* is a product of the unique forward-looking cooperative statutory scheme at issue there and is not remotely representative of this Court's grant-program jurisprudence.  For this reason, it is not surprising that the government did not cite *Lummi* at all in its briefing in the trial court.

for certain expenses ensured that the money provided under Section 9009c would serve the compensatory and backwards-looking purpose of covering "expenses incurred as a direct result of, or during, the COVID-19 pandemic." 15 U.S.C. § 9009c(c)(5).

Section 9009c's backwards-looking and compensatory focus are very different from the ongoing programs that led to equitable claims in the cases on which the government misplaces reliance. Plaintiffs here seek only to be placed in the same position they would have been in had the government complied with its statutory payment obligation. The difference is not semantic. Plaintiffs have alleged, Appx.48, 49, 51, 70, 82-83, and the government does not dispute, that Plaintiffs had revenue losses caused by the pandemic and incurred allowable expenses under subsections (c)(5) and (c)(6) during the "covered period." Due to the agency's statutory violations, Plaintiffs were forced to pay for those expenses out of pocket. Plaintiffs' claims seek money damages to put them in the same position they would have been in had the SBA not violated the law. In that world, they would have received their RRF grants and not had to pay operating expenses out-of-pocket or take out loans to do so. Plaintiffs' claims are therefore classic retrospective damages claims.

By contrast, the forward-looking grant programs relied upon by the government in *National Center* and *Lummi* were for grants in aid of *future* expenditures that had not been incurred, a difference that leads inexorably to equitable claims as a ground for relief. *See Lummi*, 870 F.3d at 1319. This Court logically concluded that it could not be fairly inferred that Congress intended to create damages claims to remedy statutory violations that were amenable only to equitable relief. *Id.* But that conclusion has no application here. Unlike the Plaintiffs here, the *Lummi* plaintiffs did not allege that they were seeking compensation for expenses already incurred; nor could they have ever done so because the statutory grants at issue there were only to subsidize *future* expenses, not compensate for past injury. This Court correctly concluded that the *Lummi* plaintiffs therefore were in effect seeking equitable relief, and the "true nature" of any relief sought by any plaintiff under that forward-looking statute would be prospective. *Id.*

Thus, RRF grants are different in kind than the grants at issue in *Lummi*. The payments under Section 9009c cannot fairly be called "thoroughly scrutinized and cabined" in the way the funds in *Lummi* were, such that every suit under the statute must necessarily be one for disbursement of prospective strings-attached grant funds. *Lummi*, 870 F.3d

37

at 1318-19. Section 9009c requires that the funds must be used to compensate for the sorts of backwards-looking pandemic-caused losses that the statute intended to cover. *See supra* pp. 35-36. In *Lummi*, by contrast, the program was ongoing and cooperative and sought to fund future projects for third-party beneficiaries—the sort of prospective statutory scheme that *Bowen* and *National Center* say requires suits to be brought in federal district court under the APA.

b. *Lummi* reasoned that any suit under the statute there would necessarily seek the disbursement of additional grant funding under the program that must be spent for third-party beneficiaries. 870 F.3d at 1315, 1318. *Lummi* therefore does not control this case, where the availability of a standard suit for compensatory damages (like this one) as opposed to extension of the program through new grant awards is entirely sensible and well-recognized. *See infra* pp. 45-48. The compensatory damages that would make Plaintiffs whole may end up being different than the actual amount Plaintiffs would have been awarded via grants. But as this Court explained in *Sanford Health Plan*, that is a question of what damages are owed, not whether the statute is money-mandating. *See Sanford Health Plan*, 969 F. 3d at 1382-83.

38

c. The dividing line between statutes remediable under the Tucker Act and the APA cannot turn on the existence of restrictions on use of grant funds. All federal funding comes with use restrictions. The government's rule would prove far too much. Take some of the statutory schemes this Court and the Supreme Court have held to be money-mandating. In *Greenlee County*, this Court held that the Payments In Lieu of Taxes statute is money-mandating. 487 F.3d at 877. That statute, however, plainly did not disburse no-strings-attached funding. Rather, the funding could only be used for "governmental purpose[s]." 31 U.S.C. § 6902(a)(1). Yet, this Court held the statute to be money-mandating, even though a suit for damages could result in the plaintiff obtaining money that could be used for any purpose—governmental or not.

Similarly in *Maine*, the mandated payment was subject to "post-payment audits" which could result in mandatory "corrective actions" and "[o]rder[s] to pay rebates." 45 C.F.R. §§ 153.540, 158.402; 78 Fed. Reg. 72,322, 72,380 (Dec. 2, 2013). In addition, the acceptance of Risk Corridor payments would have obligated the receiving entity to comply with various anti-discrimination measures. *See* 42 USC § 18116(a). Of course, none of those conditions would attach to an award of compensatory money damages, yet the

39

Supreme Court held that the statute nevertheless was money-mandating and authorized damages awards.

More generally, all disbursements of funding from the government are subject to potential clawback for "over-payments" or "payments disallowed by audits." *See* 31 U.S.C. §§ 3701, 3711.  And all federal funding comes with strings attached, including, for example, obligations not to discriminate. *See, e.g.*, 42 U.S.C.  § 2000d (Title VI); 29 U.S.C. § 794 (Rehabilitation Act). Adopting the government's argument would result in a sea change in well-settled money-mandating doctrine:  Every mandatory payment statute whose funds come with some obligation or some prospect of clawback would no longer be money-mandating.

At bottom, however one reads *National Center* and *Lummi*, *Maine* provides the rule today.  Both *National Center* and *Lummi* sought to analyze the *Bowen* line of precedents to find the dividing line between the statutes in which Congress envisioned prospective remedies under the APA and the statutes Congress envisioned damages claims under the Tucker Act.  *Maine* subsequently clarified that line of cases and imposed a simple rule:  If the statute compensates for past injuries, go to the Court of Federal Claims; if the

statute subsidizes future expenditures, go to federal district court. That clear rule resolves this case.

### 3. The Trial Court's Alternative Conclusion That Section 9009c Is Money-Mandating Even If It Affords SBA Some Discretion Is Correct

The trial court held that "Section 9009c does not provide the Administrator discretion as to whether to award a grant," Appx.17, a holding with which the government (at 28) appears to agree. The trial court went on to conclude in the alternative that even if Section 9009c afforded the agency some degree of discretion, it "would still be money-mandating because it would meet each of the three prongs of the test for determining if a discretionary statute is money-mandating." Appx.23.

The government does not attack the trial court's application of these factors on appeal, and, thus, has forfeited any argument that they were not met here. Instead, the government argues (at 28-29) that Section 9009c provided the SBA with no discretion and, thus, the trial court had no basis to reach its alternative holding. There is no need to address the government's argument if this Court agrees with the trial court's primary holding (and the government's concession) that payment under Section 9009c is mandatory, not discretionary.

41

Regardless, the trial court's alternative holding is correct. Even if a statute provides some discretion to the agency, it is nevertheless money-mandating when any one of the following applies: "(1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met. *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (quoting *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364-65 (Fed. Cir. 2005)).[7] The trial court correctly concluded that all three factors apply here. Appx.17-19. Section 9009c sets forth clear numerical standards used to compute amounts to be paid; the statute provides a statutory formula for those computations; and it mandates that the agency shall pay according to a specified condition—the order in which applications are received. *See* Section 9009c(c)(1).

The government's invocation (at 28) of *Samish*, 419 F.3d at 1364, is perplexing. In *Samish*, the plaintiff tribes had to be recognized by the federal

---

[7] The government criticizes (at 28) the trial court for relying on *Samish* for the test for when discretionary statutes are money-mandating, but that decision is routinely cited for the same proposition—no fewer than 62 times according to the Westlaw database. That includes a citation to *Samish* by this Court in *Greenlee County*, which both sides have relied upon in this case. 487 F.3d 871, 877 (Fed. Cir. 2007).

government before they would come within the class of plaintiffs to whom the grant programs at issue would be money-mandating. *Id.* at 1369. This Court explained that "the challenge to the federal government's refusal to accord recognition is limited by the contours of the political question doctrine. Recognition is a political act that is generally non-justiciable." *Id.* Accordingly, unrecognized tribes could not come directly to the Court of Federal Claims under otherwise money-mandating grant statutes until they first had been recognized. Section 9009c is not analogous. The scheme in *Samish* required the tribes to first go to district court to challenge non-recognition under one statutory scheme (which would have been nonjusticiable but-for Congress' express allowance of APA review), and only after they had obtained recognition could they bring a claim in the Court of Federal Claims under the money-mandating grant program. *Id.* at 1373.

By contrast, determining the "order in which applications are received" under Section 9009c is justiciable and factually determinable, has not been expressly limited to adjudication under the APA, and is miles apart from the political act of recognizing a sovereign nation.

## B.     Plaintiffs Were Not Required To Bring Their Claims Under The APA

The government (at 34-48) contends that, notwithstanding the Tucker Act's waiver of sovereign immunity, Plaintiffs' case should have been brought under the APA.  Not so.  Suits for money damages belong in the Court of Federal Claims under the Tucker Act.  Suits for equitable relief belong in federal district court under the APA.  Here, Plaintiffs seek money damages, not equitable relief.

1.    Plaintiffs' claims fall squarely under the Tucker Act's waiver of sovereign immunity and the Court of Federal Claims' jurisdiction.  "The Tucker Act both waives sovereign immunity for, and grants the Court of Federal Claims exclusive jurisdiction over, actions for money damages of more than $10,000." *Suburban Mortgage*, 480 F.3d at 1121; *Maine*, 590 U.S. at 322. In contrast, the Court of Federal claims generally lacks "power to grant equitable relief." *Suburban Mortg.*, 480 F.3d at 1123.  Thus, when a plaintiff sues the government for damages for violating a money-mandating statute, the only pertinent limitation to Tucker Act jurisdiction is the general inability of the Court of Federal Claims to award prospective equitable relief.  *See id.* at 1125, 1127.   The APA on the other hand, does not permit suits for

compensatory money damages or suits where there is an adequate remedy in the Court of Federal Claims. *Id.* at 1122.

Under those principles, the ultimate rule for resolving cases like this one is straightforward: "If the suit is at base a claim for money, and the relief available through the Court of Federal Claims under the Tucker Act—a money judgment—will provide an adequate remedy, the inquiry is at an end." *Id.* at 1125.

Here, Plaintiffs have brought a classic suit for compensatory money damages. Plaintiffs' claim is that SBA had a duty to follow Congress' clear directive, that SBA did not do so, and that plaintiffs were injured by that violation. Plaintiffs now seek compensation to put them in the place they would have been had SBA acted lawfully—money damages. In other words, plaintiffs "want[] the money that would have been [their] due had" SBA properly administered the statute, making this "a classic Tucker Act suit for money." *Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005) (en banc in part). The trial court therefore correctly concluded that Plaintiffs' "claim properly falls under the Tucker Act." Appx.15.

2. The government's arguments to the contrary are unpersuasive.

a. The government (at 38-43) argues that under *Bowen*, Plaintiffs' suit must be brought under the APA. But *Bowen* is inapposite here. *Bowen* held that a state's suit against HHS for withheld payments under Medicaid could be brought under the APA in district court. *Bowen*, 487 U.S. at 882-87, 901-05. As this Court has explained, the thrust of *Bowen*'s reasoning was that because "the Medicaid program was ongoing and a judgment in the case would require future cooperation between the parties" a money judgment was not necessarily "an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties"—relief that can only be provided under the APA, not by the Court of Federal Claims. *Suburban Mortg.*, 480 F.3d at 1123 (citation omitted). Here, Plaintiffs request only retrospective money damages and there is no ongoing complicated relationship that must be governed by injunctive or declaratory relief.

If there was any doubt about whether this Court properly interpreted *Bowen* in *Suburban Mortgage*, *Maine* removed it. *Maine* explained that *Bowen* was thoroughly "distinguishable on several scores" from the claim for money damages at issue there, and the same logic applies here. *Maine*, 590 U.S. at 326; *see also Suburban Mortg.*, 480 F.3d at 1127.

*First*, the "relief requested" is like *Maine* not *Bowen*. *Maine*, 590 U.S. at 326. The state in *Bowen* "did not seek money damages, but instead sued for prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations under the Medicaid program." *Id.* at 327-28. Thus, the suit in *Bowen* was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward." *Id.* at 326-27 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)); *Suburban Mortg.*, 480 F.3d at 1127. The prospective nature of the suit was crucial to *Bowen*'s outcome: "[B]ecause the Court of Federal Claims does not have the general equitable powers of a district court to grant prospective relief, the Court reasoned that *Bowen* belonged in district court." *Maine*, 590 U.S. at 327 (cleaned up).

Like the suit in *Maine*, plaintiffs' suit here "looks nothing like the requested redress in *Bowen*." *Id.* Plaintiffs' "prayer for relief" does not ask for "prospective, nonmonetary relief to clarify future obligations; [it] seek[s] specific sums already calculated, past due, and designed to compensate" for past losses. *Id.* The Tucker Act "allow[s] that remedy," so this suit "lies in the Tucker Act's heartland." *See id.*

47

*Second*, "the parties' relationship in *Bowen* differs from the one implicated here." *Id.* at 327 (citation omitted). In *Bowen*, the state and federal government "litigants' 'complex ongoing relationship[]' … made it important that a district court adjudicate future disputes" under the APA. *Id.* at 327 (citation omitted); *Suburban Mortg.*, 480 F.3d at 1127. The rationale was that the APA is "tailored to manag[e] the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets." *Id.* at 327. The RRF, however, does not involve any long-term relationship, nor does it involve two sovereigns. Instead, the RRF envisions a one-time compensatory payment for harms caused over a specific prior time period. And like the program at issue in *Maine*, the RRF "expired years ago" and "presents no special concern about managing a complex on-going relationship," which confirms that the plaintiffs "properly sued the Government in the Court of Federal Claims." *Id.*

The trial court below therefore correctly rejected the government's "attempts to shoehorn the plaintiffs' claims [here] into the *Bowen* framework." Appx.11.

b. The government (at 43-45) also points to this Court's decision in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994). But *Katz* is distinguishable on

48

similar grounds to *Bowen*. The plaintiff in *Katz* "unmistakably ask[ed] for prospective relief," not "money as compensation for a loss suffered." *Id.* at 1208-09. Specifically, the plaintiff sought to challenge a regulation that governed the amount that the plaintiff could charge for rent going forward. *See id.* at 1206. Here, in contrast to *Katz* and *Bowen*, "[t]he relief sought by the plaintiffs does not require any prospective relief." Appx.14. Instead, "the plaintiffs in the present case request retrospective damages resulting from the SBA's denial of a one-time payment of money directly from the federal government under a grant program." Appx.13-14.

c. The government (at 39) claims that Plaintiffs are not in fact seeking money damages because Plaintiffs are "attempting to enforce … the statutory mandate … to award grants in the order that applications were received" and that "any money paid would not be in compensation for an injury." That is not true. Plaintiffs are not seeking relief that would direct how SBA administers the program going forward, nor are they seeking a grant. That would be impossible because in the RRF Congress created a one-and-done grant program, which has closed.

Plaintiffs seek only retrospective "money damages," which is "compensation for the damage sustained by the failure of the Federal

49

Government to pay as mandated." *Suburban Mortg.*, 480 F.3d at 1123 (cleaned up). Time and again, courts have deemed the Court of Federal Claims the proper home for such suits "seeking to obtain the financial benefit of a prior … obligation that … has not been honored by the Government" because such suits are backwards-looking suits for damages. *Id.* at 1126-27; *see also*, *e.g.*, *Maine*, 590 U.S. at 328.

The government's argument also proves far too much. The government's theory—that the Court of Federal Claims has no jurisdiction over suits that involve adjudicating whether an agency complied with a statutory mandate—would absurdly mean that the Court of Federal Claims can never adjudicate a Tucker Act claim premised on a statutory violation. And it would mean cases like *Maine* (which, like this suit, alleged that the agency had not complied with Congress' mandate to pay money under a grant program) were wrongly decided. This Court, however, has been unequivocal: "The Court of Federal Claims has the power to make a determination of liability that will give rise to a remedy of monetary relief by finding, for example, . . . that an agency has misinterpreted its statutory mandate to pay out monies." *Kanemoto v. Reno*, 41 F.3d 641, 647 (Fed. Cir. 1994) (citations omitted). The mere fact that a claim for money damages requires a court to

engage in statutory interpretation does not turn it into an APA claim. "It is the statute, not the Government official, that provides for the payment. If the Government official's determinations under the statute are in error, the court is there to correct the matter, and to have the proper determinations made." *Fisher*, 402 F.3d at 1175.

d. The government (at 45) argues that Plaintiffs must be seeking prospective relief because determining liability and damages in this case would require "review[ing] a large subset of all applications to figure out who 'should have' received grants." This misunderstands basic remedial principles. Suits for damages do not turn into suits for prospective relief simply because the suit requires consideration of what would have happened absent the illegal action. For instance, when a plaintiff sues for damages alleging a discriminatory failure to hire, he must generally show that he would have been hired absent the discrimination and he must show what his salary would have been had it not been for the employer's discrimination. The fact that his damages may be based upon the salary he would have received had he been hired does not mean that his suit for money damages is a suit seeking employment. The same is true here. Plaintiffs seek compensation for the damages caused by SBA's statutory violations. That requires the trial court

51

to determine whether Plaintiffs should have been awarded grants, and, if so, to assess the amount of their monetary damages as a result of SBA's failure to comply with Section 9009c. That does not mean that Plaintiffs seek to reopen the RRF program and obtain a new RRF grant.

e. The government (at 46) also mistakenly attributes to the trial court a belief that the Court of Federal Claims "possess[es] jurisdiction over APA claims." That is not what the trial court held. The Court of Federal Claims lacks jurisdiction over a claim asking for prospective relief under the APA. At the same time, "it is well established that the potential availability of a remedy in district court does not of itself withdraw jurisdiction under the Tucker Act." *Slattery v. United States*, 635 F.3d 1298, 1314-15 (Fed. Cir. 2011); *see also Silver State Land LLC v. United States*, 148 Fed. Cl. 217, 222 (2020) (explaining that jurisdiction lies in the Court of Federal Claims to adjudicate breach of contract claims arising out of the same transaction giving rise to APA litigation in district court). In other words, just because *some* claims regarding a given statute *can* be brought under the APA, that does not mean that *all* claims regarding that statute *must* be brought under the APA. The trial court correctly understood and applied this distinction. *See* Appx.14-15.

The government's position, by contrast, is irreconcilable with 28 U.S.C. § 1500, which presupposes the existence of claims arising from the same operative facts over which both district courts and the Court of Federal Claims could independently exercise jurisdiction depending on the relief sought. Under the government's view, there could never be a situation in which 28 U.S.C. § 1500 would do any work because there could never be claims arising from the same operative facts over which both courts could independently exercise jurisdiction.

This case is another example of how a single statute can give rise to both APA and Tucker Act claims. A suit under Section 9009c while the RRF program remained open seeking to prohibit the agency from continuing to process applications based upon unconstitutional race or gender priority would be cognizable under the APA. *See Vitolo v. Guzman,* 999 F.3d 353 (6th Cir. 2021) (adjudicating such a claim). In *Vitolo,* there would not have been jurisdiction in the Court of Federal Claims because the plaintiffs did not seek money damages, or even an order that the agency award their grants. The *Vitolo* plaintiffs instead sought to avoid an *impending* injury through

prospective relief ensuring that SBA would process applications in the future without unconstitutionally prioritizing on the basis of race and gender.[8]

But that is in no way inconsistent with the exercise of Tucker Act jurisdiction over suits for damages in cases like this one.  Here, after all grants had been distributed, plaintiffs learned they would not receive grants.  They were able to sue only after having acquired sufficient information to allege that they would have received grants had the SBA not violated its statutory mandate.  Unlike *Vitolo*, this is not a facial challenge to Section 9009c that could have been brought the day the statute was enacted, and does not seek to change the administration of the program going forward.  Plaintiffs here seek only compensation for past injury.  Indeed, the government concedes (at 37 n.8) that it would be impossible for Plaintiffs here to obtain injunctive relief, which was the only relief sought in *Vitolo*, because (as in *Maine*) the program has closed and there is no ongoing relationship with the agency outside of the litigation.  As the trial court correctly recognized, under these circumstances Plaintiffs can sue only for compensatory damages under the Tucker Act. Appx13-15.

---

[8] *See Vitolo v.  Guzman*, 548 F. Supp. 3d 765, 773 (E.D. Tenn. 2021).

f. The government (at 35-36) claims that the trial court erred by first determining that Plaintiffs' claims are for money damages before deciding whether Section 9009c is money-mandating. This is not a valid argument. Trial courts are not constrained in how they choose to structure their opinions.

In any event, the trial court's ordering was perfectly sensible. The question of whether plaintiffs fundamentally *seek* money damages is related to the question whether the *statute authorizes* claims for money damages. And it will often be easier to start with the pleadings before delving into statutory complexities. This Court's own decisions make clear that the trial court was exactly right in its approach. *See* Appx.10-15 (citing, *e.g.*, *Suburban Mortg.*, 480 F.3d at 1125); *see also Lummi*, 870 F.3d at 1319 (first determining that plaintiffs' underlying claim was for equitable relief)). The government's assertion that the trial court's sequencing of issues in its opinion "primed" the trial court to "preemptively" determine Section 9009c to be money-mandating is contradicted by (and is disrespectful to) the trial court's extensive and comprehensive independent analysis of the money-mandating issue. Appx.16-

23.[9]  There is no indication that the trial court was unable to treat each issue

independently and analytically.[10]

## II.   Plaintiffs Have Stated A Claim Upon Which Relief Can Be Granted

A.  The Supreme Court in *Maine* stressed that its holdings "reflect a

principle as old as the Nation itself:  The Government should honor its

obligations."  590 U.S. at 328.  Here, Congress created an obligation to pay a

certain class of applicants.  Plaintiffs here have plausibly alleged that they fall

within that class and yet were not paid, so Plaintiffs have stated a claim.

---

[9] The trial court also made clear that it was not prejudging the money-mandate
issue:  "There is no question that the payment of money damages to the
plaintiffs, *if available*, would provide them with a complete and adequate
remedy for the relief currently sought."  Appx.10 (emphasis added) (citation
omitted).

[10] In a footnote, the government (at 36 n.7) observes that the trial court found
that the complaint's characterization of some agency actions as "arbitrary and
capricious" or "negligent" is not relevant to the court's jurisdiction.  The trial
court was correct.  *See, e.g.*, *Fisher*, 402 F.3d at 1175 (concluding that a
complaint alleging arbitrary and capricious agency action was "a classic
Tucker Act suit for money"); *Martinez v. United States*, 333 F.3d 1295, 1303,
1314 (Fed. Cir. 2003) (en banc); *Taylor v. United States*, 959 F.3d 1081, 1086
(Fed. Cir. 2020) ("That the complaint suggests the United States may have
acted tortiously towards the appellants does not remove it from the
jurisdiction of the Court of Federal Claims.") (cleaned up); *Keco Indus., Inc.
v. United States*, 428 F.2d 1233, 1234, 1237 (Ct. Cl. 1970) (same); *Hous. Auth.
of Slidell v. United States*, 149 Fed. Cl. 614, 637 (2020) (rejecting government
argument that complaint's reference to "arbitrary and capricious" converts
case into one under the APA) (citation omitted).  The government does not
argue otherwise.

56

In particular, Section 9009c imposed an obligation on SBA to pay eligible applicants out of the Fund in the order in which applications were received. Plaintiffs' applications were received before the Fund should have been depleted.  Plaintiffs nonetheless did not obtain the money they were entitled to because SBA blatantly ignored Congress' command—a fact the government does not contest.  Through Section 9009c and the Tucker Act, Congress created a cause of action to sue in such situations and waived sovereign immunity.  Plaintiffs have therefore stated a claim upon which relief can be granted.

B.  The government argues that Plaintiffs are out of luck because the funding Congress provided for in the RRF is now depleted.  This theory contradicts the statutory text and well-established precedent.  Moreover, the government forfeits certain Rule 12(b)(6) issues by failing to present in its brief on appeal any arguments independent of its jurisdictional arguments: (i) even if Section 9009c is capped, Plaintiffs state claims upon which relief can be granted, *see* Appx.32-33; Gov. Br. at 53-54; (ii) exhaustion of funds through disbursements to applicants in line *behind* Plaintiffs does not defeat their claim, Appx.32; and (iii) the Judgment Fund is available to satisfy a judgment in favor of Plaintiffs here, Appx.27, 32.  Plaintiffs discuss these issues here only

57

for completeness. *See McIntosh v. Dep't of Defense*, 53 F.4th 630, 641 (Fed. Cir. 2022) ("Our law is well established that arguments not raised in the opening brief are forfeited.") (cleaned up).

1.    The government argues (at 48-51) that, by appropriating a guaranteed amount of money and specifying that appropriation is not exclusive of other available source of funds, Congress limited liability under the RRF. That gets the analysis backwards.

a.    "It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." *Greenlee County*, 487 F.3d at 877 (citation omitted). Thus, even when Congress has provided *no* funds towards a money-mandating program, plaintiffs can state a claim upon which relief can be granted when the government fails to pay. *Maine*, 590 U.S. at 306 & n. 3, 312. Congress did better than that here by providing guaranteed funds for the RRF "[i]n addition to amounts otherwise available." 15 U.S.C. § 9009c(b)(2)(A).

It is true that in some instances, when Congress appropriates money and affirmatively "restrict[s] the government's liability to the amounts

appropriated," it may be read to have capped liability at that amount. *See Greenlee County*, 487 F.3d at 878. In *Greenlee County*, for example, the program provided pro-rated *reduced* awards to *all* participants because the funds appropriated were insufficient. *Id.* at 874. The plaintiff received its properly prorated award, but sought a *full* award (with no allegation of erroneous expenditures). This Court held that liability was capped because the money-mandating obligation was expressly made "subject to the availability of appropriations." *Id.* at 878.

Here, we have the exact opposite situation. Instead of stating that "amounts are available only as provided," the statute says the amount available is that which is expressly provided "[i]n addition to amounts otherwise available." 15 U.S.C. § 9009c(b)(2)(A). Congress' provision of $28.6 billion dollars *in addition to* amounts otherwise available cannot be read as an effort to *cap* liability. The government unsurprisingly points to no statute that has been held to cap liability by using a phrase like "in addition to amounts otherwise available." The trial court correctly concluded that Section 9009c does not create a capped liability fund. Appx.32-33.

The government argues that the word "otherwise" (as used in the statutory phrase "in addition to amounts otherwise available") renders the

Fund capped because "otherwise" "connotes a different situation or a different set of circumstances." Gov. Br. 51 (citation omitted). That interpretation of the word "otherwise" is in no way inconsistent with Plaintiffs' reading of the statutory phrase: Congress specified that the referenced $28.6 billion dollars will be available, and that different sources of money may be available too. The point is that Congress plainly did not cap the RRF program to only that $28.6 billion dollars.

The government (at 51 n.11) also argues that the phrase "remain available until expended" suggests a liability cap. That is incorrect. The phrase "remain available until expended" is a "term of art in appropriations legislation" that is "commonly understood as a carryover provision, not a statutory cap," which indicates that "unexpended funds 'shall remain available' for the same purpose during the succeeding fiscal year." *Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1090 (Fed. Cir. 2003), *aff'd*, 543 U.S. 631 (2005).

b. In any event, the government's cap argument is beside the point in this case. Regardless of whether one reads Section 9009c as a capped fund, Plaintiffs' claims are cognizable because they fall within the scope of the substantive payment obligation created by Section 9009c. Plaintiffs' well-pled

and uncontroverted allegations establish as a factual matter for the purpose of this appeal that their eligible applications were received before RRF funds were exhausted. *See, e.g.*, Appx.86. The agency's obligation to pay Plaintiffs therefore arose before the fund was depleted.

In *Maine*, the Supreme Court explained that "Congress can create an obligation directly through statutory language" and "impose[] a legal duty of the United States that could mature into legal liability." 590 U.S. at 310; *see also Sanford*, 969 F.3d at 1381 (holding that payment obligation matured into a legal liability through the plaintiffs' actions). Here, that obligation arose "by operation of law" as mandated by statute, GAO Redbook 7-41 (3d ed. 2015) (hereinafter "GAO Redbook"), and that occurred in the order Plaintiffs' applications were received (as indicated, *e.g.*, by the date/time applications were uploaded to SBA's electronic platform).[11] Thus, the obligation to award grants to Plaintiffs arose long before the program's funds were exhausted. Moreover, a damages suit can be "satisfied through the Judgment Fund,"

---

[11] The Supreme Court, the Federal Circuit, and other circuit courts "have relied on the opinions of the [GAO] as expressed in [the GAO Redbook] . . . whose opinions, while not binding, are expert opinion[s], which we should prudently consider." *Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1084 (Fed. Cir. 2003) (cleaned up).

which is a proper way to obtain compensatory damages for SBA's breach of its obligation, even if no money within the initial program remains. *See Maine*, 590 U.S. at 306 & n.3.

The fact that SBA unlawfully exhausted RRF funds by disbursing them to applicants in line behind Plaintiffs changes nothing. "[T]he determination of whether an obligation exceeds the amount available in the appropriation is based on the unobligated balance in the appropriation account *on the day the obligation is created.*" Steven N. Tomanelli, Appropriations Law: Principles and Practice 43 (2003) (emphasis added). The agency's obligation to pay Plaintiffs arose on or before May 3, 2021, when their applications were received, which was before the RRF was exhausted. Appx.86-87. Plaintiffs' claims are therefore within the scope of the substantive obligation created by Section 9009c.

Moreover, the Supreme Court long ago established that erroneous disbursements do not foreclose damages claims even if there is a statutory cap on the Government's liability. *See Sutton v. United States*, 256 U.S. 575, 582 (1921) (remanding to the Court of Claims because potential erroneous disbursements did not foreclose plaintiff's damages claims even though the agency disbursed all available funds). GAO has adopted the same

62

straightforward principle: "Payment to the wrong person obviously does not discharge the government's obligation.  If, through administrative mistake of fact or law or clerical error, a payment is made to a person not entitled to it, the government is still obligated to make payment to the proper claimant." GAO Redbook 14-50; *see also id.* at 7-8 ("[F]ailing to record a valid obligation in no way diminishes its validity or affects the fiscal year to which it is properly chargeable"); *id.* at 14-50 (explaining that "payment to the proper claimant should not be held up pending recovery of the erroneous payment, even though this may result in a duplicate payment").

These rules apply here.  Had the agency followed the statute and properly recorded obligations in the order applications were received, funds for Plaintiffs' awards would have been reserved *within* the fixed appropriation.  The government does not contend otherwise and fails to address the trial court's reasoning that the "key" difference here is the agency's unlawful disbursement to the wrong applicants, which makes the Judgment Fund available here.  Appx.32.

Confirming that the trial court was correct is a persuasive (though not precedential) decision in which this Court unanimously found that plaintiffs had stated claims upon which relief could be granted even though the grant

program at issue had closed and funds had been exhausted before plaintiffs filed their claims. *See Samish Indian Nation v. United States*, 657 F.3d 1330, 1335-41 (Fed. Cir. 2011), *rehrg. & rehrg. en banc denied, vacated as moot*, 568 U.S. 936 (2012).[12]  In *Samish*, this Court unanimously held that the statute at issue was not "capped in a manner that restricts the government's liability for damages" because the obligation to pay was not subject to the limiting language of the statutes in *Star-Glo Assocs., LP v. United States*, 414 F.3d 1349 (Fed. Cir. 2005) and *Greenlee County*. *Samish*, 657 F.3d at 1340.  This Court found that any monetary damages would be paid by the Judgment Fund without running afoul of the Anti-Deficiency Act. *Id.* at 1341.  In short, because the *Samish* plaintiffs' claims were within the scope of the substantive statutory obligation, exhaustion and expiration of the appropriation, including

---

[12] The *Samish* decision is non-precedential because the plaintiffs in that case voluntarily dismissed their complaint after this Court's unanimous panel decision, but while the government's petition for certiorari was pending.  That voluntary dismissal prompted the Supreme Court to order this Court's decision to be vacated as moot.  Prior to that, however, the government went on record that the Rule 12(b)(6) issues in Samish were "materially similar" to those in *Salazar v. Ramah*.  U.S. Cert. Pet., *United States v. Samish Indian Nation*, 2012 WL1961403, No. 11-1448, at 15 (June 1, 2012).  On June 18, 2012, the Supreme Court rejected the government's "materially similar" arguments in *Salazar v. Ramah*, 567 U.S. 182, 189-95 (2012), suggesting that this Court's *Samish* decision was correctly decided.  *Cf. Maine*, 590 U.S. at 308-09 (discussing principles underlying *Ramah*).

by erroneously disbursing plaintiffs' share of the appropriated funds to other participants, did not foreclose their damages claims.

3.    The government (at 51-53) argues that the sunset of the RRF program and Congress' subsequent elimination of *unobligated* funds in the Fiscal Responsibility Act (FRA) "eliminated any payment obligation under th[e] statute."  This also is not true.  As explained, the obligation to Plaintiffs attached when their applications were received.  Thus, that obligation to pay cannot be defeated by subsequent changes to the statute's funding.  Indeed, even if Congress had repealed the statute entirely, that would not alter obligations that had already attached.

The government (at 52) claims that Congress is free to "cancel its previous obligation through further legislation."  While Congress can prevent *future* obligations from attaching going forward, Congress cannot eliminate an already-matured and attached obligation without raising "serious questions" about whether it unconstitutionally "retroactively impaired" a right to payment.[13]

---

[13] *Maine*, 590 U.S. at 317 (citing *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265–66, 280 (1994); *see* GAO Redbook 1-61 to 1-62 (4th ed. 2016).

In any event, whether or not Congress *can* cancel already-matured obligations is not relevant here because Congress did not purport to cancel any obligations in the FRA. Congress did the opposite in rescinding only *unobligated* amounts.[14] As a result, the government is wrong to argue that the FRA's rescission of unobligated funds is "irreconcilable" with the enforceability of a preexisting statutory "obligation" through a money damages judgment. Gov. Br. at 52 (citations omitted).

4. The government (at 52-53) points out that Section 9009c(c)(6) requires award recipients to return unused funds to the Treasury. The government's theory appears to be that because Plaintiffs did not use the illegally withheld funds that they never received, Plaintiffs have "forfeited" their funds and so have no right to damages. Aside from the obvious implausibility of this argument, the argument does not work because Plaintiffs properly allege that they incurred allowable expenses during the covered period. Appx.83. Those

---

[14] Rescission of *unobligated* funds is akin to expiration after which an account "shall … remain available for recording, adjusting, and liquidating obligations properly chargeable to that account." 31 U.S.C. §1553(a); *see also Nat'l Guard-Fiscal Year to Be Charged for Mandated Unif. Purchases (Reconsideration)*, B-265901 (Oct. 14, 1997) (expired funds could be used to satisfy obligation retroactively adjudicated). Rescission is different from *closure*, which applies to both "obligated" and "unobligated" balances. 31 U.S.C. §1555.

expenses, which have been paid out of pocket but should have been paid with grant money, are Plaintiffs' damages. Notably, the RRF statute permitted recipients to credit past expenses against grant amounts because the covered period looked back in time (to February 2020) more than one year before Section 9009c was enacted (in March 2021). 15 U.S.C. § 9009c(a)(3). The unstated premise of the government's argument—that allowable expenses must be incurred *after* grant funds are *received*—is obviously incorrect as it would nullify more than one year of Section 9009c's stated covered period. Congress allowed past expenses to be credited. Put simply, the agency's unlawful failure to award grants to Plaintiffs required them to cover allowable expenses out of their own pockets rather than with the grant funds they should have received. Plaintiffs bring a classic damages claim to compensate them for this loss.

## CONCLUSION

This Court should affirm the trial court's order denying the government's motion to dismiss.

Respectfully submitted,

April 23, 2025

/s/ F. GREG BOWMAN
F. GREG BOWMAN
EDWARD C. REDDINGTON
CHARLES L. MCCLOUD
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000
fbowman@wc.com

Counsel for Plaintiffs-Appellees
112 Genesee Street, LLC, et al.

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATIONS

I, F. Greg Bowman, counsel for plaintiffs-appellees and a member of the Bar of this Court, certify, pursuant to Federal Circuit Rule 32(b)(1), that the attached brief complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it is proportionately spaced, has a typeface of 14 points or more, and contains 13,847 words.

April 23, 2025                              /s/ F. GREG BOWMAN
                                            F. GREG BOWMAN

## CERTIFICATE OF SERVICE

I, F. Greg Bowman, counsel for plaintiffs-appellees and a member of the Bar of this Court, certify that a copy of the attached **Response Brief** was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

April 23, 2025                              /s/ F. GREG BOWMAN
                                            F. GREG BOWMAN