No. 25-1373

# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———————————

112 GENESEE STREET, LLC, et. al.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

———————————

## DEFENDANT-APPELLANT'S REPLY BRIEF

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

PATRICIA M. McCARTHY
  *Director*

WILLIAM J. GRIMALDI
MARGARET J. JANTZEN
  *Attorneys, Commercial Litigation Branch*
  *Civil Division, U.S. Department of Justice*
  *P.O. Box 480, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 353-7994*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................ii

ARGUMENT ................................................................................................................1

I.  Section 9009c Is Not Money-Mandating .............................................................1

    A.  The Statute is Not Money-Mandating under *Maine Community Health* .......1

    B.  The Trial Court Erred in Reading Implied Money-Mandating Obligations into Non-Monetary Administrative Requirements ..............10

    C.  The Trial Court Erred in Relying on Cases That Discuss When a Discretionary Statute is Money-Mandating ..................................................12

II.  The Trial Court's Decision conflicts With This Court's Grant Precedent .........14

III.  The Trial Court Misunderstands The Scope of Tucker Act Jurisdiction ............17

    A.  The Trial Court Failed to Ascertain the True Nature of Plaintiffs' Claims ...................................................................................................17

    B.  The Trial Court Failed to Properly Apply *Bowen* and *Katz* .......................18

    C.  The Trial Court Erred in Determining that there is Concurrent Jurisdiction ................................................................................................22

IV.  Trial Court Erred in Holding that Plaintiffs State a Claim Upon Which Relief Can Be Granted ...............................................................................................23

    A.  15 U.S.C. § 9009c(b)(2)(A) Imposes a Statutory Cap on the Amount That Congress Intended to Spend For the RRF Program .......................24

    B.  Congress Subsequently Eliminated Any Payment Obligation .................25

CONCLUSION .........................................................................................................26

# TABLE OF AUTHORITIES

<u>Cases</u>

*Agwiak v. United States,*
   347 F.3d 1375 (Fed. Cir. 2003) ........................................................................2

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ..........................................................................18, 19, 20

*Doe v. United States,*
   100 F.3d 1576 (Fed. Cir. 1996) ........................................................................5

*Doe v. United States,*
   463 F.3d 1314 (Fed. Cir. 2006) ......................................................................12

*Dorsey v. United States,*
   567 U.S. 260 (2012) ........................................................................................25

*Eastport S.S. Corp. v. United States,*
   372 F.2d 1002 (Ct. Cl. 1967) ........................................... 10, 11, 12, 22

*Fisher v. United States,*
   402 F.3d 1167 (Fed. Cir. 2005) ......................................................................21

*Greenlee Cnty. Ariz. v. United States,*
   487 F.3d 871 (Fed. Cir. 2007) ................................................................ 2, 5

*Ind. Mun. Power Agency v. United States,*
   154 Fed. Cl. 752 (2021) ..................................................................................25

*Kanemoto v. Reno,*
   41 F.3d 641 (Fed. Cir. 1994) ................................................................ 5, 22

*Katz v. Cisneros,*
   16 F.3d 1204 (Fed. Cir. 1994) ........................................... 15, 18, 20, 21

*Lummi Tribe v. United States,*
   99 Fed. Cl. 584 (2011) ....................................................................................13

*Lummi Tribe v. United States,*
   870 F.3d 1313 (Fed. Cir. 2017) ................................................. 13, 14, 15, 16

*Maine Cmty. Health Options v. United States,*
590 U.S. 296 (2020) .................................................................................passim

*Mitchell v. United States,*
930 F.2d 893) (Fed. Cir. 1991) .........................................................................22

*Nat'l Ctr. for Mfg. Scis. v. United States,*
114 F.3d 196 (Fed. Cir. 1997) .............................................................14, 15, 16

*Off. of Pers. Mgmt. v. Richmond,*
496 U.S. 414 (1990) ..........................................................................................26

*Perri v. United States,*
340 F.3d 1337 (Fed. Cir. 2003) ................................................................ 13Sla

*Prairie Cnty. v. United States,*
782 F.3d 685 (Fed. Cir. 2015) ...........................................................................5

*Samish Indian Nation v. United States,*
419 F.3d 1355 (Fed. Cir. 2005) ................................................................ 13, 14

*Silver State Land LLC v. United States,*
148 Fed. Cl. 217 (2020) ...................................................................................23

*Slattery v. United States,*
635 F.3d 1298 (Fed. Cir. 2011) ......................................................................23

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.,*
480 F.3d 1116, (Fed. Cir. 2007) .........................................................17, 18, 20

*United States v. Testan,*
424 U.S. 392 (1976) ................................................................................ 11, 12

*United States v. Tohono O'Odham Nation,*
563 U.S. 307 (2011) ........................................................................................23

*Vitolo v. Guzman,*
999 F.3d 353 (6th Cir. 2021) ..........................................................................23

*W6 Rest. Grp., Ltd. v. Guzman,*
732 F.Supp.3d 739 (N.D.Oh. 2024)...........................................................12, 21

<u>Statutes</u>

2 U.S.C. § 2064 ................................................................................................25

5 U.S.C. § 8334 ................................................................................................25

15 U.S.C. § 9009a ..............................................................................................3

15 U.S.C. § 9009c ......................................................................................passim

22 U.S.C. § 2906 ..............................................................................................25

28 U.S.C. § 1500 ..............................................................................................23

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | | |
|---|---|---|
| 112 GENESEE STREET, LLC, et. al., | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 25-1373 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

## DEFENDANT-APPELLANT'S REPLY BRIEF

## I.    Section 9009c Is Not Money-Mandating

As detailed in our opening brief, the statute establishing the Restaurant Revitalization Fund (RRF), 15 U.S.C. § 9009c, is not money-mandating, which deprives the trial court of jurisdiction. Although plaintiffs-appellees disagree, they fail to establish the trial court's jurisdiction.

### A.    The Statute Is Not Money-Mandating Under *Maine Community Health*

Plaintiffs-appellees argue that the language of § 9009c is "materially indistinguishable" from the statute at issue in *Maine,* which was found to be money-mandating. Resp. Br. 4 (citing *Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020)). This is incorrect. As an initial matter, plaintiffs-appellees acknowledge that the statutory mandate of the RRF was to "award grants to eligible entities." Resp. Br. 2 But awarding grants is not the same as a mandate to pay money to someone, as was the mandate in *Maine.* There, the Supreme Court pointed to the statute's "mandatory

text" as "significant" in directing that the HHS Secretary "'shall pay' qualifying insurers." 590 U.S. at 324. Section 90009c, in contrast, contains no "shall pay" language at all. Indeed, plaintiffs-appellees identify no "shall pay" text in the statute but instead *mischaracterize* the statute as containing "'shall pay' language" that "mandates payment." Resp. Br. 10, 21. That is insufficient.

It is equally insufficient that Congress simply used the word "shall" throughout the statute. Resp. Br. 15 ("The prime indicator that an agency's obligation to make payments is mandatory is Congress' use of the word 'shall.'"). This Court has not held otherwise, as plaintiffs-appellees suggest. *See* Resp. Br. at 15-16 (citing to *Greenlee Cnty. Ariz. v. United States,* 487 F.3d 871, 877 (Fed. Cir. 2007) and *Agwiak v. United States,* 347 F.3d 1375, 1380 (Fed. Cir. 2003)). The statutory language in *Greenlee* provided that "'the Secretary of the Interior *shall make a payment* for each fiscal year . . .'" 487 F.3d at 877. And in *Agwiak,* the statutory mandate "provide[d] that '[an] allowance *shall be paid* under regulations prescribed by the President.'" 347 F.3d at 1380. In light of that language, this Court in both cases noted its repeated recognition that "use of the word 'shall' generally makes a statute money-mandating." But "shall," on its own, and uncoupled from a derivative of "to pay," does no such thing.[1]

---

[1] Indeed, the Supreme Court has observed that such "so-called money-mandating provisions are uncommon," making the statutory language in *Maine* "rare." 590 U.S. at 324. The Supreme Court explained that this was "because Congress has at its disposal several blueprints for conditioning and limiting obligations . . ." *Id.* "But Congress used none of those tools in [the statute at issue]," making it "one of the rare

Plaintiffs-appellees contrast use of the word "shall" in § 9009c with another COVID-relief program, codified at 15 U.S.C. § 9009a, which used the discretionary word "may" in several key instances. Resp. Br. 18. They argue that Congress's use of "may" in one context but "shall" in another "underscores the mandatory nature of 9009c's 'shall' directions." *Id.* In fact, comparing the language found in both statutes only proves our point. In § 9009a, the statute states, "[t]he Administrator *may* make initial grants to eligible persons or entities in accordance with this section []" and "[a]fter the end of the initial 28-day period during which the Administrator awards grants under this paragraph, the Administrator *may* award an initial grant to any eligible person or entity." 15 U.S.C. § 9009a(b)(2)(A); 9009a(b)(2)(C).

But plaintiffs-appellees cannot analogize to the § 9009a program to demonstrate that the RRF program is money-mandating because the language they rely upon is not otherwise identical across statues. Although similar in structure and purpose, § 9009c does not simply contain the language from § 9009a with the word "shall" transposed in the place of "may." Section 9009c does not contain provisions

---

laws permitting a damages suit in the Court of Federal Claims." *Id.* Section 9009c, however, is no such rarity. Accordingly, plaintiffs-appellees' argument that § 9009c is presumptively money-mandating because it was passed "less than a year" after the Supreme Court decided *Maine* cannot hold water. *See* Resp. Br. 3-4, 16, 30. If Congress intended to imitate the language found to be money-mandating in *Maine*, it certainly knew how to do so. It did not.

that state only that SBA "shall make grants to eligible persons or entities" or that SBA "shall award a grant to any eligible person or entity" after a certain time period.

Nor does the Supreme Court's decision in *Maine* support plaintiffs-appellees' argument as they suggest.  Resp. Br. 18. The language from *Maine* on which plaintiffs-appellees rely, comes from the Court's analysis of the first question the Court addressed:  whether § 1342 of the Affordable Are Act obligated the Government to pay participating insurers the full amount calculated by the statute.  *Maine*, 590 U.S. at 307, 310.  But this was an entirely separate issue from whether the statute was money-mandating such that petitioners may sue the Government under the Tucker Act "to recover on that obligation."  *Id.* (identifying the three issues presented to the Court).

Plaintiffs-appellees also liken the mandate of § 9009c to the "triple mandate" of the statutory language in *Maine* which the Court found "falls comfortably within the class of moneymandating [sic] statutes that permit recovery of money damages in the Court of Federal Claims."  Resp. Br. 19-20; 590 U.S. at 324-25.  The comparison is misplaced and does not match what the Supreme Court found significant about the statutory language in *Maine*.  Two of the three mandates in *Maine* specifically commanded payment: "the HHS Secretary . . . 'shall provide' for payment according to the statutory formula, and 'shall pay' qualifying insurers."  590 U.S. at 324-25.  The closest that plaintiffs-appellees get to similar language here is that "the Administrator shall use amounts in the Fund to make grants described in subsection (c)" and "the Administrator shall award grants to eligible entities in the order in which application

4

are received."  15 U.S.C. §§ 9009c(b)(3), (c)(1).  But nowhere does the statute

command payment at all, to anyone in particular.

　　　As we explained in our opening brief, the statute does not command payment

to a defined group, as required, but simply instructs the agency to "award grants to

eligible entities in the order in which applications are received."  15 U.S.C.

§ 9009c(c)(1).  This does not define a "class of plaintiffs" to whom payment is owed,

but constitutes a process instruction for how an agency is to review and disburse grant

money.

　　　Money-mandating statutory language must couple the command to pay with a

specific group to whom the Government shall make payment.  *See, e.g., Maine,* 590

U.S. at 302 ("shall pay" insurers with unprofitable plans); *Greenlee,* 487 F.3d at 877

("Secretary of the Interior shall make a payment . . .to each unit of general local

government in which entitlement land is located"); *Prairie County,* 782 F.3d at 686

(same); *Kanemoto,* 41 F.3d 641, 643, 646 (Fed. Cir. 1994) (Attorney General "shall pay

out of the fund the sum of $20,000 to each eligible individual").  The case relied on by

plaintiffs-appellees, *Doe* 100 F.3d 1576, 1579 (Fed. Cir. 1996)[2], similarly commands

payment to a specific individual – i.e., "Secretary may award and pay such person

---

[2] Plaintiffs-appellees read into the statute in *Doe* a baffling "ordering
requirement."  Resp. Br. 25.  Plaintiffs-appellees suggest that a long line of informers
seek to be compensated under the moiety statute – but only the first person to submit
information will be paid because only "original information" will be compensated.
*Id.*; *Doe,* 100 F.3d at 1579.  But "original" is not synonymous with "first."  Surely,
more than one person could submit original information about an instance of fraud.

[who furnishes original information which leads to recovery, fine, penalty or forfeiture] an amount that does not exceed 25 percent of the net amount so recovered."

Plaintiffs-appellees repeatedly argue that the statue identifies a "class of plaintiffs" who are entitled to payment, but never actually identity or describe *who* comprises that class. Instead, plaintiffs-appellees rely upon their own allegations that they are entitled to money in the RRF fund because they were eligible entities and, had the SBA awarded grant money in the order in which applications were received, plaintiffs-appellees would have qualified for a grant. That is not a class of persons defined by statute, but instead by plaintiffs-appellees' own legal theory. Indeed, the argument is circular: before we can define the class to whom payment is required, we must believe plaintiffs-appellees' allegations that SBA disbursed funds in the wrong order, the "correct" order of disbursement would have included plaintiffs-appellees; and, therefore, plaintiffs-appellees are within the class of persons to whom payment is owed. That is far too convoluted to be fairly interpreted as mandating compensation to a claimant.

In addition to plaintiffs-appellees' textual arguments, plaintiffs-appellees argue that the statute is money-mandating because it compensates for past injury. Plaintiffs-appellees point to *Maine* as setting forth "two key indicators" of whether a statute is money-mandating – mandatory language, and "a focus on compensating for past injury." Resp. Br. 14, 28, 40 (arguing that *Maine* "imposed a simple rule: If the statue

compensates for past injuries, go to the Court of Federal Claims.").  The Supreme

Court in *Maine* said nothing about "two key indicators" and looked only to the

statute's "focus on compensating insurers for past conduct" as a "[b]olster[]" to its

finding that the statute is money-mandating.  590 U.S. at 325.  The statutory language

is clearly the determinative factor of whether a statute is money-mandating.  *Id.*

Even if we consider the "bolstering" aspect of the Supreme Court's decision in

*Maine*, the RRF program does not reflect an "attempt to compensate a particular class

of persons for past injuries or labors."  590 U.S at 325; Resp. Br. 28-31.  The RRF

statute does not speak of "compensating" restaurants for a "past injury" at all.  *Id.*  In

fact, the opposite is true.  This was an economic stimulus benefit program.  The

statute is titled "Support for restaurants" and is found within subchapter I of the

Coronavirus Economic Stabilization Act, titled *Keeping American Workers Paid and

Employed*.  *See* 15 U.S.C. §§ 9001 to 9013, § 9009c, et seq.  Money was paid from the

Restaurant *Revitalization* Fund – not a restaurant *compensation* fund.  *Id.* at § 9009c(b)

(emphasis supplied).  To qualify for grant money, restaurants had to certify that "the

uncertainty of current economic conditions makes necessary the grant request to

support the *ongoing operations* of the eligible entity."  § 9009c(c)(2)(A)(i) (emphasis

supplied).  Congress was plainly attempting to address an ongoing social problem by

using grant money to prop up restaurants during the pandemic that might otherwise

shutter.

The "backwards-looking formula" by which the agency calculated grant awards does not change this. Resp. Br. 20. The formula set out in § 9009c(a)(7) is a simple calculation of how the agency would determine the amount of a grant award. *See* § 9009c(c)(4)(B) ("Determination of grant amount"). It looked (backwards) to past revenue earned and compared that with revenue earned during the first part of the pandemic to arrive at an approximation of the impact that the pandemic had on a restaurant's revenue. This, in turn, would indicate how much money might reasonably keep a restaurant operational throughout the pandemic. It was not a "money-mandating indicator" but a measuring stick for how much funding a restaurant might need to keep their doors open.

How a restaurant could use the grant money further supports that the RRF program was not a remedial scheme for compensation of past injuries. *See* § 9009c(c)(5)(A)-(K). The funds could be used on payroll costs, rent or mortgage obligations, utilities, maintenance expenses, supplies (including protective equipment and cleaning materials), food and beverage expenses within the normal business practice of the entity before the covered period, operational expenses, paid sick leave, any other expenses deemed to be *essential to maintaining* the eligible entity. § 9009c(c)(5)(A)-(K). This does not reflect "compensation" for "backwards-looking" losses. Resp. Br. 38. These are the kinds of expenditures necessary to keep a restaurant in business, and its employees paid. Indeed, the grant money needed to be spent on permissible expenses during the "covered period" – which ended no later

than March 11, 2023 – or be returned to the Treasury. § 9009c(c)(6). And if an entity that received funding went out of business during that time, its unused funds also needed to be returned to the Treasury. *Id.* Finally, restaurants that had not opened their doors when they applied for grant money could still qualify for an award if they had incurred payroll costs as of March 11, 2021. § 9009c(a)(7)(D).

Plaintiffs-appellees ignore all of this and instead generate their own "past injury" for which they claim "compensation." Resp. Br. 11, 67. Plaintiffs-appellees point to "not receiving [RRF] funds when they were due" as an injury that required them to pay "expenses out of pocket." *Id.* at 11. That is plainly not the type of past injury or loss provided for by § 9009c. The statute, not a plaintiff, must supply the loss or injury and command compensation. In any event, plaintiffs' legal theory is necessarily "forward-looking" and invokes equitable relief. The source of plaintiffs-appellees' alleged injury is the method SBA employed to award grants. Resp. Br. 11. Had SBA reviewed applications in a different order, plaintiffs-appellees argue that they would have received grant money before it ran out. Because the grant money was finite and there was not enough for all applicants to receive an award, this would require SBA to reorder all applicants and redetermine who should have received a grant. This would result in new entitlements to a grant long after the grant money is gone. In short, plaintiffs-appellees' legal theory is an attempt to redo the program using a different interpretation of § 9009c(c)(1) and without the other statutory limitations.

**B.    The Trial Court Erred In Reading Implied Money-Mandating Obligations Into Non-Monetary Administrative Requirements**

As our opening brief explains, the trial court erred by reading into § 9009c an implied right of compensation based on SBA's alleged failure to award grants in the manner provided by the statute.  Gov't Br. 21-26; Appx22.  Although plaintiffs-appellees appear to disclaim the idea that they have an individual right to money damages, the trial court found the statute to be money-mandating based, at least in part, on an "individual right to receive payment." *Compare* Resp. Br. 27 *with* Appx22.  The trial court derived this notion from finding that SBA was required to make grants in the order specified by § 9009c(c)(1), and because SBA lacked discretion over whether and how much money to pay specific applicants, "section 9009c can fairly be read to be money-mandating."  Appx22.  This type of implied compensation has been squarely rejected by the C and the Supreme Court.

In *Eastport S. S. Corp. v. United States,* plaintiff sought compensation under a regulatory measure that required approval by the Maritime Commission for the foreign sale of a vessel.  372 F.2d 1002, 1009 (Ct. Cl. 1967).  When the Government failed to timely approve the sale of plaintiff's ship as provided by the regulations, plaintiff suffered a business loss which he sought to recover in a suit against the United States Court of Claims.  *Id.* at 1006-07.  Like the plaintiff in *Eastport,* plaintiffs-appellees here claim that because they were harmed by an alleged failure of SBA to act in accordance with § 9009c, they are entitled to compensation for the economic loss

they sustained as a result. Resp. Br. 3, 11, 36, 67. But this theory of recovery was rejected in *Eastport* as "an unexpressed summons to compensate plaintiff," that would "necessarily [ ] open the doors to" a "mass of other regulatory and prohibitory activities of the Federal Government (including criminal prosecutions) which can and do cause pecuniary loss if improperly conducted." 372 F.2d at 1009-10. The Court explained that permitting such a suit "would also call for a drastic extension of federal liability to all of these fields." *Id.* at 1010. This is not a "policy argument" as plaintiffs-appellees characterize it, but an extremely important boundary on the jurisdiction of the Court of Federal Claims. Resp. Br. 27.

The Supreme Court affirmed the position of the Court of Claims in *United States v. Testan,* rejecting the notion "that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available to redress their violation." 424 U.S. 392, 400-01 (1976). In the face of no "express provision for an award of backpay to a person who has been erroneously classified," plaintiffs could not bring suit. *Id.* at 399-400.

Plaintiffs-appellees fail to respond to our comparison between their claim and the theory advanced by plaintiffs in *Eastport* and *Testan.* Instead, plaintiffs-appellees simply reiterate that § 9009c expressly provides for "mandatory 'shall' language." Resp. Br. 27. They attempt to distinguish *Eastport* and *Testan* by arguing that the statutes at issue there contained no "shall pay" language in contrast to the "plainly mandatory obligations" of § 9009c. Resp. Br. 27-28. But this is the premise that was

rejected in *Eastport* and *Testan.* Obligations, without more, do not create a cause of action that can be brought in the Court of Federal Claims. And even statutory violations that may result in economic loss do not create jurisdiction in the Court of Federal Claims absent a money-mandating statute. Resp. Br. 5.

Finding that § 9009c is not money-mandating does not "broadly immuniz[e] an executive-branch agency from judicial review," as plaintiffs-appellees claim. Resp. Br. 4. Indeed, as many plaintiffs can attest, district court and the Administrative Procedures Act is the proper forum and vehicle through which to challenge final agency action – including SBA's disbursement of grant money under § 9009c. *See, e.g., W6 Rest. Grp., Ltd. v. Guzman,* 732 F.Supp.3d 739 (N.D.Oh. 2024). The Court of Federal Claims does not share that role.

### C.   The Trial Court Erred In Relying On Cases That Discuss When A Discretionary Statute Is Money-Mandating

The trial court incorrectly relied upon the legal framework applying to cases where a money-mandate appears discretionary. Appx17. These cases are irrelevant to § 9009c and whether it is money-mandating. As we explained in our opening brief, these cases speak to when a statute that appears to give an agency discretion over a decision whether or not to pay an individual or group is, in fact, money-mandating. Gov't Br. 27 (citing *Doe v. United States,* 463 F.3d 1314, 1324 (Fed. Cir. 2006)). But § 9009c contains no direct payment language – whether framed in discretionary or

mandatory terms.  There is no "shall pay" and there isn't even "may pay" language in section 9009c.  And no "individual or group" is specified for payment at all.

Instead, the trial court and plaintiffs-appellees err by treating § 9009c's statutory mandate that SBA "shall award grants to eligible entities in the order in which applications are received" as direct payment language and apply the three-factor discretionary test cited in *Doe, Samish Indian Nation v. United States* and *Perri v. United States.* Appx23.[3]

This also ignores the significant difference in language between § 9009c and the statutes at issue in those cases.  In *Doe,* for example, the statutory language provided that "an employee in a position . . . *shall* receive premium pay for this duty on an annual basis . . ." 463 F.3d at 1324-25.  The fact that "the head of any agency . . . *may* provide" this pay, did not change that it was a money-mandating statute because "once a condition is met, namely the head of an agency states that a position meets the criteria listed . . . the statute requires payment to employees with that position." *Id.* at 1325.  Section 9009c contains no such statutory language indicating a direct

---

[3] In *Lummi Tribe v. United States,* 99 Fed. Cl. 584, 594 (Fed. Cl. 2011), the trial court found this statutory language to be money-mandating: "the Secretary '*shall* . . .make grants' and 'shall allocate any amounts' among Indian tribes that comply with certain requirements [ ] and directs that the funding allocation be made pursuant to a particular formula [ ]."  That finding was reversed by this Court which held that the statute is not money-mandating as tribes are not entitled under the statute to "an actual payment of money damages in the strictest terms; their only alleged harm is having been allocated too little in grant funding." *Lummi,* 870 F.3d 1313, 1318 (Fed. Cir. 2017).

payment to an individual or group to which discretion might apply. It does not

"compel payment" to anyone once certain conditions are met. *See id.* at 1324 (reciting

the three-factor test in *Samish*); Resp. Br. 42 (same).

## II.     The Trial Court's Decision Conflicts With This Court's Grant Precedent

The trial court's decision also conflicts with this Court's precedent that grant

programs, such as RRF, do not create money-mandating statutes. In *National Center*

*for Manufacturing Sciences v. United States*, 114 F.3d 196, 201 (1997) and *Lummi Tribe of the*

*Lummi Reservation, Washington v. United States,* 870 F.3d 1313 (Fed. Cir. 2017)*,* this Court

held that Federal grant-in-aid programs at issue do not create rights of action that are

susceptible to "naked money judgments" over which the Court of Federal Claims

could exercise jurisdiction.

Plaintiffs-appellees attempt to distinguish both cases based upon the specific

features of each grant programs at issue. Resp. Br. 32-35. But this is not what drove

the Court's analysis. Rather it was the "true nature" of the relief sought by the

plaintiffs and whether "a naked money judgment" was appropriate relief. Plaintiffs in

both cases styled their action as a suit for money damages, but in fact what plaintiffs

sought was a larger share of grant funding to which they believed they were owed.

*Lummi,* 870 F.3d at 1318-19; *Nat'l Cntr.,* 114 F.3d at 201. In making this

determination, the Court did not simply take plaintiffs' allegations – or *characterizations*

of their allegations – at face value; instead, the Court looked "behind the complaint"

to "the true nature of the action." *Nat'l Cntr.,* 114 F.2d at 199; *Lummi,* 870 F.3d at

1318-19.  The Court determined that plaintiffs' claims were not for "'actual, presently due money damages from the United States,'" simply because a decision may "ultimately enable the plaintiff to receive money from the government." *Lummi*, 870 F.3d at 1319 (*citing Katz v. Cisneros,* 16 F.3d 1204, 1208-09 (Fed. Cir. 1994)).  Instead, they were equitable in nature – seeking "larger strings-attached [ ] grants." *Lummi*, 870 F.3d at 1319.  Plaintiffs were not "entitled to a monetary judgment that would allow [them] to use the funds appropriated under the Act for any purpose, without restriction." *Nat'l Cntr.*, 114 F.2d at 201.  Indeed, neither statute at issue "authorize[d] a free and clear transfer of money." *Lummi*, 870 F.3d at 1319.  These restrictions precluded plaintiffs from receiving a "naked money judgment" within the competency of the Court of Federal Claims.  *Nat'l Cntr.*, 114 F.2d at 201.

Such restrictions are not a "dividing line" that we created between statutes remediable under the Tucker Act and the Administrative Procedure Act (APA), as plaintiffs-appellees argue.  Resp. Br. 39.  These are distinctions that this Court has made in cases where plaintiffs attempt to shoehorn their claims into the money-mandating requirements of the Tucker Act.

Plaintiffs-appellee next dismiss our focus on restrictions by arguing that "all disbursements of funding from the government are subject to potential clawback" and all Federal funding comes with strings attached.  Resp. Br. 40.  But this is hardly an apt observation.  Permitting the Government to audit the money it has paid to an entity is not the same as conditioning the receipt of specific money on certain uses

and during limited periods of time.  Obligations to not discriminate similarly do not speak to *how* money is used or *when* it is spent.  *Id.*

Nor are *Lummi* and *National Center* distinguishable because plaintiffs-appellees characterize their claims as "classic retrospective damages claims."  Resp. Br. 36.  In fact, they seek a disbursement of funds from the RRF to which they believe they are entitled.  An award of those funds would not be a "free and clear transfer" of money.  *Lummi,* 870 F.3d at 1319.  But under the statute, plaintiffs-appellees would need to certify that the money they seek is made necessary by "the uncertainty of current economic conditions," and "to support the ongoing operations of [their business]."  § 9009c(c)(2)(A).  Plaintiffs-appellees would then be restricted to spending the money only on the expenses enumerated in section 9009c(c)(5).  And they needed to do so during the covered period – which ended March 11, 2023 – or return the money to Treasury.  15 U.S.C. § 9009c(c)(6).  Despite plaintiffs-appellees' characterizations of their claim, this is not an award that can be cured by a "naked money judgment."  *See Nat'l Cntr.*, 114 F.2d at 201.

Plaintiffs-appellees continue to argue that section 9009c is "backwards-looking" and they only seek compensation for past injuries under that statute.  Resp. Br. 31.  The only thing that is "backwards-looking" about the RRF is how the agency would calculate the amount of a grant award.  15 U.S.C. § 9009c(a)(7).  But how else would the agency determine the extent to which a restaurant has been impacted by the pandemic without looking to the pre-pandemic revenue of that entity?  This

"backwards-looking" formula thus served as a benchmark for measuring impact and providing future funding.

## III.    The Trial Court Misunderstood The Scope Of Tucker Act Jurisdiction

### A.    The Trial Court Failed to Ascertain The True Nature of Plaintiffs' Claims

Whether plaintiffs-appellees' claims come within the jurisdiction of the Tucker Act depends upon whether § 9009c is a money-mandating statute. *See, e.g., Maine Cmmt'y Health,* 590 U.S. at 324. Resolving that question turns entirely on the statutory language. Our opening brief demonstrates that the trial court began its jurisdictional analysis not with the text of statute but by reference to plaintiffs-appellees' claims – specifically, plaintiffs-appellees' own legal characterization of the allegations. Appx10. Indeed, the trial court accepted plaintiffs-appellees' circular argument that because they sought money damages, money damages were an available remedy. *Id.*

This was in error. Rather than conducting the searching analysis required by this Court in *Suburban Mortgage Associates, Inc. v. United States*, 480 F.3d 1116, 1125 (Fed. Cir. 2007), the trial court simply took plaintiffs-appellees at their word. The result infects the entire opinion – indeed, the trial court's entire legal analysis as to whether it possessed jurisdiction suffered from the premature conclusion that plaintiffs-appellees seek retrospective money damages simply because they said so. Plaintiffs-appellees disagree, claiming that the trial court was "exactly right in its approach", Resp. Br. 55, but their argument remains circular: plaintiffs-appellees' request for

money damages cannot create jurisdiction when § 9009c is not a money-mandating statute.

### B.     The Trial Court Failed To Properly Apply *Bowen* And *Katz*

Simply requesting monetary compensation for various agency wrongs does not create jurisdiction in the Court of Federal Claims.  That is the principle which *Bowen v. Massachusetts*, 487 U.S. 879 (1988), stands for and which precludes plaintiffs-appellees' claims here.

As detailed in our opening brief, the trial court rejected our *Bowen* argument on the basis that *Bowen* "has been narrowly interpreted by the Federal Circuit."  Appx12.  Although it is true that this Court has distinguished *Bowen* on its facts, the Court has never indicated any intent to "narrow" its holding.  Appx12; *Suburban Mortg.* 480 F.3d at 1127; *Consol. Edison Co. of N.Y. v. Dep't of Energy*, 247 F.3d 1378, 1383 (Fed. Cir. 2001).

Plaintiffs-appellees extend this error, arguing that "the thrust of *Bowen's* reasoning" turned on the nature of the Medicaid program at issue and whether a money judgment alone would be adequate to compensate plaintiffs.  Resp. Br. 46.  Plaintiffs-appellees seek to distinguish *Bowen* on the grounds that the State in *Bowen*, "did not seek money damages, but instead sued for prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations."  Resp. Br. 47.  But plaintiffs-appellees omit that this characterization of the suit was determined by the Supreme Court and was contrary to how the State in that case

characterized their suit. *Bowen,* 487 U.S. at 900-01 ("The Secretary's novel submission that the entire action is barred by [the APA] must be rejected.").

And the premise upon which plaintiffs-appellees' distinction rests is similarly faulty. As the trial court did, plaintiffs-appellees distinguish their claim from *Bowen* by simply declaring that they "request only retrospective money damages and there is no ongoing complicated relationship" between the agency and the parties. Resp. Br. 46-47. Plaintiffs-appellees simply characterize their claim as seeking nothing more than money damages so that jurisdiction might lie with the trial court. The State in *Bowen* similarly characterized its claim to avoid adjudication in district court under the APA. But the Court rejected this, explaining the important distinction between money damages and equitable relief: "The State's suit to enforce § 1396b(a) . . . is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." 487 U.S. at 900. "The fact that the mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief." *Id.* This principle demonstrates why plaintiffs' theory of recovery is not a genuine Tucker Act claim: plaintiffs-appellees seek to enforce the RRF's statutory mandate that SBA disburse funds in the order in which applications are received. That the *outcome* of such a determination may result

in money paid to plaintiffs-appellees is a mere "by-product" of the court's review. *Id.*

at 909. It does not support jurisdiction in the trial court.

We are not arguing, as plaintiffs-appellees imply, that this Court incorrectly

interpreted *Bowen* in *Suburban Mortgage* or *Consolidated Edison.* Resp. Br. 46. But the

trial court ignored the analyses from those two cases and focused on the unique facts

of *Bowen* under the misperception that *Bowen* had been limited by this Court. In

*Suburban Mortgage* and *Consolidated Edison*, plaintiffs attempted the same thing that

plaintiffs-appellees here attempt – to avoid the jurisdiction of one court and, through

creative drafting of the complaint, to obtain relief in another. But forum shopping

like this through crafty pleading is not permitted. *Suburban Mortg.* 480 F.3d at 1124.

The Court – and not the plaintiff – must discern the "true nature" of a plaintiff's

claim by "look[ing] beyond the form of the pleadings to the substance of the claim."

*Id.* (cautioning litigants against "dressing up" a claim for jurisdictional purposes). The

trial court here failed to engage in such an inquiry and instead simply relied upon

plaintiffs-appellees' own statements about what relief they are seeking.

Similar infirmities extend to the trial court and plaintiffs-appellees' application

of this Court's decision in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994). By relying

on the characterization of the case ascribed by plaintiffs-appellees in their complaint,

the trial court engaged in the very behavior that this Court warned against. *See*

Appx13-14 ("plaintiffs in the present case request retrospective damages resulting

from the SBA's denial of a one-time payment of money directly from the federal

government under a grant program administered by the SBA"); *Katz,* 16 F.3d at 1207 ("[r]egardless of the characterization of the case ascribed by [plaintiffs] in the complaint, we look to the true nature of the action in determining the existence or not of jurisdiction.").

Plaintiffs-appellees can only distinguish their claim from *Katz* by relying on their own characterization of their claims. Resp. Br. 49. But the legal principle from *Katz* applies and controls – the actual *legal theory* of plaintiffs-appellees' suit is that SBA "bungled" the administration of the RRF program such that they were left without grant money when they might otherwise be entitled to it. *See W6 Restaurant Grp.,* 732 F.Supp.3d at 750. This is not a claim for money damages arising from a money-mandating statute.

Finally, we do not argue that the trial court lacks jurisdiction over any suits that "adjudicat[e] whether an agency complied with a statutory mandate." Resp. Br. 50. But the statutory mandate must be for the actual payment of money – not for the agency to do something besides paying money. Plaintiffs-appellees also misunderstand the scope of statutory interpretation to be performed by the court. Of course, the trial court is not required to accept an agency's own interpretation of statutes and regulations. At the outset of the case, the trial court shall determine whether the statute (or Constitutional provision or regulation) raised in the complaint is money-mandating. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). The trial court therefore must interpret whether the statutory text can be fairly interpreted as

mandating compensation by the Government. *See Eastport*, 372 F.2d at 1009. Then, if the trial court determines that a statute is money-mandating, it "has the power to make a determination of liability that will give rise to a remedy of monetary relief by finding . . . that an agency has misinterpreted its statutory mandate to pay out monies." *Kanemoto v. Reno*, 41 F.3d 641, 647 (Fed. Cir. 1994) (citing *Mitchell v. United States*, 930 F.2d 893, 895-97) (Fed. Cir. 1991)).

In short, the trial court is limited in its statutory interpretation to determining whether the agency has misinterpreted its statutory mandate "to pay out monies." *See id.* Plaintiffs-appellees' complaint extends far beyond such a question and contains a wide range of allegations, from failure to detect fraud to mismanagement of an online portal. This is clearly beyond the scope of the court's jurisdiction.

## D.     The Trial Court Erred In Determining That There Is Concurrent Jurisdiction

In our opening brief we explained that the trial court's holding that concurrent jurisdiction existed in both the Court of Federal Claims and district court was incorrect. Gov't Br. 45-47.[4] In response, plaintiffs-appellees ignore that the Court of Federal Claims is a court of limited jurisdiction and that if the claim does not sit within the Tucker Act, there is no jurisdiction in the trial court.

---

[4] We did not argue that the trial court held it possesses APA jurisdiction over this case. Resp. Br. 52.

There may be instances where the same operative facts could spawn cases in both a district court and the Court of Federal Claims – as plaintiffs-appellees point out in reference to 28 U.S.C. § 1500.  Resp. Br. 53; *United States v. Tohono O'Odham Nation*, 563 U.S. 307 (2011).  But each case must be based on legal theories that would bring them properly within the jurisdiction of both courts.[5]  And simply asking for money damages does not create a Tucker Act claim.  *See* Resp. Br. at 53.[6]

Finally, plaintiffs-appellees argue that their likely inability to get injunctive relief before a district court – because the program is over – creates Tucker Act jurisdiction. Resp. Br. 54.  It does not.  The unavailability of relief elsewhere does not create jurisdiction before the Court of Federal Claims – it is not a backup forum, but can only be accessed by stating a claim under the Tucker Act.

## IV.    Trial Court Erred In Holding That Plaintiffs-Appellees State A Claim Upon Which Relief Can Be Granted

Our opening brief demonstrates that even if this Court finds § 9009c to be money-mandating, plaintiffs-appellees cannot state a claim upon which relief can be

---

[5] Plaintiffs-appellees' example of *Vitolo v. Guzman* proves this point.  999 F.3d 353 (6th Cir. 2021).  The *Vitolo* plaintiffs brough suit under the Equal Protection Clause in district court.  If they had tried to bring suit at the Court of Federal Claims, they would have immediately had the problem that the Equal Protection Clause is not money-mandating.  This is true regardless of *when* the suit was filed or whether they sought money damages.  Resp. Br. 53.

[6] The basis for Tucker Act jurisdiction in *Slattery* and *Silver State,* to which plaintiffs-appellees point, were contracts with the Government.  Resp. Br. 52; *Slattery v. United States*, 635 F.3d 1298, 1300 (Fed. Cir. 2011); *Silver State Land LLC v. United States* 148 Fed. Cl. 217, 223, 257 (2020).  Neither case suggests that the Court of Federal Claims can hear cases that are not within the Tucker Act confines.

granted because liability under the RRF program was capped at $28.6 billion. Gov't

Br. 48-54. This money has been expended and Congress has defunded the program.

## A. 15 U.S.C. § 9009c(b)(2)(A) Imposes A Statutory Cap On The Amount Congress Intended To Spend For The RRF Program

There can be no genuine dispute that Congress can "expressly limit[] an

obligation to available appropriations or specific dollar amounts." *Maine Cmmty.*

*Health,* 590 U.S. at 313. Here, section 9009c(b)(2)(A) imposes such a cap.

As we explained in our opening brief, the phrase "in addition to amounts

otherwise available" cannot be read as making the Government's payment obligation

open-ended. Plaintiffs-appellees agree that "otherwise" in this context means that

different sources of money may be available. Resp. Br. 60. But like statutory

language which caps liability by making funding "subject to the availability of

appropriations" or states "available funding," the section 9009c language limits

liability if no other amounts become available. *Maine,* 590 U.S. at 313, at n7. And it is

undisputed that there was never any other money made available for the RRF

program. Resp. Br. 59.

Plaintiffs-appellees claim that we can point to "no statute that has been held to

cap liability by using a phrase like 'in addition to amounts otherwise available.'" Resp.

Br. 59. In fact, the Supreme Court in *Maine,* did precisely that. In explaining how

Congress could have capped liability for the risk corridors provision of the Affordable

Care Act, the Court contrasted Congress' silence with examples of other provisions in

the Act that capped liability, along with many other statutes where Congress "restrict[s] 'shall pay' language to an appropriation or available funds." *Maine*, 590 U.S. at 313 n7. Such "capping" language includes that Government contributions "shall be made … from the appropriations account," (2 U.S.C. § 2064), that an amount shall be contributed "from an appropriation or fund available," (5 U.S.C. § 8334), and that a designated fund from which the program is paid will consist of "amounts appropriated," and "any other amounts received by the Fund," (22 U.S.C. § 2906). The language here is at least as susceptible to capping as the examples provided by the Supreme Court in *Maine*.

## B. Congress Subsequently Eliminated Any Payment Obligation

In our opening brief we explained that the Fiscal Responsibility Act (FRA) that went into effect on June 3, 2023, permanently rescinded unobligated funds from the RRF program. Gov't Br. 52. This eliminated any obligation created by the program and precludes plaintiffs-appellees' recovery here.

Plaintiffs-appellees seek to avoid the effect of the FRA recission by arguing that SBA's obligation to pay "arose before the RRF's funds were depleted." Resp. Br. 12, 60-62, 65. But that would nullify the FRA with respect to the RRF program. Congress is free to create an obligation and then modify or eliminate *after* the obligation arose. *See Ind. Mun. Power Agency v. United States,* 154 Fed. Cl. 752 (2021); *Dorsey v. United States,* 567 U.S. 260 (2012).

Plaintiffs-appellees argue that "the agency's unlawful disbursement to the

wrong applicants" makes the Judgment Fund available to pay the relief that plaintiffs-appellees seek. Resp. Br. 63. But the Judgment Fund cannot be used to create an appropriation and circumvent Congressional intent to limit the Government's liability. *Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 434 (1990) ("the general appropriation for payment of judgments, in any event, does not create an all-purpose fund for judicial disbursement.").

Finally, plaintiffs-appellees argue that even though the covered period during which awardees were to use all of their fund money ended years ago, this should not prevent them from receiving money as damages. Resp. Br. 66. But the RRF program allowed awardees to use grants for allowable expenses prior to March 11, 2023. There is no way for plaintiffs-appellees to use any money now. Permitting them to receive money would be outside of Congress' stated intent for the program.

## <u>CONCLUSION</u>

We respectfully request that this Court reverse the decision of the trial court and dismiss the complaint for lack of jurisdiction.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/William J. Grimald
WILLIAM J. GRIMALDI
Assistant Director

26

/s/Margaret J. Jantzen
MARGARET J. JANTZEN
Senior Trial Counsel
Commercial Litigation Branch
Department of Justice, Civil
Division
P.O. Box 480
Washington, DC 20044
Telephone: (202) 353-7994
Margaret.j.jantzen@usdoj.gov

Attorneys for Defendant-Appellant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7) and Federal Circuit Rule 32(b)(1) because the brief was generated by a computer and contains 6747 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface, 14-point Garamond font.

*/s/* Margaret J. Jantzen
Margaret J. Jantzen